IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| Capital Investment Funding, LLC,<br><br>        Plaintiff,<br><br>Arthur Field; Scott Pfeiffer; Allyson Field; Alysia Hazelton; Anthony Edgar; Ashley Morey; Barry Lynn Spencer; Bart Kelley; Ben Hines; Bill Beckman; Brad Kelley; Brian Knight; Charles Pinion; D. L. Jones; David Gantt; David Lorenzo; Davyd Field; Dennis Hackney; Elizabeth Hopper; Elliot Salzman; Eugene Hopper; Gary Johnson; Gene Ahlers; Greg Bailey; J.G. "Geneva" Seller (a/k/a Geneva Campitelli); J.G. Ryckman; Jack Campitelli (aka A.J. Camp); James Caserta; Jamie McKeough; Jan Davidson; Johnny Kelley; Jose Rodriguez; Joshua Ward; Kathryn Taillon; Kirsten M. White; Mark Davidson; Martin Ender; Melinda Holbrooks; Michael Moore; Michael Parish; Mike Loprieno; Nathan Holbrooks; Paula Haney; Philip Davidson; Ralph Gleaton; Reba Cox; Robert J. L'Abbate; Roger Ezell; Ross Jones; Shawna Freeman; Stuart Katz; Advance Business Funding, LLC; Aladdin's Grill and Café, LLC; Alliance Development Partners, LLC; Amerishare Corporation; Angle Holdings, LLC; Apex Construction; Arrowhead Funding Corporation; Asante Properties, LLC (a/k/a Asante, LLC); Badger Development, LLC; Blenheim Properties, LLC; Bolingbroke United (England) Ltd; Bountiful Bingo, LLC; Bradford Financial Group, LLC; CapGain Properties, Inc.; Capital Intrastate Funding, LLC; CommunitySouth Bank and Trust (and its Receiver, Federal Deposit Insurance Company); Construction Resources, Inc.; Dunross Struan, LLC; Ezell Investment Company, LLC; Gleaton Wyatt Hewitt, P.A., as the successor in interest to Pfeiffer & Gantt, P.A., Pfeiffer, Gantt & Gleaton, P.A., Pfeiffer Gantt Gleaton Wyatt, P.A., and Pfeiffer Gleaton Wyatt Hewitt, P.A.; GodProp, LLC; Gulf Capital LP; Gulf Capital Management, Inc.; He Will Provide, LLC; Instant Cash, Inc.; Krondor Trading Co., LLC; J&H Builders, LLC; Lancaster Mortgage Bankers, LLC; Lamplighter Mortgage Company, LLC; Lion Financial, LLC; | C.A. No.: 6:12-cv-03401-MGL<br><br>**PLAINTIFF'S SECOND<br>AMENDED COMPLAINT**<br>**(Jury Trial Demanded)** |

Log Dirt, LLC; LOP Capital, LLC; Lot 37 Waters )
Edge, LLC; Lot 46 Waters Edge, LLC; Lot 6 )
Lakewater Cove, LLC; Mithril Funding, LLC; )
Monmouth Financial Group, Ltd.; Moore & )
Associates, LLC; Neighborhood Homes, LLC; )
Nevada Processing Center, Inc.; Onward Finance )
Corporation; Onward Recovery Partners )
Corporation; Our Tree House, LLC; P&G Title )
Agency, LLC; PG&G Title Insurance, LLC; )
PGGW Title Insurance, LLC; Pelican Way )
Financial, LLC; RAAF Enterprises, LLC; Red )
Lion Trading House, LLC; Saneski, LLC; Saxon )
Business Services, LLC; Saxon Holding, LLC; )
Seed Construction; Southridge Construction, Inc.; )
Steele Construction of SC, Inc.; Strategic )
Lending Solutions, LLC; Tcholok Properties, )
LLC; The Chrysler Drive Trust; The Cotton Mill )
Trust; The Old Arcadia Road Trust; The )
Pickering Road Trust; The Upper Nehalem Trust; )
Total Package Grading; Trazom, LLC; United )
Private Capital, Inc.; York Mortgage Funding, )
LLC; John Does 1-35 (names being fictitious); )
Jane Does 1-35 (names being fictitious); ABC )
Companies 1-35 (names being fictitious); )
              )
     Defendants. )
_____ )

## Introduction

This is a complex civil action which includes multiple remedies, including RICO authorized by the federal statutes at 18 U.S.C. 1961 *et seq.* ("Civil RICO"), seeking relief that includes an award of actual, punitive and treble damages resulting from the defendants' scheme to defraud, an accounting, the imposition of constructive trusts with tracing, the imposition and execution of equitable liens, divestiture, restrictions on future conduct, costs of investigation and suit, interest and attorney fees.

The first cause of this action is a widespread criminal enterprise engaged in a pattern of racketeering activity across State lines, and a conspiracy to engage in racketeering activity involving numerous RICO predicate acts during the years 1999 through 2012, as defined by 18 U.S.C. §1961.

The predicate acts alleged here cluster around mail fraud (18 U.S.C. §1341), wire fraud (18 U.S.C. §1343), financial institution fraud (18 U.S.C. § 1344), fraud relating to identification documents (18 U.S.C. § 1028), interstate transfer of monies taken by fraud (18 U.S.C. §2314), money laundering, and bribery.  Other RICO predicate acts, even if *appearing* to be isolated events, were actually part of the overall conspiracy and *pattern of racketeering activity* alleged herein.

Plaintiff brings this action to recover those moneys loaned by South Carolina noteholders who collectively invested $40 million, without knowledge of the fraudulent schemes created by and perpetuated by the defendants. Through mostly inter-related shell companies, the defendants either diverted funds from CIF or benefitted from a multitude of financial transactions with the knowledge and intent of obscuring the true nature of the various business entities and the accurate use of such moneys, and who were with the further intent to impair, obstruct, prevent, delay, and conceal the true nature and accurate use of such. The racketeering *enterprise* and the activities thereof resulted in the severe and sustained economic hardship upon Plaintiff and left Plaintiff insolvent and unable to honor its obligations with its noteholders.

Additional causes of this action include common law fraud, fraudulent inducement, negligent misrepresentation, breach of fiduciary duty, unjust enrichment, conversion, abuse of civil process, fraudulent transfer of assets in an attempt to defeat creditors, assumpsit, breach of contract, conspiracies to commit each of the aforementioned causes, and aiding and abetting each of the aforementioned causes.

Accordingly, by and through its undersigned attorneys, Plaintiff Capital Investment Funding, LLC (hereinafter referred to as "Plaintiff" or "CIF"), alleges and will respectfully show unto this honorable court the following:

## Jurisdictional Statement

**A.     Parties**

1.      Plaintiff Capital Investment Funding, LLC (hereinafter referred to as "Plaintiff" or "CIF") is a South Carolina corporation with is principal place of business in Greenville County, South Carolina.  As a result of other litigation arising out of a common nucleus of operative fact (Tomz et al., v. Capital Investment Funding, LLC et al, Court of Common Pleas, 13th Judicial Circuit, County of Greenville, South Carolina: C.A. 2008-CP-23-3665, Roberts v. Capital Investment Funding, LLC et al, Court of Common Pleas, 13th Judicial Circuit, County of Greenville, South Carolina: C.A. 2008-CP-23-5514, Bridges et al v. Capital Investment Funding, LLC et al, Court of Common Pleas, 13th Judicial Circuit, County of Greenville, South Carolina: C.A. 2008-CP-23-7457, Lee v. Capital Investment Funding, LLC et al, Court of Common Pleas, 13th Judicial Circuit, County of Greenville, South Carolina: C.A. 2008-CP-39-1184) on or about August 24, 2009, the court entered an order "(Order Approving Settlement") appointing Jerry Saad as a Receiver ("CIF's Receiver") in accordance with the South Carolina Limited Liability Company Act.  CIF's Receiver was instructed to take over and complete CIF's winding up of business and affairs, which the prior principals, managers and officers had begun in January 2008.  In the Order Approving Settlement, the court directed Defendant Arthur Field to produce all "documents, emails, computer records, mortgages and the like" to the Receiver within ten (10) days.  While Defendant Arthur Field has produced many documents related to the finances and operations of CIF, Defendant Arthur Field has willfully refused to deliver substantial records and therefore has yet to fully comply with the Court's order.  Prior to this order, control of CIF and its interests remained in the hands of one or more of the above-named defendants.

2.      As set forth in detail fully hereunder, one or more of the above-named defendants acted individually and in concert with others in various venues and projects, collectively creating an elaborate labyrinth of corporations, businesses and other entities by which the assets of CIF

were secretly siphoned, removed, extracted, absconded, pilfered, and/or wasted.  CIF brings this action directly and as the current actual or beneficial owner, manager, and/or real party in interest of the following South Carolina entities by and through which CIF's assets were funneled and/or exhausted:  Cosimo, LLC ("Cosimo"); CIF Property Holdings, LLC ("CIF Property Holdings"); WE3 Company, Inc. ("WE3"); Big Deal Land Company, LLC ("Big Deal"); and Rolling Hills Land Co., LLC ("Rolling Hills"); and as a claimant of SD Trust, LLC (including its wholly owned subsidiaries, SD Trust Fractional, LLC and SD Trust Management, LLC), which is presently subject to the jurisdiction of the of the United States Bankruptcy Court (collectively, "SD Trust").

3.      Upon information and belief, the following defendants are citizens and/or residents of the State of South Carolina:  Arthur Field; Scott Pfeiffer; Allyson Field; Alysia Hazelton; Anthony Edgar; Ashley Morey; Barry Lynn Spencer; Bart Kelley; Ben Hines; Bill Beckman; Brad Kelley; Charles Pinion; David Gantt; Davyd Field; Elizabeth Hopper; Eugene Hopper; Gary Johnson; Gene Ahlers; Greg Bailey; Jan Davidson; Johnny Kelley; Jose Rodriguez; Joshua Ward; Kathryn Taillon; Kirsten M. White; Mark Davidson; Melinda Holbrooks; Nathan Holbrooks; Paula Haney; Philip Davidson; Ralph Gleaton; Reba Cox; Roger Ezell; Ross Jones; John Does 1-15 (names being fictitious); and Jane Does 1-15 (names being fictitious).

4.      Upon information and belief, the following defendants are citizens and residents of the State of New Jersey, but are amenable to the jurisdiction of this court by virtue of their transacting business with other defendants within the State of South Carolina and/or their activities foreseeably resulted in damages and injuries to the plaintiff in the forum state: David Lorenzo; Elliot Salzman; James Caserta; Martin Ender; Robert J. L'Abbate; Stuart Katz; John Does 1-5 (names being fictitious); and Jane Does 1-5 (names being fictitious).

5.     Upon information and belief, the following defendants are citizens and residents of the State of Washington and/or Nevada, but are amenable to the jurisdiction of this court by virtue of their transacting business with other defendants within the State of South Carolina and/or their activities foreseeably resulted in damages and injuries to the plaintiff in the forum state:   D. L. Jones; J.G. "Geneva" Seller (a/k/a Geneva Campitelli); J.G. Ryckman; Jack Campitelli (a/k/a "A.J. Camp"); Jamie McKeough; Michael Moore; Shawna Freeman; John Does 1-5 (names being fictitious) and Jane Does 1-5 (names being fictitious).

6.     Upon information and belief, the following defendants are citizens and residents of the State of Illinois, but are amenable to the jurisdiction of this court by virtue of their transacting business with other defendants within the State of South Carolina and/or their activities foreseeably resulted in damages and injuries to the plaintiff in the forum state:  Brian Knight; Dennis Hackney; Michael Parish; Mike Loprieno; John Does 1-5 (names being fictitious); and Jane Does 1-5 (names being fictitious).

7.     Upon information and belief, the following defendants are citizens and residents of the State of Georgia, but are amenable to the jurisdiction of this court by virtue of their transacting business with other defendants within the State of South Carolina and/or their activities foreseeably resulted in damages and injuries to the plaintiff in the forum state: John Does 1-5 (names being fictitious); and Jane Does 1-5 (names being fictitious).

8.     Upon information and belief, the following defendant corporate entities or other legal entities are organized under the laws of South Carolina and/or have their principal places of businesses in the State of South Carolina: Advance Business Funding, LLC; Aladdin's Grill and Café, LLC; Alliance Development Partners, LLC; Angle Holdings, LLC; Apex Construction; Asante Properties, LLC (a/k/a Asante, LLC); Badger Development, LLC; Blenheim Properties, LLC; Bolingbroke United (England) Ltd; Bountiful Bingo, LLC; Bradford Financial Group, LLC; Capital Intrastate Funding, LLC; CommunitySouth Bank and Trust (and its Receiver,

Federal Deposit Insurance Company; hereinafter "CommunitySouth Bank and Trust");
Construction Resources, Inc.; Dunross Struan, LLC; Ezell Investment Company, LLC; Gleaton
Wyatt Hewitt, P.A., as the successor in interest to Pfeiffer & Gantt, P.A., Pfeiffer Gantt &
Gleaton, P.A., Pfeiffer Gantt Gleaton Wyatt, P.A., Pfeiffer Gleaton Wyatt Hewitt, P.A.
(heretofore collectively "Pfeiffer Gantt & Gleaton, P.A."); GodProp, LLC; He Will Provide,
LLC; Instant Cash, Inc.; Krondor Trading Co., LLC; J&H Builders, LLC; Lamplighter Mortgage
Company, LLC; Lion Financial, LLC; Log Dirt, LLC; Lot 37 Waters Edge, LLC; Lot 46 Waters
Edge, LLC; Lot 6 Lakewater Cove, LLC; Mithril Funding, LLC; Monmouth Financial Group,
Ltd.; Neighborhood Homes, LLC; Our Tree House, LLC; P&G Title Agency, LLC; PG&G Title
Insurance, LLC; PGGW Title Insurance, LLC; RAAF Enterprises, LLC; Red Lion Trading
House, LLC; Saneski, LLC; Saxon Business Services, LLC; Saxon Holding, LLC; Seed
Construction; Southridge Construction, Inc.; Steele Construction of SC, Inc.; Tcholok Properties,
LLC; The Cotton Mill Trust; Total Package Grading; Trazom, LLC; York Mortgage Funding,
LLC; and ABC Companies 1-25 (names being fictitious).

9.     Upon information and belief, the following corporate or other legal entities are
organized under the laws of a state other than South Carolina and/or have their principal places
of businesses in a state other than the State of South Carolina, but are amenable to the
jurisdiction of this court by virtue of their transacting business with other defendants within the
State of South Carolina and/or their activities foreseeably resulted in damages and injuries to the
plaintiff in the forum state: Amerishare Corporation; Arrowhead Funding Corporation; CapGain
Properties, Inc.; Gulf Capital LP; Gulf Capital Management, Inc.; Lancaster Mortgage Bankers,
LLC; LOP Capital, LLC; Moore & Associates, LLC; Nevada Processing Center, Inc.; Onward
Finance Corporation; Onward Recovery Partners Corporation; Pelican Way Financial, LLC;
Strategic Lending Solutions, LLC; The Chrysler Drive Trust; The Old Arcadia Road Trust; The

Pickering Road Trust; The Upper Nehalem Trust; United Private Capital, Inc.; and ABC Companies 1-10 (names being fictitious).

10.     Upon information and belief, at all times relevant herein, the individual defendants set forth hereunder acted individually and by and through the various entities identified hereafter:

a.  Upon information and belief, during the applicable times of the transactions and occurrences applicable herein, either individually or derivatively, Defendants Arthur Field, Allyson Field, Kathryn Taillon, and Kirsten M. White were officers, directors, managers, owners, shareholders, members, employees, beneficiaries, and/or agents of the following entities: Capital Investment Funding, LLC; CIF Property Holdings, LLC; Cosimo, LLC; CIF TC, LLC; and Defendants Aladdin's Grill and Café, LLC, Angle Holdings, LLC, Blenheim Properties, LLC, Bolingbroke United (England) Ltd, Bountiful Bingo, LLC, Bradford Financial Group, LLC, Capital Intrastate Funding, LLC, Dunross Struan, LLC, He Will Provide, LLC, Krondor Trading Co., LLC, Lancaster Mortgage Bankers, LLC; Lion Financial, LLC, Mithril Funding, LLC, Monmouth Financial Group, Ltd., Our Tree House, LLC, Pelican Way Financial, LLC, RAAF Enterprises, LLC, Red Lion Trading House, LLC, Trazom, LLC, and York Mortgage Funding, LLC.

b.  Upon information and belief, during the applicable times of the transactions and occurrences applicable herein, either individually or derivatively, Defendants Bart Kelley and Brad Kelley were officers, directors, managers, owners, shareholders, members, employees, beneficiaries, and/or agents of CIF.

c.  Upon information and belief, during the applicable times of the transactions and occurrences applicable herein, either individually or derivatively, Defendants Scott Pfeiffer, Alysia Hazelton, David Gantt, Paula Haney, and Ralph Gleaton were

officers, directors, managers, owners, shareholders, members, employees, beneficiaries, and/or agents of the following entities: Cosimo, LLC; SD Trust, LLC; SD Trust Fractional, LLC, SD Trust Management, LLC; and Defendants Angle Holdings, LLC, Dunross Struan, LLC, Krondor Trading Co., LLC, Monmouth Financial Group, Ltd., Our Tree House, LLC, Pfeiffer Gantt & Gleaton, P.A., P&G Title Agency, LLC, PG&G Title Insurance, LLC, PGGW Title Insurance, LLC, Red Lion Trading House, LLC, Saxon Business Services, LLC, Saxon Holding, LLC, and Tcholok Properties, LLC;

d. Upon information and belief, during the applicable times of the transactions and occurrences applicable herein, either individually or derivatively, Defendant Davyd Field was an officer, director, manager, owner, shareholder, member, employee, beneficiary, and/or agent of the following entities: Defendants Capital Intrastate Funding, LLC, He Will Provide, LLC, and Trazom, LLC.

e. Upon information and belief, during the applicable times of the transactions and occurrences applicable herein, either individually or derivatively, Defendant Ross Jones was an officer, director, manager, owner, shareholder, member, employee, beneficiary, and/or agent of the following entities: Defendant Angle Holdings, LLC.

f. Upon information and belief, during the applicable times of the transactions and occurrences applicable herein, either individually or derivatively, Defendant Bill Beckman was an officer, director, manager, owner, shareholder, member, employee, beneficiary, and/or agent of the following entity: Defendant Our Tree House, LLC.

g. Upon information and belief, during the applicable times of the transactions and occurrences applicable herein, either individually or derivatively, Defendant Ashley Morey was an officer, director, manager, owner, shareholder, member, employee, beneficiary, and/or agent of the following entity: Defendant Krondor Trading, LLC.

h. Upon information and belief, during the applicable times of the transactions and occurrences applicable herein, either individually or derivatively, Defendant Jose Rodriguez was an officer, director, manager, owner, shareholder, member, employee, beneficiary, and/or agent of the following entity: Defendants Aladdin's Grill and Café, LLC and He Will Provide, LLC.

i. Upon information and belief, during the applicable times of the transactions and occurrences applicable herein, either individually or derivatively, Defendants Anthony Edgar, Charles Pinion, David Gantt, Elizabeth Hopper, Eugene Hopper, Gary Johnson, Gene Ahlers, Jan Davidson, Joshua Ward, Mark Davidson, Melinda Holbrooks, Nathan Holbrooks, and Philip Davidson were officers, directors, managers, owners, shareholders, members, employees, beneficiaries, and/or agents of one or more of the following entities: WE3 Company Inc.; Big Deal Land Company, LLC; Rolling Hills Land Co., LLC; SD Trust, LLC; SD Trust Fractional, LLC, SD Trust Management, LLC; and Defendants Alliance Development Partners, LLC, Apex Construction, Asante Properties, LLC (a/k/a Asante, LLC), Badger Development, LLC, Construction Resources, Inc., GodProp, LLC, J&H Builders, LLC, Lamplighter Mortgage Company, LLC, Log Dirt, LLC, Lot 37 Waters Edge, LLC, Lot 46 Waters Edge, LLC, Lot 6 Lakewater Cove, LLC, Neighborhood Homes, LLC, Onward Finance Corporation, Onward Recovery Partners Corporation, Saneski, LLC, Seed Construction, Southridge Construction, Inc., Steele Construction of SC, Inc., and Total Package Grading.

j. Upon information and belief, during the times of the transactions and occurrences applicable herein, either individually or derivatively, Defendants Roger Ezell, Barry Lynn Spencer, and Ben Hines were officers, directors, managers, owners, shareholders, members, investors, creditors, employees, beneficiaries, and/or agents

of one or more of the following entities: WE3 Company Inc.; Big Deal Land Company, LLC; Rolling Hills Land Co., LLC; SD Trust, LLC; and Defendants Advance Business Funding, LLC, Instant Cash, Inc., Ezell Investment Company, LLC, and CommunitySouth Bank and Trust.

k. Upon information and belief, during the applicable times of the transactions and occurrences applicable herein, either individually or derivatively, Defendant Greg Bailey was an officer, employee and agent of Defendant CommunitySouth Bank and was an officer, director, manager, owner, shareholder, member, investor, creditor, employee, beneficiary, and/or agent of one or more of the following entities: WE3 Company Inc.; Big Deal Land Company, LLC; Rolling Hills Land Co., LLC; SD Trust, LLC; SD Trust Fractional, LLC, SD Trust Management, LLC; and Defendants Alliance Development Partners, LLC, Apex Construction, Asante Properties, LLC (a/k/a Asante, LLC), Badger Development, LLC, Construction Resources, Inc., GodProp, LLC, J&H Builders, LLC, Lamplighter Mortgage Company, LLC, Log Dirt, LLC, Lot 37 Waters Edge, LLC, Lot 46 Waters Edge, LLC, Lot 6 Lakewater Cove, LLC, Neighborhood Homes, LLC, Saneski, LLC, Seed Construction, Southridge Construction, Inc., Steele Construction of SC, Inc., and Total Package Grading.

l. Upon information and belief, during the applicable times of the transactions and occurrences applicable herein, either individually or derivatively, Defendants David Lorenzo, Elliot Salzman, James Caserta, Martin Ender, Robert J. L'Abbate, and Stuart Katz were officers, directors, managers, owners, shareholders, members, employees, beneficiaries, and/or agents of one or more of the following entities: CIF; Lancaster Resources, Inc. and its subsidiaries and affiliates; Ridgefield Park Office Complex, LLC; Calvary Asset Management, LLC; 457 Carlton Road, LLC; 39 Union Square,

LLC; 39 Union Square #401, LLC; and Defendants Bradford Financial Group, LLC, Lancaster Mortgage Bankers, LLC, Lion Financial, LLC, Monmouth Financial Group, LLC, Trazom, LLC, and York Mortgage Funding, LLC.

m.  Upon information and belief, during the applicable times of the transactions and occurrences applicable herein, either individually or derivatively, Defendants D. L. Jones, J.G. "Geneva" Seller (a/k/a Geneva Campitelli), J.G. Ryckman, Jack Campitelli (aka A.J. Camp), Jamie McKeough, Michael Moore, and Shawna Freeman were officers, directors, managers, owners, shareholders, members, employees, beneficiaries, and/or agents of one or more of the following entities:  Defendants Amerishare Corporation, Arrowhead Funding Corporation, Gulf Capital LP, Gulf Capital Management, Inc., Moore & Associates, LLC, Nevada Processing Center, Inc., Onward Recovery Partners Corporation, Onward Finance Corporation, Tcholok Properties, LLC, The Upper Nehalem Trust, The Chrysler Drive Trust, The Old Arcadia Road Trust, and The Cotton Mill Trust.

n.  Upon information and belief, during the applicable times of the transactions and occurrences applicable herein, either individually or derivatively, Defendants Brian Knight, Dennis Hackney, Michael Parish, and Mike Loprieno were officers, directors, managers, owners, shareholders, members, employees, beneficiaries, and/or agents of one or more of the following entities: Defendants LOP Capital, LLC, Strategic Lending Solutions, LLC, CapGain Properties, Inc., and United Private Capital, Inc.

**B.    Jurisdiction**

11.    This Court has jurisdiction over the subject matter by virtue of U.S.C.A. § 1331 (federal question jurisdiction), because one or more of the claims alleged arise under the laws of the United States, specifically under 28 U.S.C.A. § 1964 et seq. (Racketeer Influenced and

Corrupt Organization Act). This Court has jurisdiction of this action under 18 U.S.C. § 1964(a) ("Equity") and (c) ("Damages"), 28 U.S.C. § 1331 ("Federal Question"), 28 U.S.C. § 1337 ("Regulation of Commerce"), and under the principles of supplemental jurisdiction under 28 U.S.C. § 1367 pursuant to the Judicial Improvements Act of 1990, as codified at 28 U.S.C.A. §1367(a).

### C.    Venue

12.    In accordance with U.S.C.A. § 1391, venue is proper in the Greenville Division of the United States District Court for the District of South Carolina because one or more of the defendants reside in this division and a substantial number of the transactions at issue occurred with this division. In accordance with Local Civil Rule 3.01 DSC, counsel for the plaintiff certifies that a substantial part of the events or omissions giving rise to the claims set forth herein occurred within this division, that a majority of the above-named defendants either reside in this division or were corporations with their principal places of business within this division and/or did business relating to the events and omissions alleged.

### Factual Allegations

### A.  General

13.    Plaintiff alleges all paragraphs set forth in detail hereunder based upon the information and beliefs of the information that is currently known and/or available or that which is reasonably anticipated to be learned through discovery.

### B.   Organizers and Formation of CIF

14.    Defendant Arthur Field is an attorney who first was licensed by New Jersey in 1977 and by Connecticut 1978. He managed a commodities fund at one time and engaged in a legal practice that included real estate and business law. In the 1980s, Defendant Arthur Field passed the examinations to receive from the Financial Industry Regulatory Authority (FINRA) a

Securities Series 3 license, a Securities Series 7 license, and a Securities Series 63 license. Indeed, Defendant Arthur Field has referred to himself as a securities law expert. Defendant Arthur Field moved to South Carolina in the late 1990s, and received a Ph.D. in management science from Clemson University.  Although he presented business cards in South Carolina indicating he was a practicing attorney, Defendant Arthur Field has never been a licensed attorney in the State of South Carolina.

15.　　　Defendant Kathryn Taillon is Defendant Arthur Field's wife.

16.　　　Defendant Davyd Field is Defendant Arthur Field's son.

17.　　　Defendant Allyson Field is Defendant Arthur Field's daughter.

18.　　　Defendant Scott Pfeiffer is an attorney in South Carolina who was first licensed in SC.  His first job with a law firm was with Nelson, Mullins, Riley, and Scarborough, LLP, where he engaged in a corporate practice. In 1999, he left Nelson, Mullins, Riley, and Scarborough, LLP and formed his own firm, to engage in a "general corporate law firm for entrepreneurially owned businesses".  During the course of the transactions and occurrences underlying the claims set forth herein, Defendant Scott Pfeiffer's law firm changed names and personnel: Pfeiffer & Gantt, P.A.; and Pfeiffer Gantt & Gleaton, P.A.; Pfeiffer Gantt Gleaton Wyatt, P.A., and Pfeiffer Gleaton Wyatt Hewitt, P.A.in 1993.[1]

---

[1]In 2011, Plaintiff filed a separate legal malpractice claim against Defendant Scott Pfeiffer and Defendant Pfeiffer, Gleaton, Wyatt & Hewitt, P.A. (f/k/a Pfeiffer, Gantt & Gleaton, P.A.) that is currently pending in state court:  Capital Investment Funding, LLC v. Pfeiffer, Gleaton Wyatt & Hewitt, P.A. C.A. 2011-CP-23-7359 (Court of Common Pleas, Greenville County, South Carolina).  The legal malpractice action arises from the legal advice and legal representation provided by those defendants to the plaintiff regarding the issuance of a prospectus.  The gravamen of the complaint in this action against these defendants materially differs from the legal malpractice claim in that this action focuses almost exclusively on the acts, deeds of these defendants in establishing other corporate entities on behalf of other defendants in this action which were used as a conduit to funnel the assets from the plaintiff.  Because of the integral role Defendants Pfeiffer, Gantt, Gleaton, and other members of their firm played in the systematic formation of shell entities and disbursement of CIF's assets, these defendants are an integral part of the claims at bar.  However, because the vast majority of the other defendants in this action were not privy to the legal duties Defendants Pfeiffer and his firm owed in their role as legal counsel for the plaintiff, Plaintiff CIF has filed this action separately.

19.     Defendant Elliot Salzman was a mortgage broker who was in the business of buying and selling foreclosed properties in New Jersey. He befriended Defendant Arthur Field, who was originally from New Jersey and who handled closings and other legal work for Defendant Elliot Salzman's transactions in the 1990s.[2]

20.     At some point in the late 1990s, Defendant Arthur Field became aware of HomeGold, Inc. ("HomeGold"), which was the parent company of a South Carolina entity named Carolina Investors, Inc. ("Carolina Investors"), which raised money for its parent by selling securities to South Carolina investors.

21.     Defendants Arthur Field and Elliot Salzman arranged a meeting in New Jersey with the several investors, including Defendants David Lorenzo, James Caserta, Robert J. L'Abbate[3], and Stuart Katz, to pitch to them the idea of forming a similar business plan as HomeGold and Carolina Investors, Inc. ("Carolina Investors,"), whereby money would be raised from South Carolina investors and then sent to the parent company in New Jersey for relending and real estate development. Defendant Arthur Field had prepared a prospectus for the proposed South Carolina entity which he based on the prospectus issued by Carolina Investors.

22.     The South Carolina entity formed pursuant to this business plan developed by Defendants Arthur Field and Elliot Salzman was ultimately named Capital Investment Funding, LLC ("CIF"), the Plaintiff in this action. CIF was a South Carolina limited liability company

---

[2]In 2008, Plaintiff filed a separate suit in the Federal District Court of New Jersey to recover monies lost, stolen or misappropriated through transactions primarily based in the State of New Jersey: Capital Investment Funding, LLC v. Lancaster Resources, Inc., et al., CA No.: 2-08-cv-04714 (U.S. Distr. Ct. New Jersey). In 2009, several defendants in that case filed for protection in U.S. Bankruptcy Court in New Jersey. As a result, the civil case was stayed pending the outcome of the bankruptcy. In 2012, Plaintiff filed a motion to remove the stay for the defendants in that suit that have not filed bankruptcy. The motion is still pending as of the date this complaint was filed. The claims in that case at this time differ from those included in this complaint.

[3]In 2009, Defendant Robert L'Abbate personally filed for protection in U.S. Bankruptcy Court in New Jersey. Robert Julius L'Abbate USBC 09-11845-RG (U.S.B.C. New Jersey). In 2010, Defendant. L'Abbate was granted a discharge of debts under Section 727 of Title 11 of the United States Code (the Bankruptcy Code). Importantly, debts discharged under Section 727 do not include those arising from certain actions including fraud. Accordingly, Plaintiff's assertions of fraud and other tortuous actions claimed in this complaint against Defendant L'Abbate are not dischargeable debt under Section 727 and not otherwise precluded from prosecution hereunder.

with its main office located in the town of Easley, in Pickens County, South Carolina.  CIF had branch offices in Greenville County, Charleston County, and Horry County.

23.     CIF was formed by a filing with the South Carolina Secretary of State on January 13th, 1999, under the name "Carolina Investment Funding, LLC".  Defendants Arthur Field and Elliot Salzman signed the form as organizers of CIF.  Defendant Arthur Field was listed as the agent for service.

24.     CIF's minutes reflect that the initial meeting of its incorporators took place on February 25, 1999.  Upon formation of CIF, Lancaster Resources, Inc., a New Jersey corporation ("LRI") owned more than 90% of the CIF membership interests, with relatively small amounts of membership interests going to Defendants Kathryn Taillon, Brad Kelly, Bart Kelley and each of the directors LRI individually. The interim directors were Defendants Stuart Katz, Martin Ender, Robert L'Abbate, Arthur Field, Kathryn Taillon, and Elliot Salzman.

25.     Defendant Arthur Field told the members of LRI's Board he got the idea for CIF from Carolina Investors, which raised money from South Carolina investors for its parent, HomeGold.  Carolina Investors and HomeGold soon objected to the CIF's use of the name "Carolina Investment Funding" as being too similar, which resulted in CIF changing its name to "Capital Investment Funding" on August 5, 1999.

26.     On March 13, 2000, an Operating Agreement was executed by the members of CIF.  Defendant Elliot Salzman signed the agreement for LRI, which owned 90% of the membership interest in CIF. Defendant Arthur Field, his wife, Defendant Kathryn Taillon, Defendant Brad Kelley, Defendant Bart Kelley. Calvin L. Williams, and Lonnie Saxon also had membership interests and signed the agreement.

27.     The Operating Agreement named Defendants Arthur Field and Elliot Salzman as co-managers of CIF. The agreement provided that "*the primary purpose of [CIF] shall be to raise funding to be loaned to LRI for the purposes set forth in its Articles of Incorporation, By-*

*Laws, Operating Agreements. etc., including the making of loans to purchase, develop, operate, lease, manage and sell, alone or with others, commercial real property in the New York tri-state area, but this statement shall not confine or limit the Company's legitimate business activities.*"

28.　　　From March through July 1999, CIF received a series of capital contributions from LRI totaling $76,000.  The checks were deposited into CIF's checking account and were recorded as member capital contributions.

### C.  CIF Opens For Business With Sale of Securities and Loans To LRI

29.　　　During 1999, under the direction and control of Defendant Arthur Field, CIF opened its primary business location in Easley South Carolina.

30.　　　On February 26, 1999, Defendant Arthur Field signed Form U-1, Uniform Application to Register Securities, which was submitted to the South Carolina Securities Division ("Securities Division") in connection with its application to register securities of up to $4,000,000.

31.　　　On or about April 1, 1999 Defendant Arthur Field caused a prospectus to be issued on behalf of the plaintiff for the distribution to residents of South Carolina for the sale of CIF's securities in the form of unsecured promissory notes ("99 Prospectus"). These included an offering of $1,000,000 in Series A, 6% Subordinated One Year Debentures", and $3,000,000 in "Series 99 Floating Rate Notes". This prospectus and its subsequent amendment were filed with the Securities Division, and the issuance was subject to the provisions of the Uniform Securities Act of South Carolina. The Securities Division registered the offering on March 19, 1999.

32.　　　Under the direction and control of Defendant Arthur Field, CIF began selling unsecured promissory notes to investors in South Carolina.

33.　　　During 1999, under the direction and control of Defendant Arthur Field, CIF sold more than 60 unsecured promissory notes to more than 60 South Carolina residents and received more than $1.6 million in proceeds from such sales.  Also, during this same year, as CIF

accumulated cash from the sale of these notes, CIF would loan similar and sometime identical amounts of cash to LRI. By the end of 1999, CIF had loaned more than $1.6 million to LRI by issuing 35 checks, made payable to and deposited by LRI. The checks typically included a reference to the name of the South Carolina investor and the amount of funds received from the South Carolina investor. These checks were sent to LRI via the United States Postal Service ("US Mail"). The sale of these notes and all subsequent CIF notes and renewals constitutes the sale of securities under the statutory law of the State of South Carolina.

### D. CIF Continues Selling Its Unsecured Promissory Notes and Lending To LRI

34.       During 1999 and 2000, Defendant Arthur Field primarily controlled, as co-manager of CIF, the business activities of CIF in South Carolina. Defendant Elliot Salzman, as President and CEO of LRI, primarily controlled the relending and other business activities of LRI, including its use of the money CIF loaned to LRI.

35.       From 2000 through 2005, while still under the direction and control of Defendant Arthur Field, CIF opened three additional offices in South Carolina: one in Myrtle Beach; one in Greer; and one in Mt. Pleasant. Each of these additional offices was opened primarily to handle the sale of CIF's securities to South Carolina investors. Lending activities were handled exclusively from CIF's main office located in Easley, South Carolina, under the direct control of Defendant Arthur Field.

36.       On March 8, 2000, Defendant Arthur Field signed Form U-1, Uniform Application to Register Securities, which was submitted to the Securities Division in connection with CIF's application to register securities of up to $8,000,000.

37.       Defendant Arthur Field caused a prospectus to be issued on behalf of CIF on or about April 1, 2000, for an offering of $8,000,000 "Series 2000 Floating Rate Notes." This prospectus was filed with the South Carolina Securities Division and the issuance was subject to

the provisions of the Uniform Securities Act in the statutory law of South Carolina. The Securities Division registered the offering on March 17, 2000.

38.     Attached to this 2000 prospectus was a letter purporting to be from an independent auditors report from Want & Ender, CPAs.   In reality, this audit never occurred and the firm issued no such letter.

39.     Copies of CIF's balance sheet, included with the 2000 Prospectus, reflect $1,531,787.86 in Notes owed to investors as of December 31, 1999; as well as $3,303,139.34 in Notes owed to investors of March 8, 2000.

40.     During 2000, while still under the direction and control of Defendant Arthur Field, CIF sold more than 260 unsecured promissory notes to more than 260 South Carolina residents and received more than $10 million in proceeds from such transactions.  As in 1999, CIF accumulated cash from the collection of unsecured promissory noteholders in 2000 and, then, loaned similar and sometime identical amounts of cash to LRI.   By the end of 2000, CIF had loaned more than $8 million (over and above the $1.6 million loaned in 1999) to LRI by issuing 126 checks, made payable to and deposited by LRI. The checks typically included a reference to the name of the South Carolina investor and the amount of funds received from the South Carolina noteholder. These checks were sent to LRI via the United States Postal Service ("US Mail").

41.     In or about 2000, Defendant Arthur Field met and befriended Defendant Scott Pfeiffer, as both were interested in playing board games with military, historical, or fantasy themes.  These games are strategy games in which the players often attempt to outwit each other to consolidate their power on the game board. As will be seen, many of the business entities formed by Defendants Arthur Field and Pfeiffer took their names from these historical or fantasy themes.

42.     Having become friends with this similar interest in these strategy games, Defendants Arthur Field and Scott Pfeiffer began to intertwine their business affairs to take advantage of Defendant Arthur Field's source of funding from the investors in CIF.

43.     On February 8, 2001, Defendant Scott Pfeiffer issued an opinion letter, for purposes of registration with the South Carolina Securities Division, which stated that the CIF prospectus and the proposed notes complied with state law and were enforceable.

44.     On March 18, 2001, Defendant Arthur Field signed Form U-1, Uniform Application to Register Securities, which was submitted to the Securities Division in connection with CIF's application to register securities of up to $20,000,000.

45.     On or about April 1, 2001, Defendants Pfeiffer and Arthur Field caused CIF to issue the 2001 Prospectus for an offering of $20,000,000 "Series 2001 Floating Rate Notes". This prospectus was filed with the South Carolina Securities Division, and the issuance was subject to the provisions of the Uniform Securities Act in the statutory law of South Carolina. The Securities Division registered the offering on April 5, 2001.

46.     Copies of CIF's balance sheet, included with the 2000 Independent Auditor's Report, which accompanied the 2001 Prospectus, reflect $10,195,911 in Notes due investors as of December 31, 2000.

47.     Then, on March 12, 2001, Defendant Scott Pfeiffer issued an opinion letter to Defendant Arthur Field, in which he stated that the South Carolina Securities Division may view CIF as a "sham entity" with LRI as the actual issuer, and that CIF should do three things: (1) carefully document all transfers of funds, (2) use arm's length transactions between LRI and CIF, and (3) use portions of CIF funds for third party lending outside of loaning money to LRI in New Jersey.

48.     During 2001, while still under the direction and control of Defendant Arthur Field, CIF sold more than 800 unsecured promissory notes to more than 600 South Carolina

residents and received more than $16 million in proceeds from such sales. As in 1999 and 2000, CIF accumulated cash from the sale of its securities in 2001 and loaned similar and sometime identical amounts of cash to LRI. By the end of 2001, CIF had loaned more than $23 million (including the $9.6 million loaned in 1999 and 2001) to LRI by issuing 147 checks, made payable to and deposited by LRI. The checks typically included a reference to the name of the South Carolina noteholder and the amount of funds received from the South Carolina noteholder. These checks were sent to LRI via the United States Postal Service ("US Mail").

49.     From 2002 until 2007, while still under the direction and control of Defendant Arthur Field, CIF continued to sell its unsecured promissory notes. By the end of 2007, CIF was indebted to more than 680 South Carolina residents for more than $38 million.

50.     By March 2002, after it had loaned LRI more than $23 million, CIF ceased lending money to LRI. Then, from the remainder of 2002 until May of 2005, LRI repaid CIF approximately $6 million of principal, leaving an unpaid principal balance of more than $17 million, which balance remains unpaid as of today.

### E.  Bolingbroke: Concealment, Deception, Fraud and Conspiracy

51.     On September 27, 2001, an entity was registered with the Wyoming Secretary of State named Bolingbroke United (England) Ltd ("Defendant Bolingbroke"). The incorporator was listed as Defendant Geneva Sellers of Defendant Nevada Processing Center, Inc., a Nevada corporation.

52.     Defendant Geneva Sellers is an associate of Defendant Jack Campitelli, who also uses the alias "A.J. Camp". Defendant Jack Campitelli is an associate of Defendant Scott Pfeiffer. Eventually, the registered agent listed with the Wyoming Secretary of State's Office was "Henry Rex", the supposed president of Defendant Bolingbroke. The address was a P.O. Box in Eugene, Oregon, which was opened by Defendant Geneva Sellers and on which A.J. Camp was listed as a recipient of mail. Also, a Bank of America business investment account was opened in

South Carolina on October 18, 2001, with the signatory listed as "H Rex". This bank account used the address of Defendant Pfeiffer Gantt & Gleaton, P.A. as the address for the account. The bank did not certify the signature. Ultimately, a number of checks would be issued on this account purportedly signed by "Henry Rex".

53.    "Henry Rex" is a fictitious person and does not exist. Defendant Bolingbroke and "Henry Rex" were created by Defendant Scott Pfeiffer and Defendant Arthur Field to hide Defendant Arthur Field's true interest in Defendant Bolingbroke and the entities with which Defendant Bolingbroke would do business. Defendants Arthur Field and Pfeiffer did this to hide Defendant Arthur Field's true interest in various entities from investors, Defendant Arthur Field's partners in LRI, the South Carolina Securities Division, and others.

54.    As noted before, Defendants Arthur Field and Pfeiffer enjoyed strategy board games with historical themes. In history, Bolingbroke is the name of a castle in England. Henry Bolingbroke (because he was born at Bolingbroke castle) eventually became King Henry. Once he became king, Henry of Bolingbroke would have signed his name "Henry Rex" in the custom of English royalty. "Rex" means "king" in Latin.

55.    The first use of Defendant Bolingbroke was to loan money to Credo Land Holdings, LP ("Credo"). Credo was made of entities in which Defendant Scott Pfeiffer and Tommy Moore had ownership interests, and on September 10, 2001, Defendant Arthur Field purchased a 10% interest in Credo and a 10% interest in Saxon Holdings, LLC, a limited partner of Credo's controlled by Defendant Scott Pfeiffer. From information obtained, Defendants Arthur Field and Scott Pfeiffer learned the South Carolina Department of Transportation decided to acquire a certain parcel of land located near an interstate highway in Greenville. With that knowledge, Defendants Arthur Field and Scott Pfeiffer did cause Credo to purchase that parcel on October 16, 2001. The property was purchased from Baby Superstore, Inc. for $400,000. This transaction was completed on October 30, 2001. Credo that day gave a $340,000 note and

mortgage to Defendant Bolingbroke and a $40,000 note and mortgage to Defendant Kathryn Taillon, Defendant Field's wife. These documents were prepared and signed by Defendant Scott Pfeiffer.

56.     Some time thereafter, Defendants Arthur Field and Scott Pfeiffer conspired to have additional mortgages recorded to give the appearance of significantly more debt on the property, for the purpose of deceiving the South Carolina Department of Transportation.  Less than 18 months later, this property was condemned by the South Carolina Department of Transportation, which March of 2003 paid $1,150,000 in a check made out to Credo, Defendant Bolingbroke, Defendant Kathryn Taillon, and CIF.  The check was endorsed by Defendant Scott Pfeiffer on behalf of Credo, by Defendant Arthur Field on behalf of CIF, by Defendant Kathryn Taillon, and by "Henry Rex" for on behalf of Defendant Bolingbroke.  Of these funds, Defendant Arthur Field wrote checks from Credo to Defendant Bolingbroke for $342,963.03, and from Credo to Defendant Taillon and Defendant Arthur Field as well.  On January 31, 2003, "H Rex" also signed a release of Defendant Bolingbroke's mortgage on the property, which was supposedly witnessed by Defendant Paula Haney and Jane Passiouk, two of Defendant Pfeiffer, Gantt & Gleaton, P.A. employees.

57.     Defendants Arthur Field and others knowingly siphoned, extracted and absconded funds from CIF through ownership in Defendant Bolingbroke. Furthermore. Defendant Arthur Field and others knowingly, intentionally, and continuously concealed, withheld, and failed to disclose to the South Carolina noteholders of CIF the material ownership interest held in Defendant Boilngbroke and the improper and illegal actions of bank fraud and forgery by using the fictitious person, Henry Rex, for banking activities.

### F.     Concealment of Defendant Elliot Salzman's Improprieties and Removal

58.     As noted before, early in LRI's formation and operation, Defendant Elliot Salzman as President and CEO of LRI primarily controlled and directed LRI's business activities

and its use of the money from South Carolina investors that CIF lent LRI, while Defendant Arthur Field primarily controlled the business activities of CIF.

59.    On September 1, 2001, LRI executed a Revolving Loan Note for up to $30,000,000 in favor of CIF with interest to be paid at a rate of 12.75% per annum. Defendant Elliot Salzman and Richard Malagiere signed the note on behalf of LRI.

60.    In or before December 2001, some LRI board members became aware that Defendant Elliot Salzman had set up a separate entity and had diverted CIF funds to that entity without knowledge or authorization of LRI or its Board. These board members also became concerned about Defendant Arthur Field's actions as manager of CIF, due to his involvement with these transactions and his close relationship with Defendant Elliot Salzman. They sought explanations about and oversight over CIF's actions.

61.    Defendant Arthur Field did not wish to give up control of CIF and sought help from his friend, Defendant Scott Pfeiffer. On December 18, 2001, Pfeiffer issued an opinion letter to Defendant Arthur Field as manager of CIF, in which Defendant Scott Pfeiffer opined that moving the accounting function of CIF to New Jersey would "threaten the South Carolina nature of the company", since most of the funds were invested outside of South Carolina. Thus, he concluded that in order to meet the federal "intrastate exemption" from registration of CIF's securities with the SEC, at least the management of CIF's funds needed to remain in South Carolina. Defendant Scott Pfeiffer noted that this is why he advised Defendant Arthur Field a year earlier to begin investing in local projects, and that in relying on the federal intrastate exemption Defendant Arthur Field was "holding out to your investors that you are a South Carolina company". Defendant Scott Pfeiffer also advised Defendant Arthur Field that since he was the manager of CIF and CIF was a manager-managed LLC, the other members of LRI could not force him to relocate the accounting function. Defendant Scott Pfeiffer advised Defendant Arthur Field to resign from the board of LRI to avoid any conflicts of interest.

62.      Defendant Arthur Field, nevertheless continued to participate as an active member in the LRI Board meetings.  On December 19, 2001, a meeting of the LRI Board was held in which Defendant Arthur Field acted in his position as Chairman of the Board.  At the meeting, Defendant Arthur Field moved to dismiss the corporate counsel and secretary, Richard Malagiere, which passed.  The other members of the board were told that this was done because Malagiere was spending too much money on outside counsel.  In fact, Malagiere was spending this money in an attempt to adequately document loans Defendant Elliot Salzman had made with the money LRI had received from CIF.

63.      Additional information had come to light regarding Defendant Elliot Salzman's severe misconduct and improprieties with LRI funds during his time as president, including a certain transaction, referred to as the "*457 Westview* " transaction, which was the deemed to be "last straw" for many of the other members.  On January 3, 2002, a meeting of the LRI Board of Directors was held in which Defendant Arthur Field participated as a member.  At the meeting, the Board recognized that Defendant Elliot Salzman had diverted, misapplied, and misappropriated $5.6 million of funds borrowed from CIF for personal gain to the detriment of LRI.  As a result of Elliot Salzman gross improprieties, the Board decided to remove him (Defendant Elliot Salzman) from LRI membership, remove him as president and CEO of LRI, remove him as managing member of all the many related entities, remove him from the Board of LRI, and remove him from LRI's various LLCs management committees. The Board further decided that LRI would make no distributions to members until all Defendant Elliot Salzman's shortfalls were remedied. Once Defendant Elliot Salzman was removed from day-to-day control of LRI, it was realized that many of the loans and transactions were improperly or insufficiently documented. These actions of Defendants Elliot Salzman and Arthur Field, as well as many other parties of that suit are domiciled within the state of New Jersey are the subject of the currently pending federal lawsuit filed in New Jersey. [See, n.2, supra]

64.     Defendants Arthur Field, Scott Pfeiffer, David Lorenzo, Elliot Salzman, James Caserta, Martin Ender, Robert J. L'Abbate, and Stuart Katz intentionally, and continuously concealed, withheld, and failed to disclose to the South Carolina investors of CIF the improper detrimental conduct of Defendant Elliot Salzman and the associated actual and potential damages of such.

### G.     Creation of South Carolina Re-lenders To Mask New Jersey Lending

65.     Defendant Arthur Field continued in his efforts to solidify his control of CIF's lending activities with the help, advice and services of Defendant Scott Pfeiffer. On January 15, 2002, Defendant Arthur Field caused CIF to issue a check for $657,752 to the trust account of Defendant Pfeiffer, Gantt & Gleaton, P.A. for a direct loan from CIF to the South Carolina entity Tiger Transport Service, Inc., in which Tommy Moore (also of Credo) had a controlling interest.

66.     The next day, January 16, 2002, Defendant Scott Pfeiffer sent an opinion letter to Defendant Arthur Field as manager of CIF in which Defendant Scott Pfeiffer: (1) noted that he had now been asked to look at CIF's qualification for the federal intrastate exemption from federal securities registration; (2) expressed concern because "nearly 100% of all proceeds are sent to New Jersey for use their [sic]"; (3) recommended "to mitigate this problem" that "CIF needs to diversify its lending to lend to non-LRI entities"; (4) recommended that LRI "open a South Carolina subsidiary to be the direct borrower from CIF", which would then lend to LRI, and which should also consider placing South Carolina loans; and (4) warned that "even with these actions I cannot guarantee that you will meet the [federal intrastate exemption] test".

67.     Two days later, Defendant Scott Pfeiffer drew up the paperwork and acted as the closing attorney for the $657,752.00 CIF direct loan to Tiger Transport Service, Inc., which was guaranteed by Credo, in which Defendants Scott Pfeiffer and Arthur Field had ownership interests.

68.      Defendants Arthur Field and Scott Pfeiffer then executed a plan to disguise some of CIF's lending activities by creating a South Carolina entity to act as an intermediary in the lending from CIF to LRI in New Jersey.  This new entity was created with the hope that, if CIF's previous and continuing failures to register its securities with the SEC were ever challenged by federal or South Carolina regulators, loans through this intermediary loan arrangement would be deemed "intrastate loans" and therefore would serve to help CIF qualify for the exemption from federal registration.  Accordingly, this new entity was established with the specific intention of concealing the facts that CIF did not meet the federal requirements which would otherwise exempt CIF from registering its securities with the SEC.

69.      Thus, on January 28, 2002, Lancaster Resources (South Carolina), Inc., was formed with the filing of Articles of Incorporation with the South Carolina Secretary of State. Defendant Scott Pfeiffer was listed as the incorporator and soon he signed for the attorney certification of compliance.  On February 11, 2002, Articles of Amendment were filed changing the name of this entity to Defendant Monmouth Financial Group, Ltd ("Monmouth").   (In keeping with their interest in historical themes, according to history, Henry V was born at Monmouth Castle, and was known as Henry of Monmouth. Henry V later followed his father Bolingbroke, or Henry IV, on the throne. Henry Bolingbroke would, as noted before, sign his name "Henry Rex" upon taking the throne.)  Defendant Arthur Field signed this amendment as the incorporator. Defendant Scott Pfeiffer had ownership and management interests in Defendant Monmouth.

70.      About this time, Defendants Arthur Field and Scott Pfeiffer provided to the members of LRI an opinion letter from Defendant Scott Pfeiffer which stated that CIF could comply with the federal intrastate exemption by merely loaning to a South Carolina intermediary such as Defendant Monmouth, before the money was loaned to LRI in New Jersey.  LRI then authorized Defendant Scott Pfeiffer to form Defendant Monmouth and to be a shareholder,

officer, or director of Defendant Monmouth. The first Defendant Monmouth loan occurred on or about February 10, 2002, when Defendant Arthur Field caused $800,000 to be loaned from CIF to Defendant Monmouth, and Defendant Scott Pfeiffer then caused those funds to be loaned to LRI.

71.        In or about this same period or after, with intent, structure, and actions similar to Defendant Monmouth, Defendants Arthur Field and Scott Pfeiffer established other South Carolina entities including but not limited to Cosimo, LLC and Defendants Bradford Financial Group, LLC ("Defendant Bradford"), Lion Financial, LLC ("Defendant Lion"), and York Mortgage Funding, LLC ("Defendants York").

72.        Defendants Arthur Field, Scott Pfeiffer, and others knowingly, intentionally, and continuously concealed, withheld, and failed to fully disclose to the South Carolina noteholders of CIF (1) the material ownership interest they held and/or the operational control they maintained in Defendants Monmouth, Bradford, Lion, and York, and others; (2) and that the designed purpose of these entities was to create the false appearance that CIF was loaning money to South Carolina borrowers.

**H.        Creation of South Carolina Re-lender To Loan Money In South Carolina**

73.        Defendant Arthur Field's and Defendant Scott Pfeiffer's plan to start lending to South Carolina entities was primarily centered upon the formation of a new re-lending entity that would be loaning money predominately to South Carolina borrowers. This new entity would be created with the hope that, despite CIF's previous and continuing failures to register its securities with the SEC, over time CIF would qualify for exemption from federal registration by eventually having more than 80% of CIF's outstanding loans being used by South Carolina borrowers (80% being the federal regulatory threshold to qualify for the intrastate exemption).

74.        On January 31, 2002, Defendant Scott Pfeiffer filed with the South Carolina Secretary of State the Articles of Organization for Cosimo, LLC ("Cosimo") and was listed as

the organizer. (In keeping with their interest in historical themes once again, Cosimo took its name from Cosimo D'Medici, a historic figure from Italy during the Renaissance known for consolidating political and financial power.  On at least two occasions, Defendants Arthur Field and Scott Pfeiffer sent business letters from Cosimo which were purportedly signed by a "Larry Medici".)

75.     Fifty percent (50%) of Cosimo was owned by Defendant Red Lion Trading House, LLC, an entity controlled by Defendant Scott Pfeiffer.  The other fifty percent (50%) was owned by Defendant Bolingbroke, which, as noted before, was controlled by Defendant Arthur Field and was created for the purpose of hiding Defendant Arthur Field's ownership interest in this re-lender of CIF.  Over the years, Cosimo was co-managed by limited liability companies owned and controlled by Defendants Arthur Field and Scott Pfeiffer.

76.     Even though Cosimo was established to loan money to South Carolina borrowers, immediately after the formation of Cosimo, Defendants Arthur Field and Scott Pfeiffer began Cosimo's lending activity with a loan in New Jersey.  In January 2002, Defendant Arthur Field transferred $595,000 from CIF to Cosimo, which then lent the same amount to Guglielmi, LLC for use in New Jersey.  This transaction was facilitated through Defendant Elliot Salzman at Defendant Lancaster Mortgage Bankers, LLC. Defendant Scott Pfeiffer drew up the loan documents and functioned as the closing attorney.  He addressed the cover letter, as if the transaction was arm's length, to Defendant Alysia Hazelton as Assistant Manager of Red Lion Trading House, LLC, in which Defendant Scott Pfeiffer had ownership.  In fact, Defendant Alysia Hazleton was an employee of Defendant Pfeiffer, Gantt & Gleaton, P.A.  This sort of documentation was intended to create the illusion of an arm's length transaction, and was typical of most of the Cosimo loans which Defendant Scott Pfeiffer executed.

77.     After the initial loan to Guglielmi, LLC, Cosimo began lending to borrowers in South Carolina, Georgia, New York, Washington, and Oregon, with the majority of lending being to South Carolina borrowers.

78.     By December 2007, Cosimo had borrowed from CIF and loaned to multiple borrowers more than $11 million. As a result of Cosimo's reckless and unscrupulous activities, all of those loans were in default at the end of 2007 and remain substantially uncollectible today. Some of the more significant dealing Cosimo are discussed in more detail later in this Complaint.

### I.     LRI Outraged By CIF Re-Lending Activities

79.     Members of LRI became concerned with these relending activities of Defendants Arthur Field and Scott Pfeiffer.  Defendant Arthur Field stated that he was a passive member of LRI with no knowledge of whether LRI has any financial difficulties.  This statement is not true as the LRI Board minutes reflect Defendant Arthur Field actively participating through at least December 2002.  Defendant Arthur Field also stated that Defendant Monmouth and Cosimo were created to address Defendant Scott Pfeiffer's opinion letter that a "pass-through relending" through a South Carolina Company was necessary to comply with the federal intrastate exemption. Defendant Arthur Field stated that "neither CIF nor Defendant Arthur Field nor any other member of CIF board has anything whatsoever to do with the ownership or management of [Cosimo and Defendant Monmouth]". This statement represents a material misrepresentation of fact, i.e., a lie, because Defendant Arthur Field did in fact have such an interest through Defendant Bolingbroke.

80.     Defendant Arthur Field stated that with regard to the Guglielmi loan, Cosimo was created to "shield LRI from any connection with" Defendant Elliot Salzman.  He stated that he and Defendant Scott Pfeiffer were underwriting the Cosimo and Defendant Monmouth loans. Defendant Arthur Field stated Defendant Monmouth and Cosimo would take small markups, "to make sure they appear to be more than just sham pass throughs".  Defendant Arthur Field stated

that local loans are "what the people of SC believe their money is going for.  So, at least some of it had better be".

81.    Defendant Arthur Field represented that he did the renewal paperwork and all the accounting for CIF.  Defendant Arthur Field stated in an email:  "If we are going to try to build a firewall between CIF and LRI to comply with the state and federal securities laws, then we have to form and maintain companies such as MFG [Defendant Monmouth] and Cosimo to do it and we have to live with the 'independence' of those entities. ... Only trouble was you guys are in NJ and I have the money in SC and lending it to you directly may violate some big ass federal laws".

82.    Defendant Arthur Field also stated in an email that he is the one trying to "keep Elliot under control", and complained that the agreement Defendant Arthur Field wrote to terminate Defendant Elliot Salzman's relationship with LRI had not been signed by LRI officers.

83.    On March 29, 2002, Defendant Stuart Katz, wrote a letter to LRI's Board of Directors. Defendant Stuart Katz was a member (owner) of LRI and served as a director on LRI's Board of Directors and as the President of LRI.  His four (4) page letter to the Board Members expressed in great detail concerns of wrong doings by Defendants Elliot Salzman, Arthur Field, and Scott Pfeiffer, and included the following remarks:

> "I cannot sign an agreement that clears [Defendant] Elliot Salzman of what he did! [Defendant] Elliot Salzman stole 5+ million dollars and left us holding the bag. … I believe that by our white washing what [Defendant] Elliot [Salzman] did, we are placing ourselves at greater risk for criminal charges by assisting in his theft."

> "[Defendant] Scott Pfeiffer is the lawyer who initially gave us the opinion letter that the Blue Sky laws would not affect CIF loaning money to LRI. Out of the clear blue, [Defendant] Arthur [Field] felt it necessary for [Defendant] Scott Pfeiffer to reassess his initial opinion.  This came at a convenient time, just as we began to realize that there was going to be trouble with [Defendant] Elliot [Salzman]. I am not sure what new information came to [Defendant] Scott Pfeiffer, but low and behold his opinion changed.  His opinion is now that CIF must lend to a South

Carolina company. I believe that [Defendant] Arthur [Field] may have coerced Scott Pfeiffer into changing his opinion."

"**I do not believe that this is simple fraud committed by** [Defendant] **Elliot** [Salzman]**. I believe that this fraud would come under the RICO Statues.**" [Emphasis added]

"Remember that [Defendant] Arthur [Field] was not sending us [LRI] money until recently, **and now only enough to meet the interest payments**." [Emphasis added]

"I believe that this is just a chess match for [Defendant] Arthur [Field]."

"He [Defendant Arthur Field] has control of CIF, any and all companies formed in South Carolina, and the ability to withhold money to LRI. [Defendant] Arthur [Field] withholding money will push us into bankruptcy."

"The worst part of this is that [Defendant] Elliot [Salzman] will walk free, because we signed an Agreement of Separation claiming [Defendant] Elliot [Salzman] had a Loan."

84.     In April 2002, Defendant Arthur Field, who continued to actively participate in LRI board meetings, sent an agenda out for the April 2002 board meeting, which included ratification of the settlement agreement with Defendant Elliot Salzman based on the misconduct and the acceptance of Defendant Elliot Salzman's resignation from LRI. The meeting was held on April 17, 2002, and Defendant Arthur Field participated by telephone. Defendant Arthur Field seconded five (5) motions during the Board meeting and voted on these and several other motions during the Board Meeting.

85.     In spite of his vehement opposition and knowledge of the wrongdoings voiced in his March 29, 2002 letter, Defendant Stuart Katz voted in favor of the proposed settlement along with the rest of the Board Members, and then executed a Partial Settlement Agreement with Defendant Elliot Salzman on the next day, April 18, 2002. The terms of the Partial Settlement Agreement provided that Defendant Elliot Salzman terminated his ownership interest in LRI and several affiliated entities and resigned his employment as President of LRI. The Partial Settlement Agreement also required that Defendant Elliot Salzman repay LRI $1,747,728 plus

interest over a period of ten (10) years. Defendant Elliot Salzman did not pay any of the required payments.

86.        Meanwhile, on or about March 26, 2002, Defendant Arthur Field caused Defendant Monmouth to purchase a condominium at the River Bend development in Greenville, South Carolina from an estate for $55,000. Two years later, in February 2004, Defendant Arthur Field caused Defendant Monmouth to sell the condominium to Defendant Our Tree House for $65,000.  In connection with the purchase, Defendant Bill Beckman, signing as "Authorized Member", executed a mortgage in favor Defendant Bolingbroke in the amount of $48,000. While, CIF provided funding to Defendant Monmouth for the original purchase, through this process, funds and value were ultimately diverted to Defendants Bolingbroke. This condominium was used by Defendant Arthur Field, Defendant Scott Pfeiffer, and some of their friends as a place where they played historical and fantasy strategy board games. Defendants Arthur Field and Scott Pfeiffer also used this property as an address for Defendant Bolingbroke, Defendant Monmouth, and other entities to give the outward appearance of arm's length transactions, when, in fact the entities had common ownership and/or control by one or more of the above-named defendants.  Over 5 years later, on July 31, 2009, immediately before the Order Approving Settlement, John Emery and Defendants Ralph Gleaton and William Beckman signed a mortgage agreement with The Palmetto Bank in the amount of $36,150.  CIF did not receive any benefit from this new loan. Once again, value from this asset was diverted from CIF to the benefit of defendants.

87.        On June 5, 2002, LRI executed a Revolving Credit Promissory Note for up to $21,000,000 and an accompanying Loan Agreement in favor of CIF.  The documents were prepared by Defendant Scott Pfeiffer and were executed by Defendant Martin Ender as President of LRI and Defendant Arthur Field as manager of CIF.  As collateral for the June 5, 2002 loan agreement, LRI pledged to CIF its membership interest in nineteen (19) LLCs and mortgages in

its favor on thirteen (13) third party loans. The June 5, 2002 loan agreement also included the following payment schedule for LRI to retire its principal obligation to CIF:

| Dates Maximum | Credit Limit |
|---|---|
| July 1, 2002 - December 31, 2002 | $21,000,000 |
| January 1, 2003 - June 30, 2003 | $19,000,000 |
| July 1, 2003 - December 31, 2003 | $16,000,000 |
| January 1,2004 - June 30, 2004 | $13,000,000 |
| July 1,2004 - December 31,2004 | $10,000,000 |
| January 1,2005 - June 30, 2005 | $5,000,000 |
| July 1, 2005 - December 31, 2005 | $1,000,000 |
| January 1. 2006 | End of Term. |

88.     LRI would be unable to meet this draw down schedule.

89.     Defendants Arthur Field and Scott Pfeiffer also attended the LRI board meeting on August 18, 2002.  Defendant Arthur Field made or seconded a number of motions. He gave the CIF business update, and was present for the LRI update.

**J.     LRI Discovers Concealment of Continued Lending To Elliot Salzman**

90.     In November of 2002, a secretary at LRI was reconciling a Federal Express bill and discovered a number of transactions reflecting packages being sent from Defendant Lancaster Mortgage Bankers, LLC to Defendant Bradford  at the CIF address.  They also discovered Defendant Lancaster Mortgage Bankers, LLC packages being sent to Defendant Arthur Field's home address and one to Defendant Scott Pfeiffer for Cosimo.  Defendant Lancaster Mortgage Bankers, LLC involved Defendant Elliot Salzman.  The possibility that Defendant Arthur Field was still dealing with Defendant Elliot Salzman caused great concern to the other members of LRI.

91.     Defendant Arthur Field attended the December 22, 2002 LRI board meeting, where he made or seconded a number of motions.  Defendant Arthur Field gave the CIF update and was present for the LRI business update.  The minutes reflect there were "lengthy discussions regarding CIF and the other pass through companies it utilizes.  Who owns them and what information does LRI/CIF have about them?  [Defendant Bradford Financial Group] was

the most in question with Credo following".  Defendant Arthur Field at this time knew the ownership of these entities; Defendant BFG was formed in April 2002 with Defendant Arthur Field's wife Kathryn Taillon as the organizer; and as stated before Defendant Arthur Field had an ownership interest in Credo.

92.      In a January 13, 2003 email to his partners in LRI, Defendant Arthur Field stated: "As to [Defendant] MFG and Cosimo, I own not a single share in either of them. To my knowledge I have never received a penny from either." These statement(s) were material misrepresentations of fact, i.e., lies, given Defendant Arthur Field's effective ownership of Defendant Bolingbroke.

93.      On or around August 14, 2002, Defendant Arthur Field caused CIF to loan $2,275,000.00 to Cosimo for the Tiger related entities.  A portion of this money went to Credo, in which both Defendants Arthur Field and Scott Pfeiffer had an ownership interest.  On or about October 15, 2002, Credo loaned $550,000.00 to CIF from funds Credo had received through Cosimo from CIF.  CIF paid this money back to Credo on or about October 21, 2002.

94.      Indeed, in a letter to LRI's auditors, Smolin & Lupin in approximately April of 2003, and which was copied to Defendant Scott Pfeiffer, Defendant Arthur Field claimed that Credo had actually borrowed $500,000 on a short term note on October 15, 2002.  This statement represents a material misrepresentation of fact, i.e., a lie, as it was actually CIF that borrowed from Credo according to Defendant Arthur Field's own accounting.

95.      Late in March of 2003, the financial collapse of Carolina Investors was highly publicized in South Carolina. Criminal and civil charges of securities violations were filed against the company and its officers and directors, as over 12,000 noteholders of Carolina Investors lost over $200 million.  In response to the unease created by this event, Defendant Arthur Field sent a letter dated March 28, 2003 to noteholders to reassure them about CIF's

financial standing. In the letter, Defendant Arthur Field noted he offered to serve on a regulatory commission and had offered his "expert legal services in the drafting of legislation".

96.     Defendant Arthur Field's letter of March 28, 2003 promised that CIF would undergo voluntary semi-annual audits. This did not occur.  Defendant Arthur Field's letter also promised that two investors would be added to the management committee as observers. While this did initially occur with Sharon Finch and George Grant being so added, this did not persist after 2004.

### K.     LRI Discovers Violations Of Law And Demands CIF To Stop

97.     On April 7, 2003, Mr. Chris Devito at Smolin Lupin & Co, P.A., the auditors of LRI, sent a letter to Defendant Robert L'Abbate at LRI in which he noted his firm could not complete their audit of LRI without information on CIF's other lending activities and the ownership to those entities, including Credo, Saxon Holdings, Tiger Transport, Cosimo, and Defendants Monmouth and Bradford. These concerns were relayed to Defendant Arthur Field at CIF.

98.     Defendant Arthur Field responded to the concerns of the auditor by letter on or about April, 2003.  In justifying his lending activities outside of LRI, Defendant Arthur Field stated the following: "Fortunately, after review, our securities lawyers and our accounting firm recommended immediate diversification in a much belated attempt to gain the Safe Harbor provisions of the 1933 Act. We are a long way off, but are working very hard to achieve this." And: "It is only through swift and substantial diversification of loans inside of South Carolina that we can hope to survive federal regulatory scrutiny."  CIF investors were never told that CIF had been operating outside the federal intrastate exemption of the Federal Securities laws, that CIF was "a long way off" from complying, or that, at the time, the statement was made, that CIF was concerned about its ability to "survive regulatory scrutiny."

99.     Defendant Arthur Field had Defendant Scott Pfeiffer send Defendant Arthur Field another opinion letter, dated April 15, 2003. In it, Defendant Scott Pfeiffer discussed again the federal intrastate exemption, and noted that CIF had made "great progress" in moving towards compliance with the exemption by its cessation of direct lending to LRI and its new lending in South Carolina.  However, it continued: "Several goals need to be accomplished yet. In order to clearly qualify for the SEC Safe Harbor, 80% of all collateral should be located in South Carolina. Qualification for the safe harbor is not required, but the closer you get the more likely to succeed you will be."

100.    In an email to his LRI partners dated April 14, 2003, Defendant Arthur Field wrote that he had employed his wife, Defendant Kathryn Taillon, to assist him as the two of them handled the distributions and other financial transactions of CIF.

101.    LRI members and the LRI auditor hired investigator Michael O'Shea to look into Defendant Arthur Field's and Defendant Scott Pfeiffer's conduct in South Carolina.  On behalf of LRI, Defendant Robert L'Abbate also engaged legal counsel to review the propriety of Defendant Arthur Field's and Defendant Scott Pfeiffer's conduct.

102.    On or about April 21, 2003, Michael O'Shea and Chris DeVito from Smolin Lupin went to CIF's auditor, Porter and Highley, in Greenville, South Carolina to retrieve the audit work papers.  They were taken to Legal Eagle, a copying service to be duplicated and provided to LRI's counsel.  The next day, Defendant Arthur Field, Defendant Kathryn Taillon, and a third individual who refused to identify himself, arrived at Legal Eagle demanding return of the documents.  Defendant Arthur Field presented a business card with his Greenville, SC address identifying him as an "Attorney-at-law", even though he was not and never has been licensed in South Carolina.  The documents were copied and returned to Porter and Highley.

103.    Faced with these new developments, another special meeting of the LRI board took place on April 27, 2003 in the absence of Defendant Arthur Field.  The Board discussed

CIF and Defendant Arthur Field after LRI raised concerns about Defendant Arthur Field being manager of CIF. Defendant Robert L'Abbate's main concern was that the LRI Board and management did not know what Defendant Arthur Field was doing in South Carolina and with whom Defendant Arthur Field was conducting business. The Board discussed splitting LRI and CIF, firing Defendant Arthur Field as manager of CIF, or putting another manager in place at CIF along with Defendant Arthur Field. Ultimately, it was decided that legal counsel needed to look at the situation, and the ultimate goal was to protect the investors in South Carolina.

104.     Meanwhile, LRI's new South Carolina legal counsel reviewed CIF's actions and became concerned as to the sufficiency of the disclosures in the CIF prospectuses as well as the legality of CIF's operations under the federal intrastate exemption. In May 2003, LRI's new counsel met with Defendant Scott Pfeiffer in which he discussed some of these concerns with Defendant Scott Pfeiffer. LRI's counsel also expressed concern with the ethical and legal implications of Defendant Scott Pfeiffer functioning as the attorney while having an ownership in the various entities. Defendant Scott Pfeiffer did not defend his actions and listened with a blank stare.

105.     Defendant Scott Pfeiffer responded to the concerns of LRI's counsel with an unsigned letter dated May 7, 2003. Defendant Scott Pfeiffer proposed two (2) solutions: (1) the companies are split with Defendant Arthur Field getting CIF and LRI getting Defendant Arthur Field's interest in the New Jersey-related entities, following the creation of a trust in which the assets were placed and an effort was made to collect the roughly 1.8 million dollars still owed to LRI by Defendant Elliot Salzman for his misconduct, or (2) LRI could register a public offering to raise money to pay-off the CIF notes. Defendant Scott Pfeiffer concluded: "With the South Carolina notes repaid, the entire issue of South Carolina and the intra-state offerings disappears, and CIF is no longer needed and can be simply dissolved."

106.     Following these discussions with Defendant Scott Pfeiffer, on May 8, 2003, LRI's counsel recommended LRI get the following information from Defendant Scott Pfeiffer as soon as possible: "the maturity date of all investor notes, accountant confirmation of all money owed to investors, an accounting of all the loans to and from Cosimo, loan documentation as to the end borrower of all the Cosimo loans, and all correspondence to the Attorney General."

107.     LRI's counsel concluded that due to the actions of Defendants Arthur Field and Scott Pfeiffer, CIF clearly did not fall within the federal intrastate exemption and that CIF's activities were in violation of federal law.  They concluded that Defendant Scott Pfeiffer's assertion that CIF could be in compliance by diversifying its lending and merely lending to a South Carolina intermediary like Defendant Monmouth before sending the money out of state was "ridiculous", and that no reasonable lawyer could think such a plan was legal.

108.     Accordingly, on May 9, 2003, LRI's counsel sent a letter to LRI in which he stated: "CIF must be instructed to stop selling securities immediately.  Now that LRI has advice that the securities laws exemption is not available, it cannot permit CIF to continue selling securities at all. To do so would result in a knowing violation of the securities laws, and subject LRI and its principals to increased civil, and perhaps even criminal liability". The letter continued that Defendant Arthur Field needed to be instructed to stop selling securities for any other entity, and that someone representing LRI should be posted at CIF offices to preserve records and ensure no further sales of securities occurred.   LRI's counsel recommended that the CIF records needed to be subjected to a forensic accounting to determine the actual amount of investor liability, and that sufficient funds should be put in place to cover redemptions.

109.     On or about May 12, 2003, LRI's counsel followed up with a letter to Defendant Scott Pfeiffer in which noted their "discussions this past week" and asked for the information from CIF.

110.     When confronted with these developments, Defendant Arthur Field refused to stop selling unsecured promissory notes and responded that LRI legally could not dictate anything to Defendant Arthur Field as to how he ran CIF.

111.     On or about October 9, 2003, Defendant Arthur Field held a meeting for investors, at which he told the investors that loans are to be secured by a first mortgage, and that the appraised value had to exceed the loan by 20%.  He also stated that the company would never loan money to its managers. CIF was already lending to Cosimo, in which Defendant Arthur Field had a hidden interest through Defendant Bolingbroke and Defendant Scott Pfeiffer through Defendant Red Lion Trading.

112.     On October 10, 2003, Defendant Arthur Field issued a letter to noteholders "as part of our commitment to keep you fully informed" regarding the status of CIF's business. However, at no point in the letter did Defendant Arthur Field advise noteholders that attorneys had advised that CIF's business model was flatly illegal and subjected the company to the prospect of significant civil and criminal liability, nor that he had an interest in Cosimo and was hiding his involvement with use of Defendant Bolingbroke and a fake name. These failures to disclose represent omissions to state material facts.

**L.     LRI Forces Divestiture of CIF**

113.     At some time in or about 2003, LRI had filed a lawsuit against Elliot Salzman alleging fraud and other civil torts as related to Elliot Salzman's continued borrowing from CIF and the newly created entities.

114.     On November 24, 2003, a special meeting of the LRI board occurred to discuss these issues related to violations of federal and state law and the lawsuit against Defendant Elliot Salzman.  The members agreed to transfer LRI's 90% interest in CIF to Defendant Arthur Field in return for Defendant Arthur Field's interest in all the New Jersey LRI-related entities.

115.     At some point on or around November of 2003, Defendant Arthur Field and LRI executed a "Stock and Membership Transfer Agreement" which memorialized the split of LRI from Defendant Arthur Field and CIF.

116.     On November 24, 2003, LRI sent a letter to Defendant Arthur Field advising that LRI would pay off a number of loans prior to their maturity date at the end of the year, but requesting an extension of the maturity date of other loans to September 30, 2004.

117.     On November 25, 2003, Defendant Arthur Field responded to LRI's letter, in which he agreed to accept only $50,000 of LRI's pending $3,000,000 payment and extend the note term. Defendant Arthur Field also agreed to change the note from a fixed rate to a floating rate which had the effect of lowering LRI's interest rate at that time. In return, Defendant Arthur Field requested that LRI agree to pay $2,890,750 on Defendant Monmouth loans by December 15, 2003 and for its members to assign Wilshire interests as collateral.  Defendant Arthur Field also stated LRI was to provide a complete listing of collateral and to secure such collateral with UCC liens or mortgages if it could.

118.     On or about December 8, 2003, LRI executed resolutions memorializing the split from CIF and Defendant Arthur Field.

119.     On or about December 12, 2003, Defendant Arthur Field sent a letter to investors to inform them of his split from LRI and his acquisition of LRI's 91% interest in CIF.  In the letter, touting "significant developments at Capital Investment Funding", Defendant Arthur Field stated: "Although we had an excellent and profitable relationship with that firm LRI since our creation in January 1999, our attorneys advised us it would be preferable to disconnect the ownership of the entities.  Since LRI owned 91% of CIF, and was also its principal debtor, our advisors felt this could present a conflict of interest sometime in the future".

120.     These statements were materially misleading in a reference to an "excellent ... relationship" and a mere possible conflict of interest.  Among other things, Defendant Arthur

Field did not inform the investors that attorneys had advised LRI that CIF's business model was plainly illegal, and that the breakup was precipitated by Defendant Arthur Field's insistence on continuing CIF's sale of unsecured promissory notes despite this legal opinion and LRI's order to stop selling these notes. Defendant Arthur Field did not advise investors about the removal of Defendant Elliot Salzman from LRI for improper use of money CIF lent to LRI, and the disagreements the other members had with Defendant Arthur Field's continued dealings with Elliot Salzman despite this improper conduct. Defendant Arthur Field did not disclose the concern of the LRI Board as to Defendant Arthur Field's dealings and involvement with Defendant Scott Pfeiffer, Cosimo, Credo, Defendant Monmouth, Defendant Bradford, and other South Carolina entities.

121.    In the December 12, 2003, letter to investors, Defendant Arthur Field also stated that "all lending activities will be totally independent". This statement was materially misleading, as Defendant Arthur Field did not disclose his then-existing hidden ownership interest in Cosimo and entities through which he and Defendant Scott Pfeiffer were executing transactions.

122.    In a document dated December 2003, LRI and CIF entered into yet another Amendment to Revolving Credit Promissory Note. This document was signed by Defendant Martin Ender as President of LRI and Defendant Arthur Field as manager of CIF.

123.    This December 2003 Amendment stated it was for the purpose of converting the interest rate from a fixed to a floating rate, and "amending the payment schedule on the note". The agreement required LRI to submit by February of each year sufficient proof of collateral, by way of "mortgage or UCC lien, or similar lien sufficient to secure debt as set forth in the Uniform Commercial Code". Struck out by hand from the agreement was a provision that failure to submit sufficient proof of collateral in a timely manner would constitute a breach.

124.     This December 2003 Amendment further stated that no further advances would be made to LRI until the balance was reduced below $6,000,000, and "[t]hereafter, advances shall be limited to a maximum of 20% of CIF's total assets or such other amount as shall keep CIF within the Safe Harbor provisions of the United States Securities and Exchange Act, but not more than $9 million".   The December 2003 loan agreement also included the following payment schedule for LRI to retire its principal obligation to CIF:

| Dates Maximum | Credit Limit |
|---|---|
| January 1, 2004 - June 30, 2004 | $18,950,000 |
| July 1, 2004 - December 31, 2004 | $16,000,000 |
| January 1, 2005 - June 30, 2005 | $13,500,000 |
| July 1, 2005 - December 31, 2005 | $10,000,000 |
| January 1, 2006 - July 1, 2006 | $5,000,000 |
| July 1, 2006 - December 30, 2006 | $1,000,000 |
| December 31, 2006 - End of Term. | None |

125.     LRI would prove to be unable to meet its obligations to this pay down its loan as this scheduled.

126.     Defendants Arthur Field, Scott Pfeiffer, and others knowingly, intentionally, and continuously concealed, withheld, and failed to fully disclose to the South Carolina investors of CIF (1) that attorneys had advised LRI that CIF's business model was plainly illegal; (2) that the breakup was precipitated by Defendant Arthur Field's insistence on continuing CIF's sale of unsecured promissory notes despite this legal opinion and LRI's order to stop executing these notes; (3) the removal of Defendant Elliot Salzman from LRI for improper use of money CIF lent to LRI; (4) the disagreements the other members had with Defendant Arthur Field's continued dealings with Defendant Elliot Salzman despite this improper conduct; (5) the dealings and involvement with Defendant Scott Pfeiffer, Defendant Monmouth, Cosimo, Credo, Defendant Bradford, and other South Carolina entities.

### M.    Lending Grows Through Syndication and Culpable Lending

127.        From January 2002 through April 2002, Defendants Arthur Field and Scott Pfeiffer began their plan to dramatically and quickly increase the amount of dollars loaned on South Carolina projects by establishing new lending entities in South Carolina, including Cosimo and Defendants Bradford, Monmouth, and York.  Defendant Lion was later established in 2004. These entities were instrumental in Defendants Arthur Field and Scott Pfeiffer plan to established syndicates which would rapidly deploy investors' funds.

128.        Defendants Bradford, Monmouth, York, and Lion were managed by Defendants Arthur Field from CIF's office in Easley and Defendant Arthur Fields' home in Greenville. Cosimo began its operations inside of the law office of Defendant Pfeiffer, Gantt & Gleaton, P.A., where it remained until ownership of Cosimo was transferred to CIF in July 2009.

129.        From the onset, these entities never established commercially reasonable and generally acceptable lending policies, controls and standards. Notably, this substantial lack of policies, controls and standards, mirrored CIF, LRI, and all of the other re-lenders that were created to further CIF's cause.

130.        More specifically, under their general mode of operations, as evidenced by the lack of specific documentation, these entities did not require customers to submit loan applications, did not perform credit checks or background checks on customers or principals, did not obtain, much less scrutinize or verify, financial statements of borrowers or guarantors, did not perform any economic analysis, cash flow analysis, or projections for projects, did not perform due diligence on projects, did not properly monitor or inspect projects or construction progress, did not require proper and timely recordings of liens, and often loaned more money to borrowers in default in order to obscure the fact that the loans were in default.

131.        Thus, these entities conducted their lending activities carelessly and with reckless abandon, with the immediate goal of hurriedly and dramatically increasing the amount of CIF

moneys loaned on South Carolina projects, with no regard or intention to conduct what would be considered, by any reasonable measure, normal underwriting procedures on loans.

132.     Under the guise of needing to expand South Carolina lending volume in order to qualify for intrastate exemption to the federal registrations of CIF's securities, with the added benefit of extracting loan commitment fees, attorney fees, title insurance fees, and others fees from loan closings, Defendants Arthur Field and Scott Pfeiffer began their efforts to create various syndicates to participate in the lending schemes and scam. By design, Defendants Arthur Field and Scott Pfeiffer enticed, lured and persuaded many individuals to participate, first enrolling other lawyers and employees of Defendant Pfeiffer, Gantt and Gleaton P.A. law firm, including Defendants David Gantt, Ralph Gleaton, Paula Haney, Alysia Hazelton, and other members and employees of the law firm, and then reaching out to a multitude of others, including Defendants Anthony Edgar, Ashley Morey, Barry Lynn Spencer, Bart Kelley, Ben Hines, Bill Beckman, Brad Kelley, Brian Knight, Charles Pinion, D. L. Jones, Davyd Field, Dennis Hackney, Elizabeth Hopper, Eugene Hopper, Gary Johnson, Gene Ahlers, Greg Bailey, J.G. "Geneva" Seller (a/k/a Geneva Campitelli), J.G. Ryckman, Jack Campitelli (aka A.J. Camp), Jamie McKeough, Jan Davidson, Johnny Kelley, Jose Rodriguez, Joshua Ward, Kathryn Taillon, Kirsten M. White; Mark Davidson, Melinda Holbrooks, Michael Moore, Michael Parish, Mike Loprieno, Nathan Holbrooks, Philip Davidson, Reba Cox, Roger Ezell, Ross Jones, and Shawna Freeman.

133.     Then, with their mutual cooperation and participation, Defendants Arthur Field and Scott Pfeiffer and the aforementioned defendants set course to create a labyrinth of multiple inter-related entities, which operated as the alter-egos of these various individual defendants. The entities created including (but were not necessarily limited to) Defendants Advance Business Funding, LLC; Aladdin's Grill and Café, LLC; Alliance Development Partners, LLC; Amerishare Corporation; Angle Holdings, LLC; Apex Construction; Arrowhead Funding

Corporation; Asante Properties, LLC (a/k/a Asante, LLC); Badger Development, LLC; Blenheim Properties, LLC; Bolingbroke United (England) Ltd; Bountiful Bingo, LLC; Bradford Financial Group, LLC; CapGain Properties, Inc.; Capital Intrastate Funding, LLC; Construction Resources, Inc.; Dunross Struan, LLC; Ezell Investment Company, LLC; Gleaton Wyatt Hewitt, P.A; GodProp, LLC; Gulf Capital LP; Gulf Capital Management, Inc.; He Will Provide, LLC; Instant Cash, Inc.; Krondor Trading Co., LLC; J&H Builders, LLC; Lamplighter Mortgage Company, LLC; Lion Financial, LLC; Log Dirt, LLC; LOP Capital, LLC; Lot 37 Waters Edge, LLC; Lot 46 Waters Edge, LLC; Lot 6 Lakewater Cove, LLC; Mithril Funding, LLC; Monmouth Financial Group, Ltd.; Moore & Associates, LLC; Neighborhood Homes, LLC; Nevada Processing Center, Inc.; Onward Finance Corporation; Onward Recovery Partners Corporation; Our Tree House, LLC; P&G Title Agency, LLC; PG&G Title Insurance, LLC; PGGW Title Insurance, LLC; Pelican Way Financial, LLC;  RAAF Enterprises, LLC; Red Lion Trading House, LLC; Saneski, LLC; Saxon Business Services, LLC; Saxon Holding, LLC; Seed Construction; Southridge Construction, Inc.; Steele Construction of SC, Inc.; Strategic Lending Solutions, LLC; Tcholok Properties, LLC; The Chrysler Drive Trust; The Cotton Mill Trust; The Old Arcadia Road Trust; The Pickering Road Trust; The Upper Nehalem Trust; Total Package Grading; Trazom, LLC; United Private Capital, Inc.; York Mortgage Funding, LLC.; and ABC Companies 1-35 (names being fictitious).

134.     Most of these entities were formed by legal processes conducted by Defendants Scott Pfeiffer, David Gantt, Ralph Gleaton, who often acted as attorneys representing all parties engaged in the loan activities – CIF (as lender to Cosimo), Cosimo (as borrower from CIF and lender to various parties), and the various parties (as borrowers from Cosimo), and the various individual principals of the borrowers – despite the obvious and unconscionable direct conflict of interest of such representations.  Acting as employees and attorneys for Defendant Pfeiffer, Gantt & Gleaton, P.A., Defendants  Scott Pfeiffer, David Gantt, and or Ralph Gleaton often each met

with many of the defendants borrowers, provided them with legal advice, prepared the legal documents and forms for various defendant individuals and defendant entities, handled loans closings through the attorney trust accounts of Defendant Pfeiffer, Gantt & Gleaton, P.A., while often willfully omitting or failing to record key documents – even though they were duty bound to do so.

135.     Towards that end, Defendant Pfeiffer formed Our Tree House, LLC in January 2004, identifying his friend, Defendant Bill Beckman as its registered agent.  Defendant Pfeiffer, by and through Cosimo, LLC and Defendants Monmouth Financial Group, Ltd. and Defendant Boilingbroke United (England) Ltd. purchased a condominium at 925 Cleveland Street, Unit 27, Greenville, South Carolina in the name of Defendant Our Tree House, LLC.  The purpose of Defendant Our Tree House was two-fold:  (1) to provide a separate address so Defendants Field, Pfeiffer, Gantt and others could conceal the fact that transactions were not arm's length; and (2) provide a venue for the managers and members of the various defendant entities to socialize and participate in board games with their family, friends and associates.  The monies used from Cosimo to acquire this property have never been repaid.

136.     Thereafter, Defendants Pfeiffer, Gantt, Field and others would use the address of 925 Cleveland Street for various entities as a sham to give the appearance of arm's length transactions – that, in fact, were executed entirely in house.  For example, as the "closing attorney," Defendant Pfeiffer mailed loan packages under the letterhead of Pfeiffer, Gantt & Gleaton, to Cosimo at 925 Cleveland Street – addressed to "Dear Sir or Madam," when in fact, Defendant Pfeiffer was a manager of Cosimo.

137.     By 2006, under the direction of Defendants Arthur Field and Scott Pfeiffer, the aforementioned defendant individuals and entities formed multiple syndicates which, by design, masked transactions to give appearances of loans and ordinary business transactions made by and to independent entities negotiating at arms-length; when in reality, the syndicates bilked

millions of dollars from CIF through illegal activities under the guise of loans, loan fees, loan payoffs, lot release fees, foreclosure schemes, and so forth, all which resulted in substantial loss and harm to the detriment of CIF and its Noteholders.

138.     The illegal activities conducted by these various defendants constituted Ponzi and money laundering schemes. More specifically, the various defendants, individually and with other defendants, used various money laundering methods to extract and pilfer funds from CIF and others for the benefit of various defendants. The money laundering methods used included, but were not limited to, the following:

a.     Structuring – often known as "smurfing" – a method of placement by which cash is broken into smaller deposits of money, used to defeat suspicion of money laundering to avoid anti-money laundering reporting requirements.  A sub-component of this is to use smaller amounts of cash to purchase bearer instruments, such as money orders, and then ultimately deposit those, again in small amounts;

b.     Bulk Cash Smuggling - physically smuggling cash to another jurisdiction, where it is deposited in a financial institution, such as an offshore bank, with greater bank secrecy or less rigorous money laundering enforcement;

c.     Cash-intensive Businesses - using a business typically involved in receiving cash will use its accounts to deposit both legitimate and criminally derived cash, claiming all of it as legitimate earnings;

d.     Trade-based Laundering - under-or-over valuing invoices in order to disguise the movement of money;

e.     Trusts and Shell Companies – disguising the true owner of money – depending on jurisdiction, trusts and shell companies do not need to disclose their true, beneficial owner;

f.     Round-tripping - depositing money in a controlled foreign corporation offshore, preferably in a tax haven where minimal records are kept, and then shipped back as Foreign Direct Investment, exempt from taxation;

g.     Bank Capture  - money launderers or criminals buy a controlling interest in a bank and then move money through the bank without scrutiny;

h.     Real Estate Transactions - masking sources of funds including, but not limited to: (1) real estate purchased with illegal proceeds, then sold, and the proceeds from the sale appear to outsiders to be legitimate income, (2) the price of the property is manipulated wherein the seller will agree to a contract that under-represents the value of the property and will receive cash to make up the difference, and (3) property is sold to multiple entities all controlled by the same syndicate at increasing sale prices despite no transfer of funds to present the appearance of appreciation of real estate values in a given area;

i.     Black Salaries - compensating individuals with cash payments which are not reported to taxing authorities, and

j.     Fictional Loans - providing promissory notes without receiving as consideration some or all of principal amounts described in the promissory notes.

139.     From 2002 through 2009, under the co-management of Defendants Arthur Field and Scott Pfeiffer, Cosimo became the main outlet for the proliferation of CIF based loans outside of LRI and New Jersey. Cosimo nurtured and fostered several syndicates of illegal Ponzi and money laundering schemes, including Hopper's Syndicate, Campitelli's Syndicate, Trazom's Syndicate, and Field's Syndicate, among others. Their activities are stated herein as examples of the egregious and illegal activities perpetrated upon CIF and its Noteholders under the direction of Defendants Arthur Field and Scott Pfeiffer.

### a.  **Hopper's Syndicate Takes CIF For $8 Million**

140.     Hopper's Syndicate comprised the largest group of individuals and entities identified with the illegal conduct that resulted in harm and loss to CIF.  The group is referenced by the name of the one individual who is pervasive in a multitude of interlinked illegal activities, Defendant Eugene Hopper.

### i.  **Defendant Eugene Hopper's Background**

141.     Originally from Seneca, South Carolina, Defendant Eugene Hopper operated a residential mortgage broker business over the years, while also actively pursuing real estate and mortgage deals with the hope of striking it rich.

142.     From 1991 through December 1995, Defendant Eugene Hopper was a principal and officer of Flexible Mortgage Corporation, a New Hampshire corporation.  During these years, Defendant Eugene Hopper lived in New Hampshire.

143.     Defendant Eugene Hopper returned to live in South Carolina after 1995.

144.     By 1997, Defendant Eugene Hopper had befriended members of his church, including, but not limited to, Defendants Charles Pinion, Mark Davidson, Jan Davidson and Paul A. Chalmers.

145.     By 1997, Defendant Eugene Hopper had become associated with Defendant Roger Ezell, and his company, Defendant Instant Cash, Inc., which was known as a hard money lender.

146.     Meanwhile, in 1997, the New Hampshire Attorney General indicted Defendant Eugene Hopper on multiple counts of securities violations for selling unregistered securities. The securities were short term promissory notes yielding exorbitantly high rate of interest. The violations occurred while Defendant Eugene Hopper was living in New Hampshire in 1995.

147.     On January 2, 1998, Defendant Eugene Hopper pled guilty to two (2) counts of securities violations for selling unregistered securities to Ellen Knight and Eugene Williams, and was sentenced by the Superior Court in Sullivan County, New Hampshire, to twelve (12) months in the Sullivan County House of Correction and six (6) months in the House of Correction, consecutive.

148.     On or about December 23, 1998, Defendant Eugene Hopper was released and returned to his native state, South Carolina.

**ii.     Hopper's Syndicate Engages With Field and Pfeiffer.**

149.     Upon his return to South Carolina, Defendant Hopper continued to initiate investment schemes and/or scams.  By 2001, Defendant Eugene Hopper, along with a syndicate of individuals and entities, initiated a scam referred to by the investors as "Crystal Lakes".  This project, which is discussed in more detail later in this Complaint, was a financial disaster and failure, and resulted in a lawsuit filed in 2005 against Defendant Eugene Hopper and other members of his syndicate. The lawsuit sought to recover hundreds of thousands of dollars the plaintiffs lost as a result of conspiracy, unfair trade practices, and other causes alleged to have been committed by the defendants in that lawsuit.  Defendant David Gantt, in his capacity as a lawyer, represented some or all of the defendants in that lawsuit. The lawsuit was settled under

terms significantly adverse to Cosimo and CIF and to the direct benefit of the defendants in the lawsuit, some of whom are defendants in this lawsuit.

150.     By 2004, Hopper's Syndicate had converged with Defendants Arthur Field and Scott Pfeiffer.  Hopper's Syndicate had an intense and growing appetite for money, which it needed in order to continue its Ponzi schemes centered upon real estate development projects; Defendants Arthur Field and Scott Pfeiffer were on a quest to rapidly deploy millions of dollars of capital, in order to assuage the securities legalities referenced above.  The results were disastrous. Between 2004 and 2008, under the direct control and management of Defendants Arthur Field and Scott Pfeiffer, Cosimo consummated dozens of loans to Hopper's Syndicate under the guise of various real estate developments, all of which were funded by loans from CIF to Cosimo.  By 2007, Hopper's Syndicate owed Cosimo more than $8 million on dozens of loans, all of the loans were in default, all of the borrowers and projects were financially insolvent, and Cosimo was unable to recover any value from the underlying real estate properties because of culpable dealings of various Defendants, including Defendants Arthur Field, Scott Pfeiffer, and David Gantt.  Although these defendants represented these loans were secured by first mortgages on the projects, they were, in fact, not secured by first mortgages, because they conspired together and willfully: (1) failed to timely record, or did not record at all, Cosimo's mortgages; (2) allowed Cosimo's mortgages to be subordinate to mortgages in favor of other Defendants; (3) released Cosimo's mortgages for the benefit of these and other Defendants without just consideration; and (4) allowed Cosimo's loan proceeds to be diverted to other projects.

151.     Fueled by over $8 million in loans from Cosimo and CIF, Hopper's Syndicate expanded to include (but was not necessarily limited to) the following individuals and entities: SD Trust, LLC, WE3 Company, Inc., Rolling Hills Land Company, LLC, Big Deal Land Co., LLC, Defendants Arthur Field, Scott Pfeiffer, Alysia Hazelton, Anthony Edgar, Ashley Morey,

Barry Lynn Spencer, Bart Kelley, Ben Hines, Bill Beckman, Brad Kelley, Brian Knight, Charles Pinion, David Gantt, Davyd Field, Dennis Hackney, Elizabeth Hopper, Eugene Hopper, Gary Johnson, Gene Ahlers, Greg Bailey, Jamie McKeough, Jan Davidson, Johnny Kelley, Joshua Ward, Mark Davidson, Melinda Holbrooks, Michael Moore, Michael Parish, Mike Loprieno, Nathan Holbrooks, Paula Haney, Philip Davidson, Ralph Gleaton, Reba Cox, Roger Ezell, Ross Jones, Shawna Freeman, Advance Business Funding, LLC, Alliance Development Partners, LLC, Amerishare Corporation, Angle Holdings, LLC, Apex Construction, Arrowhead Funding Corporation, Asante Properties, LLC (a/k/a Asante, LLC), Badger Development, LLC, CapGain Properties, Inc., Capital Intrastate Funding, LLC, CommunitySouth Bank and Trust, Construction Resources, Inc., Dunross Struan, LLC, Ezell Investment Company, LLC, Gleaton Wyatt Hewitt, P.A, GodProp, LLC, Gulf Capital LP, Gulf Capital Management, Inc., Instant Cash, Inc., Krondor Trading Co., LLC, J&H Builders, LLC, Lamplighter Mortgage Company, LLC, Log Dirt, LLC, LOP Capital, LLC, Lot 37 Waters Edge, LLC, Lot 46 Waters Edge, LLC, Lot 6 Lakewater Cove, LLC, Moore & Associates, LLC, Neighborhood Homes, LLC, Nevada Processing Center, Inc., Onward Finance Corporation, Onward Recovery Partners Corporation, Our Tree House, LLC, P&G Title Agency, LLC, PG&G Title Insurance, LLC, PGGW Title Insurance, LLC, Red Lion Trading House, LLC, Saneski, LLC, Saxon Business Services, LLC, Saxon Holding, LLC, Seed Construction, Southridge Construction, Inc., Steele Construction of SC, Inc., Strategic Lending Solutions, LLC, Tcholok Properties, LLC, The Chrysler Drive Trust, The Cotton Mill Trust, The Old Arcadia Road Trust, The Pickering Road Trust, The Upper Nehalem Trust, Total Package Grading, Trazom, LLC, United Private Capital, Inc., and York Mortgage Funding, LLC.

152.    These and other parties were duped into participating in these various illegal schemes.  Often investors were promised high returns on a very short term investments (30 to 60 days), only to find out they would not get repaid as promised. Some investors decided to join the

syndicate and participate in the next scam, in order to recover the funds they lost. Thus, funds raised from new investors were used to pay off old investors as in a classic Ponzi scheme.

153.     While the number of participants grew, the methods of the scams became much more complicated and convoluted.  Loan proceeds designated to payoff first lien holders or seller financing were not used to pay off such loans, but were purposely diverted for use by other companies within the syndicate. Loan proceeds for one particular project would be used to pay costs of another or to pay totally unrelated expenses.  Loan proceeds would be used for personal enjoyment.  Money flowed freely between and among the various entities of the syndicate, sometimes by bank wire, sometimes by Western Union wire, and sometime by checks. Significant sums of cash were withdrawn from bank accounts frequently and regularly.  Cash payments were made to multiple parties without records.  Cash payments were made to a bank loan officer, who falsified construction inspections reports and approved bank loan disbursements. Mortgages were purposely not recorded.  Mortgage liens were inappropriately released.  Properties were fraudulently sold without satisfying liens.  Fraudulent deeds were issued.  Foreclosures were staged among the defendants and their related entities to avoid due process, resulting in transfers of title to investors at substantially less than full values.  Many other devious, deceptive, and illegal actions occurred.

154.     While many of these participants and loan activities often appeared to be separate and unrelated, money flowed freely between and among the various participants without regard to propriety and protocol, and without reasonable assurance of validity. Each participant was focused on receiving money and purposely turned a blind eye with a lack of consciousness as to the source of funds and resulting damages incurred by CIF, Cosimo, and others.

155.     Defendants Arthur Field and Scott Pfeiffer participated in these devious, deceptive, and illegal actions by consent in some actions and by turning a blind eye to others. Moreover, in almost all of the multiple dozens of transactions, Defendants Scott Pfeiffer, David

Gantt, and other employees of Pfeiffer & Gantt law firm handled the real estate and mortgage loan closings, acting as attorneys for all parties (CIF, Cosimo, and other transacting parties) despite the clear conflict of interests. This methodology allowed multiple transactions to continue to the detriment of the plaintiff (including Cosimo and other companies for which it has since seized control), without scrutiny or oversight of an outside third-party. Repeatedly, Defendants Scott Pfeiffer and David Gantt, either directly or through their associates employees under their employ and direction, prepared and recorded fraudulent deeds and mortgages, purposely issued fraudulent title insurance policies, purposely did not record mortgages, willfully diverted funds held in trust for purposed other than authorized, willfully failed to pay priority lien holders, willfully released mortgages and liens, and conducted many other acts that resulted in significant damages and loss to CIF, Cosimo and others.

156.        By November 2007, with knowledge of the financial implosion of CIF nearing (related to regulatory problems discussed later in this Complaint), Defendants Arthur Field and Scott Pfeiffer willfully set out to cover up the catastrophic problems that existed because the $8 million in loans that Hopper's Syndicate owed to Cosimo, and hence to CIF, were in default and were uncollectible. Under the direction of Defendants Arthur Field and Scott Pfeiffer, Defendants Scott Pfeiffer and David Gantt, either directly or through their associates under their employ and direction, prepared fraudulent notes and mortgage releases to give the appearance of consolidating and combining loans, with the result of releasing many of the borrowers from liability without consideration.

157.        The culpable and illegal nature of the Hopper's Syndicate as an enterprise as is evidenced by the lack of formal accounting records, frequent and prolific withdrawal of cash (greenback paper bills) from banks at less than $10,000 ($10,000 being the threshold which would require the bank to disclose the cash transactions to the IRS), frequent and prolific use of cash (greenback paper bills) as a form of payment and receipt, failure to keep records to record

cash transactions, failure to report cash transactions on income tax returns and IRS Form 1099, and failure to file income tax returns.

158.     Instances of devious, deceptive, and illegal actions among members of Hopper's Syndicate which resulted in more than $8 million of damage and loss to CIF, Cosimo, and others are voluminous.  Examples of devious, deceptive, and illegal acts committed by individuals and entities associated with the Hopper Syndicate are discussed in the sections that follow this section and are captioned as follows: Crystal Lakes; Lamplighter Mortgage; Waters Edge; Highlands; Sweetwater; Docks at Sweetwater; Badger.

### iii.     Examples of devious, deceptive, and illegal acts

### (1)     Crystal Lakes

159.     Upon release from jail at the end of 1998, Defendant Eugene Hopper resumed his scheming activities and immediately targeted two lakefront projects as the means to attract investors and moneys. Collectively referred to as "Crystal Lakes", the two projects included lakefront property located on Lake Jocassee in Oconee County, South Carolina, and lakefront property located in Cherokee County, South Carolina.

160.     Over the course of several years, Defendant Eugene Hopper cultivated a syndicate of individuals and entities, who over time used Ponzi schemes and money laundering techniques to entice investors to invest in Crystal Lakes with the promise of receiving exorbitantly high returns.

161.     On or about June 13, 2001, Defendants Eugene Hopper, Paul A. Chalmers, Charles Pinion, Jan Davidson, and Mark Davidson (collectively, "Crystal Lakes Defendants") and Terry Cobb formed Crystal Lakes Plantation, LLC, a South Carolina limited liability company.  Except for Defendant Mark Davidson, each Crystal Lake Defendant held an equal interest in the enterprise.  There was little, or no substantive initial capitalization of the company

and all loans to projects of the company were personal loans to principals. Crystal Lakes Plantation, LLC was promoted to be the developer of the Crystal Lakes projects.

162.      From June 2001 through December 2002, under the guise of accumulating funds to purchase the properties, the Crystal Lake Defendants enticed investors to loan money at extraordinary high rates of return to investors, making representations and legal pledges that pending funds would and could pay back all loans. The Crystal Lake Defendants also represented they were responsible persons who had the resources to back the loans.

163.      During such period, Crystal Lakes Defendants solicited various individuals for short term bridge loans lasting no longer than thirty (30) days in order to reach the time when their permanent loans were expected to fund, and thereon Crystal Lakes Defendants would introduce interested investors to Defendants Roger Ezell and Instant Cash, Inc. and induce interested investors to execute mortgages to Defendant Instant Cash, Inc. as security for loans of various amounts. Defendant Instant Cash, Inc. was owned by Defendants Roger Ezell, Barry Lynn Spencer, and Ben Hines. Substantially, all of these loans were closed by attorney James M. Williams, III (deceased).

164.      On or about August 9, 2001, Elaine R. Williams and James M. Williams, III, signed a promissory, for the benefit of Crystal Lakes Defendants, at an exorbitant interest rate to Defendant Instant Cash, Inc. in the sum of $200,000 and further signed a mortgage on their second home, a vacation house in Beaufort County, as security for the loan, under the belief and understanding that Crystal Lakes Defendants would repay the loan within thirty (30) days. The promissory note required payment of interest at 4% for 30 days, which was an annual rate of 48%.

165.      On or about August 9, 2001, Crystal Lakes Defendants signed a promissory note promising to pay Elaine R. Williams and James M. Williams, III, the exact amount of their obligation as owed by them to Instant Cash, Inc. pursuant to their note with Instant Cash, Inc.

dated August 9, 2001, plus the sum of $50,000 cash within 30 days or upon closing of "The Gaffney Project" whichever is sooner.

166.    Defendant Instant Cash, Inc. understood at the time the loan was made that the interest rate was contemplated for only a short term, but more importantly all parties understood who was actually to pay the loan to Defendant Instant Cash, Inc.

167.    In early 2002, Defendant Eugene Hopper made representations to Elaine R. Williams and James M. Williams, III and other investors that a buyer, John Dodge, entered into a purchase agreement to purchase Crystal Lake projects. Defendant Eugene Hopper further represented that John Dodge had the wherewithal to complete the purchase of the properties, because he was an heir of the Dodge automotive family and had access to a family trust that had a value of $98 million. Although John Dodge was an heir to the Dodge fortune, he was one of many heirs and was only entitled to a small periodic stipend, which was not enough complete the purchase. John Dodge was subsequently convicted of drug possession on March 31, 2003 (C.A. No. G803219, Greenville County, South Carolina). A purchase agreement was never consummated with John Dodge and the actual purchase of the property never occurred.

168.    In or about 2002, Defendant Charles Pinion mortgaged his properties to Defendant Instant Cash, Inc. in the amount of $80,000

169.    In the Spring of 2003, it became obvious that neither of the Crystal Lakes projects would come to fruition, and Crystal Lakes Defendants were all deep in the throes of lawsuits, judicial liens, and numerous allegations of malfeasance and misrepresentations, not to mention numerous loans and mortgages, like that of Elaine R. Williams and James M. Williams, III (i.e. short term contemplations owed to Defendant Instant Cash, Inc. and at exorbitant rates of interest).

170.    On April 28, 2003, Crystal Lakes Defendants formed Lakes and More, LLC, to provide a vehicle to repay Defendant Roger Ezell and Defendant Instant Cash, Inc. through

preferential transactions to Defendant Roger Ezell and/or his alter ego Defendant Ezell Investment Company, LLC.

171.     Using proceeds derived from other unsuspecting investors, Crystal Lakes Defendants made substantial payments to Defendant Roger Ezell and Defendant Ezell Investment Company, LLC, through Lakes and More, LLC, and Defendant Roger Ezell and Defendant Instant Cash, Inc. intentionally and knowingly failed to apply any said payments toward the loans issued to the unsuspecting investors, including, but not limited, Elaine R. Williams and James M. Williams, III.

172.     On or about October 22, 2003, Defendants Eugene Hopper, Charles Pinion and Josh Ward, settled a loan owed by the Crystal Lakes Defendants to Terrell Beatty in the amount of $12,500 by having Defendant Construction Resources, Inc., owned by Defendant Philip Davidson, pay Trac Co Furniture Refinishing, owned by Shelley Harris $12,500, to be paid on or before December 31, 2004.  The Crystal Lakes Defendants had borrowed $5,000 in December 2003 and had promised to repay the loan by making 15 monthly payments of $500 each, for a total of $7,500, which would have been an effective annual interest rate of 66.6%.

173.     On or about October 22, 2003, Defendant Eugene Hopper settled a loan owed to Scott Owens in the amount of $14,750. Three years earlier, Defendant Eugene Hopper had borrowed $2,750 from Scott Owens, which he had promised to pay back with 24 monthly payments of $500.00, for total payments of $12,000, which would have been an effective annual interest rate of 213.84%. The settlement provided that Defendant Construction Resources, Inc., owned by Defendant Philip Davidson, would pay Trac Co Furniture Refinishing, owned by Shelley Harris $14,750, to be paid on or before December 31, 2004.

174.     On April 19, 2004, Defendant David Gantt issued a check in the amount of $93,620.97 to Ezell Properties designated as Constructions Resources, Inc.'s loan payoff from the real estate trust account of Defendant Pfeiffer, Gantt & Gleaton, P.A.

175.      On or about January 3, 2005, Elaine R. Williams and James M. Williams, III, filed a civil lawsuit against Crystal Lakes Defendants, Civil Case No. 2004-CP-37-00823, Court of Common Pleas, County of Oconee, State of South Carolina ("Williams Case").

176.      Defendant David Gantt and Defendant Pfeiffer, Gantt & Gleaton, P.A. represented Crystal Lakes Defendants in the Williams Case.

177.      On November 10, 2005, Defendant Gantt negotiated a settlement of the Williams Case by having WE3 Company, Inc., a company owned by Defendants Eugene Hopper, Charles Pinion, and Paul Davidson, enter into a promissory note with Defendant Instant Cash, Inc. in the amount of $350,000, which required an initial payment of $50,000, 13 monthly payments of $4,375 each, and a final payment of $304,375 on December 2006.  The promissory note provided for interest an annual rate of 15%. In total, the promissory note required payments totaling $411,250.  At the time the promissory note was signed, WE3 Company, Inc. was insolvent and owed Cosimo more than $1 million.

178.      On February 6, 2007, Defendant Instant Cash, Inc. assigned its $200,000 mortgage with Elaine R. Williams and James M. Williams, III, to SD Trust, LLC, a company owned by Defendants David Gantt, Eugene Hopper, Charles Pinion, and Josh Ward.

179.      On February 29, 2008, SD Trust, LLC filed a satisfaction of its $200,000 mortgage with Elaine R. Williams and James M. Williams, III, acquired from Defendant Instant Cash, Inc. despite receiving no consideration in exchange.

180.      Through these and other unscrupulous and illegal actions, the Crystal Lakes Defendants paid approximately $1,500,000 directly and indirectly to Defendants Instant Cash, Inc., Roger Ezell, Barry Lynn Spencer, and Ben Hines under the guise of renewing the options to purchase the Crystal Lakes properties, all based upon false and misleading information provided by the Crystal Lakes Defendants that financing was readily available to complete the purchase and the subsequent sale of the properties to a fictitious buyer was imminent.

181.     The culpable and illegal nature of these activities surrounding this project as an enterprise is evidenced by the lack of formal accounting records, failure to keep records, failure to report transactions on income tax returns and IRS Form 1099, and failure to file income tax returns.

### (2)     Lamplighter Mortgage

182.     On or about December 23, 2002, Defendant Eugene Hopper formed Lamplighter Mortgage Company, LLC ("Lamplighter Mortgage"), a South Carolina limited liability company with James M. Williams, III, serving as the registered agent therefore.  Lamplighter Mortgage enabled Defendant Eugene Hopper the means to implement many of the money laundering methods necessary to prevent the funds derived from the Ponzi scheme from being traced including, but not limited to: (1) access to credit reports which enabled him access to information to impersonate others at local Western Union facilities to wire funds to oversea accounts without detection; (2) transferring real estate between related entities at less than market value; (3) transferring real estate between related entities at recorded values greater than the actual consideration given; and (4) submission of fraudulent loan applications.

183.     On several occasions, Defendant Eugene Hopper instructed employees and agents to wire funds to foreign bank accounts via Western Union, located at the Bi-Lo in Seneca, South Carolina.  Defendant Eugene Hopper owned a Western Union franchise in New Hampshire under the name of Northeast Data Products, and consequently, knew how to avert security measures by having cash wired to an account under another person's name, social security number, address and use of false identification, generally handled by Defendant Elizabeth Hopper, the daughter of Defendant Eugene Hopper.  One account is known to exist in Switzerland which was controlled by a Ms. Katherine Touzot.

184.     Defendant Eugene Hopper established a foreign bank account and gold exchange account controlled by Wade Timothy Garner.  Defendant Eugene Hopper, with the assistance of

Defendant Gene Ahlers, transferred approximately $130,000 to the account in or about May and or June 2006 and approximately $50,000 in April 2007.  Wade Timothy Garner was convicted of wire fraud in May 2007 in U.S. District Court, Anderson County, Case No. 8:07-0449.  No funds were recovered.

### (3)     Waters Edge

185.     In late 1999, Defendant Charles Pinion becomes aware that Crescent Resources Inc. ("Crescent Resources"), the real estate development subsidiary of Duke Energy, was seeking bids on approximately 173 acres on Lake Keowee, Oconee County, South Carolina. The property was referred to as "Waters Edge". Crescent Resources Inc. requires a deposit of $100,000 to submit a bid.  The deposit was refundable if the purchase funds were not secured within 30 days of the successful bid.  The successful bid had 60 days to close the purchase.

186.     Defendant Charles Pinion borrowed $50,000 from Wendell Miller and $50,000 from Eddy Wright for the deposit to submit a bid on Waters Edge with agreement to repay them $57,000 each within 30 days.

187.     Defendant Charles Pinion submitted the $100,000 deposit and a bid to purchase Waters Edge for $22,500 per acre or approximately $3.8 million. Crescent Resources accepted the bid.

188.     On August 29, 2000, Defendant Charles Pinion formed Water's Edge, Inc., a South Carolina corporation; Defendant Charles Pinion was a shareholder.

189.     On or about August 31, 2000, Water's Edge, Inc. purchases Water's Edge from Crescent Resources Inc. for $3,881,475.00.   Water's Edge, Inc. provides Defendant Charles Pinion $114,000.00 finder fee that is used to repay Wendell Miller and Eddy Wright.

190.     From August 31, 2000 through August 12, 2003, Water's Edge, Inc. sold approximately 45 lakefront lots out of 99 total lots in Waters Edge, leaving only 55 unimproved, undeveloped and undesirable interior lots.

191.     By August, 2003, Defendants Eugene Hopper and Charles Pinion saw the opportunity to buy the remaining interior lots at Waters Edge and use the purchase and development of the property as a pretense to bilk millions of dollars from Cosimo and CIF.

192.     On August 12, 2003, Defendants Eugene Hopper, Charles Pinion and Mark Davidson formed WE3 Company, Inc. ("WE3"), a South Carolina corporation, incorporated by Defendant David Gantt.

193.     From August 2003 through 2009, Defendants Eugene Hopper, Charles Pinion and Mark Davidson used WE3 as the vehicle to enroll others into their syndicate and implement various money laundering operations utilizing real estate transactions including, but not limited to: (1) obtaining title to real estate without payment of consideration; (2) selling property to related entities at highly inflated prices, often exceeding twice purported purchase price, in order to use the inflated purchase price to borrow money from multiple parties; (3) borrowing money from multiple parties using short term exorbitantly high interest rate (often exceeding 100% per annum) loans secured by mortgages on the properties, but purposely not recording the mortgages, or subsequently releasing the mortgages, or subordinating the mortgages, in order to allow selected lenders to foreclose on the property to the detriment of other creditors, including Cosimo and CIF; (4) using loan proceeds to pay other debts on other projects that were not obligations of WE3; and (5) transferring property from WE3 to stockholders without paying fair consideration or any consideration.  Examples of these culpable acts are described below.

194.     On August 29, 2003, WE3 purchased Lot 60 Moonlight Bay Subdivision for $95,000 from Landman Development, LLC, owned and managed by Ray Harris.  On the same day, WE3 then sold Lot 60 Moonlight Bay Subdivision for $175,000, to Defendant Steele Construction of SC, Inc., owned and operated by William Davidson and Defendant Philip Davidson. With that purchase, Defendant Steele Construction of SC, Inc. granted a mortgage on Lot 60 Moonlight Bay Subdivision in the amount of $35,000 to WE3. WE3 did not receive any

mortgage payment from Defendant Steele Construction of SC, Inc. Also on the same day, August 29, 2003, Steele Construction of SC, Inc. granted a mortgage on Lot 60 Moonlight Bay Subdivision in the amount of $380,000 to Stock Building Supplies, Inc.    Stock Building Supplies, Inc., a building supply company, sold building materials to various defendants including, but not limited to, Defendants Steele Construction of SC, Inc., Neighborhood Homes, LLC, Total Package Grading; Seed Construction, Apex Construction, Southridge Construction, Inc., and Saneski, LLC.  The materials sold to these companies were not used for the benefit of WE3, but were used on other projects for the benefit of these companies, their owners and other defendants. WE3 did not receive any payment from Defendant Steele Construction of SC, Inc. for the purchase of the property.  The purported gain on the sale of this property was not reported on any income tax returns of WE3 or its stockholders. On July 30, 2004, WE3 assigned the mortgage secured by Lot 60 Moonlight Bay Subdivision in the amount of $35,000 owed by Defendant Steele Construction of SC, Inc. to Faulstine Smith in exchange for $20,000. On April 22, 2005, Defendant Steele Construction of SC, Inc. sold Lot 60 Moonlight Bay Subdivision to H. Stephen Blythe and Julia Anne Blythe in the amount of $376,000. Proceeds from the sale of the property were paid to Stock Building Supplies, Inc. The purported gain on the sale of this property was not reported on any income tax returns of Defendant Steele Construction of SC, Inc. or its stockholders. Defendant David Gantt acted as attorney for WE3 and Defendant Steele Construction of SC, Inc., handling all of the sales and loan closings.

195.       On October 6, 2003, WE3 purchased Lot 12 Keowee Inlet from Joanne McClellan for $55,000, and WE3 granted a mortgage to Defendant Construction Resources, Inc. in the amount of $29,300 secured by Lot 12 Keowee Inlet. Defendant David Gantt acted as attorney handling the closing. Two days later, on October 8, 2003, WE3 sold Lot 12 Keowee Inlet to Defendant Construction Resources, Inc. for $146,500, an increase of $91,500 in just 2 days. Defendant David Gantt acted as attorney handling the closing. WE3 did not receive any payment

from Construction Resources, Inc. for the purchase of the property. The purported gain on the sale of this property was not reported on any income tax returns of WE3 or its stockholders.

196.     On August 18, 2004, WE3 purchased the remaining Water's Edge lots ("Waters Edge Project") from Water's Edge, Inc. for $2,036,021. To fund the purchase, Water's Edge, Inc. provided seller financing via a $1,520,000 first mortgage loan. WE3 also borrowed an additional $400,000 through a second mortgage loan provided by Sandra Cisson.

197.     On September 30, 2004, Cosimo wrote a check to WE3 in the amount of $205,000. The check was recorded as a loan on Cosimo's books. However, Cosimo did not obtain a promissory note, mortgage, guaranty, or any other form of loan document. Thus, the $205,000 payment was undocumented.

198.     On December 22, 2004, Cosimo loaned WE3 $595,000. The loan was secured by a first mortgage on three parcels owned by WE3. An unrelated law firm handled the loan closing. The loan closing statement reflected the loan was for $595,000, of which $197,027.74 of the proceeds were used to repay the loan made on September 30, 2004 and $210,000 was used to pay for lot releases from Water's Edge, Inc.

199.     On October 31, 2005, Cosimo provided a loan commitment letter to WE3, which stated the terms of a $940,000 loan Cosimo would make to WE3. The commitment provided that (1) Cosimo would loan WE3 a maximum amount of $940,000; (2) the loan was to be secured by a first mortgage on several parcels and a second mortgage on several other parcels of the Waters Edge Project; and (3)   WE3 would use proceeds of the loan to develop the Water Edge Project. On November 1, 2005, Cosimo's loan to WE3 was consummated and was secured by a first mortgage on several parcels and a second mortgage on several other parcels of the Waters Edge Project. Cosimo disbursed $537,000 at the closing of the loan. Defendant David Gantt acted as attorney handling the closing. From November 2005 through March 2006, Cosimo disbursed $273,300 to WE3 by bank wire and check, disbursed $30,000 to Defendant

Total Package Grading by check, and disbursed $1,200 to Carolina Pops, purportedly a non-profit music organization run by Defendant Arthur Field. Cosimo recorded these disbursements as loans to WE3. Additionally, Cosimo increased the WE3 loan balances by $98,000 through a series of convoluted journal entries giving the appearance that WE3 paid Cosimo interest on the loans, even though Cosimo never received any interest payments. As of April 5, 2006, the outstanding loan balance was $940,000.

200.     From 2004 through 2007, with the mutual cooperation of Defendants Arthur Field, Scott Pfeiffer, David Gantt, Eugene Hopper, Charles Pinion and Mark Davidson, and with funds borrowed from CIF, Cosimo disbursed an additional $2.4 million plus to entities that were controlled by these same defendants and which included, but were not limited to, Defendants Badger Development, LLC, GodProp, LLC, Lot 6 Lakewater Cove, LLC, Lot 37 Waters Edge, LLC, Lot 46 Waters Edge, LLC, Southridge Construction, Inc., Log Dirt, LLC; and Saneski, LLC. The amounts Cosimo loaned included:

| | | | |
|---|---|---|---|
| a. | Badger Development, LLC | 3-12-04 | $ 305,000 |
| b. | GodProp, LLC | 11-6-06 | 150,000 |
| c. | Lot 6 Lakewater Cove, LLC | 7-24-06 | 320,000 |
| d. | Lot 37 Waters Edge, LLC | 7-27-06 | 169,000 |
| e. | Lot 46 Waters Edge, LLC | 7-27-06 | 230,000 |
| f. | Southridge Construction, Inc. | 8-24-05 | 150,000 |
| g. | Log Dirt, LLC | 3-20-07 | 150,000 |
| h. | Saneski, LLC | 1-24-07 | 50,000 |
| i. | Big Deal Land Company, LLC | 11-16-07 | 462,100 |
| j. | Rolling Hills Land Co., LLC | 11-16-07 | 470,000 |
| | Total | | $2,456,100 |

These loans were reportedly made for the purpose of purchasing and developing lots at the Waters Edge Project, when in reality, actual development of the property never occurred. Defendant David Gantt acted as attorney handling most, if not all, of these closings.

201.     From 2004 through 2007, Cosimo recorded interest payments in a variety of ways, giving the appearance of having received interest on these loans, when in reality most of the amounts recorded as interest payments were simply a result of manipulations of closings and

transfers from other entities, many of which were handled through Defendant Pfeiffer, Gantt & Gleaton, P.A.'s attorney trust account, which would allow Defendants Pfeiffer and Gantt to use funds available from one closing to be re-characterized and transferred back to Cosimo as interest payments, thus perpetuating the Ponzi scheme.

202.      Between 2004 through 2007, while Defendant Eugene Hopper controlled the cash accounts of WE3, Defendant Mark Davidson observed and became aware of manipulations and transfers of cash between the various defendant entities. On December 15, 2005, in an email sent by Defendant Mark Davidson to Defendants Scott Pfeiffer, David Gantt, and Eugene Hopper, Defendant Mark Davidson expressed his concerns and objections about improper transfers and payments, most of which were for the benefit of entities from which he did not derive any benefit. In his email, Defendant Mark Davidson made the following comments to Defendants Eugene Hopper:

> "I asked you to personally evaluate the road situation, gave you a little bit of my opinion regarding what WE3 is doing about the Cosimo funded infrastructure, and expressed a concern that I have (personally) regarded me participating in what looks like "skimming" of company profits"

> "It is pretty obvious to anybody looking that we (WE3 partners) continue to struggle with insufficient cash flow. We do not hide the fact that we have multiple companies that do work across company lines…etc. This is not "new" nor is it something that any of us are particularly proud of.  However, to continue doing things that jeopardize our company's success is foolish."

> "if it quacks/waddles/looks like a duck… it's probably a duck"

To his credit, Defendant Mark Davidson understood the illegal nature of the dealing and insisted on terminating his direct involvement in WE3.  However, in terminating his involvement with WE3, Defendants Eugene Hopper and Charles Pinion, Defendant Mark Davidson merely perpetuated the series of fraudulent transactions that gave rise to Defendant Davidson's reasons for wanting out.  By 2007, Defendant Mark Davidson orchestrated the transfer of approximately one third of WE3's land to him for virtually no consideration.  The transfer was painted to be a redemption of Defendant Mark Davidson's one third ownership in WE3 – he gave his stock in

WE3 back to WE3 and in return WE3 transferred land to him, and no money changed hands. However, upon scrutiny of the transactions, the transfers were yet another money laundering scheme. At the time of the transfers, all of WE3's properties should have been subject to first mortgage liens payable to Cosimo. But with the cooperation of Defendants Scott Pfeiffer, David Gantt, Eugene Hopper, and Charles Pinion, Cosimo's mortgages on the transferred parcels were released, thereby allowing the land to be transferred to Defendant Mark Davidson free of Cosimo's debt. Moreover, at the time of the transfers, WE3 was insolvent and was in default on its loans with Cosimo and other lenders, rendering any transfers of property without consideration to be illegal and in avoidance of WE3's creditors. Later in 2007, Defendant Mark Davidson sold these properties (which he paid virtually nothing for) back to WE3 for the inflated price of $1 million and received cash and a promissory note and mortgage on the properties. Defendant David Gantt acted as attorney for this closing. In 2010, through a convoluted legal proceeding, Defendant Mark Davidson foreclosed on the WE3 loans and reacquired the properties from WE3. Had these transfers been legitimate, WE3 and Defendant Mark Davidson would have both reported substantial taxable gains on their respective tax returns, as these exchanges of land for stock would not have qualified as tax-free exchanges. As it was, neither WE3 nor Defendant Mark Davidson reported these property transfers on income tax returns, further supporting these transactions to be illegal money laundering schemes.

203.    As noted above, on July 27, 2006, Cosimo loaned $230,000 to Lot 46 Waters Edge, LLC, described as a South Carolina limited liability company. The signatory on behalf of Lot 46 Waters Edge, LLC was Defendant Gene Ahlers, a business associate of Defendant Eugene Hopper. Notably, Lot 46 Waters Edge, LLC was never organized or registered with the South Carolina Secretary of State and therefore was fictitious entity. The loan was documented to have been secured by a first lien on Lot 46 Waters Edge. The proceeds were allegedly used to purchase the lot from WE3. Defendant David Gantt acted as attorney for this closing. On

February 19, 2007, Lot 46 Waters Edge was split into two separate lots, Lot 46(A) Waters Edge and Lot 46(B) Waters Edge. On March 7, 2007, WE3 mortgaged Lot 46(B) to 1st Equitable, LLC, which was owned and operated by George Albright, in the amount of $125,000. Defendant David Gantt acted as attorney for this closing. On March 9, 2007, Defendant Scott Pfeiffer, on behalf of Cosimo, released its mortgage on Lot 46(B) without Cosimo receiving any consideration in exchange. Fast forward to 2009, on February 15, 2009, Lot 46(A) and Lot 46(B) were sold pursuant to a tax sale. On February 25, 2009, Defendant F. Scott Pfeiffer, on behalf of Cosimo, and George Albright, on behalf of 1st Equitable, LLC, redeemed the property by paying the delinquent taxes for the benefit of Lot 46 Waters Edge, LLC. On June 1, 2009, Lot 46 Waters Edge, LLC transfers its interest in Lot 46(A) Waters Edge and Lot 46(B) Waters Edge to Cosimo and 1st Equitable, LLC, to be held 25% by Cosimo and 75% by 1st Equitable, LLC. Cosimo issued a $42,500 credit on WE3's consolidated note in exchange therefore.

204.     By October 2007, while dealing with the pressures of the investigation by the Securities Division and with knowledge of the Securities Division having filed its "Notice of Intent to Seek the Issuance of a Stop Order Denying Effectiveness to a Registration Statement", Defendants Arthur Field and Scott Pfeiffer devised a plan to remove Cosimo's interest in WE3's assets through a structured and coordinated foreclosure process, which would obscure the illegal and convoluted transactions previously conducted with regard to WE3 and WE3's assets. The plan laundered approximately $1,250,000 through a series of transactions and entities, which eventually allowed the remaining WE3 property to be taken through foreclosure proceedings, thereby eliminating most or all of Cosimo's collateral and rendering Cosimo's loans uncollectible and worthless.

205.     In October 2007, Defendants Arthur Field directed and controlled the transfer of approximately $1,250,000 through an attorney trust account in New Jersey to Robert Miller (aka Robert Post), who was an attorney in New Jersey and in Michigan. Robert Miller in turn

transferred the funds to Urbis Group, LLC, which then moved the funds to Avatar Income Fund II, LLC, a company owned or controlled by Thomas Roy Hazelrigg, IV, who resided in Seattle, Washington, where Defendant Jack Campitelli resided. Defendant Mike Parrish and Dennis Hackney, who were recommended by Robert Miller, served as loan brokers and instigated the loan on behalf of WE3 and Avatar Income Fund II, LLC.

206.     Funded by this series of transfers, Avatar Income Fund II, LLC loaned $1,250,000 to WE3 on November 7, 2007, and in exchange received a first lien on all of WE3's property at Waters Edge, including property previously sold to other third party purchasers, and including WE3 properties that would have been subject to first priority liens securing Cosimo's loans if Defendant Scott Pfeiffer's had not culpably and willfully previously released the liens without just consideration to WE3.   Defendant David Gantt oversaw the closing, issued the title insurance policy, and prepared the closing statement, which reflected the following disbursements:

    a.    $343,848 was paid to Avatar Financial Group for the following:
        i.    $60,800 paid as a loan origination fee;
        ii.    $212,800 paid as prepayment of interest for months;
        iii.    $60,000 paid as a "marketing holdback" (a term undefined);
        iv.    $6,193 paid for payment of future property taxes to be held in escrow;
        v.    $3,040 paid as a service fee;
        vi.    $1,015 paid as a credit, background, and environmental fee (even though no due diligence was performed in connection with the loan);
    b.    $45,600 was paid to Parish Capital as a mortgage broker fee;
    c.    $5,606 was paid to Defendant P&G Title Agency, LLC as an inspection fee;
    d.    $1,222 was paid to Defendant Pfeiffer Gantt & Gleaton, PA as an inspection fee;
    e.    $13,816 was paid to Oconee County Treasurer for 2006 and 2007 property taxes;
    f.    $10,619 was paid to Water's Edge of Lake Keowee for HOA fees owed in 2006
    g.    $5,000 payable to Womble Carlyle Law Firm for lender's attorney fees,
    h.    $2,376 for title insurance premiums and recording fees,
    i.    $584 was paid to Southern Titles & Properties/Jerry Mote for title abstract fee (notably, this report acknowledged priority interests in the property which were ignored by Defendant David Gantt);
    j.    $179,439 was paid to Troy Grant, Grace Crow and Charles Walker;
    k.    $51,500 was paid to Troy Grant;
    l.    $123,288 was paid to Defendant Instant Cash, Inc.;
    m.    $618,117 was paid to Cosimo, which, by signatures of Defendant Scott Pfeiffer as Manager for Cosimo, released all of its lien interests in WE3 properties in exchange for payment of $230,386 in principal, $87,731 in interest, and $300,000

for boat slips (despite having an outstanding loan with WE3 in excess of $2,900,000 secured solely by the WE3 assets); and

n.     $53,419 was paid to WE3.

This loan was made at a time when WE3 was delinquent on its Cosimo loans and other debts, had no source of cash flow, had no source of repayment, and was insolvent. Moreover, the principals of WE3 (Defendants Eugene Hopper and Charles Pinion) were in default on more than $3 million in Cosimo loans related to other projects (Sweetwater Subdivision and Highlands). Clearly, the transfers made were not for the purpose of a *bona fide* loan, but were in furtherance of the money laundering scheme.

207.     On November 13, 2007, Avatar Income Fund II, LLC, assigned its WE3 note and mortgage to William Bingham and Beverly Bingham.

208.     On November 13, 2007, Defendants Dennis Hackney and Michael Loprieno formed LOP Capital, LLC, a New Mexico limited liability company, which become involved as more fully described below in the section entitled "(4) Highlands".

209.     On November 15, 2007, Cosimo, under the direct control and management of Defendants Arthur Field and Scott Pfeiffer, received, deposited, and recorded $618,117 received from the aforementioned closing, and recorded the deposit on Cosimo's books as follows:

a.     $300,000 recorded as a "transfer" – discussed more fully below;
b.     $230,386 recorded as repayment of principal on three Cosimo loans to parties other than WE3 as follows:
    i.     $150,000 on Cosimo's loan to Defendant Log Dirt, LLC;
    ii.     $50,000 on Cosimo's loan to Defendant Saneski, LLC;
    iii.     $30,386 on Cosimo's loan to Defendant Southridge Construction, Inc.;
c.     $63,831 recorded as payments of interest on Cosimo loans to parties other than WE3 as follows:
    i.     $1,225 on Cosimo's loan to Defendant Badger Development, LLC;
    ii.     $6,933 on Cosimo's loan to Defendant Lot 6 Lakewater Cove, LLC;
    iii.     $3,662 on Cosimo's loan to Defendant Lot 37 Waters Edge, LLC;
    iv.     $4,983 on Cosimo's loan to Defendant Lot 46 Waters Edge, LLC;
    v.     $1,167 on Cosimo's loan to Defendant Saneski, LLC;
    vi.     $3,500 on Cosimo's loan to Defendant Southridge Construction, Inc.;
    vii.     $12,600 on Cosimo's loan to Defendant Badger Development, LLC;
    viii.     $17,100 on Cosimo's loan to Defendant Badger Development, LLC;
    ix.     $12,661 on Cosimo's loan to Defendant Badger Development, LLC;

d.  $23,900 recorded as payments of loan origination fees on Cosimo's loans as follows:
    i.   $9,000 on Cosimo's loan to Defendant Badger Development, LLC;
    ii.  $1,500 on Cosimo's loan to Defendant Southridge Construction, Inc.; and
    iii. $13,400 on Cosimo's loan to WE3.

210.    On November 16, 2007, Cosimo, under the direct control and management of Defendants Arthur Field and Scott Pfeiffer, issued a $300,000 check to Big Deal Land Company. The check was undocumented and was not supported by any loan documents. The check was funded by the portion of $618,117 loan proceeds received from Avatar Income Fund II, LLC one day earlier; that portion being the $300,000 amount recorded as a "transfer". The check was also recorded as a "transfer", and therefore offset the $300,000 deposit amount recorded as a "transfer". In other words, this money laundering scheme had Avatar Income Fund II, LLC transfer $300,000 to Cosimo, dressed as a loan to WE3, then had Cosimo transfer $300,000 to Big Deal Land Company, and had Cosimo record these transactions in its books using a little used and obscure account that hid the real result, the result being a $300,000 transfer Big Deal Land Company. Big Deal Land Company never repaid Cosimo or CIF the $300,000.

211.    On November 16, 2007, in furtherance of their devious and culpable plan, Defendants Arthur Field and Scott Pfeiffer had Cosimo wire $470,000, of the $618,117 it received from the Avatar Income Fund II, LLC loan closing, to Runyan & Green, LLC, a law firm located in Toccoa, Georgia, who in turn used such amounts to fund Cosimo's consolidation of its loan to Rolling Hills Rolling Hills Land Company, LLC. This led to yet another series of money laundering transactions, which are also more fully described below in the section entitled "(4) Highlands".

212.    In August and September 2009, Defendants Arthur Field, Scott Pfeiffer, Eugene Hopper and Charles Pinion provided written and oral statements to CIF's Receiver that Cosimo's loan to WE3 was secured by first mortgages on approximately 100 acres of interior lots at Waters Edge.

213.     By 2010, Avatar Income Fund II, LLC filed a foreclosure action against WE3, in connection with the $1,520,000 loan from Avatar Income Fund II, LLC, even though the loan and mortgage had been assigned to William Bingham and Beverly Bingham. The foreclosure action sought to foreclose on the WE3 properties that were previously pledged as collateral on Cosimo's loans to WE3, but had been released as collateral on Cosimo's loans by the aforementioned actions of Defendant Scott Pfeiffer. On February 24, 2010, a foreclosure hearing was held and a foreclosure sale was ordered.  On April 5, 2010, William Bingham and Beverly Bingham offered a price of $1,550,000 at the foreclosure sale and were awarded title to the WE3 properties. On July 28, 2010, William Bingham and Beverly Bingham were granted a title to the WE3 properties, thereby eliminating most if not all of Cosimo's collateral and rendering Cosimo's loans uncollectible and worthless.

214.     In March 2010, with WE3 having been in default on its loans from Cosimo for several years, CIF's Receiver exercised Cosimo's rights under the stockholders' pledge agreements and took over the ownership and management of WE3.  Subsequently, through multiple legal processes including bankruptcy filings by WE3, CIF's Receiver and attorneys discovered that Cosimo's loan to WE3 is secured by first mortgages on only 3 interior lots of nominal value at Waters Edge, and that the mortgage liens on other lots have been subordinated or released, leaving the $2.9 million loan essentially unsecured and uncollectible. The development of the project was, at best, nominally started, and was never completed.  The only sign of any development activity by WE3 on the property is a dirt road with nominal amounts of partial incomplete curbing and a partially completed tennis court.

215.     Thus, over the course of the years, Cosimo's first mortgage positions had been inappropriately released by Defendants Scott Pfeiffer and David Gantt in order to perpetuate the Ponzi scheme, the result of which was to leave Cosimo loans to WE3 unsecured or subordinate

to others. The end result of this mad scramble was to leave Cosimo with a single consolidated note from WE3 in the amount of $2,956,200 with very little, if any, collateral.

216.    In summary, the Waters Edge Project was and is a miserable financial debacle and disaster. The aforementioned members of the Hopper Syndicate unconscionably borrowed $2.9 million from Cosimo, funded by CIF, to acquired 100 acres of interior unfinished lots on Lake Keowee, made only nominal effort to improve the property, transferred the properties to more than a dozen parties with little or no consideration, and left Cosimo and CIF holding worthless promissory notes secured by nothing of value. The aforementioned defendants willfully and intentionally perpetrated dozens of convoluted exchanges and transfers of deeds, mortgages, releases, and subordinations of mortgages, in order to mask and obscure their money laundering enterprises, all without care or concern of the substantial loss to CIF and Cosimo.

217.    The culpable and illegal nature of these activities surrounding this project as an enterprise is evidenced by the lack of formal accounting records, failure to keep records to record cash transactions, failure to report cash transactions on income tax returns and IRS Form 1099, and failure to file income tax returns.

### (4)    Highlands

218.    From 2000 through 2009, certain members of Hopper's Syndicate engaged in money laundering schemes using a lakefront project in Georgia as the primary vehicle for culpable activities. The lakefront development was located on Lake Hartwell, in Stephens County Georgia, and was commonly referred to as the "Highlands" project.  The project began between 2000 and 2004, with Paul Chalmers and Herman Pinion (father of Charles Pinion) initially acquiring the Highlands project and transferring various parcels between several persons and entities, thereby obscuring titles, values, and debts. By 2004, participants in the schemes had expanded to include Rolling Hills Land Company, LLC ("Rolling Hills"), Big Deal Land Co., LLC ("Big Deal"), The Woods of Lake Oconee, LLC, High Lake, LLC, Cory Chambers, James

Hasick, Dennis Pifer, Kathy Pifer, KDP Inc, Rhododendron, LLC, and Defendants Eugene Hopper, Charles Pinion, Josh Ward, Gene Ahlers, and Neighborhood Homes, LLC. By 2008, participants in the schemes had expanded further to include Defendants Mike Loprieno, Brian Knight, Dennis Hackney, Michael Parish, CapGain Properties, Inc., LOP Capital, LLC, Strategic Lending Solutions, LLC, United Private Capital, Inc., Jack Campitelli (aka A.J. Camp), Jamie McKeough, J.G. "Geneva" Seller (a/k/a Geneva Campitelli), J.G. Ryckman, D. L. Jones, Shawna Freeman, Nevada Processing Center, Inc., Onward Recovery Partners Corporation, and Onward Finance Corporation.

219.     In 2004, Rolling Hills and Big Deal acquired 63$^{\pm}$ acres at the Highlands. The properties were previously titled in the names of The Woods of Lake Oconee, LLC, High Lake, LLC, or Paul Chalmers. The deeds transferring title stated the consideration paid was $10 and "other valuable consideration", though the other consideration was not specified.

220.     In December 2006, under the direction and control of Defendants Arthur Field and Scott Pfeiffer, Cosimo issued, on behalf of Rolling Hills and Big Deal, Standby Letters of Credits in favor of Cory Chambers, James Hasick, Dennis Pifer, and KDP Inc. (collectively "LOC Beneficiaries"), which promised that Cosimo would pay a total of $462,100 to the LOC Beneficiaries on February 28, 2007.  Cosimo's loan documents stated that the loan was made to secure $462,100 loaned from LOC Beneficiaries to the subdivision known as Sweetwater Cove, South Carolina, a project not related to the Highlands project (further evidence of the propensity of Hopper's Syndicate's to comingle funds, assets, debts, and so forth between various projects). Cosimo's loan documents further stated that the loan would be secured by a title insured first real estate mortgage on 63± acres in Toccoa, Stephens County, Georgia. Cosimo did not get a title insured first real estate mortgage on the entire 63$^{\pm}$ acre parcel.  Rolling Hills and Big Deal never acquired any more property at the Highlands.  On February 28, 2007, Cosimo remitted checks totaling $462,100 to the LOC Beneficiaries.  Cosimo recorded these payments as loans to Big

Deal. By October 2007, Cosimo had loaned Big Deal an additional $500,000 and had outstanding Standby Letters of Credits issued for the benefit of Rolling Hills and Big Deal totaling $260,000.

221.     On November 15 and 16, 2007, while dealing with the pressures of the investigation by the Securities Division and with knowledge of the Securities Division having filed its "Notice of Intent to Seek the Issuance of a Stop Order Denying Effectiveness to a Registration Statement", Defendants Arthur Field and Scott Pfeiffer scurried to obscure Cosimo's convoluted mess of loans they had perpetrated.  As of that date, Defendants Scott Pfeiffer, David Gantt, Eugene Hopper, Charles Pinion, Josh Ward, and Reba Cox executed documents in an attempt to make various loans appear to be consolidated into a single loan made to Rolling Hills and Big Deal.  Commensurate with this consolidation loan, Rolling Hills and Big Deal executed a "Consolidation Promissory Note" payable to Cosimo in the amount of $1,256,000. The Consolidation Promissory Note provided for interest at a rate of 15% per annum, 13 monthly payments of $12,601 (based on a 30 year amortization payout), and a balloon payment of the outstanding balance on December 31, 2008.  Furthermore, commensurate with this "consolidation" loan, Cosimo unconscionably and with culpable intent loaned an additional $470,000 to Rolling Hills and Big Deal. All of this happened at a time when Rolling Hills and Big Deal were delinquent on its Cosimo loans and other debts, had no source of repayment, and were insolvent. Moreover, the principals of Rolling Hills and Big Deal (Defendants Eugene Hopper, Charles Pinion, and Josh Ward) were in default on more than $5 million in Cosimo loans related to other projects (Waters Edge and Sweetwater Subdivision).  Cosimo's loan documents stated the loan was to be secured by title insured first real estate mortgage and second first real estate mortgage on $63^{\pm}$ acres in Toccoa, Stephens County, Georgia.  At the time of this loan, not only did Cosimo not have a first mortgage on the property, but Defendants John Stenzinger, William Perry, III, and Louis Stacy, Jr. held first mortgages of $500,000 against

Rolling Hills.  The closing for this loan was handled by Andrea Runyan, an attorney employed by the law firm of Runyan and Green, LLC, located in Toccoa Georgia.

222.    On November 16, 2007, Cosimo wire transferred $470,000 to Runyan and Green, LLC and Andrea Runyan prepared a loan closing statement, which reported a $25,000 payment to Pfeiffer, Gantt & Gleaton for legal fees and $4,355 to paid Runyan and Green, LLC and others for legal fees, recording costs, title insurance premium, and other sundry items. The closing statement also reported $439,459 paid to the borrower; however, this payment was not received by Rolling Hills or Big Deal, but was diverted for culpable use.

223.    Also on November 16, 2007, Cosimo wrote a check in the amount of $300,000 to Big Deal.  No loan documents or other collaborating documents have been found to support this payment.  The payment was recorded as a transfer on Cosimo's books and was offset by an equal amount recorded as a deposit from a loan closing related to WE3 (yet another example of the propensity of Hopper's Syndicate's to comingle funds, assets, debts, and so forth between various projects).

224.    On January 31, 2008, Rolling Hills (and notably <u>not</u> Big Deal) executed and delivered a $950,000 promissory note ("LOP Capital 1st Note") in favor of Defendant LOP Capital, LLC ("Defendant LOP Capital"). This note was secured with a first mortgage on property described as The Highlands, totaling approximately 56.71$^\pm$ acres.[4]  Lake Hartwell, Toccoa, Georgia. The LOP Capital 1st Note provided for maturity in a mere 60 days, required a $95,000 "Funding Fee" paid to Defendant LOP Capital when the loan was funded, and further required $68,400 of the proceeds to be held by Defendant LOP Capital as prepayment of interest

_____

[4]The transfer of deeds and titles for the properties of this development, that took place prior to the appointment of a receiver, are a mess.  The property that is currently held by Defendants LOP Capital and CapGain, Inc. constitutes the major portion of the land contributed by Big Deal Land, LLC and Rolling Hills.  This portion of the overall development (referred to hereafter as "The Highlands property tract of 56.71$^\pm$ acres") is the subject of a *lis pendens* Plaintiff has filed to secure its rights in the same.

on the note.  Based on these amounts, the effective interest rate on amounts allegedly borrowed was more than 126%, calculated as follows:

| | | |
|---|---:|---:|
| Principal Sum Per LOP Capital 1st Note | | $950,000 |
| Less prepaid interest | $(68,400) | |
| Less Funding Fee | (95,000) | (163,400) |
| Effective Principal Borrowed | | $786,600 |

Effective Interest Rate  =  <u>126.36%</u> per year  *($163,400 / $786,600 / 60 x 365)*

The LOP Capital 1st Note recites the address of Rolling Hills as 200 A South Main Street, Greenville, South Carolina, which was the address of Pfeiffer, Gantt & Gleaton, P.A; all other records of Rolling Hills reflect its address to be in Seneca, South Carolina.  The fact that Rolling Hills was delinquent on its Cosimo loans and other debts, had no source of repayment for this loan, and was insolvent at the time this loan was made was irrelevant because the money laundering scheme never contemplated repayment of the loan. Commensurate with this loan closing, Defendant Scott Pfeiffer, on behalf of Cosimo, executed a subordination agreement ("Cosimo Subordination Agreement"), which allowed the LOP Capital 1st Note and mortgage to be superior to Cosimo's mortgage on the Rolling Hills and Big Deal properties. Most importantly, there was no valuable consideration given to Cosimo by Defendant LOP Capital in exchange for the Cosimo Subordination Agreement, which was executed a mere 77 days after Cosimo loaned Rolling Hills and Big Deal an additional $470,000 and consolidated the various loans to Rolling Hills and Big Deal, thereby resulting in a total loan outstanding of $1.256 million as of November 16, 2007.  Defendant LOP Capital performed no due diligence on the entities or their principals prior to loaning Rolling Hills and Big Deal money as the loan was merely a façade to disguise the scheme to launder money within Hopper's Syndicate.

225.      On January 31, 2008, in connection with LOP Capital 1st Note, Andrea Runyan, attorney at Runyan and Green, LLC, prepared a loan closing statement, which reported $950,000 loan proceeds disbursed as follows:

a.   $302,500 paid to Louis Stacy to pay off his first lien on the Highlands;
b.   $151,250 paid to John Stenzinger to pay off his first lien on the Highlands;
c.   $151,250 paid to William Perry to pay off his first lien on the Highlands;
d.   $19,000 paid to Brian Devlin for broker fees;
e.   $9,500 paid to Defendant Mike Parish as a consulting fee;
f.   $95,000 paid to Defendant LOP Capital for loan origination fee;
g.   $68,400 paid to Defendant LOP Capital as prepaid interest;
h.   $500 paid to Defendant LOP Capital for document preparation;
i.   $4,806 paid to Runyan and Green, LLC and others, for title insurance binder, legal fees, title insurance and various sundry costs;
j.   $5,215 paid for property taxes
k.   $142,578.62 paid to Rolling Hills as net cash loan proceeds.

The $142,578.62 was never received by Rolling Hills, but was diverted for culpable use.

226.      On February 15, 2008, the membership interests in Cosimo were ostensibly sold, transferred, or exchanged by a conveyance to Onward Recovery Partners Corporation, a Nevada corporation, which was organized by, owned by, and or controlled by J.G. Ryckman, Jack Campitelli (aka A.J. Camp), Jamie McKeough, J.G. "Geneva" Seller (a/k/a Geneva Campitelli), J.G. Ryckman, D. L. Jones, Shawna Freeman, Nevada Processing Center, Inc., and or Onward Finance Corporation, or combinations thereof.  The "Membership Interest Purchase Agreement" was executed by Defendants Ross Jones, Scott Pfeiffer, and J.G. Ryckman.

227.      Between February 15, 2008 and March 28, 2008, Defendants Scott Pfeiffer and Ross Jones claim to have resigned their positions as Co-Manager of Cosimo and Defendant Jamie McKeough claims to have been appointed Manager of Cosimo. Defendant Jamie McKeough claims to have served as Manager for Cosimo until he resigned on April 8, 2008.

228.      On March 28, 2008, Defendant LOP Capital entered into another loan to Rolling Hills in the amount of $275,000 ("LOP Capital 2nd Note").  The LOP Capital 2nd Note is dated **January 31, 2008 [emphasis added]**, This 2nd note was secured with a mortgage on property referred herein as "The Highlands property tract of 56.71$^{\pm}$ acres," Lake Hartwell, Toccoa, Georgia.  The LOP Capital 2nd Note provided for maturity in a mere 60 days, required a $22,000 "Funding Fee" paid to Defendant LOP Capital when the loan was funded, and further required $18,087 of the proceeds to be held by Defendant LOP Capital as prepayment of interest on the

note.  Based on these amounts, the effective interest rate on amounts allegedly borrowed was more than 102%, calculated as follows:

| | | |
|---|---:|---:|
| Principal Sum Per Plaintiff Second Note | | $275,000 |
| Less Payment Reserve | $(18,087) | |
| Less Funding Fee | (22,000) | (40,087) |
| Effective Principal Borrowed | | $234,913 |

Effective Interest Rate  =  <u>102.11%</u> per year *($40,087 / $234,913 / 61 x 365)*

The fact that Rolling Hills was delinquent on the $1.256 million Cosimo loan, had no source of repayment for this loan, had no source of repayment for the $950,000 that was required to be paid on the LOP Capital 1st Note in 2 more days (March 31, 2008), and was insolvent at the time this loan was made was irrelevant because the money laundering scheme never contemplated repayment of these loans.

229.        On March 28, 2008, in connection with LOP Capital 2nd Note, Andrea Runyan, attorney at Runyan and Green, LLC, prepared a loan closing statement, which reported $275,000 loan proceeds disbursed as follows

a.        $22,000 paid to Defendant LOP Capital for loan origination fee;
b.        $11,000 paid to Defendant LOP Capital as prepaid interest;
c.        $2,902 paid to Runyan and Green, LLC and others, for title insurance binder, legal fees, title insurance and various sundry costs;
d.        $18,086.54 charged as "Loan In process account"
e.        $221,021.21 paid to Neighborhood Homes, LLC as net loan proceeds.

The $18,086.54 amount charged as "Loan in process account" is an undocumented charge and was not paid to or for the benefit of Rolling Hills.  The $221,021.21 payment to Neighborhood Homes, LLC was made pursuant to written instructions signed by Defendants Eugene Hopper and Charles Pinion. Neighborhood Homes, LLC had no other connection to the Highlands project and did not provide any goods or services to Rolling Hills.  (This disbursement was yet another example the Hopper's Syndicate's free flow method of comingling funds, assets, debts, and so forth between various projects, with total disregard to legal effect.)  Commensurate with

this loan closing, Rolling Hills executed and delivered a mortgage on the Rolling Hills property in favor of Defendant LOP Capital in connection with the LOP Capital 2nd Note. The mortgage is dated March 28, 2008 and LOP Capital 2nd Note presumably referred to in this mortgage is dated January 31, 2008.  Thus, Plaintiff Second Mortgage and Plaintiff Second Note are not of even dates. Importantly, Cosimo did not execute a subordination agreement in connection with this loan; thus, Cosimo's mortgage on Rolling Hills' properties was superior to Defendant LOP Capital's mortgage on this loan.

230.      On or about March 28, 2008, Defendant Jamie McKeough, acting as Manager for Cosimo, executed a "Conditional Assignment of Mortgage" in favor of Defendant LOP Capital. The Conditional Assignment of Mortgage was dated March 28, 2008 and was signed in the State of Washington, as denoted by the signature of Defendant J. G. Sellers, who signed the form as a Notary Public for Washington.  The Conditional Assignment of Mortgage denoted Cosimo's principal place of business being At Old Arcadia Road, Shelton, Washington, which is a location owned, used or controlled by Defendants Jack Campitelli (aka A.J. Camp), J.G. Ryckman, Jack Campitelli (aka A.J. Camp), Jamie McKeough, J.G. "Geneva" Seller (a/k/a Geneva Campitelli), J.G. Ryckman, D. L. Jones, Shawna Freeman, Nevada Processing Center, Inc., Onward Finance Corporation, and or Onward Recovery Partners Corporation.  The Conditional Assignment of Mortgage also states that the assignment is given "to secure payment of a $275,000 loan from Defendant LOP Capital to Cosimo of even date herewith".  Cosimo never executed any note payable to Defendant LOP Capital and never received $275,000 or any amount from Defendant LOP Capital.  The property which was the subject of the Conditional Assignment of Mortgage was owned by D&D Investments, a South Carolina partnership that had borrowed $500,000 from Cosimo in 2002. The D&D Investments loan, which had been in default for years, was secured by a 40 acre tract of commercial property located at an exit on I-85 in Spartanburg County, South Carolina.  Except for this Conditional Assignment of Mortgage, the D&D Investment loan and

the mortgaged property had no connection with the Defendants LOP Capital or any other member of the Hopper Syndicate.  The Conditional Assignment of Mortgage was simply a ploy to allow Defendant LOP Capital to mask the true nature of the transactions, being a money laundering scheme to pilfer money and properties from Cosimo and CIF, and should be satisfied of record in the Register of Deeds Office for Spartanburg County, South Carolina.

231.        On April 7, 2008, Defendant Jamie McKeough delivered a written letter of resignation thereby terminating his appointment as Manager of Cosimo.

232.        On May 1, 2008, Defendant Red Lion Trading House, LLC, owned by several Defendants, including Defendant Scott Pfeiffer, allegedly entered into a Management Agreement with "Onward Capital Partners, Inc." The Management Agreement stated "Onward Capital Partners, Inc." was a Nevada corporation and sole shareholder of Cosimo.  The agreement employed the services of Defendant Scott Pfeiffer and Paula Haney to manage Cosimo and provided for compensation paid monthly at an annual rate of $60,000.  The Nevada Secretary of State has no record of a Nevada corporation called "Onward Capital Partners, Inc." Two Management Agreements were executed as of the same date, each signed by a different president of Onward Capital Partners, Inc.  One was executed by a Defendant J.G. Ryckman as president, and the other was executed by Defendant Eugene Hopper as president.

233.        On July 9, 2008, Defendant LOP Capital and Rolling Hills entered into another loan in the amount of $112,000 ("LOP Capital 3rd Note"). The LOP Capital 3rd Note is dated July 9, 2008 and provided for maturity on August 9, 2008.  The LOP Capital 3rd Note required a $11,200 Funding Fee paid to the Defendant LOP Capital and further required $933 of the proceeds to be held by the Defendant LOP Capital as a Payment Reserve. Based on these amounts, the effective interest rate on amounts allegedly borrowed was more than 143%, calculated as follows:

| | | |
|---|---|---|
| Principal Sum Per Plaintiff Third Note | | $112,000 |
| Less Payment Reserve | $(11,200) | |
| Less Funding Fee | ( 933) | (12,133) |
| Effective Principal Borrowed | | $ 99,867 |

Effective Interest Rate   =   143.05% per year *($12,133 / 99,866 / 31 x 365)*

The facts that Rolling Hills was delinquent on the $1.256 million Cosimo loan, had no source of repayment of this loan, had no source of repayment for the $950,000 due under the LOP Capital 1st Note, which had been delinquent since March 31, 2008, had no source of repayment for the $275,000 due under the LOP Capital 2nd Note, which had been delinquent since May 28, 2008, and was insolvent at the time this loan was made are evidence that  the money laundering scheme never contemplated repayment of these loans.

234.      On December 22, 2008, Defendant LOP Capital filed a legal action in the State of Georgia styled "Complaint on Notes", alleging Rolling Hills defaulted its notes and monies due and owing.  Therein, Defendant LOP Capital conspired with other defendants to submit material misrepresentations to the Court for the purpose of obscuring and circumventing Cosimo's liens and in order to secure all of the value of the property and proceeds from its sale for their own benefit. Defendant LOP Capital stated both implicitly and explicitly within its complaint that Georgia law governed all three notes, despite the fact that the notes explicitly stated that the notes would be govern by and construed in accordance with the laws of the State of South Carolina. Defendant LOP Capital made these statements by commission and omission in order to circumvent any notice to creditors that would otherwise be required by South Carolina law. As a result, Cosimo did not receive any notice of the foreclosure action filed in court.  Defendant LOP Capital had specific knowledge that, while the LOP Capital 1st Note was superior to Cosimo's mortgage, the mortgages securing the LOP Capital 2nd and 3rd Notes were subordinate and junior to Cosimo's mortgage.  In cooperation with the various parties and in furtherance of the money laundering scheme, Defendants Eugene Hopper, Charles Pinion, and Josh Ward raised no

defense on behalf of Rolling Hills or Big Deal, thereby allowing Defendant LOP Capital to obtain an uncontested judgment against Rolling Hills.

235.     On February 18, 2009, Defendant LOP Capital obtained a default judgment against Rolling Hills in the amount of $1,414,482.97 and illicitly obtained an order to sell the properties at a foreclosure sale, despite the fact that Defendant LOP Capital's notes and mortgages did not grant Defendant LOP Capital a "Power of Sale". On April 20, 2009, Defendant LOP Capital then acquired the properties at the foreclosure sale by submitting a credit bid in the amount of $1,384,063.74, which resulted in a deficiency amount of $30,419.23 against Rolling Hills. On April 20, 2009, Defendant LOP Capital transferred one-half of its interest in the Rolling Hills properties to an affiliate, Defendant Strategic Lending Solutions, LLC. In August 2010, Defendant Strategic Lending Solutions, LLC transferred its interest in the Rolling Hills properties to another affiliate, Defendant United Private Capital, Inc. In January 2012, Defendant United Private Capital, Inc. transferred its interest in the Rolling Hills properties to yet another affiliate, Defendant CapGain Properties, Inc. The culpable and illegal nature of these activities surrounding this project as an enterprise is further evidenced by the failure to report the taxable gains and interest income attributed to these transactions on income tax returns. Plaintiff is informed and believes that the property was fraudulently transferred to these entities for the reasons stated herein, and should therefore to be determined by this Court to be held in a constructive trust for the plaintiff.

236.     On March 30, 2009, Defendant Scott Pfeiffer, as manager of Cosimo, recorded an Affidavit of Lost Assignment in reference to the Conditional Assignment of Mortgage, which was dated one year earlier (March 28, 2008). Section 3 of the Affidavit of Lost Assignment read as follows:

> The Manager of Cosimo, LLC, Jamie McKeough, signed a conditional Assignment of Mortgage dated March 28, 2008 assigning a mortgage on property located at **60 Indy Lane, Inman, South Carolina [Emphasis added]** ….

The property described in the Affidavit of Lost Assignment was not the property that is described in the Conditional Assignment of Mortgage, that is, it was not the 40.50 acres located in Spartanburg County in the State of South Carolina.

237.     On June 15, 2009, Defendant LOP Capital filed motions in court and, without providing an accounting thereof, was granted an amended judgment in the amount of $1,537,209.72, thereby increasing the deficiency amount to $153,145.98. Cosimo did not receive any notice of the motion to amended and increase the judgment and deficiency. In cooperation with the various parties and in furtherance of the money laundering scheme, Defendants Eugene Hopper, Charles Pinion, and Josh Ward raised no defense on behalf of Rolling Hills or Big Deal, thereby allowing Defendant LOP Capital to increase the deficiency judgment.

238.     On December 31, 2009, Defendant LOP Capital filed a lawsuit with the Court of Common Pleas in Spartanburg, South Carolina against the Cosimo and CIF seeking to use the fraudulently obtained Georgia judgment against Rolling Hills as a claim to enforce the Conditional Assignment of Mortgage, thereby asserting a security interest against, foreclosing on, and forcing the sale of the 40 acre parcel located in Spartanburg County, South Carolina, which was acquired by Cosimo with the aforementioned Deed in Lieu of Foreclosure. Defendant LOP Capital's action was dismissed on November 2, 2011, for technical reasons. On November 8, 2011, Defendant LOP filed a substantially identical action in the Court of Common Pleas, County of Spartanburg, South Carolina. That case is now pending. Upon information and belief, the Conditional Assignment of Mortgage upon which Defendant LOP Capital bases its claims is wholly fraudulent and devoid of merit, executed solely to perpetuate the fraud defendants conspired to harm the plaintiff.

239.     On December 6, 2011, CIF and Cosimo filed a lawsuit in the U.S. District Court in Greenville South Carolina against Defendants LOP Capital, Strategic Lending Solutions, LLC,

Michael Loprieno, Brian Knight, Dennis Hackney, and Michael Parish seeking to recover losses Cosimo and CIF sustained as a result of the culpable actions of the aforementioned defendants.

240.     In summary, over the course of the years, the aforementioned defendants, members of Hopper's Syndicate, had laundered $1.256 million of Cosimo and CIF loans under the guise of real estate development loans on the Highlands project, when, in reality, none of the funds were used to develop the property. Instead, Cosimo's and CIF's funds were used to perpetuate the Ponzi schemes, which purposefully left Cosimo holding a single $1.256 million consolidated note from Rolling Hills and Big Deal that was ultimately unsecured and uncollectible, but only after the aforementioned defendants had participated in the convoluted processes of making unscrupulous loans and devious transfers, and effecting wrongful and deceptive court proceedings.

### (5)    Sweetwater

241.     In 2003, Eagle Group, LLC, Sweetwater Development, LLC, Chad Kirby and Ted Liberty purchased approximately 118 acres on Lake Keowee in Oconee County, South Carolina ("Sweetwater Subdivision") for $2.3 million.  Sweetwater Development, LLC and Eagle Group, LLC were owned by Chad Kirby, Ted Liberty, Bob Kahn, and Bill Kahn. Chad Kirby is the cousin of Defendant Josh Ward.  Between 2003 and 2006, two houses were constructed on the Lot 22 and Lot 27 of the subdivision. The houses were held out for sale but were not sold, primarily because the subdivision was still largely undeveloped, which made the houses isolated and the subdivision desolate. Furthermore, development of the subdivision was severely limited because utility services at the property were insufficient to allow for further expansion and development. By March 2006, Sweetwater Development, LLC was delinquent on their loan with BB&T in the amount of $2,721,618 and their loan with Stock Building Supplies in the amount of $433,566.

242.     By March 2006, Chad Kirby approached Defendants Eugene Hopper, Charles Pinion and Josh Ward about purchasing the Sweetwater Subdivision. By this time, Defendants Eugene Hopper, Charles Pinion and Josh Ward were already connected to Cosimo and Defendants Arthur Field, Scott Pfeiffer, and David Gantt, having consummated numerous loans with Cosimo, all of which were in default. In furtherance of their money laundering schemes, Defendants Eugene Hopper, Charles Pinion and Josh Ward seized the opportunity to enroll Defendants Roger Ezell, Barry Lynn Spencer, Ben Hines, Instant Cash, Inc., Pfeiffer, Gantt & Gleaton, PA, Arthur Field, Scott Pfeiffer, David Gantt, and others to finance the $6.4 million purchase of Sweetwater Subdivision under the false pretense of developing a resort living community to be marketed and sold to buyers as fractional ownership interests.

243.     In March 2006, Cosimo, under the direction of Defendants Arthur Field and Scott Pfeiffer, obtained an appraisal on the Sweetwater Subdivision. The appraisal estimated the fair market value of the property "as is" to be $3,226,000.  This valuation was based on comparative sales in the area. It also provided an appraisal amount of $7,900,000.00 as a fully developed project, but assuming more than $3 million of development costs would be incurred, which they never were.

244.     In April 2006, Defendants Arthur Field, Scott Pfeiffer, David Gantt, Eugene Hopper, Charles Pinion, Josh Ward Roger Ezell, Barry Lynn Spencer, Ben Hines, and Instant Cash, Inc., formulated and executed a plan to fund the purchase of the Sweetwater Subdivision at a purchase price of $6,400,000, despite being faced with the following overwhelmingly dire and negative factors:

     a.    The appraisal on the Sweetwater Subdivision reported the property values at only $3,226,000 in its current stage of development;

     b.    Defendants Eugene Hopper, Charles Pinion, David Gantt, and Josh Ward had no material assets or net worth;

     c.    Defendants Eugene Hopper, Charles Pinion, and Josh Ward had no reliable and reoccurring source earnings or cash flow;

    d.      Defendants Eugene Hopper, Charles Pinion, David Gantt, and Josh Ward had no ability to pay any meaningful portion of the $6.4 million purchase price or the debt service debt thereof;

    e.      Defendants Eugene Hopper, Charles Pinion, and Josh Ward were delinquent on substantially all of their financial obligations to Cosimo and others;

    f.      Defendants Eugene Hopper and Charles Pinion had judgments against them for fraud;

    g.      Defendants Eugene Hopper had been convicted of securities fraud;

    h.      Defendants Eugene Hopper, Charles Pinion, David Gantt, and Josh Ward had very low credit scores;

    i.      Defendants Eugene Hopper, Charles Pinion, David Gantt, and Josh Ward had never completed a residential development;

    j.      Defendants Eugene Hopper, Charles Pinion, David Gantt, and Josh Ward had no money available for a down payment to purchase the property;

    k.      Defendants Eugene Hopper, Charles Pinion, David Gantt, and Josh Ward had no meaningful plans on how to develop the property

    l.      Defendants Eugene Hopper, Charles Pinion, David Gantt, and Josh Ward had no plans on how to acquire $3 million in funds needed to complete the development of the property

245.      In March 2006, in order to obtain the funds to pay for the closing costs of a loan needed to purchase the Sweetwater Subdivision, Sweetwater Development, LLC borrowed $150,000 from Lillian Sonne and secured the loan with a mortgage on Lot 27 in Sweetwater Subdivision. In exchange, Lillian Sonne paid Big Deal Land Company, LLC $150,000, which was used to pay for the closing costs related to the future purchase of the Sweetwater Subdivision. Big Deal Land Company, LLC was a company owned by Defendants Eugene Hopper and Charles Pinion. Defendant David Gantt acted as attorney and handled the loan closing.

246.      On April 27, 2006, Defendants Eugene Hopper, Charles Pinion, Josh Ward and David Gantt formed SD Trust, LLC ("SD Trust"), a South Carolina limited liability company. Defendant Pfeiffer, Gantt & Gleaton, PA handled the formation of SD Trust. Defendant David Gantt owned 50%, Defendant Eugene Hopper owned 16.67%, Defendant Charles Pinion owned 16.67% and Defendant Josh Ward owned 16.67%. Defendants David Gantt, Eugene Hopper, Charles Pinion, and Josh Ward did not contribute any cash or other assets in connection with the formation of SD Trust. SD Trust, LLC was setup as a means to launder money received from

CIF investors and CommunitySouth Bank and Trust through false mortgages, construction loans and direct investment loans, and disburse said funds to the principals and their family and friends through a myriad of entities and transactions.

247.     On April 28, 2006, SD Trust purchased the Sweetwater Subdivision for $6,450,000 from Eagle Group, LLC, Sweetwater Development, LLC, Ted Liberty and Chad Kirby. SD Trust financed the purchase with two loans: (1) Defendant Instant Cash, Inc. loaned SD Trust $4,175,000, and (2) Cosimo loaned SD Trust $2,000,000, with an annual interest rate of 16.5%. The note to Defendant Instant Cash, Inc. required a $2,000,000 payment within six months of the date of the note and provided for interest an annual rate of 18%. The first mortgage held by Defendant Instant Cash, Inc. did not include the two completed houses, which would have provided a substantial amount of collateral. Instead, the transaction required the ownership of two houses be transferred Defendant Roger Ezell upon completion of the development for which no consideration was provided. Cosimo's $2 million loan to SD Trust was secured by a second mortgage (behind Defendant Instant Cash's mortgage of $4,175,000) secured by the Sweetwater Subdivision less the two houses (Lot 22 and Lot 27). Defendant David Gantt acted as attorney for all parties and handled the closing.

248.     Defendant Instant Cash, Inc. obtained the funds for its $4,175,000 loan to SD Trust as follows: (a) Defendant Advance Business Funding, LLC, a South Carolina limited liability company, owned equally by Defendants Roger Ezell, Barry Lynn Spencer, and Ben Hines, contributed $1,175,000, to Defendant Instant Cash, Inc., and (b) Defendant Instant Cash, Inc. obtains a loan from Defendant CommunitySouth Bank and Trust in the amount of $3,000,000 at an annual interest rate of prime. At the time this loan was made, Defendant Barry Lynn Spencer was a board member of CommunitySouth Bank and Trust, and Defendant Roger Ezell was a major shareholder of CommunitySouth Bank and Trust.

249.      On April 28, 2006, Defendant Instant Cash, Inc. assigned to Defendant Advance Business Funding, LLC its $4,175,000 loan with SD Trust; thereby, providing an income source of approximately $40,000 per month profit on funds provided by CommunitySouth Bank and Trust.

250.      On May 8, 2006, Defendant Saneski, LLC, a South Carolina limited liability company, solely owned and controlled by Defendant Charles Pinion, obtained a mortgage in the amount of $1,000,0000 on the two houses (Lot 22 and Lot 27) of the Sweetwater Subdivision without any consideration given to SD Trust, LLC in exchange. Defendant David Gantt acted as attorney and handled the loan closing.

251.      On May 8, 2006, Troy Grant, Grace Crow, and Charles Walker obtained a mortgage in the amount of $250,000 on the completed house located on Lot 22 of the Sweetwater Subdivision without any consideration given to SD Trust in exchange. Defendant David Gantt acted as attorney and handled the loan closing.

252.      After purchasing the Sweetwater Subdivision, SD Trust sought to obtain capital funds through presales of the fractional interests in the homes allegedly to be constructed in the Sweetwater Subdivision, despite the fact that the Sweetwater Subdivision did not have adequate utilities to support more than a few houses. In an effort to obtain funds from pre-sales, SD Trust contracted with Capital Properties America, Inc. to market the investment opportunity to purchase a fractional interest in houses to be built in the Sweetwater Subdivision. On September 27, 2006, SD Trust paid Capital Properties America, Inc. $25,000 for their marketing efforts, despite failing to secure a single sale.

253.      Likewise, SD Trust also contacted with Destination Club Partners to prepare and implement a marketing plan to sell fractional interest in the development of the Sweetwater Subdivision. From October 2006 through November 2006, SD Trust paid Destination Club Partners $212,048 for marketing services, despite failing to secure a single sale.

254.    On June 1, 2006, SD Trust conveyed title to 11.74 Acres to Joe Harris and Shelley Harris, friends of Defendant Eugene Hopper, purportedly for a purchase price of $120,000; however, there is no record of any funds having ever been received by SD Trust in connection with this transaction.

255.    On July 11, 2006, Defendant Eugene Hopper identified a purchaser for the completed house located on Lot 22. Defendants Eugene Hopper and David Gantt flew to Florida to meet with the purchaser, Jason Alonzo, a Florida resident. Defendants Eugene Hopper and David Gantt negotiated the sale of the house located on Lot 22 to Jason Alonzo. The basic terms of the sale agreement provided that Defendant Eugene Hopper would prepare the fraudulent loan application in the amount of $795,000, submit the fraudulent loan application through his mortgage company, Defendant Lamplighter Mortgage Company, LLC, and Defendant David Gantt would close the loan. In exchange for Jason Alonzo's participation in the fraud, SD Trust would pay the mortgage payment, homeowner's insurance premium, and real property taxes, and would also pay Jason Alonzo a monthly fee of $1,500 and an additional fee of $50,000 upon completion of the development. Defendant David Gantt acted as attorney and handled the loan closing. Defendant David Gantt never disclosed to Jason Alonzo that he owned 50% of SD Trust. Although the funds were transferred by New Century Mortgage, Inc. to Defendant Lamplighter Mortgage, LLC, SD Trust never received the proceeds from this sale. Instead, $500,000 was paid to Defendant Saneski, LLC in satisfaction of the fictitious mortgage placed on the property prior to the sale, and $250,000 was paid to Troy Grant, Grace Crow, and Charles Walker in satisfaction of their fictitious mortgage placed on the property prior to the sale. The remaining amounts were used to pay broker fees, loan fees, title fees, legal fees and other related closing costs.

256.    On October 5, 2006, Defendant Eugene Hopper identified another purchaser for the completed house located on Lot 27. Defendants Eugene Hopper and David Gantt flew to

Florida to meet with the new purchaser, Amando Lopez, also a Florida resident. Defendants Eugene Hopper and David Gantt negotiated the sale of the house located on Lot 27 to Amando Lopez. The basic terms of the sale agreement provided that Defendant Eugene Hopper would prepare the fraudulent loan application in the amount of $745,000, submit the fraudulent loan application through his mortgage company, Defendant Lamplighter Mortgage Company, LLC, and Defendant David Gantt would close the loan. In exchange for Amando Lopez's participation in the fraud, SD Trust would pay the mortgage payment, homeowner's insurance premium, and real property taxes, and would pay Amando Lopez a monthly fee of $1,500 and an additional fee of $50,000 upon completion of the development. Defendant David Gantt acted as attorney and handled the loan closing. Defendant David Gantt never disclosed to Jason Alonzo that he owned 50% of SD Trust. Although the funds were transferred by New Century Mortgage, Inc. to Defendant Lamplighter Mortgage, LLC, SD Trust never received the full proceeds from this sale. Instead, $500,000 was paid to Defendant Saneski, LLC in satisfaction of the fictitious mortgage placed on the property prior to sale. The proceeds received by SD Trust from this sale were promptly paid to (a) Defendant Southridge Constructions Company, Inc. in the amount of approximately $187,000, (b) Cory Chambers in the amount of $73,826.67, (c) James Hasick in the amount of $21,093.33, and (d) Dennis Pifer in the amount of $119,020. Defendant Southridge Construction Company, Inc., Cory Chambers, and James Hasick provide no services or goods to SD Trust.

257.     On November 15, 2006, Defendant Josh Ward persuaded Faulstine Smith, a family friend, to invest $2,000,000 with SD Trust. Community First Bank agreed to lend Faulstine Smith $2,000,000.00 in exchange for a first mortgage on Faulstine Smith's family home (which consisted of approximately 7 acres adjoining the Sweetwater Subdivision) and a second lien on the Sweetwater Subdivision, thereby subordinating Cosimo's $2 million second on the subdivision. Furthermore, Community First Bank required that the funds be deposited

into two accounts: one account, with Faulstine Smith being the sole signatory, would contain $400,000 to be held as prepaid interest on the mortgage; and the second account, with Faulstine Smith and Defendant Josh Ward being joint and several signatories, which would contain $1,6 million and would be made available to Faulstine Smith to invest in SD Trust, LLC.  In exchange for subordinating Cosimo's mortgage in the Sweetwater Subdivision, Defendants Arthur Field and Scott Pfeiffer on behalf of Cosimo agreed to take a second mortgage on Faulstine Smith's family home.  Due to the conflicts of interest, First Community Bank would not allow Defendant David Gantt to close the transaction.  Attorney Harvey Breland closed the transaction at the request of Defendant Scott Pfeiffer. The subordination agreement by and between Cosimo and First Community Bank was never executed or recorded, despite escrow instructions to Harvey Breland to the contrary.

258.     On November 20, 2006, Defendant Josh Ward wired funds in the amount of $1,000,000 from the Faulstine Smith account into the bank account for SD Trust.

259.     From November 20, 2006 through December 28, 2006, Defendant Josh Ward issued checks from the SD Trust bank account to Defendant Southridge Construction Company, Inc., a South Carolina corporation owned equally by Defendant Josh Ward and Defendant Charles Pinion, in an amounts totaling $800,000.  Defendant Southridge Construction Company, Inc. did not perform any material services for SD Trust.

260.     On November 20, 2006, Defendant Josh Ward issued a check from the SD Trust bank account to Defendant Total Package Grading, solely owned by Defendant Charles Pinion, in the amount of $160,000.  Defendant Total Package Grading never performed any material services for SD Trust.

261.     On November 20, 2006 and November 21, 2006, Defendant Josh Ward issued checks from the SD Trust bank account as follows: (a) Defendant Southridge Construction Company, Inc. $434,598; (b) Troy Grant $105,845; (c) Defendant Apex Construction $22,250;

(d) Harris Contracting $17,789.55; (e) Club Management, LLC $35,012;, (f) Club Realty, Inc. $40,012;, and (g) J&H Builders, LLC $30,000.  None of these individuals or entities performed any material services or provided any material goods to SD Trust.

262.     On November 21, 2006 and November 22, 2006, Defendant Josh Ward issued checks from the SD Trust bank account to Big Deal Land Company, LLC, which was owned equally by Defendant Eugene Hopper and Defendant Charles Pinion, totaling $225,000.  Big Deal Land Company, LLC did not perform any services or provide any goods to SD Trust.

263.     On November 22, 2006, Defendant Josh Ward wired the remaining funds in the amount of $600,000 from the Faulstine Smith account into the bank account for SD Trust.

264.     On November 28, 2006, Defendant Josh Ward issued a check from the SD Trust bank account to Defendant David Gantt in the amount of $50,581.  Defendant David Gantt did not perform any legitimate services or provide any legitimate goods to SD Trust in connection with these funds.

265.     On September 5, 2006, SD Trust purchased 0.44 Acres from Raymond and Sandra Savel which was located at the entrance of the Sweetwater Subdivision for $79,000.  Defendant David Gantt performed the closing and never recorded the deed.

266.     On December 28, 2006, Defendant Josh Ward issued a check from the SD Trust bank account to Ted Liberty in an amount of $27,400.  Ted Liberty did not perform services and did not provide any goods to SD Trust.

267.     By the end of December 2006, SD Trust had not constructed a single home despite having received approximately $3,000,000 from additional loans and other sources. As of December 29, 2006, SD Trust had only $13.45 in its bank accounts.

268.     On January 1, 2007, Defendant David Gantt terminated his interest in SD Trust in exchange for no consideration.

269.     On January 1, 2007, SD Trust purchased all of the shares of Bean Creek, LLC, which included 100 shares from Bruce Young and 100 shares from Sherry Young.

270.     From April 27, 2006 through May 23, 2008, Defendants Eugene Hopper, Charles Pinion, Josh Ward, and David Gantt solicited individuals to be straw purchasers of lots in the Sweetwater Subdivision.     The solicitation stated that Defendant Lamplighter Mortgage Company, LLC, wholly owned and managed by Defendant Eugene Hopper, would prepare the mortgage application.     Defendant Greg Bailey, who was a loan officer at Defendant CommunitySouth Bank and Trust, would fund the purchase and construction loan, and Defendant David Gantt would close the loan.  J& H Builders, Inc., which was owned equally by Defendants Melinda Holbrooks and Nathan Holbrooks, friends of Defendants Eugene Hopper and Charles Pinion, would prepare fraudulent construction progress report forms to submit to CommunitySouth Bank and Trust, to draw upon the construction loans.  In exchange for the straw purchaser's participation in the fraud, SD Trust would make all of the payments on the loan, provide a monthly payment to the straw purchaser of $1,500, and upon completion of the residence, the straw purchaser would receive an additional $30,000 from the sale proceeds. From September 26, 2006 through September 21, 2007, SD Trust obtained eleven construction loans from CommunitySouth Bank and Trust and at least two other banks on behalf of eleven straw purchasers under this scam, which generated approximately $4,890,000 in sales proceeds.

271.     From September 26, 2006 through September 21, 2007, Defendant Josh Ward submitted false documentation to various state governmental authorities to obtain building permits to begin construction of the eleven houses.  The foundations, frames and roofs were installed without proper permits, and were in violation of various building codes.  These buildings were constructed to enable aerial photographs to be generated for marketing materials to be used to generate additional funds through the appearance that the Sweetwater Subdivision

was a viable development.  However, none of the houses had any utilities because the current utilities to the Sweetwater Subdivision could only support a couple of houses.

272.        From September 2006 through September 2007, Defendant Greg Bailey, in his capacity as Defendant CommunitySouth Bank and Trust's loan officer in charge of the Sweetwater Subdivision construction loans, willfully falsified bank inspection reports and approved loan the draws, transferring over $5 million to various bank accounts, with full knowledge that the five houses under construction were grossly deficient.  The five houses were never completed and were as little as 20% complete and no more than 60% complete. For his participation in the fraudulent scheme, Defendant Greg Bailey received approximately $150,000 from J&H Builders, Inc. and other in the form of cash and checks.

273.        On June 2, 2008, John Hobbs, Chief Financial Officer of Defendant CommunitySouth Bank and Trust, and Tom Hale, Chief Credit Officer of CommunitySouth Bank and Trust, became aware of the scam concerning SD Trust and Defendant Greg Bailey in embezzling approximately $4,900,000, and consequently, filed a claim with the insurance carrier of Defendant CommunitySouth Bank and Trust. The insurance carrier denied the claim, which resulted in the bank filing a lawsuit against the carrier for wrongful denial of the claim.  The matter was also reported in the Bank's annual report, was reported to the Federal Bureau of Investigation.

274.        From 2006 through 2007, Defendants J&H Builders, Inc., Melinda Holbrooks, and Nathan Holbrooks received approximately $3,440,000 for their participation in the fraud.  To date, these funds have not been accounted for as funds were withdrawn in the form of cashier checks, wire transfers, cash withdrawals and/or make payments to or on behalf of other entities owned and/or controlled by other individuals including, but not limited to: Defendants Eugene Hopper, Charles Pinion, Josh Ward, Roger Ezell, Barry Lynn Spencer, and or Ben Hines.

275.      On March 16, 2007, due to persistent solicitation by Defendant David Gantt, The Kastle Group, Inc., a legal client of Defendant David Gantt, loaned SD Trust $200,000 under the false representation that a first mortgage in the amount of $240,000 was granted in exchange therefore on prime real estate.  Defendant David Gantt performed the closing and never disclosed the fact that the property securing the mortgage was already subject to three prior mortgages in excess of the value of the underlying property.

276.      On October 16, 2007, SD Trust borrowed $150,000 from Jeff Greenberg under the false representation that a first mortgage on waterfront property in the amount of $200,000 was granted in exchange.  Jeff Greenberg received a title insurance issued by Defendant P&G Title Agency, and Defendant David Gantt performed the closing.  However, the title insurance failed to disclose prior mortgages and referred to lot numbers that did not exist of record at the time of issuance or anytime thereafter.

277.      On December 3, 2007, SD Trust borrowed an additional $250,000 from Greenberg Investments, LP under the false representation that a first mortgage on waterfront property in the amount of $350,000 was granted in exchange.  Jeff Greenberg received a title insurance issued by Defendant P&G Title Agency, and Defendant David Gantt performed the closing.  However, the title insurance failed to disclose prior mortgages and referred to lot numbers that did not exist of record at the time of issuance or anytime thereafter.

278.      On January 4, 2008, SD Trust, LLC borrowed an additional $200,000 from The Kastle Group, Inc. under the false representation that a first mortgage in the amount of $240,000 was granted in exchange.  Defendant David Gantt performed the closing.

279.      On April 7, 2009, The Kastle Group, Inc. consolidated its loans with SD Trust, LLC in the amount of $652,080.

280.     On February 29, 2008, SD Trust filed a satisfaction of its $200,000 mortgage (i.e., Elaine R. Williams and James M. Williams, III) it had acquired from Defendant Instant Cash, Inc., despite receiving no consideration in exchange.

281.     On May 6, 2009, SD Trust formed SD Trust Fractional, LLC, a South Carolina limited liability company.  Defendant Scott Pfeiffer prepared and filed the formation documents with the Secretary of State of South Carolina.

282.     By 2009, SD Trust had been in default on its loans for several years, and Instant Cash, Inc. had filed a foreclosure action against SD Trust, seeking to foreclose on its first mortgage lien against the Sweetwater Subdivision.  In March 2010, CIF's Receiver exercised Cosimo's rights under the membership pledge agreements and took over the ownership and management of SD Trust.  Subsequently, SD Trust filed bankruptcy. Through multiple legal processes, CIF's Receiver and attorneys discovered that SD Trust, through its principals, Defendants Eugene Hopper, Charles Pinion, David Ward, and David Gantt, had created a quagmire out of the Sweetwater Subdivision.  Real estate development of project was barely started and was never completed.  But moreover, development of project had been so horrendously botched, as evidenced by the voluminous violations and deficiencies noted by county and state officials, that revitalization of the project was economically unfeasible. A new appraisal obtained in 2010 reported the value of the Sweetwater Subdivision had dropped to $1.2 million. Thus, with the unpaid balance of the first mortgage loan held by Instant Cash, Inc. being more than $5 million, Cosimo's second mortgage loan was virtually worthless.

283.     In summary, like Waters Edge, the Sweetwater Subdivision Project was and is a miserable financial debacle and disaster. The aforementioned members of the Hopper Syndicate obtained $2.0 million from Cosimo, (and Cosimo, funded by CIF, unconscionably loaned $2.0 million to SD Trust) in order to facilitate the acquisition of 118 acres on Lake Keowee, made only nominal effort to improve the property, transferred the properties to more than a dozen

parties with inadequate consideration, and left Cosimo and CIF holding a worthless promissory note secured by nothing of value. The aforementioned defendants willfully and perpetrated dozens of convoluted exchanges and transfers of deeds, mortgages, releases, and subordinations of mortgages, in order to mask and obscure their money laundering enterprises, all without care or concern of the substantial loss to CIF and Cosimo.

284.      The culpable and illegal nature of these activities surrounding this project as an enterprise is evidenced by the lack of formal accounting records, frequent and prolific falsification of construction documents, submission of falsified construction documents to government agencies and bank officials, frequent and prolific withdrawals of cash (greenback paper bills) from banks at less than $10,000 ($10,000 being the threshold which would require the bank to disclosure the cash transactions to the IRS), frequent and prolific use of cash (greenback paper bills) as a form of payment and receipt, failure to keep records to record cash transactions, failure to report cash transactions on income tax returns and IRS Form 1099, and failure to file income tax returns.

### (6)      Docks at Sweetwater

285.      On August 25, 2006, Big Deal, under the ownership, direction, management, and control of Defendants Eugene Hopper and Charles Pinion, submitted to J. Cayce Burwell, Administrative Assistant for Duke Energy Lake Services, fourteen (14) applications to obtain dock permits for the Sweetwater Subdivision on Lake Keowee (Lots 1, 2, 3, 3a, 4, 4a, 5, 6, 7, 8, 9, 10, 11 and 12).  On August 28, 2006, J. Cayce Burwell acknowledged receipt of Big Deal's dock permits and informed Big Deal that the permits were forwarded on to Benji Cannon for his approval. Subsequently, Duke Energy Lake Services issued dock permits.

286.      On September 7, 2007, Defendant Chuck Pinion entered into an agreement with Superior Dock Systems, Inc., 6979 West Oak Highway (24), Westminster, SC 29693, which provided that Superior Dock Systems, Inc. would construct, deliver and install 14 boat docks at a

cost of $17,995 each, for a total of $251,930. The docks were to be identical and each was to be a 24' X 28' single slip dock, with a gable roof, all aluminum, with Brazilian ironwood (IPE) decking, and would include a 40 foot ramp. The contract price reflected a significant "volume" discount from the typical price, because of the bulk purchase of 14 docks. The purchased price of a single dock is estimated have been approximately $25,000 each. The agreement gave an approximate installation date of October 2007.

287.     From October 2007 until the end of November 2007, Superior Dock Systems, Inc. installed two or three docks each week, until all 14 of the docks were in place.

288.     In October 2007, while dealing with the pressures of the investigation by the Securities Division and with knowledge of the Securities Division having filed its "Notice of Intent to Seek the Issuance of a Stop Order Denying Effectiveness to a Registration Statement", Defendants Arthur Field and Scott Pfeiffer devised a scheme to launder $500,000 out of CIF and Cosimo, which would help hide Cosimo's convoluted mess of loans they had perpetrated.

289.     On October 10, 2007, Cosimo, under the ownership, direction, management, and control of Defendants Arthur Field and Scott Pfeiffer, loaned Big Deal $500,000 dressed up as a loan for the purchase of the 14 boat docks, despite the fact that the contracted purchase price for the 14 docks was only $251,930. Furthermore, this loan was made at a time when Big Deal and SD Trust were delinquent on their Cosimo loans and other debts, had no source of cash flow, had no source of repayment, and were insolvent. Moreover, the principals of Big Deal and SD Trust (Defendants Eugene Hopper, Charles Pinion, and Josh Ward) were at that time in default on more than $7 million in Cosimo loans related to other projects (Waters Edge, Sweetwater Subdivision and Highlands). Clearly, the transfers made were not for the purpose of a *bona fide* loan, but were in furtherance of the money laundering scheme.

290.     On October 4, 2007, SD Trust, under the ownership, direction, management, and control of Defendants Eugene Hopper and Charles Pinion, entered into a purchase agreement

with Big Deal to purchase from Big Deal the 14 boat docks.

291.      On October 23, 2007, Cosimo and Big Deal filed a UCC-1 against SD Trust secured by the docks located on Lots 2, 7, 8, 9, 10, 11, and 12.  Cosimo and Big Deal also filed a UCC-1 against SD Trust secured by the docks located on Lots 13 and 14, despite the fact that the boat dock permits issued did not allow, nor did the order include docks for lots 13 & 14.

292.      On October 26, 2007, Cosimo and Big Deal filed a UCC-1 against SD Trust and Faulstine Smith, 298 Sugar Hill Road, Seneca, SC 29672, secured by the dock located on Lot 3.

293.      On November 20, 2007, Cosimo and Big Deal filed a UCC-1 against SD Trust and Robert Alexander, 351 Cherokee Lake Road, Tamassee, SC 29686, secured by the dock located on Lot 4A, and filed a UCC-1 against SD Trust and Lillian Sonne, 290-G Applewood Center Place, Suite 123, Seneca, SC 29678, secured by the dock located on Lot 4.

294.      Between November 20, 2007 and March 21, 2009, Defendants Eugene Hopper and Charles Pinion, with knowledge of, and intent of violation of, the state law which prohibits the sale of property secured by liens without satisfying the liens, sold all of the boat docks to several individuals, without remitting any payments to Cosimo and without satisfying Cosimo's liens or obtaining a release of the liens.  Defendants Eugene Hopper and Charles Pinion sold the newly constructed, unused boat docks at unrealistically low prices as follows:

| | | | |
|---|---|---|---|
| a. | Dennis Pifer | 1 dock | $ 6,000 |
| b. | John Stenzinger | 1 dock | 6,000 |
| c. | Richard Wilneau | 1 dock | 6,000 |
| d. | Bruce Limpscomb | 1 dock | 9,500 |
| e. | Steve Bridges | 1 dock | 10,000 |
| f. | Joe Echols | 1 dock | 11,400 |
| g. | Defendants Johnny Kelley | 6 docks | 36,000 |
| h. | Unknown buyers | 2 docks | 12,000 |
| | Totals | | $96,000 |

The buyers paid for their purchases by check, which, at the direction of Defendant Eugene Hopper, were made payable to Defendant Neighborhood Homes, an entity owned and or

controlled by Defendant Eugene Hopper. All but one of the buyers promptly sold the docks purchased to other individuals at substantial gains, evidence that the buyers knew the deal was illegitimate, and at best turned a blind eye, in order to buy the docks at such a deep discount and make money on the trade.

295.      On November 14, 2008, John Young, who had invested substantial amounts with Defendant Eugene Hopper over the years, and who had been duped to believe the dock would be bought free and clear of liens, agreed to buy a dock, tendered a $6,000 check to Defendant Eugene Hopper, and received a Bill of Sale from SD Trust, which specifically stated that the dock "is free and clear of all liens", and which was executed by Defendant Eugene Hopper, witnessed by Charles Pinion, and notarized. Even though his check was cashed, John Young never received the dock and therefore lost his money.

296.      In summary, on October 10, 2007, at a time when the relevant parties were delinquent on their Cosimo loans and other debts, had no source of cash flow, had no source of repayment, were insolvent, and were in default on more than $7 million in Cosimo loans related to other projects, Defendants Arthur Field, Scott Pfeiffer, Eugene Hopper and Charles Pinion fabricated a $500,000 loan from Cosimo to Big Deal and SD Trust, window dressed the loan as being secured by 14 boat docks, which only cost $251,930, and then within 18 months, Defendants Eugene Hopper and Charles Pinion sold all of 14 docks to close associates for approximately $96,000, each without repayment to Cosimo and without obtaining a release of the UCC-1 security interest held by Cosimo, leaving Cosimo and CIF with an $500,000 loan that is uncollectible, while the defendants enjoy the benefits of the cash received from selling the docks.

297.      The culpable and illegal nature of these activities surrounding this project as an enterprise is evidenced by the lack of formal accounting records, submission of falsified bills of sale, use of multiple entities with no accountability of transactions between them, failure to

report transactions on income tax returns and IRS Form 1099, and failure to file income tax returns.

### (7)    Badger

298.    On March 12, 2004, Defendant Eugene Hopper formed Badger Development, LLC, with Defendant Pfeiffer & Gantt, PA preparing and filing formation documents.

299.    On March 12, 2004, Cosimo granted a loan to Defendant Badger Development, LLC in the amount of Three Hundred Five Thousand and 00/100 Dollars ($305,000.00) secured by three lots located in Oconee County identified as "The Lions Den".

300.    On July 14, 2004, Badger Development, LLC transferred Lot 5 Lions Den to Construction Resources, Inc. allegedly in exchange for payment of $121,000.00; however, Construction Resources, Inc. did not pay any consideration to Defendant Badger Development, LLC or to Cosimo. Nevertheless, Cosimo released its mortgage on Lot 5 Lions Den without receipt of any consideration. Defendant F. Scott Pfeiffer executed the release. Defendant David Gantt performed the loan closing.

301.    On July 29, 2004, Defendant Construction Resources, Inc. mortgaged Lot 5 Lions Den to Monticello Bank in exchange for a loan in the amount of Two Hundred Fifty-two Thousand and 00/100 Dollars ($252,000.00).  Defendant David Gantt performed the closing.

302.    On September 7, 2005, Defendant Construction Resources, Inc. transferred title to Lot 5 Lions Den to Josh Ward in exchange for $10.00 assumption of the loan to Monticello Bank.  Defendant David Gantt performed the closing.

303.    On October 5, 2005, Lot 3 Lions Den was sold. Cosimo received $50,000 in exchange for releasing its mortgage. Defendant F. Scott Pfeiffer executed the release. Defendant David Gantt performed the closing.

304.     On October 25, 2005, Lot 4 Lions Den was sold. Cosimo received $150,000 in exchange for releasing its mortgage. Defendant F. Scott Pfeiffer executed the release. Defendant David Gantt performed the closing.

305.     As of October 25, 2007, Badger Development, LLC owed Cosimo $105,000 of principal on the original loan of $305,000, and all three mortgages which secured the original loan had been released, leaving the unpaid balance unsecured. Badger was in default on its Cosimo loan.

306.     As previously noted in the WE3 discussion above, on November 16, 2007, while dealing with the pressures of the investigation by the Securities Division and with knowledge of the Securities Division having filed its "Notice of Intent to Seek the Issuance of a Stop Order Denying Effectiveness to a Registration Statement", Defendants Arthur Field and Scott Pfeiffer scurried to obscure Cosimo's convoluted mess of loans they had perpetrated.  As of that date, Defendants Scott Pfeiffer, David Gantt, Eugene Hopper, and Charles Pinion executed dozens of documents in an attempt to make the loans appear to be consolidated into a single loan made to WE3. Thus, Cosimo's records were manipulated to reflect the loan to Defendant Badger Development, LLC and other loans being consolidate into a single loan without having received any consideration whatsoever. Additionally, Cosimo's first mortgage positions on the three lots owned by Defendant Badger Development, LLC had been inappropriately released by Defendants Scott Pfeiffer and David Gantt in order to perpetuate the Ponzi scheme, the result of which was to leave the Cosimo loan to Defendant Badger Development, LLC unpaid and unsecured.

### b. Campitelli's Syndicate Takes CIF For $2.775 Million

307.     Between 2001 and 2003, Defendants Arthur Field and Scott Pfeiffer befriended Defendant Jack Campitelli (aka A.J. Camp). Defendant Jack Campitelli held himself out to be an expert in tax law, international law and asset protection, the latter being an area of law focused

on transferring assets and wealth to foreign countries known to be tax havens, ostensible to hide income and assets from federal income taxation and debt collections.

308.    In or about 2003, Defendant Jack Campitelli, together with Defendants Arthur Field, Scott Pfeiffer, Jamie McKeough, Michael Moore, J.G. "Geneva" Seller (a/k/a Geneva Campitelli), J.G. Ryckman, D. L. Jones, Shawna Freeman, Amerishare Corporation, Arrowhead Funding Corporation, Gulf Capital LP; Gulf Capital Management, Inc., Moore & Associates, LLC, Nevada Processing Center, Inc., Onward Recovery Partners Corporation, Onward Finance Corporation, Tcholok Properties, LLC, The Upper Nehalem Trust, The Chrysler Drive Trust, The Old Arcadia Road Trust, The Cotton Mill Trust, and others (collectively "Campitelli's Syndicate"), formulated multiple scams designed bilk CIF and others out of millions of dollars. The scams involved real projects in South Carolina, Oregon and Washington.

309.    From 2003 through 2008, under the co-management of Defendants Arthur Field and Scott Pfeiffer, Cosimo made numerous loans to various entities participating in these projects, including (but not limited to) Tcholok Properties, LLC, Nevada Processing Center, Inc., Moore & Associates, LLC, The Upper Nehalem Trust, The Chrysler Drive Trust, The Old Arcadia Road Trust, The Cotton Mill Trust, Onward Recovery Partners Corporation, Onward Finance Corporation, Gulf Capital LP; Gulf Capital Management, Inc., Amerishare Corporation, and Arrowhead Funding Corporation.

310.    The methods of the scams were complicated and convoluted. Trusts were set up and used as borrowing mechanisms. Use of trusts ensured Campitelli's Syndicate limited exposure to public information as well as liabilities on the loans Moneys borrowed for construction to improve properties were used for other purposes and construction never occurred. Mortgages were purposely written to be self-extinguishing. Loan proceeds for one particular project would be used to pay costs of another or to pay totally unrelated expenses. Loan proceeds would be used for personal use. Foreclosures were staged to avoid due process, resulting is

transfers of title to investors at substantially less than full values. Many other devious, deceptive, and illegal actions occurred.

311.     While many of these participants and loan activities often appeared to be separate and unrelated, money flowed fluidly between various participants without regard to propriety and protocol, and without reasonable assurance of validity. Each participant was focused on receiving money and held a blind eye and a lack of consciousness as to the source of funds and resulting damages incurred by CIF, Cosimo, and others.

312.     While these devious, deceptive, and illegal actions started on small scale, by 2009, the total funds extracted from CIF through Cosimo by Campitelli's Syndicate exceeded $2.775 million.

313.     Defendants Arthur Field and Scott Pfeiffer participated in these devious, deceptive, and illegal actions by either consent or turning a blind eye to "see no evil."  Moreover, in almost all of the numerous loans to Campitelli's Syndicate, Defendants Scott Pfeiffer, David Gantt, and Ralph Gleaton handled the real estate and mortgage loan closings, acting as attorneys for all parties (CIF, Cosimo, and other transacting parties.) despite the clear conflict of interests. Of course, by handling the closings for all parties, Defendants Scott Pfeiffer, David Gantt, and Ralph Gleaton were availed the convenient opportunity to not only allow unscrupulous transactions to occur, but to facilitate the continuing and ongoing devious actions to the detriment of CIF, Cosimo and others.  In dozens of instances, Defendants Scott Pfeiffer and David Gantt, either directly or through their associates employees under their employ and direction, prepared and recorded fraudulent deeds and mortgages, purposely issued fraudulent title insurance policies, purposely did not record mortgages, willfully diverted funds held in trust for purposed other than authorized, willfully failed to pay priority lien holders, willfully released mortgages and liens, and conducted many other acts that resulted in significant damages and loss to CIF, Cosimo and others.

314.       The culpable and illegal nature of the Campitelli's Syndicate as an enterprise as is evidenced by the lack of formal accounting records and failure to file income tax returns.

315.       The devious, deceptive, and illegal actions among members of Campitelli's Syndicate resulted in damages and losses to CIF and Cosimo exceeding $2.775 million.

### c.  **Trazom's Syndicate Takes CIF For $1 Million and More**

316.       In 1999, Defendant Scott Pfeiffer met Thomas E. Moore ("Tommy Moore"). They shared common interests, and Defendant Scott Pfeiffer began representing Tommy Moore and his company, Tiger Transport Service, Inc. ("Tiger Transport"), a trucking and logistics services company.  Initially, Defendant Scott Pfeiffer handled general contract and commercial matters for Tommy Moore and Tiger Transport.

317.       From 2000 through 2005, Defendant Scott Pfeiffer and Tommy Moore had collaborated on developing a strategy to expand Moore's business activities, to include development and management of real estate.

318.       By 2006, to execute the strategy, Defendant Scott Pfeiffer or his affiliates formed the following South Carolina entities which were owned or controlled by Tommy Moore:

    a.    First Alliance Enterprises, Inc. ("First Alliance" formed in December 1999) general partner of Credo Land Holdings, LP by 2001.

    b.    Tiger Express Solutions, LLC ("Tiger Express" formed in December 1999) to act as a transportation broker for Tiger Transport.

    c.    Tiger Asset Service, LLC ("Tiger Asset" formed in February 2000) to own and develop a warehouse in Anderson County SC for use by Tiger Transport to service its customers.

    d.    Credo Land Holdings, LP ("Credo" formed in April 2001) to act as a holding company owning the entities owning various warehouse properties.

    e.    Liberty One, LLC ("Liberty One" formed in July 2002) to own a warehouse in Pickens County, SC for use by Tiger Transport to service its customers.

    f.    Liberty Two, LLC ("Liberty Two" formed in July 2002) to own a warehouse in Pickens County, SC for use by Tiger Transport to service its customers.

    g.    Simpsonville Cotton Mill, LLC ("Cotton Mill" formed in May 2002) to own and develop a mixed use residential commercial complex in Simpsonville, SC.

    h.    Tiger by the Tail, LLC ("Tiger Tail" formed in September 2002), a structure created to enable Tommy Moore and his affiliates to effect the purchase the remaining 50% shareholder interest in Tiger Transport.

    i.      Tiger Equipment Company, LLC ("Tiger Equipment" formed in October 2002) to rent equipment related to Tiger Transport.

    j.      Fork Shoals Road Development Limited Company ("Forks Shoal" formed in December 2002) to acquire a warehouse in Greenville County, SC.

Each of these entities were owned or controlled by Tommy Moore, except Credo Land Holdings, LP ("Credo") which was directly or indirectly owned as follows: 40% by Defendant Scott Pfeiffer's or his affiliates; 10% by Defendant Arthur Field; 50% by Tommy Moore.

319.      Defendant Scott Pfeiffer's and Tommy Moore's business strategy required significant amounts of capital and Defendant Scott Pfeiffer informed Tommy Moore that he was able to provide significant amounts of capital through his relationship with CIF and Cosimo.

320.      From 2001 through 2006, CIF and Cosimo, under the co-management of Defendants Arthur Field and Scott Pfeiffer, made the following series of loans to the various Tommy Moore affiliates:

    a.      CIF loaned Tiger Transport $657,762 in January 2002, which was repaid January 2004 in a transaction with Cosimo.

    b.      Funded by CIF, Cosimo loaned $1,000,000 to Liberty One in July 2002 and an additional $50,000 in August 2002. The loans were secured by a mortgage on the warehouse operated by Tiger Transport in Liberty, SC.

    c.      Funded by CIF, Cosimo loaned $2,275,000 to Asset Service in August 2002. This loan was also secured by a mortgage on the warehouse operated by Tiger Transport in Anderson, SC.

    d.      Funded by CIF, Cosimo loaned $1,000,000 to Tiger Transport in January 2004. This loan was secured by assets of Tiger Transport not otherwise subject to security interests.

    e.      Funded by CIF, Cosimo loaned $650,000 to the Cotton Mill in May 2002, which was repaid April 2003, and $800,000 in January 2005, which Defendant Scott Pfeiffer wrongfully caused to be repaid January 2005, out from proceeds of a refinancing of the Cotton Mill property by Greenville First Bank.

321.      The cash flow necessary to service the debt of Tiger Transport, Liberty One, and Asset Service and a smaller degree Cotton Mill were derived from the operations of Tiger Transport. Most of the cash used to pay debt service on the Cotton Mill loan came from sales of real property.

322.     In the fall of 2005 and winter of 2006, Tiger Transport had financial difficulties and the debt owed to Cosimo and CIF by Asset Service, Liberty One, and Tiger Transport could not be serviced and were in default.

323.     Defendant Arthur Field, Manager of CIF and Co-manager of Cosimo, and Tommy Moore agreed to mediate a global compromise settlement of the debt owed to CIF and Cosimo by Tommy Moore's affiliates.

324.     On April 6, 2006, the Tommy Moore affiliates, CIF, Cosimo, and Defendants Arthur Field, Scott Pfeiffer, David Gantt, Ralph Gleaton, Saxon Holdings, LLC, Pfeiffer, Gantt, & Gleaton, PA, and Ross Jones mediated the matters and entered into a Settlement Agreement. As a part of the Settlement Agreement; the Tommy Moore affiliates agree to sell their interests in the properties owned by Liberty One and Liberty Two to Defendants Scott Pfeiffer, David Gantt, Ralph Gleaton, Saxon Holdings, LLC, Pfeiffer, Gantt, & Gleaton, PA, and Ross Jones for $1,000,000.  Also as a part of the Settlement Agreement; the Tommy Moore affiliates agreed to sell their interest in the Anderson warehouse property owned by Asset Service to Defendant Arthur Field and his affiliates for $2,450,000.  As of this date, the total amounts owed to Cosimo and CIF was approximately $4,400,000.

325.     As of April 2006, Tommy Moore had information that the appraised value of the property was in excess of $3,200,000 with an original loan balance of $2,275,000 or projected equity in excess of $925,000.  Thus, instead of ensuring that CIF received the benefit of the value of the property held as collateral, Defendant Arthur Field breached his fiduciary duties and orchestrated a settlement which allowed the Anderson warehouse to be transferred to Trazom for his personal benefit and to the direct detriment and loss of Cosimo and CIF.  Furthermore, he allowed the CIF loan to have unconscionably favorable terms for the benefit of Trazom and to the detriment of CIF. The end result was CIF realized a loss of more than $600,000, while

Trazom acquired CIF's collateral at a price that was $750,000 less than its value – that was $750,000 stolen from CIF.

326.     On June 7, 2006, CIF loaned Cosimo $1,000,000 to fund Cosimo's loan to Jade Dragon Properties, LLC ("Defendant Jade Dragon"), which was formed in November 2005 and was principally owned by Defendant Pfeiffer, Gantt, & Gleaton, PA., or Saxon Business Services, LLC.  On June 13, 2007, with the loan proceeds received from CIF one week earlier, Cosimo loaned $1,000,000 to Jade Dragon, and Jade Dragon used the loan proceeds to purchased the Liberty One and Liberty Two warehouse property.  At closing, the $1,000,000 loan proceeds were remitted to Cosimo as payment on the Liberty One loan, the balance of which before this payment totaled $1,145,246, leaving an unpaid balance of $145,246.  Cosimo subsequently paid CIF $1,000,000, which was applied against Cosimo's debt owed to CIF.  Defendant Pfeiffer Gantt & Gleaton, PA handled the closing.

327.     On June 7, 2006, CIF transferred $2,450,000 to Defendant Trazom, LLC ("Defendant Trazom") – an entity that did not legally exist at that time.

328.     That same day, Defendant Field executed a mortgage on behalf of Trazom, LLC, at a time when Trazom did not have title to the property and which did not legally exist, in the amount of $2,650,000.00.  Defendants did not record this mortgage for over a year later on June 20, 2007.

329.     Two days later, on June 9, 2006, Defendant Arthur Field created Defendant Trazom by filing organization documents with the South Carolina Secretary of State.  Defendant Arthur Field was listed as the agent and organizer.  Defendant Trazom was entirely owned by Defendant Arthur Field.

330.     Also on June 9, 2006, CIF transferred an additional $200,000 to Defendant Trazom.

331.     On June 13, 2007, with the loan proceeds received from CIF one week earlier, Defendant Trazom purchased the 121,000 square foot warehouse located in Anderson South Carolina ("Anderson warehouse").  At closing, the $2,450,000 loan proceeds were remitted to Cosimo as payment on the outstanding loans - $145,246 applied against the Liberty One loan (thereby reducing the balance to zero) and $2,290,451 applied against the Tiger Transport loan balance (thereby reducing the balance to $27,004).

332.     Tiger Transport filed Chapter 11 bankruptcy in April 2006, and proceeded to a controlled liquidation which concluded October 10, 2007.

333.     CIF, under the direction and control of Defendant Arthur Field, transferred $725,000 to Defendant Trazom on January 2, 2007 and transferred another $250,000 to Defendant Trazom on January 29, 2007.   Although Defendant Arthur Field denoted these transfers as 'loans' to Trazom on the books of CIF, Defendant Field executed no promissory notes or loan documents.  The "loans" were never repaid.

334.     Additionally, CIF, under the direction and control of Defendant Arthur Field, transferred an additional $25,000 to Defendant Trazom on July 16, 2007.   Again, Defendant Field neither prepared nor executed any promissory note or loan documents were prepared for this transfer.   This 'loan' was never repaid. Defendant Arthur Field did not record this transaction as a loan, but instead purposefully, deceptively, and deviously manipulated CIF's books to record this payment in a way that gave the appearance that this loan and the two previous checks totaling $975,000 were paid in full in CIF books. (These transactions were a disguise for Defendant Arthur Field's money laundering schemes discussed in more detail later in this Complaint.)

335.     On September 12, 2007, Trazom, under the direction and control of Defendant Arthur Field, refinanced its mortgage debt on the Anderson warehouse by obtaining a first mortgage loan from Palmetto Bank. CIF, under the direction and control of Defendant Arthur

Field, executed a subordination agreement in favor of the bank and receive in exchange approximately $1.5 million as a partial payment on Trazom's mortgage debt owed to CIF. At the end of this exchange, Trazom owed Palmetto Bank approximately $1.5 million, secured by a first mortgage on the Anderson Warehouse, and owed CIF approximately $1.1 million, secured by a second mortgage on the Anderson Warehouse. The bank loan required the personal guaranty of Defendant Arthur Field. Because of the sweetheart deal Defendant Arthur Field arranged for himself, CIF never received a personal guaranty from Defendant Arthur Field. While Defendant Trazom was originally solely owned by Defendant Arthur Field, ownership was later transferred without valuable consideration to his son, Defendant Davyd Field, in order to avoid creditors and in furtherance of the money laundering schemes.

336.    On or about August 28, 2007, Defendant Trazom, by and through Defendant Art Field and Defendant Field, obtained a note and mortgage from Palmetto Bank in the amount of $1,650,000.00. At the same time Defendant Trazom, by and through Defendant Arthur Field and Defendant Field, executed a subordination agreement between CIF and Defendant Trazom. At the time when executing this agreement, Defendant Arthur Field represented that Trazom owed CIF $2,650,000.00 on the mortgage executed on June 7, 2006. In truth, between June 2006 and September 2007, CIF had given (or 'loaned') an additional $1,000,000.00 and only received $125,765.45 in return. Defendant Arthur Field and Defendant Davyd Field, using Defendant Trazom as their vehicle, cheated CIF out of $874,234.55 (plus accrued interest) in masking the monies owed to CIF by Defendant Trazom, in addition to the $2.65 million dollars previous provided to Trazom.

337.    Further conspiring to defraud CIF, on September 14, 2007, by and through Defendant Arthur Field and Defendant Davyd Field, CIF and Trazom amended the terms of the original promissory note that was dated June 7, 2006. An "Amended Promissory Note" was executed by Defendant Davyd Field, son of Arthur Field, signing as Manager of Defendant

Trazom, and by Defendant Arthur Field signing on behalf of CIF. The Amended Promissory Note stated the principal amount to be $1,090,488.55, even though at the time Trazom actually owed CIF – at a minimum – approximately $2,040,488.45 (exclusive of accrued interest). The amended promissory note provided for interest initially at an annual rate of 8.2%, but increasing to 8.8% by 2013. The Amended Promissory Note also included the following statements:

> "WHEREAS, Trazom, LLC has repaid the sum of $1,559,511.55 between June 7, 2006, and September 13, 2007 as requested by Holder [CIF] who is in urgent need of capital funds;…"

> "WHEREAS, to achieve such accelerated partial repayments the member(s) of Trazom obtained a first mortgage upon worse terms from Palmetto Bank, and also had to personally guarantee such loan to Palmetto Bank and this Note shall be subordinate to the terms thereof;…"

> "The term of this loan shall be extended to August 31, 2017. All principal and interest shall be due upon such date. However, provided the loan is not in default, Trazom shall have the right to extend the term for an additional 5 years to August 31, 2022…"

> "The outstanding principal shall be amortized on a **Forty (40) year [Emphasis added]** basis…"

> "Neither Davyd Field nor any other member of Trazom shall be personally liable hereon to Lender [CIF] …"

338.      On March 1, 2008, Trazom and CIF, under the direction and control of Defendant Arthur Field, purportedly amended the terms of the Amended Promissory Note that was dated September 14, 2007. A "Second Amended Promissory Note" appeared to have been executed by Defendant Davyd Field, son of Arthur Field, signing as Manager of Defendant Trazom, and by Defendant Arthur Field signing on behalf of CIF. The Second Amended Promissory Note stated the principal amount to be $1,070,008, even though Trazom actually owed CIF at a minimum – approximately $2,020,488.45 (exclusive of accrued interest). The Second Amended Note further reduced the interest rate to 6.25%, but increasing to 6.8% by 2017. The Amended Promissory Note also included the following statements:

"WHEREAS, Trazom, LLC has repaid the sum of $1,559,511.55 between June 7, 2006, and September 13, 2007 as requested by Holder [CIF] who is in urgent need of capital funds;…"

"WHEREAS, Trazom, LLC has repaid an additional $20,480.45 between September 13, 2007, and February 28, 2008, and has agreed to reduce the term of the amortization from 40 years to approximately 26 years, thus providing Capital Investment Funding, LLC with additional principal to expedite collection;…"

"WHEREAS, in consideration of such accelerated payments and as additional incentive thereof, Capital Investment Funding, LLC offered to again amend the terms of the underlying Note to reflect the terms set forth below and Trazom accepted such second offer and procured and tendered such funds;…"

"The term of this loan shall be extended to August 31, 2018. All principal and interest shall be due upon such date. However, provided the loan is not in default, Trazom shall have the right to extend the term for an additional 5 years to August 31, 2023…"

"The outstanding principal shall be amortized on a **Twenty-Six (26) year basis (reduced from 40 previously [Emphasis added]** basis…"

"In the event Borrower [Trazom] shall prepay the Note prior to maturity (or such later date as extended after payment of extension fee), then Borrower shall receive a prepayment bonus equal to Two (2%) Per-cent of the remaining principal outstanding. If prepayment shall occur prior to December 31, 2010, this bonus shall be increased to Four ($.0%) per-cent of the balance outstanding."

339.    Between August 24, 2009 and November 2009, CIF's Receiver had several conversations with Defendant Arthur Field about CIF discounting its Trazom loan for early payment.  No specific amounts were discussed nor were any agreements made. Defendant Arthur Field expressed a strong interest in negotiating a settlement that would result in CIF liquidating its Trazom loan for cash and Trazom gaining the advantage of a discount by paying the loan early and advised that he would try to arrange for a deal to accomplish such.

340.    In November 2009, Pelican Way Financial, LLC tendered a written offer to purchase from CIF the Trazom loan, which had an outstanding balance believed to be approximately $1,033,000, for a price of $500,000, slightly less than 50% of the loans face value.  The offer was in the form of a letter written dated November 10, 2009, addressed to CIF's

Receiver and purportedly signed by Doug Frederickson on behalf of Pelican Way Financial, LLC. Online records of the Florida Secretary of State reflect Pelican Way Financial, LLC was organized on November 12, 2009, with a principal address of 5495 Atlantic View, St. Augustine Florida, and reflects Defendant Arthur Field's wife, Defendant Kathryn Taillon, as manager and registered agent. Importantly, the letter states "You have advised me of the following…." The Receiver never had any communication with Doug Frederickson. The letter also states "You provided me with a copy of the Second Amended Note, which matures….." Most importantly (to be discussed later), the offer does not mention any other amendment or modification to the note. The offer was not accepted.

341. In December 2009, CIF obtained an appraisal on the Anderson warehouse, which reported an appraised value of $2.8 million. At that time, the unpaid balance of the Palmetto Bank first mortgage loan was approximately $1.55 million and the unpaid balance of the CIF second mortgage loan was approximately $1 million.

342. Between March 1, 2008, the date of the Second Amended Promissory Note, through February 2, 2012, Trazom made the following payments to CIF to be applied against its mortgage loan:

| | |
|---|---|
| 3/31/08 | $ 7,000.00 |
| 5/1/08 | 7,000.00 |
| 6/3/08 | 7,000.00 |
| 7/12/08 | 7,000.00 |
| 8/1/08 | 7,000.00 |
| 9/2/08 | 7,000.00 |
| 10/1/08 | 7,097.57 |
| 11/1/08 | 7,000.00 |
| 12/3/08 | 7,000.00 |
| 1/5/09 | 7,000.00 |
| 2/4/09 | 7,000.00 |
| 3/4/09 | 7,000.00 |
| 4/2/09 | 7,000.00 |
| 5/1/09 | 7,000.00 |
| 6/2/09 | 11,652.19 |
| 7/8/09 | 7,000.00 |
| 8/3/09 | 8,583.27 |

| | |
|---|---|
| 9/10/09 | 6,999.99 |
| 10/14/09 | 7,000.00 |
| 11/30/09 | 7,000.00 |
| 12/31/09 | 7,000.00 |
| 5/3/10 | 8,633.40 |
| 6/3/10 | 8,650.46 |
| 7/2/10 | 8,667.70 |
| 8/25/10 | 17,387.83 |
| 10/8/10 | 8,720.50 |
| 12/2/10 | 17,495.09 |
| 5/31/11 | 8,774.97 |
| 7/6/11 | 8,793.51 |
| 8/30/11 | 8,812.24 |
| Total | $249,268.72 |

343.    As noted above, CIF had received payments on a fairly regular basis from March 2008 through August 2011. Moreover, the Trazom loan was the most significant loan in CIF's wilted portfolio of loans in terms of actual cash collections, as CIF had not received more from any other loan except one, a residential loan that was paid in full upon the homeowners refinancing of the home.

344.    In November 2011, CIF served Defendant Arthur Field with a subpoena demanding he produce the records which the Order Approving Settlement had previously required him to deliver to CIF's Receiver. Defendant Arthur Field had turned over limited records to CIF's Receiver, but not all records.

345.    In the fall of 2011, Trazom began negotiating a renewal of its loan with Palmetto Bank and a new lease with the tenant at its Anderson warehouse.  A renewal loan with Palmetto Bank was consummate in January 2012. The new loan is a 5 year loan that matures in 2017. Palmetto Bank re-advanced additional approximately $100,000 to Trazom, which brought the loan balance back to the original $1.65 million amount covered by the first mortgage.

346.    Between January 2 and January 5, 2011, Defendant Arthur Field sent CIF's Receiver several emails, which provided updates regarding the refinancing arrangement with Palmetto Bank, requested CIF's Receiver provide written acknowledgement to Palmetto Bank

agreeing to the refinancing terms, and discussed CIF's Receiver's request that Defendant Arthur Field provide him with whatever Trazom documents he had.  One of Defendant Arthur Field's response to the request for copies of Trazom's loan documents stated:

> "There was a Note, an Amended Note and a Second Amended Note and a Mortgage.  Which, if any, do you have? I have photocopies of the Amended Note and Second Amended and can drop off same today."

Another email from Defendant Arthur Field stated:

> "The Amended Note was on September 14, 2007. It was for $1,090,488.45. 40 year amortization. The Second Amended Note was on March 1, 2008. $1,070,008.00.  26 year amortization plus added principal."

Most importantly (to be discussed later), none of the emails mention any other amendment or modification to the note.  On or about January 5, 2011, Defendant Kathryn Field delivered a copy of the Amended Promissory Note and the Second Amended Promissory Note to CIF's Receiver.  Importantly, copies of the original promissory note and mortgage were not included in the documents delivered.

347.     In February 2012, Trazom signed a lease renewal with its long term tenant, Inergy Automotive Systems (USA), LLC ("Inergy"), an international automotive parts manufacturer. Inergy owns and operates a large manufacturing facility located on property adjoining the Anderson warehouse. Inergy had leased the property since 2002. The previous lease was a 5 year lease and had been signed by Defendant Arthur Field as Manager for Trazom on February 2007. The new lease provides for monthly payments to Trazom in the amount of $24,200, increasing annually, resulting in an average monthly rent over the 8 year terms of approximately $27,000. The new lease also provides that Inergy will pay all taxes, insurance and ordinary maintenance on the building. The lease has a term of 8 year, expiring on February 28, 2020.

348.     By March 2011, CIF's Receiver had searched for Trazom documents, more specifically the original promissory note and mortgage, but had not found them. CIF's Receiver then scrutinized the loan payment history, confirmed with Davyd Field the aforementioned loan

payments made by Trazom, and therein recalculated interest and principal on the loan based on the Second Amended Promissory Note. Based on his calculation, the Trazom loan was in default.

349.     On March 30, 2011, Defendant Davyd Field, CIF's Receiver, and counsel for CIF's Receiver met to discuss the status of the Trazom loan, the Palmetto Bank Loan and the Inergy lease renewal. CIF's Receiver delivered to Defendant Davyd Field a notice of default and demand for payment by April 6, 2012. At the meeting, Defendant Davyd Field vehemently expressed his shock, dismay and objection to the notice and demand. His foundation for his objections rested on his belief that Defendant Trazom had been paying CIF not only the scheduled monthly payments, but additional amounts in advance, with the knowledge and acceptance of such by CIF's Receiver. The meeting was concluded with the understanding that both parties would revisit the information exchanged that day and meet again by April 6, 2012 to discuss and resolve.

350.     On April 6, 2011, Defendant Davyd Field, counsel for Trazom, CIF's Receiver, and counsel for CIF's Receiver met to discuss the status of the Trazom loan. Defendant Davyd Field and counsel for Trazom presented a well organized package of information and documents, supporting Defendant Davyd Field's position that the Trazom loan was not in default. Most importantly, the focal point of the meeting centered around a document entitled "Modification Agreement Effecting Second Amended Note" ("Modification Agreement"). CIF's Receiver had never seen this document before, as this document was presented to CIF's Receiver for the first time at this meeting. The Modification Agreement was a two-page document, dated June 3, 2009, signed by Defendant Arthur Field, as manager and member of CIF, and by Defendant Davyd Field, as manager of Trazom (but not member). Defendant Arthur Field presented this document to CIF's Receiver in support of his contention that the Trazom loan was not in default because this document provided that CIF would forgive payments of interest on monthly payments if Trazom would make small payments of principal in advance. The terms of the

Modification Agreement are ludicrous.  Specifically, the Modification Agreement included the following statements:

> "Whereas a meeting was held on or about June 1, 2009, by and between Davyd Field, as Manager of Trazom, LLC, Arthur Field as Manager of Capital Investment Funding, LLC, and Jerry Saad, C.P.A., who may eventually be appointed Receiver of Capital Investment Funding, LLC pursuant to a Global Settlement Agreement executed by all parties thereto and awaiting confirmation by the court, and …"

> "Whereas, it was agreed by all parties it would be beneficial to accelerate reduction of Trazom's outstanding principal balance while maintaining a revenue stream to Capital Investment Funding, LLC, and Trazom is willing to do so in forgiveness of a portion of interest payments annually…"

> "Trazom, LLC shall pay at least 5 months additional principal annually to Capital Investment Funding, LLC with additional principal to be…added to the regular monthly payment. Extra principal shall be added in an amount equal to the next "due" principal amount utilized by the parties and appended to the Second Amended Promissory Note."

> "In return, for each month of principal so prepaid, Trazom shall in the following calendar year, be excused from paying one month of regular principal and interest (the principal portion having already been paid) not to exceed a total of 5 months in any calendar year, or a maximum interest forgiveness of $27,500, whichever is less."

351.     This Modification Agreement was a sham and was fabricated by Defendants Arthur Field and Davyd Field to further extract value and money from CIF.  The Modification Agreement was not prepared on June 3, 2009, but was prepare in response to CIF's Receiver's demand for payment.  As previously mentioned, multiple discussions and emails with Defendant Arthur Field consistently acknowledged the existence of the original promissory note, the Amended Promissory Note, and the Second Amended Promissory Note, but never even hinted at the existence of this Modification Agreement.  The letter received from Pelican Way Financial LLC in 2009 offering to purchase the Trazom loan, which was crafted by Defendant Arthur Field, acknowledged the existence of the original promissory note and the Second Amended Promissory Note, but never even hinted at the existence of this Modification Agreement.  The

Modification Agreement conveniently places CIF's Receiver at the meeting held to negotiate and execute the Modification Agreement; however, CIF's Receiver was not a any such meeting. Moreover, the Modification Agreement was not signed by CIF's Receiver. No witnesses signed the Modification Agreement. The print format of the Modification Agreement is poor, unlike substantially all other loan documents for Trazom, and is indicative of a document prepared in a hurry on low priced ink jet printer not used in an office. More importantly, even if the Modification Agreement was execute on June 3, 2009, the terms are extremely detrimental to CIF as the concept of the agreement is this: if Trazom increases its normal $7,000 monthly payment to CIF to approximately $8,800, and does that for 5 calendar months in a year, then the following year, Trazom does not have to pay interest for those 5 months. The following illustrates the detrimental impact of this arrangement to CIF: Trazom's scheduled payments for one year would ordinarily be $84,000 ($7,000 per month times 12 months); This arrangement provides that if Trazom pays $93,000 in one year ($7,000 per month times 7 months, plus $8,800 per month times 5 months), then CIF would forgive approximately $27,500 of interest the following year. Thus, Defendants Arthur Field's and Defendant Davyd Field's position, that CIF is better off receiving $9,000 of principal payments seven months early in exchange for forgiving $27,500 of interest, is preposterous.

352.    As reflected in the schedule of payments shown above, Trazom prepaid extra principal payment many times, but never prepaid 5 principal payments in a calendar year or a 12 month period.  Thus, even if the Modification Agreement was authentic, valid, and enforceable, Trazom never met the conditions and no forgiveness is required under the terms of the agreement.

353.    In June 2012, having rejected the validity of the Modification Agreement and Defendant Davyd Field's position that the Trazom loan was not in default, CIF filed a lawsuit in Anderson County to foreclose on CIF's second mortgage loan. Trazom answered the lawsuit and

presented counterclaims against CIF, and including Trazom's reliance on earlier reports issued by CIF's Receiver to the Noteholder of CIF's, which stated the Trazom loans were current.

### d. Field's Syndicate of Family and Friends Abscond With CIF Funds

354.     Defendants Arthur Field, Kathryn Taillon, Allyson Field, Kirsten M. White, Elliot Salzman, Lion and Lancaster Mortgage Bankers, LLC together, by design, masked transactions to give appearances of loans and ordinary business transactions made by and to independent entities negotiating at arms-length; when in reality, millions of dollars were siphoned from CIF through devious, deceptive, and illicit acts, all which resulted in substantial loss and harm to the detriment of CIF and its Noteholders.

355.     The following are examples of such devious, deceptive, and illegal acts:

### (i)     Lion Financial And Lancaster Mortgage Speculate and Lose Millions

356.     In 2004, Defendant Arthur Field created Defendant Lion Financial, LLC ("Defendant Lion") as a speculative investment vehicle for his family. Defendants Arthur Field and Kathryn Tallion operated the company from the family residence located at 310 Thornblade Boulevard in Greenville South Carolina.

357.     Defendant Lancaster Mortgage Bankers, LLC was a company managed, owned, or controlled by Defendant Elliot Salzman.

358.     Defendants Lion and Lancaster Mortgage Bankers, LLC were both ostensibly in the business of buying and selling residential mortgage loans. Between 2004 and 2007, Defendant Lancaster Mortgage Bankers, LLC bought loans from various banks and lenders and resold them within a matter of days.  Defendant Lion worked closely with Defendant Lancaster Mortgage Bankers, LLC, often buying as many as 30 loans per day from Defendant Lancaster Mortgage Bankers, LLC. Over a four year period, Defendant Lion bought hundreds of loans from Defendant Lancaster Mortgage Bankers, LLC.

359.     To fund its speculative mortgage trading business, Defendant Lion borrowed money from CIF. Defendant Lancaster Mortgage Bankers, LLC obtained its operating capital primarily from CIF, either directly from CIF or through Defendants Monmouth or Bradford.

360.     By 2005, at its peak, Defendant Lion was indebted to CIF for more than $6.3 million.  By January 2008 (the date CIF declared commence "winding down"), Defendant Lion's unpaid outstanding balance tossed to CIF was $2.7 million, which remains unpaid as of the date this Complaint was filed.

361.     On August 31, 2007, Defendant Lancaster Mortgage Bankers, LLC filed bankruptcy.  At the time of filing, Defendant Lancaster Mortgage Bankers, LLC reported total debts in excess of $63 million, including $1.1 million owed to Defendant Bradford and $360,000 owed to Defendant Lion.

362.     In December 2007, Defendant Lion filed motions in bankruptcy court claiming Defendant Lion had purchased seven notes from Defendant Lancaster Mortgage Bankers, LLC immediately before the bankruptcy filing and alleging Defendant Lion should be entitled to collect all of the proceeds from the seven loans, the face value of which was more than $1.1 million.

363.     In October 2008, Defendant Lion reached an agreement with the US Trustee in the case.  The settlement agreement provided that Defendant Lion would pay the US Trustee (on behalf of the Bankruptcy Estate of Defendant Lancaster Mortgage Bankers, LLC) 25% of the proceeds it ultimately collects from the loans.

364.     In April 2009, the US Trustee remitted payment to Defendant Lion in the amount of $59,077, which represented Defendant Lion's share of proceeds the US Trustee had collected on the loans.

365.     On October 13, 2009, Defendant Lion paid CIF $94,661. When he tendered payment to CIF, Arthur Field stated that the check represented all of the money Defendant Lion had and that Defendant Lion was no longer in business and was defunct.

### (ii)     Family Residences Purchased With CIF Funds

366.     In January 2004, Defendant Kathryn Taillon purchased the family residence located at 310 Thornblade Boulevard in Greenville South Carolina from a third party for $910,000. Defendants Arthur Field and Kathryn Taillon, and their daughter, Allyson Field, made this house their personal residence from 2004 through the date this Complaint was filed.

367.     The purchase of the 310 Thornblade Boulevard house was financed with a $637,000 mortgage loan from Defendant Lancaster Mortgage Bankers, LLC. To finance the loan to Defendant Kathryn Taillon, Defendant Lancaster Mortgage Bankers, LLC received funding through Defendant Monmouth, which in turn had received its funding from CIF.

368.     Two years later, in February 2006, Defendant Lancaster Mortgage Bankers, LLC executed and filed an Affidavit of Lost Assignment of Mortgage, evidencing the transfer of Defendant Kathryn Tallion mortgage loan from Defendant Lancaster Mortgage Bankers, LLC to Lehman Brothers Bank, FSB.

369.     Upon information and belief, the mortgage was satisfied in full with funds from CIF or related entities.

370.     In May 2009, in the face of lawsuits filed against her by CIF Noteholders, Defendant Kathryn Tallion executed and recorded a deed which transferred the family residence into the name of her daughter, Allison Field. The transfer of title was made with no monetary consideration. Plaintiff is informed and believes that the property was fraudulently transferred to these entities for the reasons stated herein, and should therefore to be determined by this Court to be held in a constructive trust for the plaintiff.

371.     On July 19, 2012, Defendant Allyson Field executed a Mortgage Deed in favor of Lexon Insurance Company, as collateral for bond posted on behalf of Defendant Arthur Field in the General Sessions Court of Richland County.

372.     On or about September 3, 2011, Defendants Art Field and Kathryn Taillon cash to purchase another residence at 5489 Atlantic NW, St. Augustine, Florida.  Plaintiff is informed and believes that the property was fraudulently transferred to these entities for the reasons stated herein, and should therefore to be determined by this Court to be held in a constructive trust for the plaintiff.

### (iii)   Lion Transfers Loan To Kirsten White Without Consideration

373.     On August 9, 2006, Defendant Arthur Field caused Defendant Lion Financial, LLC to loan $97,500 to Gary J. and Lori Lynn Malvern.  The loan was secured by a second mortgage the Malvern's personal residence located on 22 Stone Hollow Greenville, South Carolina.

374.     On March 13, 2009, Defendant Arthur Field caused Defendant Lion Financial, LLC to assign the $97,500 note and mortgage to Defendant Kirsten M. White. Defendant Kirsten M. White was the wife of Defendant David Gantt, prior to their divorce in or about 2010. (She was formerly known Kirsten W. Gantt.)  Defendant Kirsten M. White is a close acquaintance of Defendants Arthur Field and Kathryn Taillon.

375.     On May 4, 2010, Defendants Arthur Field and Pelican Way Financial, LLC financed Defendant Kirsten M. White's purchase and construction of her personal residence located at 5 Aldgate Way in Greer, South Carolina.  The recorded deed to the property reflects the total cost of the property including construction was $238,500. After the construction of the house was completed, on October 1, 2010, Defendants Arthur Field recorded two mortgages on Defendant Kirsten M. White's property on October 1, 2010 – a mortgage in the amount of $175,000 in favor of Defendant Pelican Way Financial, LLC, and a second mortgage in the

amount of $33,000 in favor of [Defendant] Arthur M. Field, Trustee. Greenville County property tax records report the property tax value as $235,000.

376.     On July 10, 2012, Defendant Kathryn Taillon executed and had recorded a Power of Attorney naming Defendant Kirsten M. White as her "Attorney", granter Defendant Kirsten M. White full powers to act on behalf of Defendant Kathryn Taillon.

377.     On September 5, 2012, Defendant Kirsten M. White executed and a "mortgage loan satisfaction" for the Malvern loan, which was recorded in the Greenville County records.

378.     CIF records reflect it never received any payments for any of these loans.

    **(iv)     Field Refuses To Produce Lion Records**

379.     Defendant Field has failed and refused to produce records or an accounting for Defendant Lion. Thus, not only are activities of its loans unaccounted for, no records of the business operations of Defendant Lion have been produced.

380.     Furthermore, at no time has Defendant Arthur Field disclosed the details of the loan which financed the purchase of his family's personal residence, and CIF records do not reflect receiving any payments as repayment of such amounts advanced thereof.

381.     Additionally, Defendant Arthur Field has not disclosed the details of the assignment of the Malvern loan and mortgage to Defendant Kirsten M. White.

382.     In summary, Defendants Arthur Field, Kathryn Taillon, Allyson Field, Kirsten M. White, Elliot Salzman, Lion and Lancaster Mortgage Bankers, LLC created their unscrupulously speculative investment vehicles, Defendants Lion and Lancaster Mortgage Bankers, LLC, and operated them with willful and reckless abandoned, culminating in over $63 million in unpaid debts to third parties and at least $3.7 million of unpaid funds from CIF. Meanwhile, Defendants Arthur Field, Allyson Field, and Kathryn Taillon enjoy their personal residence while withholding pertinent records to avoid the consequences of scrutiny, and Defendant Kirsten M. White received the benefits of the loan assignment without CIF receiving fair consideration.

### e.  **Field's Syndicate Takes CIF For $550,000 and More**

383.        On April 26, 2006, Defendant Arthur Field and a business associate, Ramon Ashy, Jr., formed Defendant He Will Provide LLC.  One half of the membership interests of Defendant He Will Provide, LLC was owned by Krondor, LLC, which was owned and or controlled by Defendant Arthur Field. The other half was owned by Phoenician Family Limited Partnership, which was owned and or controlled by Ramon Ashy, Jr.

384.        On August 18, 2006, Defendant Arthur Field and a business associate, Mohammed Edris, formed Defendant Aladdin's Café & Grill, LLC. One half of the membership interests of Defendant Aladdin's Café & Grill, LLC was owned by Defendant RAAF Enterprises, LLC, which was owned and or controlled by Defendant Arthur Field. The other half was owned by Mohammed Edris.

385.        On September 21, 2006, under the direction and control of Defendant Arthur Field, CIF loaned $700,000 to Defendant He Will Provide LLC. Defendant Arthur Field recorded transaction in CIF's books as a "Short term Loan 610 Congaree".  Defendant Arthur Field has not provided any records that document and support this loan transaction.

386.        On September 22, 2006, Defendant He Will Provide LLC purchased 610 Congaree Road, located in Greenville, SC, from Lone Star Steakhouse & Saloon of South Carolina, Inc.  The deed stated that the consideration was $1,350,000.  Defendant Arthur Field recorded the purchase in the books of Defendant He Will Provide LLC. He also recorded capital contributions from "Member One" and "Member Two" in the amounts of $700,000 and $637,221, respectively.

387.        On October 3, 2006, NBSC Bank loaned $1,156,000 to Defendant He Will Provide LLC. The loan closing statement reflects borrower received $1,147,004.  The books of Defendant He Will Provide LLC reflect the loan proceeds were <u>not</u> <u>deposited</u> in its bank account, but instead were distributed directly to the members: $700,000 to "Field/Taillon/Krondor" and

$447,004 to "Ashy/Phoenician Family Limited Partnership". Defendant Arthur Field and Ramon Ashy Jr. both signed NBSC Bank's mortgage loan as <u>members</u> and both signed personal guarantees.

388.     On October 3, 2006, Defendant Arthur Field recorded in the CIF books a $700,000 deposit as repayment of the "Short term Loan 610 Congaree". However, no interest was paid on this loan. The $700,000 was paid from the proceeds of the mortgage loan from NBSC Bank, which was secured with a first mortgage lien on the property.

389.     From September 16, 2006 until December 26, 2006, under the direction and control of Defendant Arthur Field, CIF wrote eight checks made payable to Defendant Aladdin's Café & Grill, LLC as follows:

|  |  |  |
|---|---|---|
| 9-16-06 | #1776 | $  50,000 |
| 9-20-06 | #1777 | 100,000 |
| 10-12-06 | #1784 | 100,000 |
| 11-21-06 | #1797 | 50,000 |
| 12-2-06 | #1800 | 50,000 |
| 12-15-06 | #1800 | 25,000 |
| 12-26-06 | #1800 | 50,000 |
| Total as of 12-26-06 |  | $425,000 |

390.     On October 6, 2006, Defendant He Will Provide LLC recorded a $100,000 deposit on its books. The deposit was recorded as a payment received from Defendant Aladdin's Café & Grill, LLC for purchase of equipment.

391.     On December 26, 2006, Defendant Arthur Field signed a loan commitment letter from CIF to Defendant Aladdin's Café & Grill, LLC. The letter provided that CIF would loan Defendant Aladdin's Café & Grill, LLC up to $475,000. The commitment letter also stated that the loan proceeds were to be used to acquire equipment and leasehold improvements at 610 Congaree Road. The commitment letter made no mention that Defendant Aladdin's Café & Grill, LLC had already received $425,000 from CIF.

392.     On December 30, 2006, Defendant Aladdin's Café & Grill, LLC executed a $475,000 Promissory Note and Security Agreement payable to CIF. As additional security on the loan, RAAF Enterprises, LLC and Mohammed Edris executed a Membership Pledge Agreements, pledging all of their membership interests in Defendant Aladdin's Café & Grill, LLC. The promissory note did not provide for interest on $425,000 that CIF had already advanced to Defendant Aladdin's Café & Grill, LLC between September 16, 2006 and December 30, 2006.

393.     Between January 6, 2007 and May 14, 2007, under the direction and control of Defendant Arthur Field, CIF wrote three checks made payable to Defendant Aladdin's Café & Grill, LLC totaling $100,000.

394.     As of May 14, 2007, CIF's loans to Defendant Aladdin's Café & Grill, LLC totaled $525,000, which was $50,000 more than the loan provided.

395.     Defendant Aladdin's Café & Grill, LLC did not make any payments to CIF until March 2007.  From March 21,2007 through September 9, 2007, Defendant Aladdin's Café & Grill, LLC paid CIF five payments as follows:

| | |
|---|---|
| 3-21-07 | $       851 |
| 6-27-07 | 3,563 |
| 7-16-07 | 3,552 |
| 8-10-07 | 3,552 |
| 9-08-07 | 3552 |
| Total as of 9-08-07 | $ 15,070 |

396.     In or about January 2007, Defendant Aladdin's Café & Grill, LLC opened its business, which was touted as a high-end Moroccan restaurant.  The business was an immediate failure and the loan from CIF remained in default.  By September 2007, in order to mask the bad loan and failed business, Defendant Arthur Field recruited Defendant Jose Rodriguez to help him change the business to a night club and cover up the failure. Defendant Jose Rodriguez had been in the construction business and had borrowed money from CIF on three projects, one of which

was recorded as in paid full, while the others were shown as being in default. Defendant Jose Rodriguez had no previous experience in owning or operating a night club business.

397.     Between October 26 and October 30, 2007, under the direction and control of Defendant Arthur Field, CIF created papers and exchanged funds with Defendant Jose Rodriguez to give the appearance that CIF was loaning money to Defendant Jose Rodriguez, who in turn was acquiring the business from Defendant Aladdin's Café & Grill, LLC. This was further designed to give the appearance that Defendant Aladdin's Café & Grill, LLC paid off its loan from CIF in full, including interest. Effecting this plan, CIF issued seven checks to Defendant Jose Rodriguez totaling $550,000. Defendant Jose Rodriguez, in turn, wrote two checks to CIF totaling $519,451. CIF recorded the checks as new loans to Defendant Jose Rodriguez and recorded the deposits as payoff of Defendant Aladdin's Café & Grill, LLC loan.

398.     Defendant Jose Rodriguez did open up a night club business, but the business failed from the beginning and closed within months.

399.     On July 9, 2008, with the restaurant and night club businesses closed, Defendant He Will Provide LLC signed a lease with Joshua Knuckles and Esther Knuckles dba Knuckle-Up Entertainment LLC. The lease was a two year lease and had a one year option. Monthly rent payments under the lease were $5,500 for the 1st year, $6,500 for the next year, and $7,500 for the option period, plus 100% of the property taxes.

400.     On August 4, 2008, Ramon Ashy Jr. died in a car wreck. His father, Ramon Ashy Sr., was appointed Personal Representative for the Estate of Ramon Ashy Jr.

401.     Defendant He Will Provide LLC received the rent payments, including payments for property taxes, from July 2008 through August 2009.

402.     Defendant He Will Provide LLC paid the NCSC mortgage payments, which were $9,754 per month, from November 2006 through August 2009.

403.    On July 14, 2009, Ramon Ashy, Sr. executed a Quit Claim Deed, signing it as Acting Manager of Defendant He Will Provide LLC, thereby transferring ownership of 610 Congaree Road to CIF. The deed stated that it was for "satisfaction of obligation from Defendant Aladdin's Café & Grill, LLC, its successors and assigns to Capital Investment Funding, LLC". The deed made no reference to the fact that NBSC Bank still held a mortgage loan on the property and the balance on the loan was $1.1 million. Additionally, delinquent property taxes on the property at that time totaled $25,187.

404.    CIF's Receiver collected the rents and paid the NBSC Bank mortgage payments from September through December 2009. The Receiver obtained an appraisal in December 2009 which reported that the appraised value of the property was $800,000. Since the value of the property was significantly less than NBSC Bank's $1.1 million mortgage balance and delinquent property taxes, the Receiver stopped paying the mortgage payments.

405.    In January 2010, NBSC Bank sent a notice to the Receiver exercising its rights under its loan agreement to collect the rents directly. NBSC Bank then started foreclosure proceedings and paid the delinquent 2008 and 2009 property taxes, which totaled $50,454.

406.    On March 1, 2011, the court granted the foreclosure and issued an order for the sale of the property. The court also the affirmed the validity and enforceability of the personal guarantees that NCSC Bank held from Defendant Arthur Field and [the Estate of] Ramon Ashy, Jr. Notable, CIF did not obtain personal guarantees from Defendants Arthur Field, Ramon Ashy, Jr. or Mohammed Edris.

407.    On June 10, 2011, NBSC Bank was deeded the property in the foreclosure sale. On June 30, 2011, NBSC Bank sold the property to an unrelated party for $566,000.

408.    Through these series of events, Defendant Arthur Field used CIF's $700,000 to buy property, took an additional $550,000 to start a restaurant business, and never had to pay a penny out of his pocket. Then, the business failed, and he walked away without having to pay a

penny. He let CIF finance his fancies with no intention of repaying the money if the business failed. Meanwhile, CIF lost $550,000 and never receives any interest on the $700,000 or the $550,000 loans.

### N.  Defendant Field's Continued Knowledge Of LRI's Deterioration

409.     LRI's financial position continued to deteriorate and it was unable to live up to the principal payment schedule put in place with the December 2003 amendment. According to Defendant Arthur Field's own books, LRI last made a principal payment on the LRI direct loans on May 12, 2005.  As time passed, LRI fell further and further behind on the draw down schedule put in place by the December 2003 Amendment to the revolving note. By 2006, the inability of CIF's largest creditor to pay its debts timely meant that CIF's largest creditor was insolvent and unable to pay CIF, and with the consequence that CIF's was also insolvent.

410.     Nevertheless, in January of 2006, Defendant Arthur Field sold 5% of his ownership interest in CIF to Sharon and Glen Finch for $136,500. Defendant Arthur Field helped them set up a South Carolina entity named Log Cabin Financial, LLC to own this interest.  In selling this 5% to the Finches, Defendant Arthur Field told them CIF's business was very healthy.

411.     On November 7, 2006, Defendant Arthur Field sent an email to the president of the Lancaster Group stating that he had to cancel an $8 million loan commitment because LRI and the related Lancaster Group had not paid CIF and "were in default in their payment of principal to CIF".  Defendant Arthur Field continued:

> "We still need whatever money you can send ASAP. I have other commitments still waiting. Plus, we would like to clean up the default. The Atty General is waiting on the revised prospectus and I don't want to let anyone know your firm has not made a principal payment in over 1 year, despite the promissory note on file with the Atty General showing payments due of roughly $4 Million annually;"

> "We have a new auditor who is supposed to start on 11/9. I will delay that for 10 days but I doubt I can wait beyond 12/1. I doubt the auditor will be

as liberal as our prior auditor and will object greatly to the non-payment of principal. Most assuredly this will cause a problem for CIF."

"I have gone $200K in the hole. Between redemptions and small loan commitments I had to honor, I am overdrawn on available cash to lend. I can maintain this for a very short period, but not more than 10 days without fear of incident."

Defendant Arthur Field added: "I must insist upon an immediate payment of at least $1.5 million to help you cure the current default".

### O. Money Laundering: Defendant Field Covertly Sends Money To LRI

412.     By November 2006, with LRI being insolvent and being unable to make the payment allegedly demanded by Defendant Arthur Field to cure its default, CIF was in the midst of a financial disaster.  Recognizing the financial crisis at hand, Defendants Arthur Field, David Lorenzo; Elliot Salzman; James Caserta; Martin Ender; Robert J. L'Abbate; Stuart Katz set course and engaged in a series of money laundering and bank fraud schemes in 2006 through 2008, which were designed to give the appearance that LRI was paying CIF loan payments, thereby hiding and obscuring CIF's insolvency from the view of regulatory authorities and CIF's noteholders.

413.     On December 29, 2006, under the direct control, knowledge, consent, and approval of Defendants David Lorenzo, James Caserta, Martin Ender, Robert J. L'Abbate, and Stuart Katz, LRI issued three checks: a check to Defendant Monmouth for $500,000 with the memo line "principal payoff" - right before end of the year 2006; a check to Defendant Monmouth for $14,186.50, with the memo notation "11/01 -11/30"; and a check to CIF for interest on its direct debt, in the amount of $153,938.22.  At the time LRI issued these checks (the "LRI checks") for a total of $668,124.72, it had only $373.77 in the bank.

414.     Defendant Arthur Field then caused Defendant Monmouth to issue a check (the "Monmouth check"), dated December 31, 2006, to CIF for the amount of $514,186.50, as a supposed payment of principal and interest.

415.     At the time Defendant Arthur Field caused Defendant Monmouth's check to be issued, Defendant Monmouth had only $11,631.10 in the bank.

416.     On January 2, 2007, Defendant Arthur Field caused CIF to "loan" $725,000 to Defendant Trazom. The same day, Defendant Trazom paid $750,000 to LRI, with a check (the "Trazom check") signed by Defendant Arthur Field, which had the memo line "Acquisition Wyckoff $250K balance".

417.     Defendant Arthur Field did not physically deposit the LRI checks totaling $668,124.72 until January 4, 2007.  They were physically deposited at a branch, and this was the day after Defendant Arthur Field's Trazom check to LRI cleared, on January 3, 2007.

418.     Defendant Arthur Field did not physically deposit the Monmouth check he wrote to CIF, dated December 31, 2006, to the CIF account until January 8, 2007.

419.     Defendant Arthur Field structured the transaction like this so he could later claim that LRI repaid CIF $500,000 of principal in 2006, and was current on all its payments of interest in 2006.  These circular checking account transactions evidenced an intent to create a false appearance about LRI, and served to postpone the inevitable day of reckoning from the reality that CIF's lead debtor was insolvent.

420.     The January payments from LRI inevitably came due and LRI still did not have any money.  Thus, in furtherance of the same scheme, Defendant Arthur Field caused CIF to "loan" an additional $250,000 to Defendant Trazom by check dated January 29, 2007.  With a check dated the next day, January 30, 2007, Defendant Trazom paid $250,000 to LRI, with a check signed by Defendant Arthur Field that had the memo line merely stating "Bal note purchase".

421.     On January 31, 2007, under the direct control, knowledge, consent, and approval of Defendants David Lorenzo, James Caserta, Martin Ender, Robert J. L'Abbate, and Stuart Katz, LRI wrote two interest payment checks dated January 31, 2007; one check for $153,938.22 to

CIF and the other for $14,186.05 to Defendant Monmouth.  At the time it wrote these checks, LRI had just over $200 in the bank.  Defendant Arthur Field booked the checks as paid on January 31, 2007.

422.      Defendant Arthur Field's Trazom check for $250,000 cleared in LRI's account on February 1, 2007.

423.      Defendant Arthur Field physically deposited LRI's check into the Defendant Monmouth account on February 5, 2007.  He then wrote a check for $14,180.00 from Defendant Monmouth to CIF that was dated January 31, 2009, at a time when Defendant Monmouth only had $11,671.94 in the bank. Defendant Arthur Field deposited this check from Defendant Monmouth to CIF on February 7, 2007.

424.      The two payments to LRI totaling $1,000,000, made in January and February 2007 from CIF through Defendant Trazom to LRI, were supposedly for the purchase of a $600,000 note and mortgage from SRG 457, LLC payable to LRI, secured by a mortgage on a residential house located at 457 Carlton Road in Wyckoff, New Jersey ("457 Carlton Road"). Four years earlier, in March of 2002, under the direct control, knowledge, consent, and approval of Defendants Arthur Field, David Lorenzo, James Caserta, Martin Ender, Robert J. L'Abbate, and Stuart Katz, CIF had loaned $600,750 to Defendant Monmouth, which in turn loaned the same amount to LRI, which in turn loan those funds to SRG 457, LLC.  In December 2002, such Defendants caused CIF to loan an additional $100,000 to SRG 457, LLC in similar fashion, noted in CIF's records with the memo "SRG increase".  SRG 457, LLC allegedly used all of these funds to purchase and improve 457 Carlton Road in 2002.  Very soon thereafter, SRG 457, LLC defaulted on the loans.  On August 29, 2006, LRI filed foreclosure against SRG 457, LLC for failure to pay its obligation to LRI.

425.      On July 16, 2007, Defendant Arthur Field then caused CIF to pay Defendant Trazom $25,000, and forgave Defendant Trazom's outstanding loan balance by the full

$1,000,000 by booking the transaction as the purchase of real property (when in fact CIF had supposedly only purchased a note and mortgage already in foreclosure, and for which it did not even have any assignment yet). Defendant Arthur Field's Quickbooks memorialized this transaction as: *"SRG 457 Purchase real property NJ foreclosure; satisfy outstanding mortgage [of Trazom]; CIF to collect interest from 7/1/07; Trazom to acquire and assign SRG 457 to CIF immediately; foreclosure to continue in LRI and CIF name"*.

426.    Thus, in January and February 2007, Defendants Arthur Field, David Lorenzo, James Caserta, Martin Ender, Robert J. L'Abbate, and Stuart Katz caused CIF to pay $1,000,000 to LRI through Defendant Trazom, for a $600,000 note and mortgage that was already in foreclosure proceedings, on a property for which CIF had already lent LRI over $700,000. Defendants Arthur Field, David Lorenzo, James Caserta, Martin Ender, Robert J. L'Abbate, and Stuart Katz did this so LRI could send substantially all of the $1,000,000 back to Defendant Monmouth and CIF as "payment" of interest and principal.  The purpose of these transactions was to enable Defendants Arthur Field, David Lorenzo, James Caserta, Martin Ender, Robert J. L'Abbate, and Stuart Katz to hide the reality that LRI, CIF's leading debtor, was insolvent, thereby delaying the immediate consequence of CIF facing insolvency.

427.    Importantly, Defendants Arthur Field, David Lorenzo, James Caserta, Martin Ender, Robert J. L'Abbate, and Stuart Katz did not even bother to immediately secure for CIF the asset CIF supposedly purchased for $1,000,000.   It was not until June 6, 2008 - over a year later – that LRI executed an Assignment on behalf of LRI II, LRI's successor in interest. It was not until July 28, 2008 when Defendant Arthur Field caused CIF to file a motion to intervene in an imminent foreclosure sale of the underlying property at 457 Carlton Road.

428.    On or about August 27, 2008, Defendant Arthur Field caused CIF to enter into a contract to sell the 457 Carlton Road property to 457 Carlton Road, LLC, for $394,000. The contract with CIF was signed for 457 Carlton Road, LLC by its Managing Member, Defendant

Elliot Salzman, who was, as noted before, the long-time friend of Defendant Arthur Field and who had been kicked out of LRI for financial improprieties with LRI money lent to it by CIF.

429.     The deed to CIF from the court ordered sheriff's sale from the foreclosure was issued on September 15, 2008.  On September 22, 2008, Defendant Arthur Field prepared a deed conveying the 457 Carlton Road property to 457 Carlton Road LLC.  On October 21, 2008, Defendant Elliot Salzman sent a letter to Defendant Arthur Field with a check for CIF's net proceeds from the sale of $305,998.63.  Defendant Arthur Field never cashed the check on behalf of CIF.  He ultimately delivered it to the Receiver of CIF, on or about sometime in December 2011 when the Receiver inquired about this transaction.  Defendant Arthur Field advised the Receiver that he [Defendant Arthur Field] did not cash the check because he knew the check was would be returned for insufficient funds.

430.     Thus, under the direct control, knowledge, consent, and approval of Defendants Arthur Field, David Lorenzo, Elliot Salzman, James Caserta, Martin Ender, Robert J. L'Abbate, and Stuart Katz, CIF transferred $1,000,000 to LRI allegedly in exchange for a $600,000 note and mortgage that was already in foreclosure on a property for which CIF had lent LRI over $700,000 four years earlier, then sold the property to an entity owned and controlled by Defendant Elliot Salzman (who had already been kicked out of LRI for financial improprieties) for a mere $394,000, for which CIF only received a check for the net of $305,778.63, which Defendant Arthur Field did not attempt to cash or to collect.  These transactions caused a large loss to CIF and were for the purpose of assisting Defendants Arthur Field, David Lorenzo, Elliot Salzman, James Caserta, Martin Ender, Robert J. L'Abbate, and Stuart Katz in their efforts to hide and obscure LRI's and CIF's insolvency, and for the purpose of allowing Defendant Elliot Salzman to abscond with hundreds of thousands of dollars. [5]

---

[5]  In May 2012, Plaintiff filed a separate suit in the Superior Court of New Jersey to recover monies lost, stolen or misappropriated through these transactions related to 457 Carlton Road: Capital Investment Funding, LLC

431.     Further, on June 19, 2009, long after these transactions had taken place, Defendant Arthur Field filed with the South Carolina Secretary of State a "Statement of Dissociation" from Defendant Trazom, in which he stated that he had left the membership of Defendant Trazom on July 1, 2007 - nearly two years earlier, and 15 days before Defendant Arthur Field had caused CIF to write a $25,000 check to Trazom allegedly to buy the note from Defendant Trazom for the full $1,000,000.

### P.  Continued Money Laundering To Further Conceal LRI's Deterioration

432.     As LRI's financial position continued to falter, Defendants Arthur Field, David Lorenzo, James Caserta, Martin Ender, Robert J. L'Abbate, and Stuart Katz continued to launder money to LRI related entities so that they could send it back as payments on the LRI debt, and thereby continue the concealment of the LRI's and CIF's insolvencies.

433.     On March 29, 2007, under the direct control, knowledge, consent, and approval of Defendants Arthur Field, David Lorenzo, James Caserta, Martin Ender, Robert J. L'Abbate, and Stuart Katz, CIF sent $290,000 by wire to Lancaster Developers, a Lancaster related entity, supposedly to "purchase units".

434.     On April 2, 2007, under the Defendants Arthur Field, David Lorenzo, James Caserta, Martin Ender, Robert J. L'Abbate, and Stuart Katz, Lancaster Developers wired $9,290.12 to Defendant Monmouth.

435.     That day, Defendant Arthur Field then wrote a check for $9,290 from Defendant Monmouth to CIF to represent LRI's interest payment.

436.     On April 2, 2007 as well, under the direct control, knowledge, consent, and approval of Defendants Arthur Field, David Lorenzo, James Caserta, Martin Ender, Robert J.

---

v. Calvary Asset Management LLC, Robert Sypher, an individual; Elliot Salzman, an individual; 457 Carlton Road, LLC, Arthur Field, an individual; John Does 1-10 (fictitious names); and ABC Corporations 1-10 (fictitious names); Docket No. L-3790-12.  Because most of the defendants in that suit are domiciled within the state of New Jersey and the real property is located within the state of New Jersey, Plaintiff is proceeding here with actions different and distinct from those in the New Jersey case. Calvary Asset Management LLC, Robert Sypher, Elliot Salzman, and 457 Carlton Road, LLC would otherwise be parties in this case.

L'Abbate, and Stuart Katz, Lancaster Developers wired $155,217.49 to CIF for LRI's interest on the direct debt, which Defendant Arthur Field booked as occurring on March 30, 2007.

437.      On April 18, 2007, some of the remaining shareholders of LRI executed a Written Consent, in which it was noted that LRI was in default in its loan to CIF, and had "no liquid assets to make any payment to CIF or its subsidiary, and no credit".  The document also noted that LRI had interests in real property, but that it was subject to mortgages and LRI had no ability to make mortgage payments.

438.      Of course, while Defendant Arthur Field's scheme took care of the March payments, inevitably the April payments to CIF and to Defendant Monmouth had to occur, and LRI could not make them.

439.      Lancaster Developers started the month of April 2007 with about $63 in the bank. Thus, on April 24, 2007, Defendant Arthur Field caused CIF to send another $290,000 by wire to Lancaster Developers.  This time Defendant Arthur Field's Quickbooks entry reflects it was for "condo purchase acquisition".

440.      Once Lancaster Developers had the money from CIF, it on April 30, 2007 wired CIF $155,217.49 for LRI's direct debt interest, and $9,290.12 to Defendant Monmouth for LRI's interest payment to Defendant Monmouth, all under the direct control, knowledge, consent, and approval of Defendants Arthur Field, David Lorenzo, James Caserta, Martin Ender, Robert J. L'Abbate, and Stuart Katz,.

441.      That day, Defendant Arthur Field then wrote a check for $9,290 from Defendant Monmouth to CIF to represent LRI's interest payment.

442.      Under the direct control, knowledge, consent, and approval of Defendants Arthur Field, David Lorenzo, James Caserta, Martin Ender, Robert J. L'Abbate, and Stuart Katz, LRI and Lancaster Developers then used some of the remaining funds to make a supposed "principal payment" to Defendant Monmouth on May 2, 2007.  Lancaster Developers actually wired

Defendant Monmouth $50,492.39 on May 1, 2007. On May 2, 2007, Defendant Arthur Field wrote a Defendant Monmouth check to CIF for $50,000.

443.      As with the $1,000,000 Trazom transaction to prop up LRI described previously, Defendants Arthur Field, David Lorenzo, James Caserta, Martin Ender, Robert J. L'Abbate, and Stuart Katz did obtain any documentation that CIF owned the two condo units supposedly purchasing with $580,000 of CIF and thus investor money.

444.      It was a year later in May of 2008 before Defendant Arthur Field sent an email to LRI, on which he copied Defendant Scott Pfeiffer, in which he stated: "I have asked twice more now about the condo units. I have a buyer wanting both of CIF's units. I have not heard anything from you nor received the necessary paperwork. I don't want to lose the sale".

445.      On May 23, 2008, LRI responded with an email which attached among other things a contract memorializing the sale of Unit 401 only.

446.      On May 27, 2008, Defendant Arthur Field sent an email to LRI, on which he copied Defendant Scott Pfeiffer, in which he enclosed "title affidavits and deeds to units 401 and 109", and asked that they be executed.

447.      On July 21, 2008, Defendant Arthur Field sent an email to LRI in which he stated, among other things: "This firm's primary goal is to recoup its $580,000 or as much as can be gotten swiftly. (We still don't understand why a deed with clear title wasn't recorded in 2007 as agreed for each unit, but will overlook that for the time being if this matter is resolved correctly before August 15). … I might expect it might be difficult for whomever received the funds to explain where the $580,000 went last year in that event. Let us hope that doesn't become an issue."

448.      There was no resolution as to whether CIF even owned these properties to which it had sent Lancaster Developers a total of $580,000 a year earlier. Thus, CIF had to file suit in New Jersey on July 25, 2008, in an attempt to obtain an ownership interest in the properties

which CIF had supposedly purchased a year earlier. In the lawsuit, CIF was not even sure what it was supposed to have received when Defendant Arthur Field caused CIF to send the total of $580,000 to LRI for the two properties. CIF alleged it sent the money based solely on representations that title would be transferred to CIF, "or that CIF would be granted some other security interest in Unit 401".

449.    Indeed, Defendant Arthur Field signed a Certification, dated November 3, 2008, that was filed in the lawsuit, in which he noted that as of May 15, 2008 - a year after he sent the money to LRI - he had "not heard anything nor received the necessary documentation reflecting ownership of Units 401 and 409".

450.    Ultimately, LRI did provide title to CIF for Unit 401. Defendant Arthur Field then caused CIF to sell that condo to an entity that involved Robert Sypher and Defendant Elliot Salzman (who had, as noted before, been kicked out as President and CEO of LRI for financial improprieties). The net CIF received after all of this was a net of only $184,423.10.

451.    LRI's financial position had gotten so bad that in June of 2007 Defendant Robert L'Abbate approached Defendant Arthur Field for a loan in order to make LRI payroll. In order to continue his scheme and avoid having to advise investors and regulatory authorities of the true dire financial status of LRI and thus CIF, Defendant Arthur Field caused CIF to loan L'Abbate personally $75,000 on June 10, 2007, which L'Abbate paid back on June 26, 2007 by getting a home equity loan.

### Q. October 2007 Agreement

452.    On October 1, 2007, LRI II (as successor in interest to LRI) entered with CIF into an "Agreement to Repay Indebtedness owed by Lancaster Resources, Inc., to Capital Investment Funding, LLC". This document was signed by Defendant Robert L'Abbate as Manager of LRI, II and Defendant Arthur Field, as manager of CIF and Defendant Monmouth.

453.       The October 1, 2007 agreement stated that since LRI was merging into LRI II, it was for the purpose of LRI II assuming the debt LRI owed to CIF and CIF's wholly owned subsidiary MFG. The outstanding amounts LRI owed were listed as $17,424,980.89 owed to CIF and $922,251.60 owed to MFG.

454.       The October 1, 2007 agreement waived all defaults under the prior agreements.

455.       The October 1, 2007 agreement extended the maturity date of the loans, setting forth yet another payment schedule, as follows:

|  | Principal |
|---|---|
| Dates Principal | Payment Due |
| October 31, 2007 | $500,000 |
| December 31, 2007 | $1,000,000 |
| June 30, 2008 | $2,500,000 |
| December 31, 2008 | $4,500,000 |
| June 30, 2009 | $4,000,000 |
| December 31, 2009 | $7,847,232   (remaining balance) |

456.       The October 1, 2007 agreement also included a Release of Collateral in which CIF and Defendant Monmouth released LRI and LRI II of "any and all security interests they may have in collateral under the [previously existing] Loan Documents and Promissory Note".

457.       The October 1, 2007 agreement further stated that LRI II was to provide in February of each year proof of sufficient collateral, including "valuations in form commonly accepted in the industry" such as independent commercial appraisals.  CIF never obtained collateral from LRI II and, therefore, LRI II never provided proof of such to CIF.

458.       Finally, the October 1, 2007 agreement had a confidentiality provision which precluded disclosure to anyone but the professional advisors of CIF, LRI II, and L'Abbate.

459.       On October 10, 2007, Defendant Arthur Field prepared and distributed to CIF's Noteholders the *THIRD QUARTER REPORT TO NOTE HOLDER*. This report stated that "LRI made no payment on its direct debt to the Company [CIF] in 2006, and the Company [CIF] and LRI began negotiating the repayment agreement in 2007." The report further stated that a loan

agreement was finalized in September 2007, whereby the maturity of the loan had been extended through 2009. The report did not specifically mention that no payment had been received in 2007, that the agreement waived all defaults under the prior loan agreements, and that all CIF had released all of the collateral on the loans.

460.     LRI II was unable to make the principal payments as required by this latest agreement, and purportedly made its last interest payment to Defendant Monmouth in January 2008, which Defendant Arthur Field recording as occurring in December 2007.

461.     Thus, while dealing with the pressures of the investigation by the Securities Division, and only none days prior the Securities Division filing its "Notice of Intent to Seek the Issuance of a Stop Order Denying Effectiveness to a Registration Statement", Defendant Arthur Field executed an agreement which purported to waive LRI's prior defaults, release all of LRI's collateral on its loans, and extend until 2009 the maturity date on the loans, which exceeded $18 million and comprised almost half of CIF's entire loan portfolio.

### R.    The Winding Up

462.     As a result of regulatory scrutiny and intervention as discussed herein, Defendants Arthur Field and Scott Pfeiffer decided to wind up CIF and called a CIF board meeting on January 15, 2008.  Defendant Arthur Field called Sharon Finch and asked her to attend the meeting.  He did not tell her at that time that the company was in difficult financial position or that he wanted to wind the company up. At the meeting, Defendant Arthur Field presented to Finch and others that CIF's position was still very positive, and it was related that all the investors would be paid back.  Defendant Arthur Field then asked Sharon Finch if anyone had a motion, and looked at her.  She then made the motion to wind up the business, feeling as if Defendant Arthur Field expected her to make the motion.

463.     The minutes from this meeting reflect a very detailed winding up motion being made by Finch, and that Defendant Arthur Field abstained from the first vote on the motion.

However, the details of this motion came from Defendant Arthur Field, and the motion was his proposal that he was advocating to Finch and the other members. The minutes further describe that, pursuant to the terms of the Senior Notes and the respective prospectuses, interest on the Senior Notes shall cease being accrued after January 14, 2008, and that "a 10 year period is reasonable for the wind up".

464.    On January 20, 2008, Defendant Arthur Field notified noteholders that CIF would be winding up. Characterizing the company's financial position as solvent and "in good financial condition", he stated he "strongly believed" all noteholders could be substantially repaid. Nevertheless, the noteholders were informed that payments to them would cease until all of CIF's assets were liquidated.

## S. Defendant Field Withdraws Capital from an Insolvent Company

465.    Despite knowing full well the true dire status of LRI and thus CIF, and having engaged in the above described schemes to prop up LRI so he would not have to disclose the true financial condition to investors and the Securities Division, Defendant Arthur Field made sure to get as much as he could out of CIF before the inevitable demise that he was keeping a secret.

466.    In 2007, Defendant Arthur Field wrote multiple payroll checks to himself totaling $235,807. In addition to these payroll checks and management fee checks, on May 25, 2007, Defendant Arthur Field wrote a check to himself for $180,000 from a CIF bank account, as a "partial distribution capital account" and on August 31, 2007 he wrote a check to himself for $90,000 as a "capital distribution".

467.    Additionally, in 2008 and 2009, after CIF declared it would be "winding up" its business and payments to noteholders had been halted, Defendant Arthur Field wrote multiple checks to himself as Manager Fees, totaling $212,404 in 2008 and $173,901 in 2009.

468.     At all times when these payments occurred from 2007 through 2009, CIF was in fact insolvent, despite Defendant Arthur Field's comprehensive efforts to mask and obscure the pitiful and dire financial condition of CIF.

469.     Although Cosimo had been in default of loans it received from CIF almost shortly after the loans were made, shortly before the collapse of CIF, Defendant Pfeiffer (as manager of Defendant Red Lion Trading) declared its loans to CIF to be in default and, in accordance with the terms of the operation agreement," tendered the ownership of Cosimo to CIF.

**T.  Investor Lawsuits and The Mediated Settlement**

470.     Faced with the proposition that they may have to wait as much as 10 years to receive any of their investment back, the South Carolina investors were outraged.  Soon after January 2008, several civil lawsuits were filed in South Carolina Circuit Courts against CIF as well as some of the defendants in this case. The various cases alleged damages and claims as a result of breach of contract, misrepresentation, negligent misrepresentation negligence, breach of fiduciary duties, tortious misconduct, fraudulent misrepresentation, fraudulent concealment, constructive fraud, conversion, civil conspiracy, and violations of the South Carolina Unfair Trade Practices Act, These cases were consolidated into a single case and that case was certified as a class action case entitled <u>Tomz et al v. Capital Investment Funding</u>, et al Case No: 2008-CP-23-3665.

471.     Mediation of the class action case resulted in a settlement of the case in 2009. The terms of the settlement were subject of a hearing and were thereafter fully stated in the Court's order entitled "Mediated Global Settlement Agreement And Order Approving Settlement", ("Order") issued on August 24, 2009.  Among other things, the Order stipulated that:

     a.    Defendant Arthur Field resign as Manager of CIF;
     b.    Jerry T. Saad, CPA ("Mr. Saad") be appointed as Receiver for CIF;
     c.    Defendant Arthur Field delivers to Mr. Saad all CIF records within 10 days;
     d.    CIF issue a Confession of Judgment to the Class Plaintiffs in the amount of $38,491,392; and

     e.      "Class Counsel may reinstitute any claim or action dismissed without prejudice…within the time limit imposed by law or court rule".

472.      As of August 24, 2009, Defendant Arthur Field did resign as Manager of CIF.

473.      As of August 24, 2009, Mr. Saad began serving as Receiver for CIF.

### U.  Criminal Indictments of Defendants Field and Pfeiffer

474.      On or about June 13, 2012, the South Carolina Attorney General formally indicted Defendants Arthur Field and Scott Pfeiffer on multiple counts of conspiracy, securities fraud and forgery related to their roles in CIF:  <u>State of South Carolina v. Arthur Field and Scott Pfeiffer</u>, C.A. No. 2112-GS-4708.

### V.  Receiver's Discovery of Defendants' Culpable Conduct

475.      As of August 24, 2009, the Receiver began his services for CIF.

476.      On August 24, 2009, the Receiver met with Defendant Arthur Field and Class Counsel Stanly Case to discuss the immediate tasks at hand: transitioning CIF management to the Receiver.

477.      On or about August 27, 2009, Defendant Arthur Field delivered to the Receiver limited quantities of banking records, recent mail items, and a small quantity of other records. Defendant Arthur Field later delivered records to the Receiver in stages. The Receiver received some Cosimo records on or about September 14, 2009.  Thereafter, the Receive received the bulk of the remaining Cosimo records in December 2009 and he received limited quantities of CIF records from time to time. While Defendant Arthur Field did give the Receiver additional records from time to time, he has not yet delivered to the Receiver all of CIF's records.[6]

478.      Over the course of September 2009, the Receiver began executing plans to identify, marshal and liquidate CIF's assets. On parallel course, he also focused on significant

---

[6] The Receiver requested on various occasions Defendant Arthur Field deliver all CIF records.  Receiver believes that even as of the date of the filing of this COMPLAINT, Defendant Arthur Field still retains substantial quantities of CIF records. In or about January 2012, the Receiver filed a motion in the South Carolina Circuit Court that oversees the receivership, seeking the Court's intervention in recovery of such records. That motion is still pending.

pending legal matters, including the LRI bankruptcy, several federal and state lawsuits that were ongoing, and several foreclosure lawsuits that were in process. The Receiver also visited most of the identified properties located in South Carolina and New Jersey.

479.       Over the course of subsequent months, from October 2009 through January 2010, the Receiver received more records from time to time, obtained formal and informal appraisals and evaluations on properties, began efforts to collect moneys on loan in default, began efforts to liquidate properties, and sold several parcels. During this time period, the Receiver did not discover, identify, or become aware of the culpable nature of any specific acts as related to the allegations of this COMPLANT.

480.       On December 23, 2009, the Receiver received a notice that Defendant LOP Capital, LLC was filing a lawsuit against Cosimo in connection with a parcel of land Cosimo obtained from a borrower via a deed in lieu of foreclosure in satisfaction of debt owed to Cosimo. On January 21, 2010, the Receiver accepted service of that lawsuit. In the weeks to follow, the Receiver began investigating the facts surrounding the lawsuit, but did not discover the egregious and culpable acts until months later, in or about May 2010.

481.       On April 21, 2010, the Receiver and his legal counsel met with Defendants Eugene Hopper and Scott Pfeiffer. The meeting was held at the offices of Defendant Pfeiffer, Gantt, and Gleaton, P.A. The Receiver called the meeting to discuss the delinquency status of the numerous loans Cosimo made to four borrowers: SD Trust; Big Deal; Rolling Hills; and WE3. Each of the four borrowers were owned and controlled by some combination of Defendants Eugene Hopper, Charles Pinion, Josh Ward, David Gantt, and Mark Davidson. Defendants Eugene Hopper was deemed to be the leader of the pack. Prior to the meeting, in February 2010, the Receiver had delivered to each of the aforementioned borrowers and defendants (as guarantors) a formal written notice of default and demand of full payment. This meeting was also

held to discuss the certain foreclosure actions on properties owned by some of the borrowers that were schedule to occur in May 2010.

482.     This meeting turned out to be starting point for the Receiver being alerted to and becoming aware of culpable acts committed by any of the defendants.

483.     In this meeting, Defendants Eugene Hopper admitted to the Receiver knowledge that:

   a.  Cosimo loaned Big Deal $500,000;
   b.  The purpose of the loan was to purchase 14 boat docks;
   c.  The boat docks were install at the Sweetwater project as planned;
   d.  UCC liens on these docks were filed, thereby securing Cosimo's loan;
   e.  He made the decision to sell the docks in order to raise money to pay bills;
   f.  He knew it was illegal to sell the docks without satisfying the liens;
   g.  He did not get Cosimo to approval the sale of the docks;
   h.  He did not get Cosimo to release the liens;
   i.  Cosimo did not receive any benefit from the sales.

484.     During the meeting, the Receiver informed Defendant Eugene Hopper that, because the aforementioned loans were in default, Cosimo was exercising its rights under the respective membership interest and stock pledge agreements to take control and ownership of SD Trust, Big Deal, Rolling Hills, and WE3. The Receiver also notified Defendant Eugene Hopper that all of the records of SD Trust, Big Deal, Rolling Hills, and WE3 should be protected and not destroyed or altered, and should be relinquished as soon as possible.  Defendant Eugene Hopper agreed to meet the Receiver the following week at the borrowers' office in Seneca whereby Defendant Eugene Hopper would relinquish such records.

485.     Delivery of the records was delayed because Defendant Eugene Hopper, Charles Pinion, Gene Ahlers, and the borrowers were physically evicted from their offices in Seneca on or about April 27, 2010, which forced them to scurry to find an alternate location for relocation of their offices and records.

486.     On May 3, 2010, the Receiver met Defendant Eugene Hopper, Defendant Gene Ahlers, and Paul Chalmers at a storage warehouse in Walhalla, South Carolina. Defendants

Eugene Hopper and Gene Ahlers gave limited assistance to the Receiver. The Receiver identified and seized substantially all records that could be identified as records of SD Trust, Big Deal, Rolling Hills, and WE3.

487.     Additionally on May 3, 2010, the Receiver did cause SD Trust to file for Chapter 11 protection in the US Bankruptcy Court.

488.     Over the course of the next many months, the Receiver and the attorney engaged to handle the bankruptcy conducted very detailed and methodically investigations of the activities of SD Trust, Big Deal, Rolling Hills, and WE3.  Through this process, the Receiver and counsel began to piece together the elaborate labyrinth of individuals, entities, scams, and Ponzi schemes which prevailed unchecked within this group. The investigations quickly pointed up the chain to Cosimo and CIF, and to all of the defendants associated with Cosimo and CIF, because the Hopper Syndicate and all of its scams and schemes could not have existed, much less proliferated, without those incestuous relationships between the lender, the borrowers, and the attorneys.  It thus came to light that they all knew and they all participated.

489.     Also during these months, other lawsuits and legal issues arose - matters connected to LRI, Campitelli, Trazom, Tcholok, New Jersey real estate, and others.  As the Receiver investigated the underlying causes, he began to piece together the elaborate labyrinth of individuals, entities, scams, and Ponzi schemes in these areas as well. The culture was pervasive and went unchecked until the money ran out in 2007.

## FOR A FIRST CAUSE OF ACTION

**As to Defendants Arthur Field; Scott Pfeiffer; Allyson Field; Alysia Hazelton; Anthony Edgar; Ashley Morey; Barry Lynn Spencer; Bart Kelley; Ben Hines; Bill Beckman; Brad Kelley; Brian Knight; Charles Pinion; D. L. Jones; David Gantt; David Lorenzo; Davyd Field; Dennis Hackney; Elizabeth Hopper; Elliot Salzman; Eugene Hopper; Gary Johnson; Gene Ahlers; Greg Bailey; J.G. "Geneva" Seller (a/k/a Geneva Campitelli); J.G. Ryckman; Jack Campitelli (aka A.J. Camp); James Caserta; Jamie McKeough; Jan Davidson; Johnny Kelley; Jose Rodriguez; Joshua Ward; Kathryn Taillon; Kirsten M. White; Mark Davidson; Martin Ender;**

**Melinda Holbrooks; Michael Moore; Michael Parish; Mike Loprieno; Nathan Holbrooks; Paula Haney; Philip Davidson; Ralph Gleaton; Reba Cox; Robert J. L'Abbate; Roger Ezell; Ross Jones; Shawna Freeman; Stuart Katz; Advance Business Funding, LLC; Aladdin's Grill and Café, LLC; Alliance Development Partners, LLC; Amerishare Corporation; Angle Holdings, LLC; Apex Construction; Arrowhead Funding Corporation; Asante Properties, LLC (a/k/a Asante, LLC); Badger Development, LLC; Blenheim Properties, LLC; Bolingbroke United (England) Ltd; Bountiful Bingo, LLC; Bradford Financial Group, LLC; CapGain Properties, Inc.; Capital Intrastate Funding, LLC; CommunitySouth Bank and Trust (and its Receiver, Federal Deposit Insurance Company); Construction Resources, Inc.; Dunross Struan, LLC; Ezell Investment Company, LLC; Gleaton Wyatt Hewitt, P.A., as the successor in interest to Pfeiffer & Gantt, P.A., Pfeiffer, Gantt & Gleaton, P.A., Pfeiffer Gantt Gleaton Wyatt, P.A., and Pfeiffer Gleaton Wyatt Hewitt, P.A.; GodProp, LLC; Gulf Capital LP; Gulf Capital Management, Inc.; He Will Provide, LLC; Instant Cash, Inc.; Krondor Trading Co., LLC; J&H Builders, LLC; Lancaster Mortgage Bankers, LLC; Lamplighter Mortgage Company, LLC; Lion Financial, LLC; Log Dirt, LLC; LOP Capital, LLC; Lot 37 Waters Edge, LLC; Lot 46 Waters Edge, LLC; Lot 6 Lakewater Cove, LLC; Mithril Funding, LLC; Monmouth Financial Group, Ltd.; Moore & Associates, LLC; Neighborhood Homes, LLC; Nevada Processing Center, Inc.; Onward Finance Corporation; Onward Recovery Partners Corporation; Our Tree House, LLC; P&G Title Agency, LLC; PG&G Title Insurance, LLC; PGGW Title Insurance, LLC; Pelican Way Financial, LLC;  RAAF Enterprises, LLC; Red Lion Trading House, LLC; Saneski, LLC; Saxon Business Services, LLC; Saxon Holding, LLC; Seed Construction; Southridge Construction, Inc.; Steele Construction of SC, Inc.; Strategic Lending Solutions, LLC; Tcholok Properties, LLC; The Chrysler Drive Trust; The Cotton Mill Trust; The Old Arcadia Road Trust; The Pickering Road Trust; The Upper Nehalem Trust; Total Package Grading; Trazom, LLC; United Private Capital, Inc.; York Mortgage Funding, LLC; John Does 1-35 (names being fictitious); Jane Does 1-35 (names being fictitious); ABC Companies 1-35 (names being fictitious)**

## Violation of 18 U.S.C. 1962(a) ("Civil RICO I")

490.     Plaintiff incorporates all previous allegations, to extent not inconsistent herewith, as if set forth *in toto* hereunder.

491.     Plaintiff is a "person" within the meaning of 18 U.S.C. § 1961(3) and 1964(c).

492.     The above-identified defendants are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c) and (d).

493.     As set forth in paragraphs 1 through 468 supra, these defendants received income, directly and/or indirectly, from a pattern of racketeering activity, as defined by 18 U.S.C.

§1961(1)(B) and (5), in which these defendants participated as principals, but not limited to the following:

    a.   Multiple instances of mail fraud in violation of 18 U.S.C. §1341;

    b.   Multiple instances of wire fraud in violation of 18 U.S.C. §1343; and/or

    c.   Multiple instances of transportation of stolen goods, including money obtained by fraud, in violation of 18 U.S.C. §2314.

494.     This income was thereafter used and/or invested in other enterprises that affect interstate commerce.

495.     Plaintiff's business and/or property was injured as a direct and/or proximate result of these defendants' use and/or investment of the income in these enterprises, within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) and (d), as it relates to the assets and interest of the plaintiff.

496.     As a direct cause in fact, Plaintiff has been damaged and is entitled to actual damages, trebled thereafter, plus attorney's fees and costs, in an amount to be determined by the Court and jury.

## FOR A SECOND CAUSE OF ACTION

**As to Defendants Arthur Field; Scott Pfeiffer; Allyson Field; Alysia Hazelton; Anthony Edgar; Ashley Morey; Barry Lynn Spencer; Bart Kelley; Ben Hines; Bill Beckman; Brad Kelley; Brian Knight; Charles Pinion; D. L. Jones; David Gantt; David Lorenzo; Davyd Field; Dennis Hackney; Elizabeth Hopper; Elliot Salzman; Eugene Hopper; Gary Johnson; Gene Ahlers; Greg Bailey; J.G. "Geneva" Seller (a/k/a Geneva Campitelli); J.G. Ryckman; Jack Campitelli (aka A.J. Camp); James Caserta; Jamie McKeough; Jan Davidson; Johnny Kelley; Jose Rodriguez; Joshua Ward; Kathryn Taillon; Kirsten M. White; Mark Davidson; Martin Ender; Melinda Holbrooks; Michael Moore; Michael Parish; Mike Loprieno; Nathan Holbrooks; Paula Haney; Philip Davidson; Ralph Gleaton; Reba Cox; Robert J. L'Abbate; Roger Ezell; Ross Jones; Shawna Freeman; Stuart Katz; Advance Business Funding, LLC; Aladdin's Grill and Café, LLC; Alliance Development Partners, LLC; Amerishare Corporation; Angle Holdings, LLC; Apex Construction; Arrowhead Funding Corporation; Asante Properties, LLC (a/k/a Asante, LLC); Badger Development, LLC; Blenheim Properties, LLC; Bolingbroke United (England) Ltd; Bountiful**

**Bingo, LLC; Bradford Financial Group, LLC; CapGain Properties, Inc.; Capital Intrastate Funding, LLC; CommunitySouth Bank and Trust (and its Receiver, Federal Deposit Insurance Company); Construction Resources, Inc.; Dunross Struan, LLC; Ezell Investment Company, LLC; Gleaton Wyatt Hewitt, P.A., as the successor in interest to Pfeiffer & Gantt, P.A., Pfeiffer, Gantt & Gleaton, P.A., Pfeiffer Gantt Gleaton Wyatt, P.A., and Pfeiffer Gleaton Wyatt Hewitt, P.A.; GodProp, LLC; Gulf Capital LP; Gulf Capital Management, Inc.; He Will Provide, LLC; Instant Cash, Inc.; Krondor Trading Co., LLC; J&H Builders, LLC; Lancaster Mortgage Bankers, LLC; Lamplighter Mortgage Company, LLC; Lion Financial, LLC; Log Dirt, LLC; LOP Capital, LLC; Lot 37 Waters Edge, LLC; Lot 46 Waters Edge, LLC; Lot 6 Lakewater Cove, LLC; Mithril Funding, LLC; Monmouth Financial Group, Ltd.; Moore & Associates, LLC; Neighborhood Homes, LLC; Nevada Processing Center, Inc.; Onward Finance Corporation; Onward Recovery Partners Corporation; Our Tree House, LLC; P&G Title Agency, LLC; PG&G Title Insurance, LLC; PGGW Title Insurance, LLC; Pelican Way Financial, LLC; RAAF Enterprises, LLC; Red Lion Trading House, LLC; Saneski, LLC; Saxon Business Services, LLC; Saxon Holding, LLC; Seed Construction; Southridge Construction, Inc.; Steele Construction of SC, Inc.; Strategic Lending Solutions, LLC; Tcholok Properties, LLC; The Chrysler Drive Trust; The Cotton Mill Trust; The Old Arcadia Road Trust; The Pickering Road Trust; The Upper Nehalem Trust; Total Package Grading; Trazom, LLC; United Private Capital, Inc.; York Mortgage Funding, LLC; John Does 1-35 (names being fictitious); Jane Does 1-35 (names being fictitious); ABC Companies 1-35 (names being fictitious)**

## Violation of 18 U.S.C. 1962(b) ("Civil RICO II")

497.     Plaintiff incorporates all previous allegations, to extent not inconsistent herewith, as if set forth *in toto* hereunder.

498.     Plaintiff is a "person" within the meaning of 18 U.S.C. § 1961(3) and 1964(c).

499.     The above-identified defendants are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c) and (d).

500.     As set forth in paragraphs 1 through 481 *supra*, the operations, actions and conduct of these defendants, individually and by and through the respective corporate defendants, constitute an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) and (d), as it relates to the assets and interest of the plaintiff.

501.     Through a pattern of racketeering activity, as defined by as defined by 18 U.S.C. §1961(1)(B) and (5), these defendants, individually and by and through their respective corporate

entities, specifically intended to acquire or maintain an interest in and/or control of the enterprise, including, but not limited to the following:

    a.   Multiple instances of mail fraud in violation of 18 U.S.C. §1341;

    b.   Multiple instances of wire fraud in violation of 18 U.S.C. §1343; and

    c.   Multiple instances of transportation of stolen goods, including money obtained by fraud, in violation of 18 U.S.C. §2314.

502.    Said enterprise engaged in and/or affected interstate or foreign commerce, within the meaning of 18 U.S.C. § 1962(c) and (d).

503.    The actions of these defendants resulted in injury to Plaintiff's business or property by reason of these defendants' acquisition and/or maintenance of the interest in, or control over the enterprise.

504.    As a direct cause in fact, Plaintiff has been damaged and is entitled to actual damages, trebled thereafter, plus attorney's fees and costs, in an amount to be determined by the Court and jury.

## FOR A THIRD CAUSE OF ACTION

**As to Defendants Arthur Field; Scott Pfeiffer; Allyson Field; Alysia Hazelton; Anthony Edgar; Ashley Morey; Barry Lynn Spencer; Bart Kelley; Ben Hines; Bill Beckman; Brad Kelley; Brian Knight; Charles Pinion; D. L. Jones; David Gantt; David Lorenzo; Davyd Field; Dennis Hackney; Elizabeth Hopper; Elliot Salzman; Eugene Hopper; Gary Johnson; Gene Ahlers; Greg Bailey; J.G. "Geneva" Seller (a/k/a Geneva Campitelli); J.G. Ryckman; Jack Campitelli (aka A.J. Camp); James Caserta; Jamie McKeough; Jan Davidson; Johnny Kelley; Jose Rodriguez; Joshua Ward; Kathryn Taillon; Kirsten M. White; Mark Davidson; Martin Ender; Melinda Holbrooks; Michael Moore; Michael Parish; Mike Loprieno; Nathan Holbrooks; Paula Haney; Philip Davidson; Ralph Gleaton; Reba Cox; Robert J. L'Abbate; Roger Ezell; Ross Jones; Shawna Freeman; Stuart Katz; Advance Business Funding, LLC; Aladdin's Grill and Café, LLC; Alliance Development Partners, LLC; Amerishare Corporation; Angle Holdings, LLC; Apex Construction; Arrowhead Funding Corporation; Asante Properties, LLC (a/k/a Asante, LLC); Badger Development, LLC; Blenheim Properties, LLC; Bolingbroke United (England) Ltd; Bountiful Bingo, LLC; Bradford Financial Group, LLC; CapGain Properties, Inc.; Capital Intrastate Funding, LLC; CommunitySouth Bank and Trust (and its**

**Receiver, Federal Deposit Insurance Company); Construction Resources, Inc.; Dunross Struan, LLC; Ezell Investment Company, LLC; Gleaton Wyatt Hewitt, P.A., as the successor in interest to Pfeiffer & Gantt, P.A., Pfeiffer, Gantt & Gleaton, P.A., Pfeiffer Gantt Gleaton Wyatt, P.A., and Pfeiffer Gleaton Wyatt Hewitt, P.A.; GodProp, LLC; Gulf Capital LP; Gulf Capital Management, Inc.; He Will Provide, LLC; Instant Cash, Inc.; Krondor Trading Co., LLC; J&H Builders, LLC; Lancaster Mortgage Bankers, LLC; Lamplighter Mortgage Company, LLC; Lion Financial, LLC; Log Dirt, LLC; LOP Capital, LLC; Lot 37 Waters Edge, LLC; Lot 46 Waters Edge, LLC; Lot 6 Lakewater Cove, LLC; Mithril Funding, LLC; Monmouth Financial Group, Ltd.; Moore & Associates, LLC; Neighborhood Homes, LLC; Nevada Processing Center, Inc.; Onward Finance Corporation; Onward Recovery Partners Corporation; Our Tree House, LLC; P&G Title Agency, LLC; PG&G Title Insurance, LLC; PGGW Title Insurance, LLC; Pelican Way Financial, LLC; RAAF Enterprises, LLC; Red Lion Trading House, LLC; Saneski, LLC; Saxon Business Services, LLC; Saxon Holding, LLC; Seed Construction; Southridge Construction, Inc.; Steele Construction of SC, Inc.; Strategic Lending Solutions, LLC; Tcholok Properties, LLC; The Chrysler Drive Trust; The Cotton Mill Trust; The Old Arcadia Road Trust; The Pickering Road Trust; The Upper Nehalem Trust; Total Package Grading; Trazom, LLC; United Private Capital, Inc.; York Mortgage Funding, LLC; John Does 1-35 (names being fictitious); Jane Does 1-35 (names being fictitious); ABC Companies 1-35 (names being fictitious)**

## <u>Violation of 18 U.S.C. 1962(c) ("Civil RICO III")</u>

505. Plaintiff incorporates all previous allegations, to extent not inconsistent herewith, as if set forth *in toto* hereunder.

506. Plaintiff is a "person" within the meaning of 18 U.S.C. § 1961(3) and 1964(c).

507. The operations, actions and conduct of these defendants, individually and by through their respective corporate entities, constitute an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) and (d), as it relates to the assets, interests and operations of the plaintiff, whose activities were engaged in and/or affected interstate or foreign commerce, within the meaning of 18 U.S.C. § 1962(c) and (d).

508. These defendants, individually and by through their respective corporate entities, are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c) and (d).

509.     These defendants, individually and by through their respective corporate entities, were employed by or associated with enterprise(s), that are/were engaged in or affecting interstate commerce.

510.     These defendants, individually and by through their respective corporate entities, conducted or participated in the conduct and/or affairs of the enterprise through a pattern of racketeering activity, as defined by as defined by 18 U.S.C. §1961(1)(B) and (5), including but not limited to:

      a.  Multiple instances of mail fraud in violation of 18 U.S.C. §1341;

      b.  Multiple instances of wire fraud in violation of 18 U.S.C. §1343; and/or

      c.  Multiple instances of transportation of stolen goods, including money obtained by fraud, in violation of 18 U.S.C. §2314.

511.     The actions of these defendants resulted in injury to Plaintiff's business or property.

512.     As a direct cause in fact, Plaintiff has been damaged and is entitled to actual damages, trebled thereafter, plus attorney's fees and costs, in an amount to be determined by the Court and jury.

## FOR A FOURTH CAUSE OF ACTION

**As to Defendants Arthur Field; Scott Pfeiffer; Allyson Field; Alysia Hazelton; Anthony Edgar; Ashley Morey; Barry Lynn Spencer; Bart Kelley; Ben Hines; Bill Beckman; Brad Kelley; Brian Knight; Charles Pinion; D. L. Jones; David Gantt; David Lorenzo; Davyd Field; Dennis Hackney; Elizabeth Hopper; Elliot Salzman; Eugene Hopper; Gary Johnson; Gene Ahlers; Greg Bailey; J.G. "Geneva" Seller (a/k/a Geneva Campitelli); J.G. Ryckman; Jack Campitelli (aka A.J. Camp); James Caserta; Jamie McKeough; Jan Davidson; Johnny Kelley; Jose Rodriguez; Joshua Ward; Kathryn Taillon; Kirsten M. White; Mark Davidson; Martin Ender; Melinda Holbrooks; Michael Moore; Michael Parish; Mike Loprieno; Nathan Holbrooks; Paula Haney; Philip Davidson; Ralph Gleaton; Reba Cox; Robert J. L'Abbate; Roger Ezell; Ross Jones; Shawna Freeman; Stuart Katz; Advance Business Funding, LLC; Aladdin's Grill and Café, LLC; Alliance Development Partners, LLC; Amerishare Corporation; Angle Holdings, LLC; Apex Construction; Arrowhead Funding Corporation;**

**Asante Properties, LLC (a/k/a Asante, LLC); Badger Development, LLC; Blenheim Properties, LLC; Bolingbroke United (England) Ltd; Bountiful Bingo, LLC; Bradford Financial Group, LLC; CapGain Properties, Inc.; Capital Intrastate Funding, LLC; CommunitySouth Bank and Trust (and its Receiver, Federal Deposit Insurance Company); Construction Resources, Inc.; Dunross Struan, LLC; Ezell Investment Company, LLC; Gleaton Wyatt Hewitt, P.A., as the successor in interest to Pfeiffer & Gantt, P.A., Pfeiffer, Gantt & Gleaton, P.A., Pfeiffer Gantt Gleaton Wyatt, P.A., and Pfeiffer Gleaton Wyatt Hewitt, P.A.; GodProp, LLC; Gulf Capital LP; Gulf Capital Management, Inc.; He Will Provide, LLC; Instant Cash, Inc.; Krondor Trading Co., LLC; J&H Builders, LLC; Lancaster Mortgage Bankers, LLC; Lamplighter Mortgage Company, LLC; Lion Financial, LLC; Log Dirt, LLC; LOP Capital, LLC; Lot 37 Waters Edge, LLC; Lot 46 Waters Edge, LLC; Lot 6 Lakewater Cove, LLC; Mithril Funding, LLC; Monmouth Financial Group, Ltd.; Moore & Associates, LLC; Neighborhood Homes, LLC; Nevada Processing Center, Inc.; Onward Finance Corporation; Onward Recovery Partners Corporation; Our Tree House, LLC; P&G Title Agency, LLC; PG&G Title Insurance, LLC; PGGW Title Insurance, LLC; Pelican Way Financial, LLC; RAAF Enterprises, LLC; Red Lion Trading House, LLC; Saneski, LLC; Saxon Business Services, LLC; Saxon Holding, LLC; Seed Construction; Southridge Construction, Inc.; Steele Construction of SC, Inc.; Strategic Lending Solutions, LLC; Tcholok Properties, LLC; The Chrysler Drive Trust; The Cotton Mill Trust; The Old Arcadia Road Trust; The Pickering Road Trust; The Upper Nehalem Trust; Total Package Grading; Trazom, LLC; United Private Capital, Inc.; York Mortgage Funding, LLC; John Does 1-35 (names being fictitious); Jane Does 1-35 (names being fictitious); ABC Companies 1-35 (names being fictitious)**

## <u>Violation of 18 U.S.C. 1962(d) ("Civil RICO IV")</u>

513.     Plaintiff incorporates all previous allegations, to extent not inconsistent herewith, as if set forth *in toto* hereunder.

514.     Plaintiff is a "person" within the meaning of 18 U.S.C. § 1961(3) and 1964(c).

515.     These defendants, individually and by through their respective corporate entities, are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c) and (d).

516.     The operations, actions and conduct of these defendants, individually and by through their respective corporate entities, constitute an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) and (d), as it relates to the assets, interests and operations of the plaintiff.

517.     The enterprise(s) were engaged in and/or affected interstate or foreign commerce, within the meaning of 18 U.S.C. § 1962(c) and (d).

518.     As set forth in Paragraphs 1 through 468, supra, through a pattern of racketeering activity, as defined by 18 U.S.C. §1961(1)(B) and (5), these defendants, individually and by through their respective corporate entities, conspired to violate 18 U.S.C. §1962 (a), (b) or (c), in one or more of the following manners:

      a.   Multiple instances of mail fraud in violation of 18 U.S.C. §1341;

      b.   Multiple instances of wire fraud in violation of 18 U.S.C. §1343; and/or

      c.   Multiple instances of transportation of stolen goods, including money obtained by fraud, in violation of 18 U.S.C. §2314.

519.     The object of the conspiracy was to conceal and/or convert monies loaned from or funds provided by the plaintiff to these defendants, by and through their respective companies.

520.     By and through their respective companies, these defendants each acted overtly in furtherance of the conspiracy with an express and/or implicit agreement to commit the predicate acts set forth above and with knowledge that the acts were part of a pattern racketeering activity, defined by 18 U.S.C. §1961(1)(B) and (5).

521.     The actions of these defendants resulted in injury to Plaintiff's business or property, by reason of the overt act(s) that predicate the violations of 18 U.S.C. §1961, et. seq.

522.     As a direct cause in fact, Plaintiff has been damaged and is entitled to actual damages, trebled thereafter, plus attorney's fees and costs, in an amount to be determined by the Court and jury.

### FOR A FIFTH CAUSE OF ACTION

**As to Defendants Arthur Field; Scott Pfeiffer; Alysia Hazelton; Anthony Edgar; Ashley Morey; Barry Lynn Spencer; Ben Hines; Bill Beckman; Brian Knight; Charles Pinion; D. L. Jones; David Gantt; David Lorenzo; Davyd Field; Dennis Hackney; Elizabeth Hopper; Elliot Salzman; Eugene Hopper; Gary Johnson; Gene Ahlers; J.G. "Geneva" Seller (a/k/a Geneva**

Campitelli); J.G. Ryckman; Jack Campitelli (aka A.J. Camp); James Caserta; Jamie McKeough; Jose Rodriguez; Joshua Ward; Kathryn Taillon; Mark Davidson; Martin Ender; Melinda Holbrooks; Michael Moore; Michael Parish; Mike Loprieno; Nathan Holbrooks; Paula Haney; Philip Davidson; Reba Cox; Robert J. L'Abbate; Roger Ezell; Ross Jones; Shawna Freeman; Stuart Katz; Advance Business Funding, LLC; Aladdin's Grill and Café, LLC; Alliance Development Partners, LLC; Amerishare Corporation; Angle Holdings, LLC; Apex Construction; Arrowhead Funding Corporation; Asante Properties, LLC (a/k/a Asante, LLC); Badger Development, LLC; Blenheim Properties, LLC; Bolingbroke United (England) Ltd; Bountiful Bingo, LLC; Bradford Financial Group, LLC; CapGain Properties, Inc.; Capital Intrastate Funding, LLC; Construction Resources, Inc.; Dunross Struan, LLC; Ezell Investment Company, LLC; Gleaton Wyatt Hewitt, P.A., as the successor in interest to Pfeiffer & Gantt, P.A., Pfeiffer, Gantt & Gleaton, P.A., Pfeiffer Gantt Gleaton Wyatt, P.A., and Pfeiffer Gleaton Wyatt Hewitt, P.A.; GodProp, LLC; Gulf Capital LP; Gulf Capital Management, Inc.; He Will Provide, LLC; Instant Cash, Inc.; Krondor Trading Co., LLC; J&H Builders, LLC; Lancaster Mortgage Bankers, LLC; Lamplighter Mortgage Company, LLC; Lion Financial, LLC; Log Dirt, LLC; LOP Capital, LLC; Lot 37 Waters Edge, LLC; Lot 46 Waters Edge, LLC; Lot 6 Lakewater Cove, LLC; Mithril Funding, LLC; Monmouth Financial Group, Ltd.; Moore & Associates, LLC; Neighborhood Homes, LLC; Onward Finance Corporation; Onward Recovery Partners Corporation; Our Tree House, LLC; P&G Title Agency, LLC; PG&G Title Insurance, LLC; PGGW Title Insurance, LLC; Pelican Way Financial, LLC; RAAF Enterprises, LLC; Red Lion Trading House, LLC; Saneski, LLC; Saxon Business Services, LLC; Saxon Holding, LLC; Seed Construction; Southridge Construction, Inc.; Steele Construction of SC, Inc.; Strategic Lending Solutions, LLC; Tcholok Properties, LLC; The Chrysler Drive Trust; The Cotton Mill Trust; The Old Arcadia Road Trust; The Pickering Road Trust; The Upper Nehalem Trust; Total Package Grading; Trazom, LLC; United Private Capital, Inc.; York Mortgage Funding, LLC; John Does 1-35 (names being fictitious); Jane Does 1-35 (names being fictitious); ABC Companies 1-35 (names being fictitious)

## (Breach of Contract)

523.     Plaintiff realleges all above paragraphs, to the extent not inconsistent herewith, as if each is set forth *in toto* hereunder.

524.     Plaintiff, directly and by and through its assignors and predecessors' in interests (as set forth in Paragraph 2, supra), contracted with the above-identified defendants, individually, and by and through the respective entities for which these defendants were agents, employees, owners, members, shareholders, managers, officers, or directors, to pay money monies loaned from, or services to be provided for the benefit of, the plaintiff.

525.     Defendants materially and substantially breached their contract(s) by refusing to pay monies loaned and/or provided the services contracted to perform.

526.     As a direct and proximate result, Plaintiff has been damaged as set forth fully hereunder, thereby entitling Plaintiff to actual damages in an amount to be determined by the Court and the jury duly empaneled and empowered to hear such cause.

### FOR A SIXTH CAUSE OF ACTION

**As to Defendants Arthur Field; Scott Pfeiffer; Alysia Hazelton; Anthony Edgar; Ashley Morey; Barry Lynn Spencer; Ben Hines; Bill Beckman; Brian Knight; Charles Pinion; D. L. Jones; David Gantt; David Lorenzo; Davyd Field; Dennis Hackney; Elizabeth Hopper; Elliot Salzman; Eugene Hopper; Gary Johnson; Gene Ahlers; J.G. "Geneva" Seller (a/k/a Geneva Campitelli); J.G. Ryckman; Jack Campitelli (aka A.J. Camp); James Caserta; Jamie McKeough; Jose Rodriguez; Joshua Ward; Kathryn Taillon; Mark Davidson; Martin Ender; Melinda Holbrooks; Michael Moore; Michael Parish; Mike Loprieno; Nathan Holbrooks; Paula Haney; Philip Davidson; Reba Cox; Robert J. L'Abbate; Roger Ezell; Ross Jones; Shawna Freeman; Stuart Katz; Advance Business Funding, LLC; Aladdin's Grill and Café, LLC; Alliance Development Partners, LLC; Amerishare Corporation; Angle Holdings, LLC; Apex Construction; Arrowhead Funding Corporation; Asante Properties, LLC (a/k/a Asante, LLC); Badger Development, LLC; Blenheim Properties, LLC; Bolingbroke United (England) Ltd; Bountiful Bingo, LLC; Bradford Financial Group, LLC; CapGain Properties, Inc.; Capital Intrastate Funding, LLC; Construction Resources, Inc.; Dunross Struan, LLC; Ezell Investment Company, LLC; Gleaton Wyatt Hewitt, P.A., as the successor in interest to Pfeiffer & Gantt, P.A., Pfeiffer, Gantt & Gleaton, P.A., Pfeiffer Gantt Gleaton Wyatt, P.A., and Pfeiffer Gleaton Wyatt Hewitt, P.A.; GodProp, LLC; Gulf Capital LP; Gulf Capital Management, Inc.; He Will Provide, LLC; Instant Cash, Inc.; Krondor Trading Co., LLC; J&H Builders, LLC; Lancaster Mortgage Bankers, LLC; Lamplighter Mortgage Company, LLC; Lion Financial, LLC; Log Dirt, LLC; LOP Capital, LLC; Lot 37 Waters Edge, LLC; Lot 46 Waters Edge, LLC; Lot 6 Lakewater Cove, LLC; Mithril Funding, LLC; Monmouth Financial Group, Ltd.; Moore & Associates, LLC; Neighborhood Homes, LLC; Onward Finance Corporation; Onward Recovery Partners Corporation; Our Tree House, LLC; P&G Title Agency, LLC; PG&G Title Insurance, LLC; PGGW Title Insurance, LLC; Pelican Way Financial, LLC; RAAF Enterprises, LLC; Red Lion Trading House, LLC; Saneski, LLC; Saxon Business Services, LLC; Saxon Holding, LLC; Seed Construction; Southridge Construction, Inc.; Steele Construction of SC, Inc.; Strategic Lending Solutions, LLC; Tcholok Properties, LLC; The Chrysler Drive Trust; The Cotton Mill Trust; The Old Arcadia Road Trust; The Pickering Road Trust; The Upper Nehalem Trust; Total Package Grading; Trazom, LLC; United Private Capital, Inc.; York Mortgage Funding, LLC;**

**John Does 1-35 (names being fictitious); Jane Does 1-35 (names being fictitious); ABC Companies 1-35 (names being fictitious)**

**(Breach of Contract Accompanied by a Fraudulent Act)**

527.      Plaintiff realleges all above paragraphs, to the extent not inconsistent herewith, as if each is set forth *in toto* hereunder.

528.      The above-identified defendants, individually, and by and through the respective entities for which these defendants were agents, employees, owners, members, shareholders, managers, officers, or directors, breached their contracts to pay money monies loaned from, or services to be provided for the benefit of, the plaintiff.

529.      Defendants had a fraudulent intent relating to the breaching of the contract and not merely to its making.

530.      Defendants' breach was accompanied by a fraudulent act, which can be characterized by dishonesty in fact, unfair dealing and/or the unlawful appropriation of Plaintiff's property and/or money by design.

531.      As a direct and proximate result, Plaintiff has been damaged as set forth fully hereunder, thereby entitling Plaintiff to actual and punitive damages in an amount to be determined by the Court and the jury duly empaneled and empowered to hear such cause.

## FOR A SEVENTH CAUSE OF ACTION

**As to Defendants Arthur Field; Scott Pfeiffer; Alysia Hazelton; Anthony Edgar; Ashley Morey; Barry Lynn Spencer; Ben Hines; Bill Beckman; Brian Knight; Charles Pinion; D. L. Jones; David Gantt; David Lorenzo; Davyd Field; Dennis Hackney; Elizabeth Hopper; Elliot Salzman; Eugene Hopper; Gary Johnson; Gene Ahlers; J.G. "Geneva" Seller (a/k/a Geneva Campitelli); J.G. Ryckman; Jack Campitelli (aka A.J. Camp); James Caserta; Jamie McKeough; Jose Rodriguez; Joshua Ward; Kathryn Taillon; Mark Davidson; Martin Ender; Melinda Holbrooks; Michael Moore; Michael Parish; Mike Loprieno; Nathan Holbrooks; Paula Haney; Philip Davidson; Reba Cox; Robert J. L'Abbate; Roger Ezell; Ross Jones; Shawna Freeman; Stuart Katz; Advance Business Funding, LLC; Aladdin's Grill and Café, LLC; Alliance Development Partners, LLC; Amerishare Corporation; Angle Holdings, LLC; Apex Construction; Arrowhead Funding Corporation; Asante Properties, LLC (a/k/a Asante, LLC); Badger**

**Development, LLC; Blenheim Properties, LLC; Bolingbroke United (England) Ltd; Bountiful Bingo, LLC; Bradford Financial Group, LLC; CapGain Properties, Inc.; Capital Intrastate Funding, LLC; Construction Resources, Inc.; Dunross Struan, LLC; Ezell Investment Company, LLC; Gleaton Wyatt Hewitt, P.A., as the successor in interest to Pfeiffer & Gantt, P.A., Pfeiffer, Gantt & Gleaton, P.A., Pfeiffer Gantt Gleaton Wyatt, P.A., and Pfeiffer Gleaton Wyatt Hewitt, P.A.; GodProp, LLC; Gulf Capital LP; Gulf Capital Management, Inc.; He Will Provide, LLC; Instant Cash, Inc.; Krondor Trading Co., LLC; J&H Builders, LLC; Lancaster Mortgage Bankers, LLC; Lamplighter Mortgage Company, LLC; Lion Financial, LLC; Log Dirt, LLC; LOP Capital, LLC; Lot 37 Waters Edge, LLC; Lot 46 Waters Edge, LLC; Lot 6 Lakewater Cove, LLC; Mithril Funding, LLC; Monmouth Financial Group, Ltd.; Moore & Associates, LLC; Neighborhood Homes, LLC; Onward Finance Corporation; Onward Recovery Partners Corporation; Our Tree House, LLC; P&G Title Agency, LLC; PG&G Title Insurance, LLC; PGGW Title Insurance, LLC; Pelican Way Financial, LLC; RAAF Enterprises, LLC; Red Lion Trading House, LLC; Saneski, LLC; Saxon Business Services, LLC; Saxon Holding, LLC; Seed Construction; Southridge Construction, Inc.; Steele Construction of SC, Inc.; Strategic Lending Solutions, LLC; Tcholok Properties, LLC; The Chrysler Drive Trust; The Cotton Mill Trust; The Old Arcadia Road Trust; The Pickering Road Trust; The Upper Nehalem Trust; Total Package Grading; Trazom, LLC; United Private Capital, Inc.; York Mortgage Funding, LLC; John Does 1-35 (names being fictitious); Jane Does 1-35 (names being fictitious); ABC Companies 1-35 (names being fictitious)**

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

532.    Plaintiff realleges all above paragraphs, to the extent not inconsistent herewith, as if each is set forth *in toto* hereunder.

533.    There is an implied covenant of Good Faith and Fair Dealing in all contracts entered into or to be performed in the State of South Carolina.

534.    Defendants' actions as alleged herein were unreasonable, willful, reckless, and unjustified, and amount to a breach of the implied In-Law duty of Good Faith and Fair Dealing inherent in all contracts.

535.    As a proximate result, Plaintiff has suffered actual and consequential damages.

536.    As a direct and proximate result, Plaintiff has been damaged as set forth fully hereunder, thereby entitling Plaintiff to actual and punitive damages in an amount to be determined by the Court and the jury duly empaneled and empowered to hear such cause.

## FOR AN EIGHTH CAUSE OF ACTION

**As to Defendants Arthur Field; Scott Pfeiffer; Alysia Hazelton; Anthony Edgar; Ashley Morey; Barry Lynn Spencer; Bart Kelley; Ben Hines; Bill Beckman; Brad Kelley; Brian Knight; Charles Pinion; D. L. Jones; David Gantt; David Lorenzo; Davyd Field; Dennis Hackney; Elizabeth Hopper; Elliot Salzman; Eugene Hopper; Gary Johnson; Gene Ahlers; Greg Bailey; J.G. "Geneva" Seller (a/k/a Geneva Campitelli); J.G. Ryckman; Jack Campitelli (aka A.J. Camp); James Caserta; Jamie McKeough; Jan Davidson; Jose Rodriguez; Joshua Ward; Kathryn Taillon; Mark Davidson; Martin Ender; Melinda Holbrooks; Michael Moore; Michael Parish; Mike Loprieno; Nathan Holbrooks; Paula Haney; Philip Davidson; Ralph Gleaton; Reba Cox; Robert J. L'Abbate; Roger Ezell; Ross Jones; Shawna Freeman; Stuart Katz; Advance Business Funding, LLC; Aladdin's Grill and Café, LLC; Alliance Development Partners, LLC; Amerishare Corporation; Angle Holdings, LLC; Apex Construction; Arrowhead Funding Corporation; Asante Properties, LLC (a/k/a Asante, LLC); Badger Development, LLC; Blenheim Properties, LLC; Bolingbroke United (England) Ltd; Bountiful Bingo, LLC; Bradford Financial Group, LLC; CapGain Properties, Inc.; Capital Intrastate Funding, LLC; CommunitySouth Bank and Trust (and its Receiver, Federal Deposit Insurance Company); Construction Resources, Inc.; Dunross Struan, LLC; Ezell Investment Company, LLC; Gleaton Wyatt Hewitt, P.A., as the successor in interest to Pfeiffer & Gantt, P.A., Pfeiffer, Gantt & Gleaton, P.A., Pfeiffer Gantt Gleaton Wyatt, P.A., and Pfeiffer Gleaton Wyatt Hewitt, P.A.; GodProp, LLC; Gulf Capital LP; Gulf Capital Management, Inc.; He Will Provide, LLC; Instant Cash, Inc.; Krondor Trading Co., LLC; J&H Builders, LLC; Lancaster Mortgage Bankers, LLC; Lamplighter Mortgage Company, LLC; Lion Financial, LLC; Log Dirt, LLC; LOP Capital, LLC; Lot 37 Waters Edge, LLC; Lot 46 Waters Edge, LLC; Lot 6 Lakewater Cove, LLC; Mithril Funding, LLC; Monmouth Financial Group, Ltd.; Moore & Associates, LLC; Neighborhood Homes, LLC; Onward Finance Corporation; Onward Recovery Partners Corporation; Our Tree House, LLC; P&G Title Agency, LLC; PG&G Title Insurance, LLC; PGGW Title Insurance, LLC; Pelican Way Financial, LLC; RAAF Enterprises, LLC; Red Lion Trading House, LLC; Saneski, LLC; Saxon Business Services, LLC; Saxon Holding, LLC; Seed Construction; Southridge Construction, Inc.; Steele Construction of SC, Inc.; Strategic Lending Solutions, LLC; Tcholok Properties, LLC; The Chrysler Drive Trust; The Cotton Mill Trust; The Old Arcadia Road Trust; The Pickering Road Trust; The Upper Nehalem Trust; Total Package Grading; Trazom, LLC; United Private Capital, Inc.; York Mortgage Funding, LLC; John Does 1-35 (names being fictitious); Jane Does 1-35 (names being fictitious); ABC Companies 1-35 (names being fictitious)**

### (Negligence)

537.    Plaintiff realleges all above paragraphs, to the extent not inconsistent herewith, as if each is set forth *in toto* hereunder.

538.     In their capacities as agents, agents, employees, owners, members, shareholders, managers, officers, or directors of the plaintiff, its assignors and/or predecessor's in interests (as set forth in Paragraph 2, supra), the above-identified defendants (both directly and by and through related companies and/or corporations in which they were or may have been serving in a dual capacity), owed a duty of care to the Plaintiff to exercise their duties with reasonable care.

539.     These defendants negligently, grossly negligently, willfully, wantonly and/or recklessly breached the standard of care in one or more of the following particulars:

    a.  failing to exercise and/or to discharge their duties owed to the plaintiff in good faith;
    b.  failing to properly document transactions;
    c.  failing to properly investigate the ability to pay of a loan applicants;
    d.  failing to perfect the plaintiff's interests;
    e.  failing to monitor the performance of any given contract;
    f.  failing to account for proceeds received;
    g.  loaning monies to persons or parties where there was a conflict of interest;
    h.  loaning monies to persons or parties where were in default of current loans with the plaintiff;
    i.  failing to notify Plaintiff that parties were in default of their loans;
    j.  failing to act once a party had defaulted;
    k.  converting Plaintiff's money for their own use and benefit; and
    l.  failing to exercise ordinary care and diligence commensurate with the applicable standard of care.

540.     As a direct and proximate result, Plaintiff has been damaged as set forth fully hereunder, thereby entitling Plaintiff to actual and punitive damages in an amount to be determined by the Court and the jury duly empaneled and empowered to hear such cause.

## FOR A NINTH CAUSE OF ACTION

**As to Defendants Arthur Field; Scott Pfeiffer; Alysia Hazelton; Anthony Edgar; Ashley Morey; Bart Kelley; Bill Beckman; Brad Kelley; Charles Pinion; D. L. Jones; David Gantt; David Lorenzo; Davyd Field; Elizabeth Hopper; Elliot Salzman; Eugene Hopper; Gary Johnson; Gene Ahlers; J.G. "Geneva" Seller (a/k/a Geneva Campitelli); J.G. Ryckman; Jack Campitelli (aka A.J. Camp); James Caserta; Jamie McKeough; Jan Davidson; Jose Rodriguez; Joshua Ward; Kathryn Taillon; Mark Davidson; Martin Ender; Melinda Holbrooks; Michael Moore; Nathan Holbrooks; Paula Haney; Philip Davidson; Ralph Gleaton; Reba Cox; Robert J. L'Abbate; Roger Ezell; Ross Jones; Shawna Freeman; Stuart Katz; Aladdin's Grill and Café,**

**LLC; Alliance Development Partners, LLC; Amerishare Corporation; Angle Holdings, LLC; Apex Construction; Arrowhead Funding Corporation; Asante Properties, LLC (a/k/a Asante, LLC); Badger Development, LLC; Blenheim Properties, LLC; Bolingbroke United (England) Ltd; Bountiful Bingo, LLC; Bradford Financial Group, LLC; Capital Intrastate Funding, LLC; Construction Resources, Inc.; Dunross Struan, LLC; Gleaton Wyatt Hewitt, P.A., as the successor in interest to Pfeiffer & Gantt, P.A., Pfeiffer, Gantt & Gleaton, P.A., Pfeiffer Gantt Gleaton Wyatt, P.A., and Pfeiffer Gleaton Wyatt Hewitt, P.A.; GodProp, LLC; Gulf Capital LP; Gulf Capital Management, Inc.; He Will Provide, LLC; Krondor Trading Co., LLC; J&H Builders, LLC; Lancaster Mortgage Bankers, LLC; Lamplighter Mortgage Company, LLC; Lion Financial, LLC; Log Dirt, LLC; Lot 37 Waters Edge, LLC; Lot 46 Waters Edge, LLC; Lot 6 Lakewater Cove, LLC; Mithril Funding, LLC; Monmouth Financial Group, Ltd.; Moore & Associates, LLC; Neighborhood Homes, LLC; Onward Finance Corporation; Onward Recovery Partners Corporation; Our Tree House, LLC; P&G Title Agency, LLC; PG&G Title Insurance, LLC; PGGW Title Insurance, LLC; Pelican Way Financial, LLC; RAAF Enterprises, LLC; Red Lion Trading House, LLC; Saneski, LLC; Saxon Business Services, LLC; Saxon Holding, LLC; Seed Construction; Southridge Construction, Inc.; Steele Construction of SC, Inc.; Tcholok Properties, LLC; The Chrysler Drive Trust; The Cotton Mill Trust; The Old Arcadia Road Trust; The Pickering Road Trust; The Upper Nehalem Trust; Total Package Grading; Trazom, LLC; York Mortgage Funding, LLC; John Does 1-35 (names being fictitious); Jane Does 1-35 (names being fictitious); ABC Companies 1-35 (names being fictitious)**

### (Breach of Fiduciary Duty)

541.    Plaintiff realleges all above paragraphs, to the extent not inconsistent herewith, as if each is set forth *in toto* hereunder.

542.    In their capacities as agents, agents, employees, owners, members, shareholders, managers, officers, or directors of the plaintiff, its assignors and/or predecessor's in interests (as set forth in Paragraph 2, supra), the above-identified defendants (both directly and by and through related companies and/or corporations in which they were or may have been serving in a dual capacity), owed a fiduciary duty to Plaintiff to insure they acted in its best interest at all times regarding the transactions and occurrences set forth herein.

543.    Defendants materially and substantially breached their fiduciary duty in one or more of the following particulars:

a. failing to exercise and/or to discharge their duties owed to the plaintiff in good faith;
b. failing to properly document transactions;
c. failing to properly investigate the ability to pay of a loan applicants;
d. failing to perfect the plaintiff's interests;
e. failing to monitor the performance of any given contract;
f. failing to account for proceeds received;
g. loaning monies to persons or parties where there was a conflict of interest;
h. loaning monies to persons or parties where were in default of current loans with the plaintiff;
i. failing to notify Plaintiff that parties were in default of their loans;
j. failing to act once a party had defaulted;
k. converting Plaintiff's money for their own use and benefit; and
l. failing to exercise ordinary care and diligence commensurate with the applicable standard of care; and
m. failing to exercise ordinary care and diligence commensurate with the applicable standard of care.

544.    As a direct and proximate result, Plaintiff has been damaged as set forth fully hereunder, thereby entitling Plaintiff to actual and punitive damages in an amount to be determined by the Court and the jury duly empaneled and empowered to hear such cause.

## FOR A TENTH CAUSE OF ACTION

**As to Defendants Arthur Field; Scott Pfeiffer; Allyson Field; Alysia Hazelton; Anthony Edgar; Ashley Morey; Barry Lynn Spencer; Bart Kelley; Ben Hines; Bill Beckman; Brad Kelley; Brian Knight; Charles Pinion; D. L. Jones; David Gantt; David Lorenzo; Davyd Field; Dennis Hackney; Elizabeth Hopper; Elliot Salzman; Eugene Hopper; Gary Johnson; Gene Ahlers; Greg Bailey; J.G. "Geneva" Seller (a/k/a Geneva Campitelli); J.G. Ryckman; Jack Campitelli (aka A.J. Camp); James Caserta; Jamie McKeough; Jan Davidson; Johnny Kelley; Jose Rodriguez; Joshua Ward; Kathryn Taillon; Kirsten M. White; Mark Davidson; Martin Ender; Melinda Holbrooks; Michael Moore; Michael Parish; Mike Loprieno; Nathan Holbrooks; Paula Haney; Philip Davidson; Ralph Gleaton; Reba Cox; Robert J. L'Abbate; Roger Ezell; Ross Jones; Shawna Freeman; Stuart Katz; Advance Business Funding, LLC; Aladdin's Grill and Café, LLC; Alliance Development Partners, LLC; Amerishare Corporation; Angle Holdings, LLC; Apex Construction; Arrowhead Funding Corporation; Asante Properties, LLC (a/k/a Asante, LLC); Badger Development, LLC; Blenheim Properties, LLC; Bolingbroke United (England) Ltd; Bountiful Bingo, LLC; Bradford Financial Group, LLC; CapGain Properties, Inc.; Capital Intrastate Funding, LLC; CommunitySouth Bank and Trust (and its Receiver, Federal Deposit Insurance Company); Construction Resources, Inc.; Dunross Struan, LLC; Ezell Investment Company, LLC; Gleaton Wyatt Hewitt, P.A., as the successor in interest to Pfeiffer & Gantt, P.A., Pfeiffer, Gantt & Gleaton, P.A., Pfeiffer Gantt Gleaton Wyatt, P.A., and**

**Pfeiffer Gleaton Wyatt Hewitt, P.A.; GodProp, LLC; Gulf Capital LP; Gulf Capital Management, Inc.; He Will Provide, LLC; Instant Cash, Inc.; Krondor Trading Co., LLC; J&H Builders, LLC; Lancaster Mortgage Bankers, LLC; Lamplighter Mortgage Company, LLC; Lion Financial, LLC; Log Dirt, LLC; LOP Capital, LLC; Lot 37 Waters Edge, LLC; Lot 46 Waters Edge, LLC; Lot 6 Lakewater Cove, LLC; Mithril Funding, LLC; Monmouth Financial Group, Ltd.; Moore & Associates, LLC; Neighborhood Homes, LLC; Nevada Processing Center, Inc.; Onward Finance Corporation; Onward Recovery Partners Corporation; Our Tree House, LLC; P&G Title Agency, LLC; PG&G Title Insurance, LLC; PGGW Title Insurance, LLC; Pelican Way Financial, LLC;  RAAF Enterprises, LLC; Red Lion Trading House, LLC; Saneski, LLC; Saxon Business Services, LLC; Saxon Holding, LLC; Seed Construction; Southridge Construction, Inc.; Steele Construction of SC, Inc.; Strategic Lending Solutions, LLC; Tcholok Properties, LLC; The Chrysler Drive Trust; The Cotton Mill Trust; The Old Arcadia Road Trust; The Pickering Road Trust; The Upper Nehalem Trust; Total Package Grading; Trazom, LLC; United Private Capital, Inc.; York Mortgage Funding, LLC; John Does 1-35 (names being fictitious); Jane Does 1-35 (names being fictitious); ABC Companies 1-35 (names being fictitious)**

### (Aiding and Abetting Breach of Fiduciary Duty)

545.    To the extent not inconsistent herewith, all previous allegations are incorporated herein as if set forth *in toto* hereunder.

546.    The above-identified defendants, individually, and by and through the respective entities for which these defendants were agents, employees, owners, members, shareholders, managers, officers, or directors, knew or reasonably should have known that a fiduciary relationship existed between the plaintiff and those defendants identified in Count Nine (*supra*).

547.    These defendants knowingly participated in the breach of fiduciary duty by the defendants identified in Count Nine (*supra*) to the plaintiff.

548.    As a direct and proximate result, Plaintiff has been damaged as set forth fully hereunder, thereby entitling Plaintiff to actual and punitive damages in an amount to be determined by the Court and the jury duly empanelled and empowered to hear such cause.

### FOR AN ELEVENTH CAUSE OF ACTION

**As to Defendants Arthur Field; Scott Pfeiffer; Allyson Field; Alysia Hazelton; Anthony Edgar; Ashley Morey; Barry Lynn Spencer; Bart Kelley;**

**Ben Hines; Bill Beckman; Brad Kelley; Brian Knight; Charles Pinion; D. L. Jones; David Gantt; David Lorenzo; Davyd Field; Dennis Hackney; Elizabeth Hopper; Elliot Salzman; Eugene Hopper; Gary Johnson; Gene Ahlers; Greg Bailey; J.G. "Geneva" Seller (a/k/a Geneva Campitelli); J.G. Ryckman; Jack Campitelli (aka A.J. Camp); James Caserta; Jamie McKeough; Jan Davidson; Johnny Kelley; Jose Rodriguez; Joshua Ward; Kathryn Taillon; Kirsten M. White; Mark Davidson; Martin Ender; Melinda Holbrooks; Michael Moore; Michael Parish; Mike Loprieno; Nathan Holbrooks; Paula Haney; Philip Davidson; Ralph Gleaton; Reba Cox; Robert J. L'Abbate; Roger Ezell; Ross Jones; Shawna Freeman; Stuart Katz; Advance Business Funding, LLC; Aladdin's Grill and Café, LLC; Alliance Development Partners, LLC; Amerishare Corporation; Angle Holdings, LLC; Apex Construction; Arrowhead Funding Corporation; Asante Properties, LLC (a/k/a Asante, LLC); Badger Development, LLC; Blenheim Properties, LLC; Bolingbroke United (England) Ltd; Bountiful Bingo, LLC; Bradford Financial Group, LLC; CapGain Properties, Inc.; Capital Intrastate Funding, LLC; CommunitySouth Bank and Trust (and its Receiver, Federal Deposit Insurance Company); Construction Resources, Inc.; Dunross Struan, LLC; Ezell Investment Company, LLC; Gleaton Wyatt Hewitt, P.A., as the successor in interest to Pfeiffer & Gantt, P.A., Pfeiffer, Gantt & Gleaton, P.A., Pfeiffer Gantt Gleaton Wyatt, P.A., and Pfeiffer Gleaton Wyatt Hewitt, P.A.; GodProp, LLC; Gulf Capital LP; Gulf Capital Management, Inc.; He Will Provide, LLC; Instant Cash, Inc.; Krondor Trading Co., LLC; J&H Builders, LLC; Lancaster Mortgage Bankers, LLC; Lamplighter Mortgage Company, LLC; Lion Financial, LLC; Log Dirt, LLC; LOP Capital, LLC; Lot 37 Waters Edge, LLC; Lot 46 Waters Edge, LLC; Lot 6 Lakewater Cove, LLC; Mithril Funding, LLC; Monmouth Financial Group, Ltd.; Moore & Associates, LLC; Neighborhood Homes, LLC; Nevada Processing Center, Inc.; Onward Finance Corporation; Onward Recovery Partners Corporation; Our Tree House, LLC; P&G Title Agency, LLC; PG&G Title Insurance, LLC; PGGW Title Insurance, LLC; Pelican Way Financial, LLC; RAAF Enterprises, LLC; Red Lion Trading House, LLC; Saneski, LLC; Saxon Business Services, LLC; Saxon Holding, LLC; Seed Construction; Southridge Construction, Inc.; Steele Construction of SC, Inc.; Strategic Lending Solutions, LLC; Tcholok Properties, LLC; The Chrysler Drive Trust; The Cotton Mill Trust; The Old Arcadia Road Trust; The Pickering Road Trust; The Upper Nehalem Trust; Total Package Grading; Trazom, LLC; United Private Capital, Inc.; York Mortgage Funding, LLC; John Does 1-35 (names being fictitious); Jane Does 1-35 (names being fictitious); ABC Companies 1-35 (names being fictitious)**

### (Civil Conspiracy)

549.    To the extent not inconsistent herewith, all previous allegations are incorporated herein as if set forth *in toto* hereunder.

550.    The above-identified defendants, individually, and by and through the respective entities for which these defendants were agents, employees, owners, members, shareholders, managers, officers, or directors, combined together for the purpose of injuring the plaintiff.

551.    As a direct and proximate result, Plaintiff was specially injured thereby.

552.    As a direct and proximate result, Plaintiff has been damaged as set forth fully hereunder, thereby entitling Plaintiff to actual and punitive damages in an amount to be determined by the Court and the jury duly empanelled and empowered to hear such cause.

## FOR A TWELFTH CAUSE OF ACTION

**As to Defendants Arthur Field; Scott Pfeiffer; Alysia Hazelton; Anthony Edgar; Barry Lynn Spencer; Ben Hines; Charles Pinion; D. L. Jones; David Gantt; David Lorenzo; Elizabeth Hopper; Elliot Salzman; Eugene Hopper; Gary Johnson; Gene Ahlers; Greg Bailey; J.G. "Geneva" Seller (a/k/a Geneva Campitelli); J.G. Ryckman; Jack Campitelli (aka A.J. Camp); James Caserta; Jamie McKeough; Jan Davidson; Johnny Kelley; Jose Rodriguez; Joshua Ward; Kathryn Taillon; Mark Davidson; Martin Ender; Melinda Holbrooks; Michael Moore; Nathan Holbrooks; Paula Haney; Philip Davidson; Ralph Gleaton; Reba Cox; Robert J. L'Abbate; Roger Ezell; Ross Jones; Shawna Freeman; Stuart Katz; Advance Business Funding, LLC; Aladdin's Grill and Café, LLC; Alliance Development Partners, LLC; Amerishare Corporation; Angle Holdings, LLC; Apex Construction; Arrowhead Funding Corporation; Asante Properties, LLC (a/k/a Asante, LLC); Badger Development, LLC; Blenheim Properties, LLC; Bolingbroke United (England) Ltd; Bountiful Bingo, LLC; Bradford Financial Group, LLC; Capital Intrastate Funding, LLC; CommunitySouth Bank and Trust (and its Receiver, Federal Deposit Insurance Company); Construction Resources, Inc.; Dunross Struan, LLC; Ezell Investment Company, LLC; Gleaton Wyatt Hewitt, P.A., as the successor in interest to Pfeiffer & Gantt, P.A., Pfeiffer, Gantt & Gleaton, P.A., Pfeiffer Gantt Gleaton Wyatt, P.A., and Pfeiffer Gleaton Wyatt Hewitt, P.A.; GodProp, LLC; Gulf Capital LP; Gulf Capital Management, Inc.; He Will Provide, LLC; Instant Cash, Inc.; Krondor Trading Co., LLC; J&H Builders, LLC; Lancaster Mortgage Bankers, LLC; Lamplighter Mortgage Company, LLC; Lion Financial, LLC; Log Dirt, LLC; Lot 37 Waters Edge, LLC; Lot 46 Waters Edge, LLC; Lot 6 Lakewater Cove, LLC; Mithril Funding, LLC; Monmouth Financial Group, Ltd.; Moore & Associates, LLC; Neighborhood Homes, LLC; Onward Finance Corporation; Onward Recovery Partners Corporation; Our Tree House, LLC; P&G Title Agency, LLC; PG&G Title Insurance, LLC; PGGW Title Insurance, LLC; Pelican Way Financial, LLC; RAAF Enterprises, LLC; Red Lion Trading House, LLC; Saneski, LLC; Saxon Business Services, LLC; Saxon Holding, LLC; Seed Construction; Southridge Construction, Inc.; Steele Construction of SC, Inc.; Tcholok**

**Properties, LLC; The Chrysler Drive Trust; The Cotton Mill Trust; The Old Arcadia Road Trust; The Pickering Road Trust; The Upper Nehalem Trust; Total Package Grading; Trazom, LLC; York Mortgage Funding, LLC; John Does 1-35 (names being fictitious); Jane Does 1-35 (names being fictitious); ABC Companies 1-35 (names being fictitious)**

### (Tortious Interference With Contract)

553.    To the extent not inconsistent herewith, all previous allegations are incorporated herein as if set forth *in toto* hereunder.

554.    The above-identified defendants, individually, and by and through the respective entities for which these defendants were agents, employees, owners, members, shareholders, managers, officers, or directors, knowingly sought to induce and has, in fact, induced the breach of the contractual agreement by and between Plaintiff, directly and by and through its assignors and predecessors' in interests (as set forth in Paragraph 2, supra).

555.    These defendants have therefore committed intentional interference with contractual relationships.

556.    As a direct and proximate result, Plaintiff has been damaged as set forth fully hereunder, thereby entitling Plaintiff to actual and punitive damages in an amount to be determined by the Court and the jury duly empanelled and empowered to hear such cause.

## <u>FOR A THIRTEENTH CAUSE OF ACTION</u>

**As to Defendants Arthur Field; Scott Pfeiffer; Alysia Hazelton; Anthony Edgar; Barry Lynn Spencer; Ben Hines; Charles Pinion; D. L. Jones; David Gantt; David Lorenzo; Davyd Field; Elizabeth Hopper; Elliot Salzman; Eugene Hopper; Gary Johnson; Gene Ahlers; Greg Bailey; J.G. "Geneva" Seller (a/k/a Geneva Campitelli); J.G. Ryckman; Jack Campitelli (aka A.J. Camp); James Caserta; Jamie McKeough; Jan Davidson; Jose Rodriguez; Joshua Ward; Kathryn Taillon; Mark Davidson; Martin Ender; Melinda Holbrooks; Michael Moore; Nathan Holbrooks; Paula Haney; Philip Davidson; Ralph Gleaton; Reba Cox; Robert J. L'Abbate; Roger Ezell; Ross Jones; Shawna Freeman; Stuart Katz; Advance Business Funding, LLC; Alliance Development Partners, LLC; Angle Holdings, LLC; Apex Construction; Asante Properties, LLC (a/k/a Asante, LLC); Badger Development, LLC; Blenheim Properties, LLC; Bolingbroke United (England) Ltd; Bountiful Bingo, LLC; Bradford Financial Group, LLC; Capital Intrastate Funding, LLC; CommunitySouth Bank and Trust (and its**

**Receiver, Federal Deposit Insurance Company); Construction Resources, Inc.; Dunross Struan, LLC; Ezell Investment Company, LLC; Gleaton Wyatt Hewitt, P.A., as the successor in interest to Pfeiffer & Gantt, P.A., Pfeiffer, Gantt & Gleaton, P.A., Pfeiffer Gantt Gleaton Wyatt, P.A., and Pfeiffer Gleaton Wyatt Hewitt, P.A.; GodProp, LLC; Gulf Capital LP; Gulf Capital Management, Inc.; He Will Provide, LLC; Instant Cash, Inc.; Krondor Trading Co., LLC; J&H Builders, LLC; Lancaster Mortgage Bankers, LLC; Lamplighter Mortgage Company, LLC; Lion Financial, LLC; Log Dirt, LLC; Lot 37 Waters Edge, LLC; Lot 46 Waters Edge, LLC; Lot 6 Lakewater Cove, LLC; Mithril Funding, LLC; Monmouth Financial Group, Ltd.; Moore & Associates, LLC; Neighborhood Homes, LLC; Onward Finance Corporation; Onward Recovery Partners Corporation; Our Tree House, LLC; P&G Title Agency, LLC; PG&G Title Insurance, LLC; PGGW Title Insurance, LLC; Pelican Way Financial, LLC; RAAF Enterprises, LLC; Red Lion Trading House, LLC; Saneski, LLC; Saxon Business Services, LLC; Saxon Holding, LLC; Seed Construction; Southridge Construction, Inc.; Steele Construction of SC, Inc.; Total Package Grading; Trazom, LLC; York Mortgage Funding, LLC; John Does 1-35 (names being fictitious); Jane Does 1-35 (names being fictitious); ABC Companies 1-35 (names being fictitious)**

### (Usurpation of Corporate Opportunity)

557.     To the extent not inconsistent herewith, all previous allegations are incorporated herein as if set forth *in toto* hereunder.

558.     The opportunity to Plaintiff, directly and by and through its assignors and predecessors' in interests (as set forth in Paragraph 2, supra), existed while the above-identified defendants owed a fiduciary duty to the plaintiff.

559.     The above-identified defendants exploited the Plaintiff's business opportunity for their own personal benefit to the resulting detriment of the plaintiff.

560.     As such, these defendants violated their duties of Good Faith, Fairness and Loyalty to the plaintiff.

561.     As a direct and proximate result, Plaintiff has been damaged as set forth fully hereunder, thereby entitling Plaintiff to actual and punitive damages in an amount to be determined by the Court and the jury duly empanelled and empowered to hear such cause.

## FOR A FOURTEENTH CAUSE OF ACTION

**As to Defendants Arthur Field; Scott Pfeiffer; Allyson Field; Alysia Hazelton; Anthony Edgar; Ashley Morey; Barry Lynn Spencer; Ben Hines; Bill Beckman; Brian Knight; Charles Pinion; D. L. Jones; David Gantt; David Lorenzo; Davyd Field; Dennis Hackney; Elizabeth Hopper; Elliot Salzman; Eugene Hopper; Gary Johnson; Gene Ahlers; Greg Bailey; J.G. "Geneva" Seller (a/k/a Geneva Campitelli); J.G. Ryckman; Jack Campitelli (aka A.J. Camp); James Caserta; Jamie McKeough; Jan Davidson; Johnny Kelley; Jose Rodriguez; Joshua Ward; Kathryn Taillon; Kirsten M. White; Mark Davidson; Martin Ender; Melinda Holbrooks; Michael Moore; Michael Parish; Mike Loprieno; Nathan Holbrooks; Paula Haney; Philip Davidson; Ralph Gleaton; Reba Cox; Robert J. L'Abbate; Roger Ezell; Ross Jones; Shawna Freeman; Stuart Katz; Advance Business Funding, LLC; Aladdin's Grill and Café, LLC; Alliance Development Partners, LLC; Amerishare Corporation; Angle Holdings, LLC; Apex Construction; Arrowhead Funding Corporation; Asante Properties, LLC (a/k/a Asante, LLC); Badger Development, LLC; Blenheim Properties, LLC; Bolingbroke United (England) Ltd; Bountiful Bingo, LLC; Bradford Financial Group, LLC; CapGain Properties, Inc.; Capital Intrastate Funding, LLC; CommunitySouth Bank and Trust (and its Receiver, Federal Deposit Insurance Company); Construction Resources, Inc.; Dunross Struan, LLC; Ezell Investment Company, LLC; Gleaton Wyatt Hewitt, P.A., as the successor in interest to Pfeiffer & Gantt, P.A., Pfeiffer, Gantt & Gleaton, P.A., Pfeiffer Gantt Gleaton Wyatt, P.A., and Pfeiffer Gleaton Wyatt Hewitt, P.A.; GodProp, LLC; Gulf Capital LP; Gulf Capital Management, Inc.; He Will Provide, LLC; Instant Cash, Inc.; Krondor Trading Co., LLC; J&H Builders, LLC; Lancaster Mortgage Bankers, LLC; Lamplighter Mortgage Company, LLC; Lion Financial, LLC; Log Dirt, LLC; LOP Capital, LLC; Lot 37 Waters Edge, LLC; Lot 46 Waters Edge, LLC; Lot 6 Lakewater Cove, LLC; Mithril Funding, LLC; Monmouth Financial Group, Ltd.; Moore & Associates, LLC; Neighborhood Homes, LLC; Onward Finance Corporation; Onward Recovery Partners Corporation; Our Tree House, LLC; P&G Title Agency, LLC; PG&G Title Insurance, LLC; PGGW Title Insurance, LLC; Pelican Way Financial, LLC; RAAF Enterprises, LLC; Red Lion Trading House, LLC; Saneski, LLC; Saxon Business Services, LLC; Saxon Holding, LLC; Seed Construction; Southridge Construction, Inc.; Steele Construction of SC, Inc.; Strategic Lending Solutions, LLC; Tcholok Properties, LLC; The Chrysler Drive Trust; The Cotton Mill Trust; The Old Arcadia Road Trust; The Pickering Road Trust; The Upper Nehalem Trust; Total Package Grading; Trazom, LLC; United Private Capital, Inc.; York Mortgage Funding, LLC; John Does 1-35 (names being fictitious); Jane Does 1-35 (names being fictitious); ABC Companies 1-35 (names being fictitious)**

### (Conversion)

562.     Plaintiff realleges all above paragraphs, to the extent not inconsistent herewith, as if each is set forth *in toto* hereunder.

563.      Plaintiff had a right to possess monies and/or properties owned.

564.      Without authority from the Plaintiff, the above-identified defendants took possession of Plaintiff's monies and/or exercised a right of ownership over the same, all to the exclusion of the rights of the Plaintiff.

565.      Such actions constitute conversion of Plaintiff's money and/or property.

566.      As a direct and proximate result, Plaintiff was damaged, thereby entitling Plaintiff to actual and punitive damages hereunder in an amount to be determined by the Court and the jury duly empaneled and empowered to hear such cause.

## FOR A FIFTEENTH CAUSE OF ACTION

**As to Defendants Arthur Field; Scott Pfeiffer; Alysia Hazelton; Anthony Edgar; Ashley Morey; Barry Lynn Spencer; Ben Hines; Brian Knight; Charles Pinion; D. L. Jones; David Gantt; David Lorenzo; Davyd Field; Dennis Hackney; Elizabeth Hopper; Elliot Salzman; Eugene Hopper; Gary Johnson; Gene Ahlers; J.G. "Geneva" Seller (a/k/a Geneva Campitelli); J.G. Ryckman; Jack Campitelli (aka A.J. Camp); James Caserta; Jamie McKeough; Jan Davidson; Jose Rodriguez; Joshua Ward; Kathryn Taillon; Mark Davidson; Martin Ender; Melinda Holbrooks; Michael Moore; Michael Parish; Mike Loprieno; Nathan Holbrooks; Paula Haney; Philip Davidson; Reba Cox; Robert J. L'Abbate; Roger Ezell; Ross Jones; Shawna Freeman; Stuart Katz; Advance Business Funding, LLC; Aladdin's Grill and Café, LLC; Alliance Development Partners, LLC; Amerishare Corporation; Angle Holdings, LLC; Apex Construction; Arrowhead Funding Corporation; Asante Properties, LLC (a/k/a Asante, LLC); Badger Development, LLC; Blenheim Properties, LLC; Bolingbroke United (England) Ltd; Bountiful Bingo, LLC; Bradford Financial Group, LLC; CapGain Properties, Inc.; Capital Intrastate Funding, LLC; Construction Resources, Inc.; Dunross Struan, LLC; Ezell Investment Company, LLC; Gleaton Wyatt Hewitt, P.A., as the successor in interest to Pfeiffer & Gantt, P.A., Pfeiffer, Gantt & Gleaton, P.A., Pfeiffer Gantt Gleaton Wyatt, P.A., and Pfeiffer Gleaton Wyatt Hewitt, P.A.; GodProp, LLC; Gulf Capital LP; Gulf Capital Management, Inc.; He Will Provide, LLC; Instant Cash, Inc.; Krondor Trading Co., LLC; J&H Builders, LLC; Lancaster Mortgage Bankers, LLC; Lamplighter Mortgage Company, LLC; Lion Financial, LLC; Log Dirt, LLC; LOP Capital, LLC; Lot 37 Waters Edge, LLC; Lot 46 Waters Edge, LLC; Lot 6 Lakewater Cove, LLC; Mithril Funding, LLC; Monmouth Financial Group, Ltd.; Moore & Associates, LLC; Neighborhood Homes, LLC; Onward Finance Corporation; Onward Recovery Partners Corporation; Our Tree House, LLC; P&G Title Agency, LLC; PG&G Title Insurance, LLC; PGGW Title Insurance, LLC; Pelican Way Financial, LLC;  RAAF Enterprises, LLC; Red Lion Trading House, LLC; Saneski,**

**LLC; Saxon Business Services, LLC; Saxon Holding, LLC; Seed Construction; Southridge Construction, Inc.; Steele Construction of SC, Inc.; Strategic Lending Solutions, LLC; Tcholok Properties, LLC; The Chrysler Drive Trust; The Cotton Mill Trust; The Old Arcadia Road Trust; The Pickering Road Trust; The Upper Nehalem Trust; Total Package Grading; Trazom, LLC; United Private Capital, Inc.; York Mortgage Funding, LLC; John Does 1-35 (names being fictitious); Jane Does 1-35 (names being fictitious); ABC Companies 1-35 (names being fictitious)**

### (Promissory Estoppel)

567.     Plaintiff realleges all above paragraphs, to the extent not inconsistent herewith, as if each is set forth *in toto* hereunder.

568.     The above-identified defendants, individually, and by and through the respective entities for which these defendants were agents, employees, owners, members, shareholders, managers, officers, or directors, promised to pay money monies loaned from, or services to be provided for the benefit of, the plaintiff.

569.     These promises were unambiguous on their terms.

570.     Plaintiff reasonably relied upon Defendants' promise(s).

571.     Defendants expected and foresaw that Plaintiff would rely upon their promise(s).

572.     Plaintiff was injured in reliance upon the promise(s) by Defendants.

573.     As a direct and proximate result, Plaintiff has been damaged as set forth fully hereunder, thereby entitling Plaintiff to actual and punitive damages in an amount to be determined by the Court and the jury duly empaneled and empowered to hear such cause.

### FOR A SIXTEENTH CAUSE OF ACTION

**As to Defendants Arthur Field; Scott Pfeiffer; Allyson Field; Alysia Hazelton; Anthony Edgar; Ashley Morey; Barry Lynn Spencer; Bart Kelley; Ben Hines; Bill Beckman; Brad Kelley; Brian Knight; Charles Pinion; D. L. Jones; David Gantt; David Lorenzo; Davyd Field; Dennis Hackney; Elizabeth Hopper; Elliot Salzman; Eugene Hopper; Gary Johnson; Gene Ahlers; Greg Bailey; J.G. "Geneva" Seller (a/k/a Geneva Campitelli); J.G. Ryckman; Jack Campitelli (aka A.J. Camp); James Caserta; Jamie McKeough; Jan Davidson; Johnny Kelley; Jose Rodriguez; Joshua Ward; Kathryn Taillon; Kirsten M. White; Mark Davidson; Martin Ender; Melinda Holbrooks; Michael Moore; Michael Parish; Mike Loprieno;**

Nathan Holbrooks; Paula Haney; Philip Davidson; Ralph Gleaton; Reba Cox; Robert J. L'Abbate; Roger Ezell; Ross Jones; Shawna Freeman; Stuart Katz; Advance Business Funding, LLC; Aladdin's Grill and Café, LLC; Alliance Development Partners, LLC; Amerishare Corporation; Angle Holdings, LLC; Apex Construction; Arrowhead Funding Corporation; Asante Properties, LLC (a/k/a Asante, LLC); Badger Development, LLC; Blenheim Properties, LLC; Bolingbroke United (England) Ltd; Bountiful Bingo, LLC; Bradford Financial Group, LLC; CapGain Properties, Inc.; Capital Intrastate Funding, LLC; CommunitySouth Bank and Trust (and its Receiver, Federal Deposit Insurance Company); Construction Resources, Inc.; Dunross Struan, LLC; Ezell Investment Company, LLC; Gleaton Wyatt Hewitt, P.A., as the successor in interest to Pfeiffer & Gantt, P.A., Pfeiffer, Gantt & Gleaton, P.A., Pfeiffer Gantt Gleaton Wyatt, P.A., and Pfeiffer Gleaton Wyatt Hewitt, P.A.; GodProp, LLC; Gulf Capital LP; Gulf Capital Management, Inc.; He Will Provide, LLC; Instant Cash, Inc.; Krondor Trading Co., LLC; J&H Builders, LLC; Lancaster Mortgage Bankers, LLC; Lamplighter Mortgage Company, LLC; Lion Financial, LLC; Log Dirt, LLC; LOP Capital, LLC; Lot 37 Waters Edge, LLC; Lot 46 Waters Edge, LLC; Lot 6 Lakewater Cove, LLC; Mithril Funding, LLC; Monmouth Financial Group, Ltd.; Moore & Associates, LLC; Neighborhood Homes, LLC; Nevada Processing Center, Inc.; Onward Finance Corporation; Onward Recovery Partners Corporation; Our Tree House, LLC; P&G Title Agency, LLC; PG&G Title Insurance, LLC; PGGW Title Insurance, LLC; Pelican Way Financial, LLC;  RAAF Enterprises, LLC; Red Lion Trading House, LLC; Saneski, LLC; Saxon Business Services, LLC; Saxon Holding, LLC; Seed Construction; Southridge Construction, Inc.; Steele Construction of SC, Inc.; Strategic Lending Solutions, LLC; Tcholok Properties, LLC; The Chrysler Drive Trust; The Cotton Mill Trust; The Old Arcadia Road Trust; The Pickering Road Trust; The Upper Nehalem Trust; Total Package Grading; Trazom, LLC; United Private Capital, Inc.; York Mortgage Funding, LLC; John Does 1-35 (names being fictitious); Jane Does 1-35 (names being fictitious); ABC Companies 1-35 (names being fictitious)

## (Unjust Enrichment)

574.     Plaintiff realleges all above paragraphs, to the extent not inconsistent herewith, as if each is set forth *in toto* hereunder.

575.     Plaintiff, directly and by and through its assignors and predecessors' in interests (as set forth in Paragraph 2, supra), conferred a non-gratuitous benefit upon the above-identified defendants in providing money for these defendants' use of the same.

576.     These defendants used and/or converted the same to revenue for their own use and enjoyment.

577.    It would be unjust, unfair and inequitable for Defendants to retain these benefits without having to pay for the same.

578.    As a direct and proximate result, Plaintiff has been damaged and is entitled to the amount owed, plus pre-judgment interest accrued on the same, in an amount to be determined by the Court.

## FOR A SEVENTEENTH CAUSE OF ACTION

**As to Defendants Arthur Field; Scott Pfeiffer; Alysia Hazelton; Anthony Edgar; Ashley Morey; Barry Lynn Spencer; Bart Kelley; Ben Hines; Bill Beckman; Brad Kelley; Brian Knight; Charles Pinion; D. L. Jones; David Gantt; David Lorenzo; Davyd Field; Dennis Hackney; Elizabeth Hopper; Elliot Salzman; Eugene Hopper; Gary Johnson; Gene Ahlers; Greg Bailey; J.G. "Geneva" Seller (a/k/a Geneva Campitelli); J.G. Ryckman; Jack Campitelli (aka A.J. Camp); James Caserta; Jamie McKeough; Jan Davidson; Jose Rodriguez; Joshua Ward; Kathryn Taillon; Mark Davidson; Martin Ender; Melinda Holbrooks; Michael Moore; Michael Parish; Mike Loprieno; Nathan Holbrooks; Paula Haney; Philip Davidson; Reba Cox; Robert J. L'Abbate; Roger Ezell; Ross Jones; Shawna Freeman; Stuart Katz; Advance Business Funding, LLC; Aladdin's Grill and Café, LLC; Alliance Development Partners, LLC; Amerishare Corporation; Angle Holdings, LLC; Apex Construction; Arrowhead Funding Corporation; Asante Properties, LLC (a/k/a Asante, LLC); Badger Development, LLC; Blenheim Properties, LLC; Bolingbroke United (England) Ltd; Bountiful Bingo, LLC; Bradford Financial Group, LLC; CapGain Properties, Inc.; Capital Intrastate Funding, LLC; CommunitySouth Bank and Trust (and its Receiver, Federal Deposit Insurance Company); Construction Resources, Inc.; Dunross Struan, LLC; Ezell Investment Company, LLC; Gleaton Wyatt Hewitt, P.A., as the successor in interest to Pfeiffer & Gantt, P.A., Pfeiffer, Gantt & Gleaton, P.A., Pfeiffer Gantt Gleaton Wyatt, P.A., and Pfeiffer Gleaton Wyatt Hewitt, P.A.; GodProp, LLC; Gulf Capital LP; Gulf Capital Management, Inc.; He Will Provide, LLC; Instant Cash, Inc.; Krondor Trading Co., LLC; J&H Builders, LLC; Lancaster Mortgage Bankers, LLC; Lamplighter Mortgage Company, LLC; Lion Financial, LLC; Log Dirt, LLC; LOP Capital, LLC; Lot 37 Waters Edge, LLC; Lot 46 Waters Edge, LLC; Lot 6 Lakewater Cove, LLC; Mithril Funding, LLC; Monmouth Financial Group, Ltd.; Moore & Associates, LLC; Neighborhood Homes, LLC; Nevada Processing Center, Inc.; Onward Finance Corporation; Onward Recovery Partners Corporation; Our Tree House, LLC; P&G Title Agency, LLC; PG&G Title Insurance, LLC; PGGW Title Insurance, LLC; Pelican Way Financial, LLC; RAAF Enterprises, LLC; Red Lion Trading House, LLC; Saneski, LLC; Saxon Business Services, LLC; Saxon Holding, LLC; Seed Construction; Southridge Construction, Inc.; Steele Construction of SC, Inc.; Strategic Lending Solutions, LLC; Tcholok Properties, LLC; The Chrysler Drive Trust; The Cotton Mill Trust;**

**The Old Arcadia Road Trust; The Pickering Road Trust; The Upper Nehalem Trust; Total Package Grading; Trazom, LLC; United Private Capital, Inc.; York Mortgage Funding, LLC; John Does 1-35 (names being fictitious); Jane Does 1-35 (names being fictitious); ABC Companies 1-35 (names being fictitious)**

**(Fraud)**

579.     Plaintiff realleges all above paragraphs, to the extent not inconsistent herewith, as if each is set forth *in toto* hereunder.

580.     The above-identified defendants, individually, and by and through the respective entities for which these defendants were agents, employees, owners, members, shareholders, managers, officers, or directors, represented to Plaintiff, both directly and by and through its assignors and predecessors' in interests (as set forth in Paragraph 2, supra), that they would pay monies loaned from, or provided services for the benefit of, the plaintiff.

581.     These representations were false.

582.     These representations were material.

583.     These defendants either knew the representations were false or made such representations with a reckless disregard of their truth or falsity.

584.     These defendants intended Plaintiff to act upon Defendants' representations.

585.     Plaintiff was ignorant of falsity of Defendants' representations.

586.     Plaintiff relied upon the truth of Defendants' representations.

587.     Plaintiff had a right to rely upon the truth of Defendants' representations.

588.     As a direct and proximate result, Plaintiff was damaged, thereby entitling Plaintiff to actual and punitive damages hereunder in an amount to be determined by the Court and the jury duly empaneled and empowered to hear such cause.

## FOR AN EIGHTEENTH CAUSE OF ACTION

**As to Defendants Arthur Field; Scott Pfeiffer; Alysia Hazelton; Anthony Edgar; Ashley Morey; Barry Lynn Spencer; Bart Kelley; Ben Hines; Bill Beckman; Brad Kelley; Brian Knight; Charles Pinion; D. L. Jones; David Gantt; David Lorenzo; Davyd Field; Dennis Hackney; Elizabeth Hopper; Elliot Salzman; Eugene Hopper; Gary Johnson; Gene Ahlers; Greg Bailey; J.G. "Geneva" Seller (a/k/a Geneva Campitelli); J.G. Ryckman; Jack Campitelli (aka A.J. Camp); James Caserta; Jamie McKeough; Jan Davidson; Jose Rodriguez; Joshua Ward; Kathryn Taillon; Mark Davidson; Martin Ender; Melinda Holbrooks; Michael Moore; Michael Parish; Mike Loprieno; Nathan Holbrooks; Paula Haney; Philip Davidson; Reba Cox; Robert J. L'Abbate; Roger Ezell; Ross Jones; Shawna Freeman; Stuart Katz; Advance Business Funding, LLC; Aladdin's Grill and Café, LLC; Alliance Development Partners, LLC; Amerishare Corporation; Angle Holdings, LLC; Apex Construction; Arrowhead Funding Corporation; Asante Properties, LLC (a/k/a Asante, LLC); Badger Development, LLC; Blenheim Properties, LLC; Bolingbroke United (England) Ltd; Bountiful Bingo, LLC; Bradford Financial Group, LLC; CapGain Properties, Inc.; Capital Intrastate Funding, LLC; CommunitySouth Bank and Trust (and its Receiver, Federal Deposit Insurance Company); Construction Resources, Inc.; Dunross Struan, LLC; Ezell Investment Company, LLC; Gleaton Wyatt Hewitt, P.A., as the successor in interest to Pfeiffer & Gantt, P.A., Pfeiffer, Gantt & Gleaton, P.A., Pfeiffer Gantt Gleaton Wyatt, P.A., and Pfeiffer Gleaton Wyatt Hewitt, P.A.; GodProp, LLC; Gulf Capital LP; Gulf Capital Management, Inc.; He Will Provide, LLC; Instant Cash, Inc.; Krondor Trading Co., LLC; J&H Builders, LLC; Lancaster Mortgage Bankers, LLC; Lamplighter Mortgage Company, LLC; Lion Financial, LLC; Log Dirt, LLC; LOP Capital, LLC; Lot 37 Waters Edge, LLC; Lot 46 Waters Edge, LLC; Lot 6 Lakewater Cove, LLC; Mithril Funding, LLC; Monmouth Financial Group, Ltd.; Moore & Associates, LLC; Neighborhood Homes, LLC; Nevada Processing Center, Inc.; Onward Finance Corporation; Onward Recovery Partners Corporation; Our Tree House, LLC; P&G Title Agency, LLC; PG&G Title Insurance, LLC; PGGW Title Insurance, LLC; Pelican Way Financial, LLC; RAAF Enterprises, LLC; Red Lion Trading House, LLC; Saneski, LLC; Saxon Business Services, LLC; Saxon Holding, LLC; Seed Construction; Southridge Construction, Inc.; Steele Construction of SC, Inc.; Strategic Lending Solutions, LLC; Tcholok Properties, LLC; The Chrysler Drive Trust; The Cotton Mill Trust; The Old Arcadia Road Trust; The Pickering Road Trust; The Upper Nehalem Trust; Total Package Grading; Trazom, LLC; United Private Capital, Inc.; York Mortgage Funding, LLC; John Does 1-35 (names being fictitious); Jane Does 1-35 (names being fictitious); ABC Companies 1-35 (names being fictitious)**

### (Negligent Misrepresentation)

589.      Plaintiff realleges all above paragraphs, to the extent not inconsistent herewith, as if each is set forth *in toto* hereunder.

590.    The above-identified defendants, individually, and by and through the respective entities for which these defendants were agents, employees, owners, members, shareholders, managers, officers, or directors, made false representations to Plaintiff, both directly and by and through its assignors and predecessors' in interests (as set forth in Paragraph 2, supra), to repay monies loaned from, or to provide services for the benefit of, the plaintiff.

591.    Defendants had a pecuniary interest in making these statements.

592.    Defendants owed a duty of care to see that they communicated truthful information to Plaintiff.

593.    Defendants breached that duty by failing to exercise due care.

594.    Plaintiff justifiably relied on Defendants' representation.

595.    Plaintiff suffered pecuniary loss as proximate result of his reliance upon that representation.

596.    As a direct and proximate result, Plaintiff was damaged, thereby entitling Plaintiff to actual and punitive damages hereunder in an amount to be determined by the Court and the jury duly empaneled and empowered to hear such cause.

## FOR A NINETEENTH CAUSE OF ACTION

**As to Defendants Arthur Field; Scott Pfeiffer; Alysia Hazelton; Anthony Edgar; Ashley Morey; Barry Lynn Spencer; Bart Kelley; Ben Hines; Bill Beckman; Brad Kelley; Brian Knight; Charles Pinion; D. L. Jones; David Gantt; David Lorenzo; Davyd Field; Dennis Hackney; Elizabeth Hopper; Elliot Salzman; Eugene Hopper; Gary Johnson; Gene Ahlers; Greg Bailey; J.G. "Geneva" Seller (a/k/a Geneva Campitelli); J.G. Ryckman; Jack Campitelli (aka A.J. Camp); James Caserta; Jamie McKeough; Jan Davidson; Johnny Kelley; Jose Rodriguez; Joshua Ward; Kathryn Taillon; Mark Davidson; Martin Ender; Melinda Holbrooks; Michael Moore; Michael Parish; Mike Loprieno; Nathan Holbrooks; Paula Haney; Philip Davidson; Ralph Gleaton; Reba Cox; Robert J. L'Abbate; Roger Ezell; Ross Jones; Shawna Freeman; Stuart Katz; Advance Business Funding, LLC; Aladdin's Grill and Café, LLC; Alliance Development Partners, LLC; Amerishare Corporation; Angle Holdings, LLC; Apex Construction; Arrowhead Funding Corporation; Asante Properties, LLC (a/k/a Asante, LLC); Badger Development, LLC; Blenheim Properties, LLC; Bolingbroke United (England) Ltd; Bountiful Bingo, LLC; Bradford Financial Group,**

**LLC; CapGain Properties, Inc.; Capital Intrastate Funding, LLC; CommunitySouth Bank and Trust (and its Receiver, Federal Deposit Insurance Company); Construction Resources, Inc.; Dunross Struan, LLC; Ezell Investment Company, LLC; Gleaton Wyatt Hewitt, P.A., as the successor in interest to Pfeiffer & Gantt, P.A., Pfeiffer, Gantt & Gleaton, P.A., Pfeiffer Gantt Gleaton Wyatt, P.A., and Pfeiffer Gleaton Wyatt Hewitt, P.A.; GodProp, LLC; Gulf Capital LP; Gulf Capital Management, Inc.; He Will Provide, LLC; Instant Cash, Inc.; Krondor Trading Co., LLC; J&H Builders, LLC; Lancaster Mortgage Bankers, LLC; Lamplighter Mortgage Company, LLC; Lion Financial, LLC; Log Dirt, LLC; LOP Capital, LLC; Lot 37 Waters Edge, LLC; Lot 46 Waters Edge, LLC; Lot 6 Lakewater Cove, LLC; Mithril Funding, LLC; Monmouth Financial Group, Ltd.; Moore & Associates, LLC; Neighborhood Homes, LLC; Onward Finance Corporation; Onward Recovery Partners Corporation; Our Tree House, LLC; P&G Title Agency, LLC; PG&G Title Insurance, LLC; PGGW Title Insurance, LLC; Pelican Way Financial, LLC;  RAAF Enterprises, LLC; Red Lion Trading House, LLC; Saneski, LLC; Saxon Business Services, LLC; Saxon Holding, LLC; Seed Construction; Southridge Construction, Inc.; Steele Construction of SC, Inc.; Strategic Lending Solutions, LLC; Tcholok Properties, LLC; The Chrysler Drive Trust; The Cotton Mill Trust; The Old Arcadia Road Trust; The Pickering Road Trust; The Upper Nehalem Trust; Total Package Grading; Trazom, LLC; United Private Capital, Inc.; York Mortgage Funding, LLC; John Does 1-35 (names being fictitious); Jane Does 1-35 (names being fictitious); ABC Companies 1-35 (names being fictitious)**

### (Unfair Trade Practice)

597.     Plaintiff realleges all above paragraphs, to the extent not inconsistent herewith, as if each is set forth *in toto* hereunder.

598.     The actions and/or omissions by Defendants constitute unfair and/or deceptive trade practices in the conduct of trade/commerce, which are unlawful in the State of South Carolina, as set forth by the Code of Law of South Carolina (1976), § 39-5-20, et seq..

599.     The actions of Defendants affect the public interest because they are capable of repetition in the deceiving and defrauding of members of the public who might similarly engage the services of the defendants.

600.     The actions of the Defendant are willful, within the definition and meaning of § 39-5-140 (S.C. Code, 1976), entitling Plaintiff to treble his actual damages hereunder, plus

attorney's fees, in an amount to be determined by the Court and the jury duly empaneled and empowered to hear such cause.

## FOR A TWENTIETH CAUSE OF ACTION

**As to Defendants Arthur Field, Kathryn Taillon, Davyd Field, Trazom, LLC, Allyson Field, LOP Capital, LLC, United Private Capital, LLC, CapGain Properties, LLC, and Kirsten M. White**

**(Fraudulent Conveyances)**

601.     Plaintiff realleges all above paragraphs, to the extent not inconsistent herewith, as if each is set forth *in toto* hereunder.

602.     The above-identified have transferred, sold, conveyed and/or received the assets of the plaintiff (both directly and derivatively) for nominal or no consideration in an attempt to thwart creditors, such as the plaintiff, from recovering the same.  To wit:

603.     On or about May 7, 2009, when Defendant Taillon knew discovery of multiple claims were imminent, Defendant Taillon (wife of Defendant Arthur Field) conveyed the property at 310 Thornblade Boulevard, Greer, SC 29650 to Defendant Allyson Field, the daughter of Defendant Arthur Field, for nominal or no consideration.  As set forth herein above, upon information and belief, the residence at 310 Thornblade was acquired with the misappropriated assets of the plaintiff.

604.     On or about May 10, 2010, Defendant Arthur Field, by and through a purported trust, issued a mortgage to Defendant Kirsten White, who upon information and believe is the paramour of Defendant Arthur Field and/or Defendant Kathryn Taillon, for property at Lot 3 Cottage at Riverwood Farm in Greer, South Carolina.  Upon information and belief, said mortgage utilized funds and proceeds Defendant Field had improperly absconded from the plaintiff.  Upon information and belief, Defendant White received nominal or no consideration for the mortgage.

605.        Upon information and belief, Defendant LOP Capital transferred a half interest in the Highlands Property in Stephens County, Georgia (referred herein as described The Highlands property tract of 56.71$^{\pm}$ acres) to Defendant United Private Capital, LLC, for little or no consideration.   Upon information and belief, Defendant United Private Capital, LLC conveyed that interest to Defendant CapGain Properties, LLC for little or no consideration.   Upon information and belief, the transfer of this property was to defraud, delay and/or hinder creditors, like the plaintiff, from recovering their assets and monies owed.  As such, title to such property should be transferred by to the plaintiff.

606.        Said transactions were made with the intent to defraud creditors, like the plaintiff.

607.        Section 27-23-10 of the South Carolina Code of Laws, as amended, prohibits such conveyances as to be clearly and utterly void.

608.        Plaintiff is entitled to have these conveyances set aside and to have the property sold at public auction with the proceeds applied to costs, attorney's fees, and the Plaintiff's judgment according to law.

## FOR A TWENTY-FIRST CAUSE OF ACTION
**As to Defendants Arthur Field, Kathryn Taillon, Davyd Field, Trazom, LLC, LOP Capital, LLC, United Private Capital, LLC, CapGain Properties, LLC, Our Tree House, LLC, Allyson Field and Kirsten M. White**

### (Constructive Trusts)

609.        Plaintiff realleges all above paragraphs, to the extent not inconsistent herewith, as if each is set forth *in toto* hereunder.

610.        The above-identified defendants have received money and/or property (both real and personal) which does not equitably belong to them and which they cannot in good conscience retain and/or withhold from the plaintiff, which is beneficially entitled to the same, because the monies and/or properties were acquired through fraud and/or a breach of trust to the plaintiff and/or in violation of fiduciary duties owed to the plaintiff.  To wit:

a.  Upon information and belief, Defendant Art Field and Defendant Davyd Field conspired in concert to convey the ownership interest of Defendant Trazom, LLC in the name of Davyd Field alone in a purposeful and deliberate attempt to conceal the fact that Defendant Trazom had received over one million dollars more than Trazom reported from the plaintiff.  Thereafter, Defendants Arthur Field and Davyd Field further conspired to defraud the plaintiff by executing amendments and memoranda under the guise of renegotiating the terms of the original promissory note – all to Plaintiff's detriment.  Said transfer of interest and subsequent fraudulent agreements were made with the intent of defrauding the plaintiff.  Wherefore, the assets of Defendant Trazom, LLC should be held in constructive trust for the benefit of the plaintiff, including title to the property commonly referred to as 4 Greentree Road, Anderson, South Carolina 29625.

b.  Upon information and belief, the property at 310 Thornblade Boulevard, Greer, South Carolina, currently in the name of Defendant Allison Field, was acquired with misappropriated and/or fraudulently obtained funds and/or proceeds of the plaintiff.  Wherefore, title to 310 Thornblade Boulevard, Greer, South Carolina should be transferred to the plaintiff and/or ordered to be held in a constructive trust for the benefit of the plaintiff, until such time as it can be sold.

c.  Upon information and belief, the property at 5489 Atlantic NW, St. Augustine, Florida, currently in the name of Defendants Arthur Field and Kathryn Taillon, was acquired with misappropriated and/or fraudulently obtained funds and/or proceeds of the plaintiff.

Wherefore, title to 5489 Atlantic NW, St. Augustine, Florida should be transferred to the plaintiff and/or ordered to be held in a constructive trust for the benefit of the plaintiff, until such time as it can be sold.

d.   Upon information and belief, the property at 925 Cleveland Street, Unit 27, Greenville, South Carolina 29601, currently in the name of Defendants Our Tree House, LLC, was acquired with misappropriated and/or fraudulently obtained funds and/or proceeds of the plaintiff. Wherefore, title to 925 Cleveland Street, Unit 27, Greenville, South Carolina 29601, should be transferred to the plaintiff and/or ordered to be held in a constructive trust for the benefit of the plaintiff, until such time as it can be sold.

e.   Upon information and belief, Defendant LOP Capital transferred half its interest in the Highlands Property in Stephens County, Georgia (referred to herein as "The Highlands property tract of $56.71^{\pm}$ acres") to Defendant United Private Capital, LLC, for little or no consideration. Upon information and belief, Defendant United Private Capital, LLC conveyed that interest to Defendant CapGain Properties, LLC for little or no consideration.  Wherefore, title to the Highlands (as described in particular above) should be transferred to the plaintiff and/or ordered to be held in a constructive trust for the benefit of the plaintiff, until such time as it can be sold.

f.   Upon information and belief, the property at Lot 3 Cottage at Riverwood Farm in Greer, South Carolina, currently in the name of Defendants Kirsten White, was acquired with misappropriated and/or fraudulently obtained funds and/or proceeds of the plaintiff.

Wherefore, title to Lot 3 Cottage at Riverwood Farm in Greer, South Carolina should be transferred to the plaintiff and/or ordered to be held in a constructive trust for the benefit of the plaintiff, until such time as it can be sold.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiff demands that judgment be entered against each of the defendants, jointly and severally, in favor of the plaintiff:

1.    For compensatory damages for damage and injury to business or property in an amount as yet undetermined, including, but not limited to, amounts due under all contracts and/or agreements, with prejudgment interest that has accrued thereon, amounts received by these defendants with prejudgment interest that has accrued thereon, loss of income, loss of use, all of which trebled where permitted by the applicable statute;

2.    For damages for injury to business or property trebled in accordance with 18 U.S.C. § 1964(c);

3.    For recovery of all monies and property obtained by defendants as a consequence of the bad acts set forth herein, including but not limited to, rescission and return of all fraudulently transferred property, both real and personal;

4.    For the cancellation of any purported obligation that was fraudulently entered into by the defendants with the intent of defrauding and/or harming the plaintiff.

4.    For punitive damages,

5.    For reasonable attorney fees in accordance with 18 U.S.C. § 1964(c), and

6.    For costs of investigation in an undetermined amount, trebled in accordance with 18 U.S.C. § 1964(c).

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all issues so triable.

Respectfully submitted,

**Pillsbury & Read, P.A.**

_____
Rodney F. Pillsbury (Fed Bar #5963)
(Email:  rpillsbury@prlawpa.com)

John M. Read IV (Fed Bar #7684)
(Email:  jread@prlawpa.com)
1204-A  E. Washington Street
Greenville, SC  29601
Phone: (864) 241-9828
Fax:    (864) 241-9818

**ATTORNEYS FOR PLAINTIFF**

March 19, 2013