IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| Capital Investment Funding LLC, ) | C.A. No.: 6:12-cv-03401-MGL-JDA |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **REPORT AND RECOMMENDATION** |
| ) | **OF MAGISTRATE JUDGE** |
| Arthur Field, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

This matter is before the Court on motions to dismiss filed by the following Defendants/groups of Defendants: Kathryn Taillon [Doc. 68]; Arthur Field [Doc. 81]; Trazom LLC [Doc. 102]; Davyd Field [Doc. 227]; Allyson Field [Doc. 240]; James Caserta, Martin Ender, and David Lorenzo [Doc. 308]; Stuart Katz [Doc. 332]; Elliot Salzman [Doc. 342]; Advance Business Funding LLC, Ezell Investment Company LLC, Roger Ezell, Benjamin Hines, Instant Cash Inc., and Barry Lynn Spencer [Doc. 354]; Pelican Way Financial LLC [Doc. 375]; and Joshua Ward [Doc. 461]. Pursuant to the provisions of 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2)(e), D.S.C., this magistrate judge is authorized to review all pre-trial matters in cases involving litigation by individuals proceeding pro se and to submit findings and recommendations to the District Court.[1]

---

[1] Of the Defendants who have moved to dismiss the action, Kathryn Taillon, Arthur Field, and Elliot Salzman are proceeding pro se. Additionally, Defendants Jan Davidson, Nathan Holbrooks, and Mark Davidson are proceeding pro se in this case.

## BACKGROUND

Plaintiff, an ongoing corporate entity, filed this complex civil action on November 29, 2012 [Doc. 1], and amended its Complaint on February 15, 2013 [Doc. 6] and March 19, 2013 [Doc. 11]. Plaintiff alleges twenty-one causes of action, including civil Racketeer Influenced and Corrupt Organizations Act ("RICO") claims and numerous state law claims, and brings this action "to recover those moneys loaned by South Carolina noteholders who collectively invested $40 million, without knowledge of the fraudulent schemes created by and perpetuated by the defendants." [*Id.* at 3.]

Plaintiff is a South Carolina corporation with its principal place of business in Greenville, South Carolina. [*Id.* ¶ 1.] Plaintiff was formed in 1999 and received a series of capital contributions from March through July 1999, totaling $76,000. [*Id.* ¶¶ 23–28.] In 1999, Plaintiff opened its primary business location and began selling unsecured promissory notes to investors in South Carolina. [*Id.* ¶¶ 29–33.] Plaintiff continued to sell unsecured promissory notes through 2007 [*id.* ¶¶ 34–49] and, from 2000 through 2005, opened three additional offices in South Carolina—in Myrtle Beach, Greer, and Mt. Pleasant [*id.* ¶ 35]. By the end of 2007, Plaintiff was indebted to more than 680 South Carolina residents for more than $38 million. [*Id.* ¶ 49.]

On January 20, 2008, Defendant Arthur Field notified noteholders that CIF would be winding up, but characterized the company's financial position as solvent. [*Id.* ¶ 464.] After that, Defendant Arthur Field wrote multiple checks to himself, totaling $212,404 in 2008 and $173,901 in 2009, as manager fees even though payments to noteholders had

2

been halted. [*Id.* ¶ 467.] As part of a settlement agreement of a state court class action, a receiver was appointed for CIF on August 24, 2009. [*Id.* ¶¶ 470–73.]

The 183-page Second Amended Complaint contains specific details of the alleged racketeering activity; however, Plaintiff generally alleges Defendants unlawfully diverted funds from Plaintiff, leaving Plaintiff insolvent and unable to honor its obligations with its noteholders. [*Id.* at 3.] Plaintiff alleges Defendants engaged in mail fraud, wire fraud, and transportation of stolen goods, including money obtained by fraud [*id.* ¶¶ 493, 501, 510, 518] and that Defendants' activities constituted Ponzi and money laundering schemes [*id.* ¶¶ 138, 139, 150, 152, 160, 182, 201, 215, 240, 306, 488, 489].

As previously noted, currently pending before the Court are eleven motions to dismiss filed by eighteen Defendants. [Docs. 68, 81, 102, 227, 240, 308, 332, 342, 354, 375, 461.] Plaintiff has filed a response in opposition each of the pending motions to dismiss [Docs. 176, 204, 229, 318, 265, 384, 393, 396, 414, 428, 477], and replies have been filed with respect to nine of the pending motions to dismiss [Docs. 190, 238, 253, 365, 286, 419, 421, 427, 456]. Accordingly, the motions are ripe for review.

