IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Capital Investment Funding LLC, | ) | C.A. No.: 6:12-cv-03401-MGL-JDA |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| Arthur Field, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| Capital Investment Funding LLC, | ) | C.A. No.: 6:13-cv-02326-MGL-JDA |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| Arthur Field, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the Court on motions filed in two related cases, *Capital Investment Funding LLC v. Arthur Field, et al.*, Case No. 6:12-cv-3401-MGL-JDA (D.S.C. 2012) (the "2012 Case"), and *Capital Investment Funding LLC v. Arthur Field, et al.*, Case No. 6:13-cv-2326-MGL-JDA (D.S.C. 2013) (the "2013 Case"). The following motions are pending in the 2012 Case: a motion for sanctions filed by Defendant Elliot Salzman [Doc. 573][1] and supplemental motions to dismiss filed by the following Defendants/groups of Defendants: Arthur Field [Doc. 507]; Kathryn Taillon [Doc. 510]; Pelican Way Financial LLC [Doc. 534]; James Caserta, Martin Ender, and David Lorenzo [Doc. 535]; Advance

---

[1] All citations to the docket are docket entries in the 2012 Case unless otherwise noted as 2013 Case docket entries.

Business Funding LLC, Ezell Investment Company LLC, Roger Ezell, Benjamin Hines, Instant Cash Inc., and Barry Lynn Spencer [Doc. 536]; Joshua Ward [Doc. 543]; Elliot Salzman [Doc. 546]; Allyson Field [Doc. 547]; and Stuart Katz [Doc. 548]. The following motions are pending in the 2013 Case: motions to dismiss filed by Defendants Arthur Field [2013 Case Docs. 39, 81]; Kathryn Taillon [2013 Case Docs. 42, 93]; Allyson Field [2013 Case Docs. 46, 47]; Kirsten M. White [2013 Case Doc. 94]; and Elliot Salzman [2013 Case Doc. 113]. Pursuant to the provisions of 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2)(e), D.S.C., this magistrate judge is authorized to review all pre-trial matters in cases involving litigation by individuals proceeding pro se and to submit findings and recommendations to the District Court.[2]

## BACKGROUND

Plaintiff, an ongoing corporate entity, filed the 2012 Case on November 29, 2012 [Doc. 1], and amended its Complaint in the 2012 Case on February 15, 2013 [Doc. 6] and March 19, 2013 [Doc. 11]. Plaintiff filed the 2013 Case on August 26, 2013 [2013 Case Doc. 1], admitting that the 2013 Case arises from the "same transactions and occurrences" as the 2012 Case and that it filed the 2013 Case to include defendants who were not served at all or claim not to have been served within the appropriate statutory time period in the 2012 Case [*id.* at 2]. In the 2013 Case, Plaintiff attempts to incorporate by reference the entirety of the Second Amended Complaint filed in the 2012 Case. [*Id.*]

---

[2]Of the Defendants who have moved to dismiss these actions, Arthur Field, Kathryn Taillon, Elliot Salzman, Allyson Field, and Kirsten M. White are proceeding pro se. Additionally, Defendants Jan Davidson, Nathan Holbrooks, Philip Davidson, Mark Davidson, and Gary Johnson are proceeding pro se in one or both of these cases.

In the 2012 Case, Plaintiff alleges twenty-one causes of action [Doc. 11]; in the 2013 Case, Plaintiff alleges fourteen causes of action[3] [2013 Case Doc. 1]. The causes of action include civil Racketeer Influenced and Corrupt Organizations Act ("RICO") claims and numerous state law claims, and Plaintiff brings these actions "to recover those moneys loaned by South Carolina noteholders who collectively invested $40 million, without knowledge of the fraudulent schemes created by and perpetuated by the defendants." [Doc. 11 at 3.][4]

Plaintiff is a South Carolina corporation with its principal place of business in Greenville, South Carolina. [*Id.* ¶ 1.] Plaintiff was formed in 1999 and received a series of capital contributions from March through July 1999, totaling $76,000. [*Id.* ¶¶ 23–28.] The primary purpose of Plaintiff was to make loans to certain business entities to enable such entities to "purchase, develop, operate, lease, manage and sell" real property. [*Id.* ¶ 27.] In 1999, Plaintiff opened its primary business location and began selling unsecured promissory notes to investors in South Carolina. [*Id.* ¶¶ 29–33.] Plaintiff continued to sell unsecured promissory notes through 2007 [*id.* ¶¶ 34–49] and, from 2000 through 2005, opened three additional offices in South Carolina—in Myrtle Beach, Greer, and Mt.