## APPLICABLE LAW

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) "should not be granted unless it appears certain that the plaintiff can prove no set of facts which would support [his] claim and would entitle [him] to relief. In considering a motion to dismiss, the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). In addition to the complaint, the

court "may consider documents attached to the complaint . . . so long as they are integral to the complaint and authentic." *Sec'y of State for Def. v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) (citing Fed. R. Civ. P. 10(c)).

With respect to well-pleaded allegations, the Supreme Court explained the interplay between Rule 8(a) and Rule 12(b)(6) in *Bell Atlantic Corp. v. Twombly*:

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level . . . .

550 U.S. 544, 555 (2007) (internal citations omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." (citing *Twombly*, 550 U.S. at 556)); *E. Shore Mkts., Inc. v. J.D. Assocs., Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000) (noting that court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments"); 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1216, at 235–36 (3d ed. 2004) ("[T]he pleading must contain something more . . . than a bare averment that the pleader wants compensation and is entitled to it or a statement of facts that merely creates a suspicion that the pleader might have a legally cognizable right of action.").

**DISCUSSION**

All but two of the motions to dismiss argue that this case is barred by the Private Securities Litigation Reform Act (the "PSLRA")[2]; additionally, each of the motions to dismiss asserts that the case is barred by the statute of limitations applicable to RICO actions. Because many Defendants make these arguments, among others, which if successful, would bar the civil RICO claims—the only federal claims in this case[3]—in the interest of judicial economy, the Court should first determine whether the PSLRA and/or the statute of limitations bars Plaintiff from bringing its RICO claims.

*PSLRA*

The RICO Act provides civil and criminal penalties for persons engaged in a "pattern of racketeering activity." 18 U.S.C. § 1962. A pattern of racketeering activity "requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5). An act of racketeering is commonly referred to as a predicate act. The RICO Act includes a list of criminal offenses that constitute "racketeering activity" or predicate acts. 18 U.S.C. § 1961(1).

---

[2] The motions to dismiss filed by Defendants Allyson Field [Doc. 240] and Joshua Ward [Doc. 461] do not argue the action is barred by the PSLRA.

[3] The Court has jurisdiction over the state law causes of action only by exercising supplemental jurisdiction. A civil action for Plaintiff's state law claims could be cognizable in this Court under the diversity statute if that statute's requirements are satisfied. However, this Court does not have diversity jurisdiction in this case because Plaintiff is a South Carolina corporation with its principal place of business in Greenville County, South Carolina [Doc. 11 ¶ 1], and at least some Defendants are citizens and/or residents of the State of South Carolina [*id.* ¶ 3] or entities organized under the laws of South Carolina [*id.* ¶ 8]. Accordingly, Plaintiff's state law claims could be heard by this Court only through the exercise of supplemental jurisdiction, which allows federal courts to hear and decide state law claims along with federal law claims. Federal courts are permitted to decline supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3), however, if "the district court has dismissed all claims over which it has original jurisdiction." Therefore, the Court recommends addressing the federal law claims—the claims over which the Court has original jurisdiction—before addressing the state law claims.

5

The PSLRA, passed in 1995, amended § 1964(c) of the RICO statute. In relevant part, the PSLRA provides, "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962 [RICO]." 18 U.S.C. § 1964(c). The Committee Conference Report accompanying the PSLRA explained that the amendment was not intended merely to "eliminate securities fraud as a predicate offense in a civil RICO action," but also to prohibit plaintiffs from "plead[ing] other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud." H.R. Conf. Rep. No. 104-369 at 47 (1995). Thus, "a plaintiff cannot avoid the RICO Amendment's bar by pleading mail fraud, wire fraud and bank fraud as predicate offenses in a civil RICO action if the conduct giving rise to those predicate offenses amounts to securities fraud."[4] *Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 330 (3d Cir. 1999).

Some Defendants argue this case is barred by the PSLRA because the alleged acts are actionable as securities fraud. Given multiple courts' determinations that RICO actions related to Ponzi schemes are barred, this Court is inclined to find that this case is barred by the PSLRA. However, additional briefing is needed, as discussed below, to determine whether the predicate acts alleged by Plaintiff were undertaken in connection with securities fraud.