---

[3]Although the 2013 Case alleges only fourteen causes of action, as previously stated, Plaintiff also attempts to incorporate by reference the entirety of the Second Amended Complaint filed in the 2012 Case, which alleges twenty-one causes of action.

[4]All citations in this factual background section and throughout much of this Report and Recommendation are to allegations in the Second Amended Complaint in the 2012 Case because the majority of the allegations in the Complaint in the 2013 Case are the same as the allegations in the 2012 Case and, as previously stated, the Second Amended Complaint in the 2012 Case is incorporated by reference in the 2013 Case, and is in fact included as an attachment to the Complaint filed in the 2013 Case. [2013 Case Doc. 1-1.]

3

Pleasant [*id.* ¶ 35].  By the end of 2007, Plaintiff was indebted to more than 680 South Carolina residents for more than $38 million.  [*Id.* ¶ 49.]

On January 20, 2008, Defendant Arthur Field notified noteholders that CIF would be winding up, but characterized the company's financial position as solvent.  [*Id.* ¶ 464.] After that, Defendant Arthur Field wrote multiple checks to himself, totaling $212,404 in 2008 and $173,901 in 2009, as manager fees even though payments to noteholders had been halted.  [*Id.* ¶ 467.]  As part of a settlement agreement of a state court class action, a receiver was appointed for CIF on August 24, 2009.  [*Id.* ¶¶ 470–73.]

The 183-page Second Amended Complaint contains specific details of the alleged racketeering activity; however, Plaintiff generally alleges Defendants unlawfully diverted funds from Plaintiff, leaving Plaintiff insolvent and unable to honor its obligations with its noteholders.  [*Id.* at 3.]  Plaintiff alleges Defendants engaged in mail fraud, wire fraud, and transportation of stolen goods, including money obtained by fraud [*id.* ¶¶ 493, 501, 510, 518] and that Defendants' activities constituted Ponzi and money laundering schemes [*id.* ¶¶ 138, 139, 150, 152, 160, 182, 201, 215, 240, 306, 488, 489].

**The 2012 Case Procedural History**

Previously in the 2012 Case, eleven motions to dismiss were filed by eighteen Defendants. [Docs. 68, 81, 102, 227, 240, 308, 332, 342, 354, 375, 461.] On January 14, 2014, the Court denied with leave to refile the then-pending motions to dismiss.  [Doc. 505.] The Court directed the moving Defendants to file supplemental motions addressing whether the Private Securities Litigation Reform Act ("PSLRA") bars Plaintiff's RICO claims and whether the applicable statute of limitations bars Plaintiff's RICO claims.  [*Id.*]  As

4

noted, currently pending before the Court are a motion for sanctions filed by Defendant Salzman and nine supplemental motions to dismiss filed by sixteen Defendants. [Docs. 507, 510, 534, 535, 536, 543, 546, 547, 548.] Plaintiff has filed a consolidated response to the supplemental motions to dismiss [Doc. 560], and replies have been filed with respect to seven of the pending supplemental motions to dismiss [Docs. 563, 566, 567, 568, 569, 574]. Plaintiff has also filed a response in opposition to the motion for sanctions. [Doc. 581.] Accordingly, the motions are ripe for review.