In *Bald Eagle*, the Third Circuit considered a plaintiff's allegation that a defendant bank had assisted in "a massive Ponzi scheme . . . perpetrated through the purchase and

---

[4]Before the RICO amendment, "plaintiffs regularly elevated fraud to RICO violations because RICO offered the potential bonanza of recovering treble damages." *Bald Eagle*, 189 F.3d at 327.

sale of [securities] in violation of securities laws including § 10(b) of the Securities Exchange Act of 1934," and determined that the alleged scheme was "at the heart of th[e plaintiff's] RICO action." *Id.* at 328. The court concluded that "[a] Ponzi scheme is ongoing, and it continues only so long as new investors can be lured into it so that the early investors can be paid a return on their 'investment.' Consequently, conduct undertaken to keep a securities fraud Ponzi scheme alive is conduct undertaken in connection with the purchase and sale of securities." *Id.* at 330. The plaintiffs in *Bald Eagle* conceded that some of the conduct alleged constituted securities fraud. *See id.* at 329. However, they claimed that various actions taken in the course of the securities fraud were not, themselves, actionable as securities fraud and thus could be pled as RICO predicate acts without running afoul of the PSLRA. *See id.* (noting the plaintiff argued that "obtaining *deposits* of funds, failing to maintain collateral, failing to maintain custody of funds, paying out more funds to withdrawing clients than the fair value of their account, providing false trust statements (*after* deposits are obtained), and lying to bank regulators" did not constitute securities fraud (citations and quotations omitted) (emphasis in original)). In rejecting that argument, the Third Circuit held that "[a]llowing such surgical presentation of the cause of action . . . would undermine the congressional intent behind the RICO Amendment." *Id.* at 330.

Relying heavily on *Bald Eagle*, the Southern District of Florida similarly held that the PSLRA bars conduct undertaken to keep a Ponzi scheme alive from forming the basis for a RICO claim. *Adams v. Rothstein*, No. 11-61688-CIV, 2012 WL 1605098, at *6 (S.D. Fl. May 8, 2012). In *Adams*, the plaintiffs alleged that defendants solicited investors to

purchase interests in litigation settlements, representing that the recipients were willing to accept a discounted settlement amount in exchange for an immediate payout; accordingly, the investor would fund the up-front payment and, in return, would be paid back the pre-funded settlement over time.  *Id.* at *1.  Investors were induced with an offering memorandum and related documents to purchase interests in two Delaware limited partnerships that purportedly pooled investors' funds to buy settlements from litigants.  *Id.*  However, the settlements were bogus and, instead, funds were moved between banks "in an effort to cover redemptions before the scheme collapsed."  *Id.* at 2 (quotations and citations omitted).  The plaintiffs argued the predicate acts were not actionable securities fraud because the plaintiffs were defrauded in their purchase of bogus structured settlement agreements and not in their limited partnership interests, which constituted securities.  *Id.* at 4.  However, the court rejected the "attempt to divorce the fraudulent acts from the securities that they purchased," finding a sufficient connection between the conduct alleged as predicate acts and the purchase or sale of securities because the purchase or sale of securities was an integral part of the Ponzi scheme in order to keep the scheme alive.  *Id.* at 4–6.

In the instant case, Plaintiff alleges that Defendants' activities constituted Ponzi and money laundering schemes.  [Doc. 11 ¶¶ 138, 139, 150, 152, 160, 182, 201, 215, 240, 306, 488, 489.]  Plaintiff alleges it received member capital contributions from March through July 1999, totaling $76,000.  [*Id.* ¶ 28.]  Thereafter, Paintiff sold unsecured promissory notes from 1999 through 2007 [*id.* ¶¶ 29–49] and, by the end of 2007, Plaintiff was indebted to more than 680 South Carolina residents for more than $38 million [*id.* ¶

8

49]. Plaintiff also alleges that the sale of notes and renewals constitutes the sale of securities. [*Id.* ¶ 33.]

From these allegations, it appears that this case is similar to *Bald Eagle* and *Adams*, and Plaintiff's contention that the liability of Defendants in this action is not based upon any representations or misrepresentations for the sale of any security and instead "is exclusively predicated on the fraudulent acts and actions in which [Defendants] engaged in obtaining monies from [Plaintiff]" [Doc. 229 at 20] ignores that the sale of securities was an integral part of the Ponzi schemes. The Ponzi schemes could not have continued without loans from Plaintiff, and Plaintiff could not have continued lending without continuing to sell unsecured promissory notes.[5] Moreover, by Plaintiff's own admission, monies loaned by Plaintiff were used to keep the Ponzi scheme alive. [*See, e.g.*, Doc. 11 ¶ 240 (noting Plaintiff's funds were used to perpetuate the Ponzi schemes).] Plaintiff also ignores that the monies it loaned to various individuals and entities to perpetuate the Ponzi schemes were raised through the sale of unsecured promissory notes.[6] Additionally, although the Second Amended Complaint fails to include information about what investors were told to induce them to purchase the unsecured promissory notes, Plaintiff does allege that on January 20, 2008, Defendant Arthur Field notified noteholders that Plaintiff would be winding up and misrepresented the company's financial position as solvent [*id.* ¶ 464]

---

[5] Plaintiff alleges CIF funds fostered illegal Ponzi and money laundering schemes from 2002 through 2009 [Doc. 11 ¶ 139], and Plaintiff raised funds through the sales of unsecured promissory notes from 1999 through 2007 [*id.* ¶¶ 29–49].