**The 2013 Case Procedural History**

Currently pending before the Court in the 2013 Case are eight motions to dismiss. [2013 Case Docs. 39, 42, 46, 47, 81, 93, 94, 113.] Plaintiff has filed a response in opposition with respect to four of the pending motions to dismiss [2013 Case Docs. 86, 100, 103, 105], and a reply has been filed with respect to one of the pending motions to dismiss [2013 Case Doc. 114]. The motions are ripe for review.[5]

## APPLICABLE LAW

**Motion to Dismiss Standard**

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a motion to dismiss for failure to state a claim should not be granted unless it appears certain that the plaintiff can

---

[5] On February 20, 2014, recognizing that the PSLRA and statute of limitations issues raised in the 2012 Case were also raised in the 2013 Case, the Court stayed the 2013 Case pending resolution of the PSLRA and statute of limitations issues. [2013 Case Doc. 118.] At the time the 2013 Case was stayed, Plaintiff's deadlines for filing its responses in opposition to some of the pending motions to dismiss had not expired, and some Defendants' deadlines for filing replies had not expired. Even though responses and replies have not been filed with respect to every pending motion to dismiss, it is appropriate for the Court to rule on the motions because the parties were put on notice that the Court would decide these issues for both cases in the context of the 2012 Case. [*Id.*] Plaintiff had ample time to respond to the same arguments raised in the supplemental motions to dismiss filed in the 2012 Case, and its response in opposition in the 2012 Case was filed on April 7, 2014 [Doc. 560], well after any response deadlines would have expired in the 2013 Case.

prove no set of facts which would support her claim and entitle her to relief. When considering a motion to dismiss, the court should "accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, the court "need not accept the legal conclusions drawn from the facts" nor "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). Further, for purposes of a Rule 12(b)(6) motion, a court may rely on only the complaint's allegations and those documents attached as exhibits or incorporated by reference. *See Simons v. Montgomery Cnty. Police Officers*, 762 F.2d 30, 31 (4th Cir. 1985). If matters outside the pleadings are presented to and not excluded by the court, the motion is treated as one for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 12(d).

With respect to well-pleaded allegations, the United States Supreme Court explained the interplay between Rule 8(a) and Rule 12(b)(6) in *Bell Atlantic Corp. v. Twombly*:

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

6

550 U.S. 544, 555 (2007) (footnote and citations omitted); *see also* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1216, at 235–36 (3d ed. 2004) ("[T]he pleading must contain something more . . . than a bare averment that the pleader wants compensation and is entitled to it or a statement of facts that merely creates a suspicion that the pleader might have a legally cognizable right of action.").

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). The plausibility standard reflects the threshold requirement of Rule 8(a)(2)—the pleader must plead sufficient facts to show he is entitled to relief, not merely facts consistent with the defendant's liability. *Twombly*, 550 U.S. at 557 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" (quoting *Twombly*, 550 U.S. at 557)). Accordingly, the plausibility standard requires a plaintiff to articulate facts that, when accepted as true, demonstrate that the plaintiff has stated a claim that makes it plausible the plaintiff is entitled to relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).

## DISCUSSION

**Motions to Dismiss**

As stated in the previous Report and Recommendation in the 2012 Case [Doc. 478], in the interest of judicial economy, the Court should first determine whether the PSLRA and/or the statute of limitations bars Plaintiff from bringing its RICO claims—the only federal claims in this case.[6] As discussed below, the Court recommends that the RICO claims be dismissed because they are barred by the PSLRA.[7]

The RICO Act provides civil and criminal penalties for persons engaged in a "pattern of racketeering activity." 18 U.S.C. § 1962. A pattern of racketeering activity "requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5). An act of racketeering is commonly referred to as a predicate act. The RICO Act includes a list of criminal offenses that constitute "racketeering activity" or predicate acts. 18 U.S.C. § 1961(1).

---

[6] The Court has jurisdiction over the state law causes of action only by exercising supplemental jurisdiction. A civil action for Plaintiff's state law claims could be cognizable in this Court under the diversity statute if that statute's requirements are satisfied. However, this Court does not have diversity jurisdiction in this case because Plaintiff is a South Carolina corporation with its principal place of business in Greenville County, South Carolina [Doc. 11 ¶ 1], and at least some Defendants are citizens and/or residents of the State of South Carolina [*id.* ¶ 3] or entities organized under the laws of South Carolina [*id.* ¶ 8]. Accordingly, Plaintiff's state law claims could be heard by this Court only through the exercise of supplemental jurisdiction, which allows federal courts to hear and decide state law claims along with federal law claims.