[6] According to the Second Amended Complaint, Plaintiff received $76,000 in member capital contributions [Doc. 11 ¶ 28] but apparently raised the rest of the funds it loaned to various individuals and entities through the sale of unsecured promissory notes [*id.* ¶ 29–49 (noting Paintiff sold unsecured promissory notes from 1999 through 2007 and, by the end of 2007, Plaintiff was indebted to more than 680 South Carolina residents for more than $38 million)].

even though "at all times . . . from 2007 through 2009, [Plaintiff] was in fact insolvent" [*id.* ¶ 468].

Plaintiff argues that the sale of securities and the fraudulent acts that form the basis of the Second Amended Complaint are completely separate. [*See* Doc. 229 at 20 (stating this action is not based on any representations or misrepresentations for the sale of securities but instead is based on the fraudulent acts and actions defendants engaged in to obtain monies from Plaintiff).] However, Plaintiff cannot avoid the PSLRA's bar against bringing RICO actions based on predicate acts that occur in connection with securities fraud merely by failing to plead facts related to the purchase or sale of securities. *Cf. City and Cnty. of San Francisco v. Philip Morris, Inc.*, 957 F.Supp. 1130, 1139 (N.D. Cal. 1997) ("Plaintiffs should not be allowed to avoid the bar against RICO recovery for the pecuniary loss associated with personal injury merely by asserting a derivative claim."); *Metropolitan Life Ins. Co. v. Atkins*, 225 F.3d 510, 512 (5th Cir. 2000) (considering whether the misrepresentation exception to the Federal Torts Claims Act's waiver of sovereign immunity applied and holding, "the manner in which a plaintiff chooses to plead her claim is not controlling; rather, a court must 'look to the essential act that spawned the damages' to determine whether the misrepresentation exception bars the claim" (quoting *Saraw Partnership v. United States*, 67 F.3d 567, 570 (5th Cir. 1995))).

As stated, Plaintiff alleges it obtained funds through the sale of securities and then loaned that money to Defendants, whose allegedly fraudulent acts diverted funds from Plaintiff, leaving it insolvent and unable to honor its obligations with its noteholders. From these allegations, it appears the sale of securities was integral to the continuation of the

Ponzi schemes because the schemes could not have continued without additional monies raised from the sale of the unsecured promissory notes. Additionally, Plaintiff asserts that "Defendants Arthur Field and Scott Pfeiffer[7] were indicted on or about June 13, 2012 on multiple counts of conspiracy, securities fraud and forgery related to their roles in CIF." [*Id.* ¶ 474 (footnote added).] Thus, although Plaintiff failed to include information regarding what induced the noteholders to purchase Plaintiff's unsecured promissory notes, the Second Amended Complaint alleges two of the primary actors in all the Ponzi schemes were indicted for securities fraud.

The relevant question here is whether the conduct alleged as predicate acts in this case were in connection with the purchase or sale of securities. *See Bald Eagle*, 189 F.3d at 330; *Sell v. Zions First Nation Bank*, No. CV 05 0684 PHX SRB, 2006 WL 322469, at *10 (D. Az. Feb. 9, 2006) ("[T]he question is not whether a plaintiff can state a claim under a non-securities-related predicate act, but whether the allegations that form the basis of that predicate act occur 'in connection with' securities fraud."). However, the Court needs additional information to be able to make this determination. Specifically, the Court needs information relating to the sales of the unsecured promissory notes,[8] including, at a minimum, what investors were told to induce them to purchase the unsecured promissory notes, what was included in the prospectus from Plaintiff, what investors believed Plaintiff

---

[7] Scott Pfeiffer was dismissed as a defendant on June 3, 2013. [*See* Doc. 177 (stipulation of dismissal with prejudice).]