[7] The Court declines to fully address the statute of limitations arguments. In briefing this issue, Plaintiff argues the doctrine of adverse domination tolls the statute of limitations. In contrast, Defendants argue the Fourth Circuit rejects the adverse domination doctrine unless the state in which the district court sits has adopted the doctrine. However, Defendants ignore the important distinction that the Fourth Circuit cases so holding are all cases in which the federal courts were borrowing state statutes of limitations for the substantive causes of action. Here, because the statute of limitations at issue is a federal statute of limitations, federal rather than state tolling doctrines govern Plaintiff's civil RICO claims. *See Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 347 (2d Cir. 1994) (noting that the Supreme Court in *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143 (1987), was concerned with uniformity regarding the statute of limitations and such uniformity concerns would dictate that federal tolling doctrines govern in civil RICO actions); *see also Stokes v. Pullen*, 112 F.3d 1062 (4th Cir. 1997) (unpublished table decision) (holding that a purely federal claim was subject to a federal statute of limitations and, therefore, a state savings statute did not apply). Neither party has addressed the application of the adverse domination doctrine to the four-year federal statute of limitations applicable in RICO cases. Plaintiff alternatively relies on an equitable tolling argument but relies on state court cases applying equitable tolling rather than federal tolling doctrines. Because neither party has fully briefed the statute of limitations arguments and because the Court has concluded that the RICO claims in this case are barred by the PSLRA, the Court declines to fully address the statute of limitations arguments.

The PSLRA, passed in 1995, amended § 1964(c) of the RICO statute. In relevant part, the PSLRA provides, "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962 [RICO]." 18 U.S.C. § 1964(c). The Committee Conference Report accompanying the PSLRA explained that the amendment was not intended merely to "eliminate securities fraud as a predicate offense in a civil RICO action," but also to prohibit plaintiffs from "plead[ing] other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud." H.R. Conf. Rep. No. 104-369 at 47 (1995). Thus, "a plaintiff cannot avoid the RICO Amendment's bar by pleading mail fraud, wire fraud and bank fraud as predicate offenses in a civil RICO action if the conduct giving rise to those predicate offenses amounts to securities fraud."[8] *Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 330 (3d Cir. 1999).

In *Bald Eagle*, the Third Circuit considered a plaintiff's allegation that a defendant bank had assisted in "a massive Ponzi scheme . . . perpetrated through the purchase and sale of [securities] in violation of securities laws including § 10(b) of the Securities Exchange Act of 1934," and determined that the alleged scheme was "at the heart of th[e] plaintiff's] RICO action." *Id.* at 328. The court concluded that "[a] Ponzi scheme is ongoing, and it continues only so long as new investors can be lured into it so that the early investors can be paid a return on their 'investment.' Consequently, conduct undertaken to keep a securities fraud Ponzi scheme alive is conduct undertaken in connection with the

---

[8] Before the RICO amendment, "plaintiffs regularly elevated fraud to RICO violations because RICO offered the potential bonanza of recovering treble damages." *Bald Eagle*, 189 F.3d at 327.

9

purchase and sale of securities." *Id.* at 330. The plaintiffs in *Bald Eagle* conceded that some of the conduct alleged constituted securities fraud. *See id.* at 329. However, they claimed that various actions taken in the course of the securities fraud were not, themselves, actionable as securities fraud and thus could be pled as RICO predicate acts without running afoul of the PSLRA. *See id.* (noting the plaintiff argued that "obtaining *deposits* of funds, failing to maintain collateral, failing to maintain custody of funds, paying out more funds to withdrawing clients than the fair value of their account, providing false trust statements (*after* deposits are obtained), and lying to bank regulators" did not constitute securities fraud (citations and quotations omitted) (emphasis in original)). In rejecting that argument, the Third Circuit held that "[a]llowing such surgical presentation of the cause of action . . . would undermine the congressional intent behind the RICO Amendment." *Id.* at 330.