[8] The Court is aware that Plaintiff argues "the liability of the defendants in this action is not based upon any representation (or misrepresentation) for the sale of any security" [Doc. 229 at 20]; however, to determine whether the fraudulent acts alleged in the Second Amended Complaint were in connection with the purchase or sale of securities, the Court needs to know more about the sale of the unsecured promissory notes. Plaintiff alleges that it sold unsecured promissory notes and that two of the primary actors were indicted on securities fraud charges but has failed to include any information regarding the sales themselves.

would do with their money, whether investors received any distributions from Plaintiff, and whether investors received any financial reports from Plaintiff. Additionally, it would be beneficial to know the status of the criminal case against Defendant Arthur Field and Scott Pfeiffer. *See In re Ikon Office Solutions, Inc. Securities Litigation*, 86 F.Supp.2d 481, 487 (E.D. Pa. 2000) ("[T]he underlying financial improprieties are actionable as securities fraud, as clearly demonstrated by the ERISA claim and the Pennsylvania [securities fraud] complaint as a whole.").

Accordingly, the Court recommends that the pending motions to dismiss be denied with leave to refile supplemental motions addressing whether the PSLRA bars the RICO claims in this case.[9] The motions and memoranda in support thereof should, at a minimum, address whether the conduct alleged as predicate acts in this case were in connection with the purchase or sale of securities and should include information relating to the sales of the unsecured promissory notes and the status of the criminal case against Defendant Arthur Field and Scott Pfeiffer.

### *Statute of Limitations*

The RICO statute does not contain an express statute of limitations. However, the Supreme Court has established a four-year statute of limitations applicable to civil RICO actions. *Agency Holding Corp. v. Malley–Duff & Associates, Inc.*, 483 U.S. 143, 156–57 (1987). With respect to when a claim under RICO accrues, the Fourth Circuit has adopted a theory of accrual known as the "injury discovery" rule. *Pocahontas Supreme Coal Co.*

---

[9]As previously stated, because the PSLRA potentially bars the civil RICO claims and the civil RICO claims are the only federal claims in this case, in the interest of judicial economy, the Court should first determine whether the PSLRA bars Plaintiff from bringing its RICO claims before addressing the 17 state law causes of action over which the Court does not have original jurisdiction.

*v. Bethlehem Steel Corp.*, 828 F.2d 211 (4th Cir. 1987). The injury discovery rule provides that the statute of limitations begins to run "when a plaintiff knows or should know of the injury that underlies his cause of action." *Id.* at 220 (citing *Compton v. Ide*, 732 F.2d 1429, 1433 (9th Cir. 1984)). Accordingly, the statute of limitations begins to run when the plaintiff discovers the injury, not when he discovers racketeering activity. *See Detrick v. Panalpina, Inc.*, 108 F.3d 529, 540–41 (4th Cir. 1997) (holding the statute of limitations began to run when the plaintiffs were injured and not when they discovered allegedly fraudulent activity). However, under the doctrine of adverse domination, the statute of limitations is tolled for any period during which a corporate plaintiff was under the adverse domination and control of wrongdoers. *See RTC v. Gardner*, 798 F.Supp. 290, 794–95 (D.D.C. 1992) (citing federal cases applying the doctrine); *Quilling v. Grand Street Trust*, No. 3:04 CV 251, 2005 WL 1983879, at *7 (W.D.N.C. Aug. 12, 2005) (applying the doctrine of adverse domination to equitably toll the statute of limitations on a fraudulent conveyance claim until a receiver was appointed, recognizing that "'so long as a corporation remains under the control of wrongdoers, it cannot be expected to take action to vindicate the harms and injustices perpetrated by the wrongdoers'").

The Court is inclined to find that the adverse domination doctrine applies in this case and therefore the statute of limitations was tolled until the Receiver was appointed. However, because the Court has afforded the parties the opportunity to rebrief the PSLRA issue and the statute of limitations likewise would be a bar to the only federal claims in this case, the Court recommends that the pending motions to dismiss be denied with leave to refile the supplemental motions discussed above, also addressing whether the statute of

limitations bars the RICO claims in this case. The motions and memoranda in support thereof should, at a minimum, address the applicability of the adverse domination doctrine to this case.

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, the Court recommends that the motions to dismiss [Docs. 68, 81, 102, 227, 240, 308, 332, 342, 354, 375, 461] be denied with leave to refile only with respect to the PSLRA and statute of limitations arguments as addressed above. If the district judge adopts this Report and Recommendation, the undersigned will establish a briefing schedule for the supplemental motions. Additionally, if matters outside the pleadings are presented, the Court will treat the motions as motions for summary judgment under Rule 56 and this Report and Recommendation serves as notice, giving all parties a reasonable opportunity to present material that is pertinent to the motions. *See* Rule 12(d).

IT IS SO RECOMMENDED.

s/Jacquelyn D. Austin
United States Magistrate Judge

December 20, 2013
Greenville, South Carolina