Relying heavily on *Bald Eagle*, the Southern District of Florida similarly held that the PSLRA bars conduct undertaken to keep a Ponzi scheme alive from forming the basis for a RICO claim. *Adams v. Rothstein*, No. 11-61688-CIV, 2012 WL 1605098, at *6 (S.D. Fl. May 8, 2012). In *Adams*, the plaintiffs alleged that defendants solicited investors to purchase interests in litigation settlements, representing that the recipients were willing to accept a discounted settlement amount in exchange for an immediate payout; accordingly, the investor would fund the up-front payment and, in return, would be paid back the pre-funded settlement over time. *Id.* at *1. Investors were induced with an offering memorandum and related documents to purchase interests in two Delaware limited partnerships that purportedly pooled investors' funds to buy settlements from litigants. *Id.*

However, the settlements were bogus and, instead, funds were moved between banks "in an effort to cover redemptions before the scheme collapsed." *Id.* at 2 (quotations and citations omitted).  The plaintiffs argued the predicate acts were not actionable securities fraud because the plaintiffs were defrauded in their purchase of bogus structured settlement agreements and not in their limited partnership interests, which constituted securities. *Id.* at 4.  However, the court rejected the "attempt to divorce the fraudulent acts from the securities that they purchased," finding a sufficient connection between the conduct alleged as predicate acts and the purchase or sale of securities because the purchase or sale of securities was an integral part of the Ponzi scheme in order to keep the scheme alive. *Id.* at 4–6.

In the instant cases, Plaintiff alleges that Defendants' activities constituted Ponzi and money laundering schemes. [Doc. 11 ¶¶ 138, 139, 150, 152, 160, 182, 201, 215, 240, 306, 488, 489.]  Plaintiff alleges it received member capital contributions from March through July 1999, totaling $76,000.  [*Id.* ¶ 28.]  Thereafter, Plaintiff sold unsecured promissory notes from 1999 through 2007 [*id.* ¶¶ 29–49] and, by the end of 2007, Plaintiff was indebted to more than 680 South Carolina residents for more than $38 million [*id.* ¶ 49].  Plaintiff also alleges that the sale of notes and renewals constitutesdthe sale of securities.  [*Id.* ¶ 33.]

Here, the Ponzi schemes could not have continued without loans from Plaintiff, and Plaintiff could not have continued lending without continuing to sell unsecured promissory

notes.[9]  Moreover, by Plaintiff's own admission, monies loaned by Plaintiff were used to keep the Ponzi scheme alive. [*See, e.g.*, Doc. 11 ¶ 240 (noting Plaintiff's funds were used to perpetuate the Ponzi schemes).]  The monies Plaintiff loaned to various individuals and entities to perpetuate the Ponzi schemes were raised through the sale of unsecured promissory notes.[10]   Additionally, the Second Amended Complaint includes many allegations about misrepresentations made to *noteholders* and references Defendants' actions and failure to disclose information with respect to "investors" and "noteholders" rather than to Plaintiff.  [*See, e.g.*, Doc. 11 ¶ 57 ("Furthermore, Defendant Arthur Field and others knowingly, intentionally, and continuously concealed, withheld, and failed to disclose *to the South Carolina noteholders* of CIF the material ownership interest held in Defendant Bolingbroke and the improper and illegal actions of bank fraud and forgery by using the fictitious person, Henry Rex, for banking activities."[11]), ¶ 64 ("Defendants . . . intentionally, and continuously concealed, withheld, and failed to disclose *to the South Carolina investors* of CIF the improper detrimental conduct of Defendant Elliot Salzman and the

---

[9] Plaintiff alleges CIF funds fostered illegal Ponzi and money laundering schemes from 2002 through 2009 [Doc. 11 ¶ 139], and Plaintiff raised funds through the sales of unsecured promissory notes from 1999 through 2007 [*id.* ¶¶ 29–49].

[10] According to the Second Amended Complaint, Plaintiff received $76,000 in member capital contributions [Doc. 11 ¶ 28] but apparently raised the rest of the funds it loaned to various individuals and entities through the sale of unsecured promissory notes [*id.* ¶ 29–49].

[11] Bolingbroke and Henry Rex are examples of an entity and fictitious person that Plaintiff alleges were created to hide Defendant Arthur Field's true interest in the companies with which Plaintiff conducted business.  Defendant Bolingbroke United (England) Ltd ("Bolingbroke") was registered with the Wyoming Secretary of State.  [Doc. 11 ¶ 51.]  The incorporator was listed as Defendant Geneva Sellers, who is an associate of Defendant Jack Campitelli, who is an associate of former Defendant Scott Pfeiffer.  [*Id.* ¶¶ 51–52.]  The registered agent was listed as Henry Rex, the purported president of Defendant Bolingbroke. [*Id.* ¶ 52.]  However, Plaintiff alleges that Henry Rex is a fictitious person, whose name was derived from Defendant Arthur Field and former Defendant Scott Pfeiffer's enjoyment of strategy board names with historical themes.  [*Id.* ¶¶ 53–54.] Plaintiff alleges that Defendant Arthur Field "knowingly siphoned, extracted and absconded funds from CIF through ownership in Defendant Bolingbroke."  [*Id.* ¶ 57.]

associated actual and potential damages of such."[12]), ¶ 72 ("Defendants . . . knowingly, intentionally, and continuously concealed, withheld, and failed to fully disclose *to the South Carolina noteholders* of CIF (1) the material ownership interest they held and/or the operational control they maintained in Defendants . . . ; (2) and that the designed purpose of these entities was to create the false appearance that CIF was loaning money to South Carolina borrowers."[13]), ¶ 95–96 (discussing a letter dated March 28, 2003 from Defendant Arthur Field *to noteholders* "to reassure them about CIF's financial standing" and to promise that "CIF would undergo voluntary semi-annual audits," which never occurred, and that "two investors would be added to the management committee as observers," which only occurred through the following calendar year); ¶ 111 (describing a meeting *for investors* held by Defendant Arthur Field where investors were told that the company would never loan money to its managers, which it was already doing by lending to Cosimo, in which Defendant Arthur Field had a hidden interest through Defendant Bolingbroke and Defendant Scott Pfeiffer had a hidden interest through Defendant Red Lion Trading[14]); ¶ 112 (describing a letter *to noteholders* omitting material facts about CIF); ¶ 121 (describing a letter to investors that stated that "all lending activities will be totally independent," which

---

[12]Plaintiff alleges that Defendant Salzman set up a separate entity and diverted CIF funds to that entity. [Doc. 11 ¶ 60.] As a result, Defendant Salzman was removed from day-to-day control of Plaintiff's parent company. [*Id.* ¶ 63.]

[13]Plaintiff alleges Defendant Arthur Field and former Defendant Scott Pfeiffer established entities in South Carolina and caused Plaintiff to loan money to the new entities who then turned around and loaned the money to out-of-state entities. [Doc. 11 ¶¶ 65–72.] Thus, the entities were created to give the false appearance that Plaintiff was loaning money to South Carolina borrowers when the money was actually going out of state. [*Id.*]

[14]Plaintiff alleges that Defendant Cosimo, LLC ("Cosimo") was an entity created to loan money predominately to South Carolina borrowers. [Doc. 11 ¶ 73.] Defendant Red Lion Trading House, LLC, an entity controlled by former Defendant Pfeiffer, owned 50% of Cosimo, and Defendant Bolingbroke, an entity controlled by Defendant Arthur Field, owned the other 50% of Cosimo. [*Id.* ¶ 75.]

statement was materially misleading because Defendant Arthur Field had a then-existing hidden ownership interest in Cosimo and entities through which he and Defendant Scott Pfeiffer were executing transactions); ¶ 126 ("Defendants . . . knowingly, intentionally, and continuously concealed, withheld, and failed to fully disclose *to the South Carolina investors* of CIF . . . ."); ¶¶ 464, 468 (alleging Defendant Arthur Field *notified noteholders* that Plaintiff would be winding up and misrepresented the company's financial position as solvent even though "at all times . . . from 2007 through 2009, [Plaintiff] was in fact insolvent") (emphasis added).] Plaintiff further asserts that funds raised from new investors were used to pay off old investors as in a classic Ponzi scheme. [*Id.* ¶ 152.]

Plaintiff argues that the allegations in the Second Amended Complaint are separate and wholly unrelated to the sale of securities or any misrepresentations made to the noteholder in relation to those sales, that any reference to security activities between Defendant Arthur Field and the noteholders is strictly in the context of factual background and not alleged as predicate acts, and that the funds that fueled the Ponzi scheme were raised through fraudulent commercial and real estate lending transactions and not through the sale of securities. [Doc. 560.] The Court finds this argument uncompelling because Plaintiff alleges it obtained funds through the sale of securities and then loaned that money to Defendants, whose allegedly fraudulent acts diverted funds from Plaintiff, leaving it insolvent and *unable to honor its obligations with its noteholders*. From these allegations, it appears the sale of securities was integral to the continuation of the Ponzi schemes because the schemes could not have continued without additional monies raised from the sale of the unsecured promissory notes. Although Plaintiff now argues that the funds that fueled the Ponzi scheme were raised through fraudulent commercial and real estate

14

lending transactions and not through the sale of securities, a review of the Second Amended Complaint reveals that other than the initial $76,000 in member capital contributions, the only other funds the Second Amended Complaint alleges to have been raised were through the sale of unsecured promissory notes from 1999 through 2007. [Doc. 11 ¶¶ 28–49.]

The relevant question therefore is whether the conduct alleged as predicate acts in this case was in connection with the purchase or sale of securities. *See Bald Eagle*, 189 F.3d at 330; *Sell v. Zions First Nation Bank*, No. CV 05 0684 PHX SRB, 2006 WL 322469, at *10 (D. Az. Feb. 9, 2006) ("[T]he question is not whether a plaintiff can state a claim under a non-securities-related predicate act, but whether the allegations that form the basis of that predicate act occur 'in connection with' securities fraud."). The Court concludes that the alleged fraud arose in connection with the sale of securities. Plaintiff seeks to recover money it is obligated to pay its noteholders. However, the only connection the noteholders have to the allegedly fraudulent commercial transactions is through the purchase of promissory notes. As such, the noteholders would be barred by the PSLRA from bringing RICO claims themselves because any conduct alleged directly by the noteholders would be in connection with the sale of securities. Allowing Plaintiff to bring this action to recover money it ultimately owes the noteholders would merely circumvent the PSLRA.[15]

---

[15] Plaintiff argues that Defendant Arthur Field cannot invoke the protection of the PSLRA because he has been convicted in connection with the securities fraud. [Doc. 560 at 9–10 n.1.] The PSLRA's bar "does not apply to an action against any person that is criminally convicted in connection with the fraud." 18 U.S.C. § 1964(c). In *Krear v. Malek*, 961 F.Supp. 1065, 1076 (E.D. Mich. 1997), the court interpreted this "conviction exception" language narrowly to find that the exception is available only to those plaintiffs against whom a defendant has specifically been convicted of criminal fraud. Thus, in *Krear*, the court held that "[u]nless the plaintiffs are named victims of the scheme to defraud in the information, this court cannot find that they have been criminally defrauded and are thereby entitled to invoke the 'conviction exception.'" *Id.* at 1077. Here, the Court has reviewed the indictment, which does not specifically list victims, but does reference losses to *investors* and not to Plaintiff. [*E.g.*, Doc. 203-2 ¶ 241.] The Court finds the reasoning in *Krear* especially

Additionally, as previously stated, the Second Amended Complaint draws a tight connection between the sale of securities and the fraud alleged as predicate acts. Although Plaintiff now attempts to argue that any reference to the sale of securities or misrepresentations to noteholders is merely background information, the Second Amended Complaint speaks for itself—"Plaintiff brings this action to recover those moneys loaned *by South Carolina noteholders*" and Plaintiff was left insolvent and *unable to honor its obligations with its noteholders.* [Doc. 11 at 3.] Plaintiff cannot now argue that the Court should ignore distinct details of the alleged fraudulent scheme and focus only on the portion of the scheme that has nothing to do with the sale of securities. *See Gatz v. Ponsoldt*, 297 F. Supp. 2d 719, 731 (D. Del. 2003) ("A plaintiff cannot circumvent the PSLRA's exclusion of securities fraud as a RICO predicate act through artful pleading."). Instead, the Court must "carefully examine the predicate acts in relation to the overall fraudulent conduct to determine if they are part of a scheme that operated as a fraud on sellers or purchasers of securities." *Hollinger Int'l, Inc. v. Hollinger Inc.*, No. 04 C 0698, 2004 WL 2278545, at *6 (N.D. Ill. Oct. 8, 2004) (citations omitted); *see also In re Enron Corp. Securities Litigation*, 284 F.Supp.2d 511, 622 (S.D. Tex. 2003) (noting that section 10(b) of the Securities Exchange Act of 1934 reaches a scheme that operated as a fraud on sellers or purchasers of securities). The fraudulent real estate transactions, loans, and

---

persuasive in this case because Plaintiff may have other creditors in addition to the noteholders such that any recovery by Plaintiff may not fully reach the noteholders; however, the noteholders, and not Plaintiff or any of Plaintiff's other creditors, were the ones criminally defrauded. Thus, the conviction exception should be available, if at all, to the noteholders and not to Plaintiff. Indeed, another related case, *Harold Brooks, et al. v. Arthur M. Field and Frederick Scott Pfeiffer*, Case No. 6:14-cv-2267-MGL (D.S.C. 2014) (the "2014 Case"), has very recently been filed as a class action by the noteholders alleging RICO violations. By this Report and Recommendation, the Court makes no finding with respect to whether the conviction exception would be available to all 1,142 purported class members in the 2014 Case.

other money transfers that Plaintiff alleges give rise to its RICO claims were part of a scheme to induce the noteholders to purchase or renew promissory notes because the funds raised through the sale of the promissory notes were needed to keep the Ponzi scheme alive. The fraudulent real estate transactions, loans, and other money transfers made it look as if Plaintiff was lending as it represented it would in the prospectus, which is the only way investors would continue to purchase or renew notes. As such, the fraudulent real estate transactions, loans, and other money transfers were "in connection with" the purchase or sale of securities and are barred by the PSLRA; thus, Plaintiff's RICO claims should be dismissed.[16]

**Motion for Sanctions**

Defendant Elliot Salzman seeks Rule 11 sanctions, including that the Court allow Defendant Salzman to file his reply belatedly and that the Court award monetary sanctions and/or any other sanctions the Court deems just and equitable. Defendant Salzman complains that Plaintiff's counsel did not physically mail the consolidated response to Defendant's supplemental motion to dismiss until April 14, 2014, but included a certificate of service reflecting a mailing date of April 7, 2014. [Doc. 573.] Plaintiff's counsel admits that he mailed the response on April 14, 2014 and included a certificate of service reflecting a mailing date of April 7, 2014, but states that it was an office oversight. [Doc. 581.] The Court recommends that Defendant Salzman's motion for sanctions be granted to the extent he asks the Court to allow his belated reply but denied with respect to his

---

[16]As previously noted, Plaintiff's state law claims could be heard by this Court only through the exercise of supplemental jurisdiction. Federal courts are permitted to decline supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3), however, if "the district court has dismissed all claims over which it has original jurisdiction." The undersigned recommends that the Court decline to exercise supplemental jurisdiction in this case.

request for monetary sanctions. As such, the Court has considered arguments raised in Defendant Salzman's reply in preparing this Report and Recommendation.

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, the Court recommends that the supplemental motions to dismiss in the 2012 Case [Docs. 507, 510, 534, 535, 536, 543, 546, 547, 548] be GRANTED, that the motion for sanctions in the 2012 Case [Doc. 573] be GRANTED IN PART AND DENIED IN PART, that the motions to dismiss in the 2013 Case [2013 Case Docs. 39, 42, 46, 47, 81, 93, 94, 113] be GRANTED, and that both cases be DISMISSED.

IT IS SO RECOMMENDED.

s/Jacquelyn D. Austin<br>
United States Magistrate Judge

June 20, 2014
Greenville, South Carolina